**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **MICHAEL MACALUSO**<br>　　　　　**Plaintiff**<br>　　**v.**<br><br>**APPLE INC.**<br>　　　　　**Defendant** | **CIVIL ACTION NO.:**<br>**2:21-CV-01361-GEKP** |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION TO EXCLUDE PLAINTIFF'S EXPERTS**

Plaintiff, by and through counsel, hereby files a Memorandum of Law in opposition to Defendant's Motion to Exclude Plaintiff's Experts, David Klitsch and Michael Eskra.

**I.      INTRODUCTION**

On March 2, 2020, a fire badly damaged the home and personal property of Michael Macaluso. Thankfully, Mr. Macaluso, his fiancé Michaelene Tiger and their two children (ages 4 and 7) were not present at the time the fire began and were uninjured.

The Macaluso family had a fairly normal morning. Ms. Tiger discovered that her Apple iPad's battery was dead, so she connected the tablet to its charger and plugged the charger into a duplex outlet on the kitchen counter before leaving with one of the children at approximately 8:30 a.m. Mr. Macaluso left with the couple's other child around 10:00 a.m., leaving the home unoccupied. When Mr. Macaluso returned to the property more than an hour later, his home was ablaze.

Local fire departments responded and eventually suppressed and extinguished the fire, which appeared to have originated within the kitchen of the residence. As is their custom in this jurisdiction, however, the local fire officials contacted the Pennsylvania State Police Fire Marshal to investigate the cause and origin of the fire.



Fire Chief O'Brien reported to Pennsylvania State Trooper and Deputy Fire Marshal Winters that the fire appeared as though it started on the kitchen countertop. Trooper Winters, a fire investigation expert, responded to the Macaluso home immediately. Within hours, Trooper Winters conducted an extensive fire scene exam examination as recommended by NFPA 921. In so doing, he worked from the areas of the least fire damage to the areas of the most fire damage.

In the kitchen, Trooper Wilson observed, "a distinct V-shaped fire pattern that went from the wall at the left side of the stove, in an upward direction to the ceiling." *See* Exhibit A, State Police Report, at 4. Further, he, "cleared the debris off (the) countertop and observed a hole in the wall at the countertop where the V-shaped fire pattern had started…On the countertop below the hole in the wall, I located melted debris that was stuck to the countertop. Upon examining this debris, I found the remains of a portable electronic tablet, including what appeared to be the melted batteries and other internal components." *See* Id.  In his report, Trooper Winters also documented

that the fire, "originated at the kitchen counter, to the left side of the stove," and he wrote that the cause of the fire was, "either …  a malfunction with the receptacle in the wall or a malfunction of the iPad that was lying on the counter." *See* Exhibit A, State Police Report, at 5.

Plaintiff retained three experts to investigate the circumstances of this fire – a fire origin and cause expert, a chemical engineering expert and an electrical engineering expert. Plaintiff's fire origin and cause expert, David Klitsch (a retired PSP deputy fire marshal, a certified fire and explosion investigator and current President of the Pennsylvania Chapter of the International Association of Arson Investigators) conducted two inspections of the property – one on March 5, 2020, and one on March 31, 2020. On each date, he meticulously documented the scene as recommended by NFPA 921. The coronavirus pandemic had just begun, which precluded the possibility of other parties attending, so Mr. Klitsch took care to videotape the fire scene's condition and his harvest of relevant artifacts. Mr. Klitsch also conducted careful interviews of Mr. Macaluso, Ms. Tiger, and Trooper Winters within days of his assignment to preserve their version of events. Later, Mr. Klitsch participated in the joint laboratory examination of the fire artifacts, including the remains of the iPad, which occurred on June 25, 2020 and October 7, 2021.

Mr. Klitsch relied on witness statements, fire patterns and fire dynamics – methods recommended by NFPA 921 – and ultimately determined that the fire began in kitchen, to the left of the electric range at countertop level. Moving to cause, Mr. Klitsch considered a number of potential heat sources of ignition located within the area of the fire's origin as NFPA 921 recommends, including the kitchen outlet, associated electrical wiring and the Apple iPad. Applying the scientific method, Mr. Klitsch systematically collected and analyzed available data relevant to these potential ignition sources, developed and tested hypotheses regarding the fire's

ignition and selected a final hypothesis after disproving all but one  – an iPad malfunction caused the fire.

During the initial laboratory examination of fire artifacts, Mr. Klitsch discovered that the controls of the nearby electric range's left rear burner was in the "on" position. Mr. Klitsch therefore considered the hypothesis that heat from the kitchen range's left rear burner ignited the fire. Mr. Klitsch disproved this hypothesis, however, when he tested that theory. Mr. Klitsch determined that there was no competent fuel source in the area of the left rear burner. Also, the witnesses stated that the range had not been operated on the day of the fire. Meanwhile, the fire patterns he observed and the principles of fire dynamics he applied indicated to him that the fire likely began on the countertop area to the left of the kitchen range.

Meanwhile, Plaintiff's electrical engineering expert, Dr. Frank Ferrese, likewise considered a number of potential ignition sources within the area of origin (on the countertop, left of the range). Separate and apart from the analysis performed by Mr. Klitsch, Dr. Ferrese eliminated all potential ignition sources within the area of origin except a malfunction of the Apple iPad. Specifically, Dr. Ferrese examined the electrical outlet identified by Trooper Winters and its associated wiring and conclusively eliminated them as potential causes. It should be noted that the defendant does not challenge Dr. Ferrese's opinion that the iPad was the sole competent ignition source of this fire.

Plaintiff's chemical engineering and battery expert, Michael Eskra, also conducted a systemic investigation pursuant to the scientific method as recommended by NFPA 921. Mr. Eskra reviewed the fire scene photographs, witness interviews, CT scans of the remains of the iPad, x-rays and other evidence developed during discovery. Mr. Eskra participated in the laboratory examination, physically examined the fire artifacts and performed exemplar testing. He defined

the problem, collected data, analyzed that data, developed hypotheses, tested his hypotheses and selected a final hypothesis, just as NFPA 921 recommends. He determined that one of the two batteries within the iPad suffered a short circuit, which caused a thermal runaway incident and resulted in the iPad's flaming condition. In his report and deposition, Mr. Eskra articulated the extensive research he has performed with regard to lithium battery fires and the publications he has authored on the subject, as well as the specific bases for his opinions in this case. Mr. Eskra attached the "slices," or still images, from the CT scan that actually depict the iPad battery's failure point.

Messrs. Klitsch and Eskra rigorously, systemically and faithfully followed the recommendations of NFPA 921, the universally recognized "gold standard" for the investigation of fires and explosions, and applied the scientific method in forming their opinions, which are based on sufficient facts and data. Their opinions are reliable and this Honorable Court should deny the defendant's motion to preclude their testimony.

## II.   STATEMENT OF FACTS AND PROCEDURAL HISTORY

On March 2, 2020 there was a fire at 122 Slaymaker Road in Milford, Pennsylvania. *See* Exhibit A, State Police Report. The property was owned by Plaintiff Michael Macaluso, who resides there with his fiancé, Michalene Tiger, their two children ages 4 and 7, and Michalene's brother. *See* Exhibit B, David Klitsch Report, at 9. On the morning of the fire, Michalene made cinnamon buns in the oven, plugged her iPad into a charger to the left of the stove in the kitchen after the battery had died, and left the house with one of her children around 8:30am. *See* Exhibit B, David Klitsch Report, at 9-10, 12-13. Michael later left with the other child around 10:00am, leaving the home empty. *See* Exhibit B, David Klitsch Report, at 9-10, 12-13. No one used the electric stovetop range in the kitchen on the day of the fire. *See* Exhibit B, David Klitsch Report,

at 9-10, 12-13. As a chef, Mr. Macaluso testified that it was his habit to always check the stove before leaving the house. *See* Exhibit B, David Klitsch Report, at 20. Mr. Macaluso returned to the property over an hour later and discovered the fire.

The fire was investigated by a Pennsylvania State Police Fire Marshal.  The State Police Fire Investigator noted a "distinct 'V-shaped' fire pattern that went from the wall at the left side of the stove, in an upward direction to the ceiling. *See* Exhibit A, State Police Report, at 4. He further "observed a hole in the wall at the countertop where the 'V-shaped' fire pattern started. *See* Exhibit A, State Police Report, at 4. On the countertop, he found the remains of the iPad.

Plaintiff's insurance carrier retained fire origin and cause expert, David Klitsch, to investigate the fire.  He placed the origin of the fire on the countertop to the left of the stove. Exhibit B, David Klitsch Report, at 24. He considered a number of hypotheses and concluded that he could rule out all potential ignition sources within the area of origin except for a failure of the iPad. Exhibit B, David Klitsch Report, at 15-24.

Plaintiff's retained electrical engineer, Dr. Frank Ferrese. Dr. Ferresse considered a number of competent ignition sources within the area of the fire's origin and was unable to rule out a failure of the iPad as a cause of the fire. Exhibit C, Dr. Frank Ferrese Report, at 7.

Plaintiff retained chemical engineering and battery expert, Michael Eskra. Mr. Eskra opined that the iPad failed after an internal short occurred in its lithium ion battery. *See* Exhibit D, Michael Eskra Report, at 11. Eskra explained and outlined the defect.  *See* Exhibit D, Michael Eskra Report, at 4-6.  Eskra's opinion is that the battery failed through no fault of the user. *See* Exhibit D, Michael Eskra Report, at 11.

Plaintiff filed suit against Defendant, the manufacturer of the iPad. Defendant now moves to preclude Mr. Klitsch and Mr. Eskra. For the reasons expressed below, Plaintiff respectfully requests the Court deny Defendant's motion.

## III.    LEGAL STANDARD

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case."

Fed. R. Evid. 702.

To qualify as an expert witness, the witness must have specialized knowledge in the area of testimony resulting from knowledge, skill, experience, training, or education. *See e.g. Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *2 (E.D. Pa. June 25, 2013). The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *United States v. Fleet Mgmt., Ltd.*, 332 F. App'x 753, 757 (3d Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir.1994)). At minimum, an expert's "skill or knowledge" must be "greater than the average layman with regard to the scientific matter at issue." *Elcock v. Kmart Corp.*, 233 F.3d 734, 742 (3d Cir.2000). "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Curry, LLC*, 2013 WL 3196390, at *2 (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir.2008)). The Federal Rules of

Evidence Advisory Committee has stated:

> [n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training, or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

Fed. R. Evid. 702 (2005) (Advisory Committee's Note, 2000 Amendment).

In *Daubert v. Merrell Dow Pharmaceuticals* the Supreme Court described the district court's role under Rule 702 as gatekeepers of evidence and scientific testimony, "ensur[ing] that any and all scientific testimony or evidence is not only relevant, but reliable." *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 324 (E.D. Pa. 2015) (citing *Daubert*, 509 U.S. 579 (1993)). An expert's opinion is reliable if it is based in sound methodology and technique. *In re Paoli R.R. Yard PCB Litig.,* 35 F.3d at 742.

A "district court must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable" *Dalton*, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (quoting *Kumho Tire v. Carmichael*, 526 U.S. 137 at 152 (1999)). Notably, this evaluation does not include an analysis of the expert's conclusion. Rather, the focus remains on the principles and methodology the expert employed. *Id.* at 744. If the principles and methodologies are reliable, then its conclusions should be scrutinized by the fact finder. *Id.*

> [T]he evidentiary requirement of reliability is lower than the merits standard of correctness.  As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process-competing expert testimony and active cross examination, rather than excluded from juror's scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.

*USAA Cas. Ins. Co. v. Metro. Edison Co.,* No. 1:12-CV-1178, 2014 WL 3943706, at *4 (M.D. Pa. Aug. 12, 2014) (citing *United States v. Mitchell*, 365 F. 3d 215, 244 (3d Cir. 2004)). Regarding

this preference, "the Third Circuit has emphasized that not only do the Rules of Evidence generally 'embody a strong preference for admitting any evidence that may assist the trier of fact,' but Rule 702 specifically 'has a liberal policy of admissibility.'" *Dalton*, 112 F. Supp. 3d at 325 (citing *Pineda*, 520 F.3d at 243).

## IV.   LEGAL ARGUMENT

The expert testimony of both Mr. Klitsch and Mr. Eskra is admissible. Plaintiff will address each expert's testimony and Defendant's challenges to such testimony below.

### A.   David Klitsch employed the methodology recommended by NFPA 921 and the scientific method.

Mr. Klitsch reached his expert opinion by following the scientific method as outlined in National Fire Protection Association 921 – a Guide for Fire and Explosion Investigations. The scientific method, as outlined in NFPA 921, has been determined by a number of district courts in this circuit to be a reliable method to determine the cause of a fire. *See, e.g., Hoang v. Funai Corp.*, 652 F. Supp. 2d 564, 567 (M.D. Pa. 2009); *Allstate Ins. Co. v. Hamilton Beach/Proctor-Silex, Inc.*, No. 2:06CV1186, 2008 WL 3891259, at *5 (W.D. Pa. Aug. 19, 2008); *State Farm Fire & Cas. Co. v. Hartman Contractors*, No. CV 14-6535, 2017 WL 2180292, at *7 (E.D. Pa. May 18, 2017).

Klitsch is a certified fire investigator, former Pennsylvania State Police Deputy Fire Marshal and certified fire investigation instructor who has personally conducted thousands of fire investigations pursuant to the methodology outlined in NFPA 921 throughout his career and regularly participates in subject matter training. *See* Exhibit H, C.V. of David B. Klitsch. Klitsch's qualifications are appropriately unchallenged here. Klitsch performed this fire investigation the methodology described in NFPA 921: Guide to Fire and Explosion Investigations ("NFPA 921"). Exhibit B, David Klitsch Report, at 4-5.

During his more than two year investigation, Klitsch performed a fire scene examination, conducted witness interviews, reviewed deposition testimony transcripts, reviewed fire investigation reports prepared by the Dingman Township Volunteer Fire Company and Pennsylvania State Police Fire Marshal, reviewed the owner's manual for the relevant General Electric range, performed evidence examinations in a laboratory, reviewed the results of exams performed by others, reviewed written discovery responses and documents produced in connection therewith and studied peer-reviewed texts, literature and treatises (NFPA 921: Guide to Fire and Explosion Investigations, Fire Protection Handbook, Ignition Handbook and Kirks Fire Investigation). Exhibit B, David Klitsch Report, at 1-2. Klitsch examined the exterior and interior of the fire-damaged dwelling systematically during his examination on March 5, 2020, moving from the area of least damage to the area of most damage while documenting his observations along the way through digital photographs. Exhibit B, David Klitsch Report, at 3. Klitsch again visited the site, conducting another follow-up exam and removal of evidence on March 31, 2020. Exhibit B, David Klitsch Report, at 3. Klitsch's detailed fire scene findings and analysis are identified on pages 3-8 of his report and incorporated herein by reference. Exhibit B, David Klitsch Report, at 3-8.

Under the scientific method in this context, to determine the cause of a fire, an investigator is to define the problem, collect data, analyze data, develop hypotheses, test the hypotheses, and select a final hypothesis. *See* Exhibit E, NFPA 921 Provisions, § 4.3 and Figure 4.3 (general method to fire investigation). Developing and then testing hypotheses are the key steps in reliably determining the cause of a fire and are accomplished using inductive and deductive reasoning:

**4.3.5 Develop a Hypothesis (Inductive Reasoning).** Based on the data analysis, the investigator produces a hypothesis, or hypotheses, to explain the phenomena, whether it be the nature of fire patterns, fire spread, identification of the origin, the ignition sequence, the fire cause, or the causes of damage or responsibility for the

fire or explosion incident. This process is referred to as inductive reasoning. These hypotheses should be based solely on the empirical data that the investigator has collected through observation and then developed into explanations for the event, which are based upon the investigator's knowledge, training, experience, and expertise.

**4.3.6 Test the Hypothesis (Deductive Reasoning).** The investigator does not have a valid or reliable conclusion unless the hypothesis can stand the test of careful and serious challenge. Testing of the hypothesis is done by the principle of deductive reasoning, in which the investigator compares the hypothesis to all known facts as well as the body of scientific knowledge associated with the phenomena relevant to the specific incident. Testing of a hypothesis should be designed to disprove, or refute, the hypothesis. This may also be referred to as falsification of the hypothesis. If the hypothesis is refuted or not supported, it should be discarded and alternate hypotheses should be developed and tested.

*See* Exhibit E, NFPA 921 Provisions, §§ 4.3.5 and 4.3.6.

In practice, the scientific method involves using the data collected to hypothesize different reasonable possible causes of the fire and to then methodically rule them out based on the evidence known to the investigator. If the investigator is left with one reasonable possible hypothesis, the investigator may opine that this is the probable cause of the fire. The scientific method does not require an investigator "prove" his hypothesis. Rather, as long as the "likelihood of the hypothesis being true is greater than 50 percent" the investigator can determine that the hypothesis is the "probable" cause of a fire and express that opinion with reasonable scientific certainty. *See* Exhibit E, NFPA 921 Provisions, §§ 4.5.1 and 4.5.2. Thus, an investigator that can rule out all other reasonable possible causes – save one – has reliably determined the cause of a fire under Rule 702.[1]

Mr. Klitsch reached his opinion by employing the exact same methodology. Klitsch

---

[1] *See, e.g., Mut. Ben. Ins. Co. v. Kaz, Inc.*, No. 1:12-CV-2108, 2014 WL 671445, at *3 (M.D. Pa. Feb. 20, 2014); *Cmty. Ass'n Underwriters of Am., Inc. v. Rhodes Dev. Grp. Inc.*, No. 1:09-CV-0257, 2013 WL 818596, at *11 (M.D. Pa. Mar. 5, 2013); *Hoang*, 652 F. Supp. 2d at 568; *State Farm Fire & Cas. Co.*, 2017 WL 2180292, at *7; *Allstate Ins. Co. v. Anderson*, No. CV 15-2651, 2016 WL 2939506, at *3 (E.D. Pa. May 20, 2016); *Dalton*, 112 F. Supp. 3d at 329.

determined the area of origin based on his scene observations, burn pattern analysis and witness statements. Upon examining the scene, he noted "thermal damage and mass loss . . . against the east wall, specifically to much of the area to the left of the electric stove." Exhibit B, David Klitsch Report, at 4. Accordingly, he concluded that the fire originates in the "kitchen, to the left of the stove at countertop level." Exhibit B, David Klitsch Report, at 14.

After determining the area of origin, Klitsch continued to rely on the scientific method to identify potential ignition sources at or near the area of origin. See Exhibit 1, at p. 14. He then considered a number of hypothetical ignition sources both within and near to this area of origin. He considered a failure of the wall mounted GFCI receptacle but ruled it out after finding no evidence of abnormal electric activity. Exhibit B, David Klitsch Report, at 15. He considered a failure of the nearby coffee maker but ruled it out after noting it was relatively intact after the fire. Exhibit B, David Klitsch Report, at 15-16. He considered a malfunction of the microwave but ruled it out based on burn patterns showing it was attacked by the fire rather than the cause. Exhibit B, David Klitsch Report, at 16.

He further considered the range stove top. He was able to rule out the range based upon a lack of fuel present on the surface of the range, burn patterns showing that the fire started to the left of the range, and the testimony of the Mr. Macaluso and Ms. Tiger that they did not use the burner on the day of the fire. Exhibit B, David Klitsch Report, at 17-23. In addition, Mr. Klitsch observed the existence of identical fire patterns on the front *and rear* of the left-side of the control panel to the range.  Exhibit B, David Klitsch Report, at 22-23. *See* Exhibit F, David Klitsch Dep. Tr., at 99.  Had the fire began from the ignition of a combustible item placed on one of the burners in front of the control panel, there would not be an identical fire pattern (left to right) behind the control panel which was placed against the wall.  The rear of the panel would have been protected.

Mr. Klitsch attached photos of the front and rear of the control panel to his report in order to demonstrate the afore-mentioned patterns. Exhibit B, David Klitsch Report, at 22. Mr. Klitsch also considered evidence that the control of the rear left burner was found in the 'on' position after the fire but ultimately reconciled this evidence with the afore-mentioned evidence which suggested that the range was not the source of the fire and explained, in his experience in fire investigation, that the control could have been turned on during the fire by falling debris. *See* Exhibit B, David Klitsch Report, at 17-23.

He defined the problem, collected data, analyzed data, formed hypotheses, tested hypotheses, eliminated hypotheses and formed a final hypothesis after final assessment and consideration of the data collected during his investigation. Exhibit B, David Klitsch Report, at 15-23. A detailed account of the potential ignition sources identified and systematically eliminated by Klitsch are identified in his report on pages 15-23. Exhibit B, David Klitsch Report, at 15-23.

Applying the scientific method, Klitsch systematically eliminated all potential ignition sources within and near the area of origin except the iPad. Exhibit B, David Klitsch Report, at 23.

Mr. Klitsch's methodology has previously been deemed reliable for purposes of Federal Rule of Evidence 702 by this court. *See Allstate Ins. Co. v. Anderson,* No. CV 15-2651, 2016 WL 2939506 (E.D. Pa. May 20, 2016), amended, No. CV 15-2651, 2016 WL 2997675 (E.D. Pa. May 23, 2016). Much like here, the Defendants in that case challenged Mr. Klitsch's methodology arguing that Klitsch failed to resolve inconsistent data. The court disagreed.

Furthermore, that court determined that the "Defendants' challenges ultimately go to the weight of his (Klitsch's) opinions." *Id.* at 1. "Any weaknesses or inadequacies Defendants believe exist with the facts and assumptions of Klitsch's conclusions may be challenged on cross-examination. See Stecyk v. Bell Helicopter Textron, Inc., 295 F.3d 408, 415 (3d Cir. 2002) ("A

party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."); Breidor v. Sears, Roebuck, and Co., 722 F.2d 1134, 1138-39 (3d Cir. 1983) ("Where there is a logical basis for an expert's opinion testimony, the credibility and weight of that testimony is to be determined by the jury, not the trial judge."). _Id_. at 4.

> ### i.     Witness statements are proper evidence for the determination the area of the fire's origin

Defendant claims Mr. Klitsch's method was unreliable because it alleges he "uncritically" accepted witness statements over physical evidence in determining the area of the fire's origin. *See* Defendant's Motion, ECF No. 34-1, at 10-12. The Defendant mischaracterizes Mr. Klitsch's fire origin determination to suggest that he based his determination solely on the statements of Mr. Macaluso and Ms. Tiger that they did not use the burner on the day of the fire.

As an initial matter, whether the range was within Mr. Klitsch's area of origin or not is a distinction without any relevance as it pertains his methodology. As made clear in his report and at his deposition, even though it was outside of his stated area of origin, he still considered the stove as a potential ignition source and used the same deductive reasoning outlined by NFPA 921 in order to rule it out as he did with the other potential ignition sources he identified within the area of origin. *See* Exhibit B, David Klitsch Report, at 17-23. As such, Mr. Klitsch's methodology under NFPA 921 would not have changed even if it he had considered the stove to be within the area of the fire's origin.

Nonetheless, Mr. Klitsch properly considered the statements of Mr. Macaluso and Ms. Tiger in his fire origin analysis. Under NFPA 921, witness statements are valid evidence that a fire investigator is to consider in addition to burn patterns and fire dynamics. *See* Exhibit E, NFPA 921 Provisions, § 18.1.2. No type of evidence is given more weight over another under NFPA 921.

While Mr. Macaluso and Ms. Tiger's statements that they did not use the range or store combustibles on the range before the fire was part of Mr. Klitsch's calculus of evidence used to determine the area of the fire's origin, it was not the sole piece of evidence.

The witnessed burn patterns were his primary piece of evidence in determining that the fire originated to the left of the stove. Per both Mr. Klitsch and the State Police Fire Marshal and as seen in the photograph shown above, the primary damage at the scene was to the left of the stove. *See* Exhibit F, David Klitsch Dep. Tr., at 97-99. Had the fire started on the range, it would have spread to the right more and burned papers on the nearby refrigerator that were found unburned after the fire or melted the right side filter of the microwave located on top of the stove. *See* Exhibit F, David Klitsch Dep. Tr., at 179-180. Thus, Mr. Klitsch properly excluded the range both from the area of origin and as a competent ignition source.

Moreover, NFPA 921 specifically recognizes that "[i]t is unusual for a hypothesis to be totally consistent with all of the data" and advises that "contradictory data should be recognized and resolved." *See* Exhibit E, NFPA 921 Provisions, § 18.7.2. That is exactly what Mr. Klitsch has done here. He recognized that the statements of Mr. Macaluso and Ms. Tiger, the burn patterns, timeline, and mass loss to the left of the range were in contrast to the burner control having been found in the 'on' position after the fire and reconciled that evidence based on his experience. The thrust of Defendant's argument here is that it thinks he reached the wrong conclusion based on such evidence – an argument that has nothing to do with Mr. Klitsch's methodology or the relevance of his opinion to the facts of the case.

> ## ii. NFPA 921 section 25.3.2 addresses origin determinations involving appliance fires

In addition to the above, Mr. Klitsch's assessment of the range is entirely appropriate under NFPA 921 section 25.3.2. In Chapter 25, regarding appliance fires, section 25.3.2 counsels that

"[i]f the degree of damage to the appliance is not appreciably greater than the rest of the fire origin, then the appliance should not be chosen solely by virtue of its presence" and references the following photo that looks quite similar to scene of the fire at Mr. Macaluso's home:

**Figure 25.3.2(a) Overall View of the Stove with Fire Patterns Displayed on Left Side — Stove Top Raised Post Incident**



*See* Exhibit D, NFPA 921 Provisions

In other words, NFPA 921 warns against the inclusion of the range merely because of its proximity to the area observed to have the most fire damage. Defendant takes issue with Mr. Klitsch's opinion that the burner's control knob could have been turned on during the fire or fire suppression efforts by arguing that he lacks a basis for this opinion. *See* Defendant's Motion, ECF No. 34-1, at 21-24. In addition to the above, Mr. Klitsch's opinion is properly based on his experience as a fire origin and cause investigator, along with the facts that the cabinets, microwave, and other debris from the cabinets were found on the floor after the fire and the fact that another

control knob on the same range was found displaced as a result of being knocked off during the course of the fire. *See* Exhibit B, David Klitsch Report, at 17-24; Exhibit F, David Klitsch Dep. Tr., at 230-232, 236-237, 251.

Again, this was not an opinion reached in a vacuum but the result of Mr. Klitsch's calculus of all the evidence available. And it is his calculus of competing evidence that is the primary source of Defendant's issue with Mr. Klitsch. Defendant's experts considered the same evidence and reached a different conclusion, therefore, Defendant contends that Mr. Klitsch opinion is inadmissible. Defendant's experts reject the testimony of the Mr. Macaluso and Ms. Tiger and credit the burner being found 'on' at the lab exam in order to support their conclusion that the range must have been the cause of the fire. Presumably, their only logical conclusion advanced by the defense experts is that Mr. Macaluso – a chef by trade – placed unidentified combustibles on top of the burner, turned it on, and left the house. Defendant's experts do not offer any explanation as to why someone would do this.  It suffices to say that which expert offers the correct calculus of competing evidence is a question for the jury and not a proper question for a *Daubert* motion.

### iii.   No one can seriously dispute lithium ion batteries are a competent ignition source

Defendant argues that Klitsch lacks evidence necessary to opine that the iPad was a competent ignition source. *See* Defendant's Motion, ECF No. 34-1, at 13-15. In so doing, the Defendant intentionally confuses the terms sufficient fuel, first material ignited, and competent ignition source.  Mr. Klitsch has always maintained that the iPad was the cause of the fire and a competent ignition source.  When presented with additional data after he produced his own report, Klitsch identified an additional fuel load within the area of fire origin (i.e. cardboard chip box from Costco) after reviewing the defendant's expert report.  That is precisely what we expect a competent and credible investigator to do under NFPA 921.  As mentioned above, the scientific

method in this context, to determine the cause of a fire, an investigator is to define the problem, collect data, analyze data, develop hypotheses, test the hypotheses, and select a final hypothesis. *See* Exhibit E, NFPA 921 Provisions, § 4.3 and Figure 4.3 (general method to fire investigation).

Mr. Klitsch did just that. Further, he did not change his final hypothesis in any way, or materially alter any aspect of his opinion. Defendant attempts to confuse Mr. Klitsch's opinion on the origin and cause of the fire with his opinion on the first material likely ignited. A fair reading of Mr. Klitsch's report and deposition testimony reveal that Mr. Klitsch's opinion – that the area of the fire's origin was at the countertop to the left of the stove and that he could not rule out the iPad as the cause of the fire – did not change. Klitsch clarified the likely first material ignited by the iPad. Though in his report he opined that the likely first fuel ignited was the cabinets, upon a further review of the record and the reports of Defendant's experts, he also agreed that the cardboard box of chips located on a cutting board next to the iPad could have been the first material ignited. *See* Exhibit F, David Klitsch Dep. Tr., at 51, 55, 57.

The identification of an additional fuel load does not cause his opinion to change, and it certainly doesn't make his methodology less reliable or proffered testimony inadmissible. It is important to note that Defendant's experts, likewise, do not offer anything other than their own experience to support their opinion that the range could have ignited *unidentified* "combustibles" allegedly left on the range. *See* Exhibit I  Defendant's Expert Report, at 18-19. In the grand scheme of Plaintiff's claim and Mr. Klitsch's opinion that the iPad could not be excluded as the cause of the fire, the first material ignited matters very little. Again, Defendant's experts did not even endeavor to identify a first material ignited other than reference generic "combustibles" they alleged Mr. Macaluso left on the range. *See* Exhibit I, Defendant's Expert Report, at 18-19. Importantly, Mr. Klitsch testified that, whether it was the cabinets above the countertop or a box

of chips that may have sat on a cutting board close to the iPad, the failure of the iPad could have ignited either. *See* Exhibit F, David Klitsch Dep. Tr., at 55, 77-79. [2]

More importantly, Defendant ignores Mr. Klitsch's testimony that he based this determination on his experience as a fire origin and cause expert and videos he has seen of lithium ion batteries failing. *See* Exhibit F, David Klitsch Dep. Tr., at 219-220. Klitsch's opinion is further informed by the expert opinions of Plaintiff's other experts, Dr. Ferrese and Michael Eskra, who separately opined that the iPad was a competent ignition source. *See generally* Exhibit C, Dr. Frank Ferrese Report, at 7; Exhibit D, Michael Eskra Report, at 11; Exhibit G, Michael Eskra Dep. Tr., at 192-193. Defendant further ignores that Mr. Klitsch did not reach this opinion in a vacuum, rather, it was the result of considering all the other evidence indicating there were no other competent ignition sources within the area of the fire's origin. Accordingly, Mr. Klitsch's clarification of the first material likely ignited is harmless.  *See* Fed. R. Civ. Pro. 37(c)(1).

**B.     Michael Eskra employed the methodology recommended by NFPA 921 and the scientific method.**

Michael Eskra is an expert is the design, manufacture, and failure of batteries, including lithium ion batteries like those contained in the iPad at issue here. Mr. Eskra has a Bachelor of Science degree in Chemical Process Engineering and has completed credits towards a Masters in Engineering Management. He has over 30 years' experience working in the battery industry where he has designed and developed manufacturing processes for lithium ion and other types of batteries. *See* Exhibit D, Michael Eskra Report, at 56-66. He holds five patents related to materials, batteries and manufacturing.  He has authored hundreds of papers throughout his career on topics

---

[2] Defendant moves to preclude videotaped experimental testing performed after Mr. Klitsch's report was produced. Mr. Klitsch did not prepare a supplemental or rebuttal report which referenced the testing, and Plaintiff does not intend to introduce it at trial.

involving batteries and battery failures. *See* Exhibit D, Michael Eskra Report, at 56-66.  Over the course of his career, Eskra has taken apart tens of thousands of abused battery cells and regularly offers opinions on the cause of battery-related fires. *See* Exhibit D, Michael Eskra Report, at 56-66.  He is also a certified Fire Explosion Investigator.  *See* Exhibit D, Michael Eskra Report, at 56-66.

Mr. Eskra's methodology has recently been deemed reliable for purposes of Federal Rule of Evidence 702 by a district court in the Western District of Wisconsin. *See Auto-Owners Ins. Co. v. Makita USA, Inc.*, No. 20-CV-220-WMC, 2021 WL 6196975, at 4 (W.D. Wis. Dec. 30, 2021).

In furtherance of his retention in the instant case, Mr. Eskira reviewed CT scans of the iPad's batteries, examined the iPad itself along with the other appliances and evidence collected from the fire scene, and reviewed the statements and deposition transcripts of the witnesses to the fire. *See* Exhibit D, Michael Eskra Report, at 2. Mr. Eskra described his methodology "for role of batteries in fire" in more detail in an article he co-authored and appended as Appendix A to his report. *See* Exhibit D, Michael Eskra Report, at 12-19. As part of his method, he examines CT scans to determine if batteries were a cause or a victim of the fire and identifies the specific pieces of evidence visible in a CT scan that point to whether the battery was cause or a victim of the fire. *See* Exhibit D, Michael Eskra Report, at 12-19.

The subject batteries were "pouch" style lithium ion batteries. Mr. Eskra explains that battery cells:

> are made in a configuration, where the negative is made up of a thin copper foil with negative active material that is primarily graphite, applied on both sides, and the positive is made up of a thin aluminum foil with positive active material, which is a metal oxide, applied on both sides. These two electrodes have a layer of separator installed between them . . . . pouch cells contain flat layers.

*See* Exhibit D, Michael Eskra Report, at 3.

When a short occurs internally to the cell, it can cause destruction of the cell structure in the vicinity of the short. As a result of the short, when the battery cell experiences a thermal runaway, it results in a rapid rise in temperature that can cause the aluminum cathode current collector to melt, hot gas to vent, and eventually the explosion of the cell, releasing a large quantity of heat into the area of origin and forcing further thermal runaway of adjacent battery cells. *See* Exhibit D, Michael Eskra Report, at 3.

As such, Mr. Eskra examines CT scans of pouch battery cells to look for evidence of damage internal to the cell and evidence of gas vent pathways. *See* Exhibit D, Michael Eskra Report, at 18. For "pouch" type lithium ion battery cells – which is the type of battery used in the subject iPad – he explained that "[p]ouch cells which are causal [to the fire] normally exhibit a damage field in the interior of a cell, in the region of the short. . . . Victim cells do not show the internal damage field, and their area of greatest damage normally [is] on the outer portion of the cell interior." *See* Exhibit D, Michael Eskra Report, at 19.

When examining the CT scans of the two battery cells of the subject iPad, Mr. Eskra described the left side battery as exhibit signs of fire attack. Specifically he noted the left cell has damage to the upper right edge of the battery resulting in mass loss and a rounded edge and exhibits "consistent electrode windings that appear continuous up until the right edge of the cell where the electrode is fragment." *See* Exhibit D, Michael Eskra Report, at 8-9. Thus, the CT scan of left battery cell showed signs that it was attacked by fire. By contrast, the right side battery cell showed internal damage consistent that gas pathways consistent an internal short that had "pushed and severed the electrodes to allow for expanding gases and heat." *See* Exhibit D, Michael Eskra Report, at 10. He concluded that the "very localized short . . . cannot be attributed to external heating such as by attack by fire. *See* Exhibit D, Michael Eskra Report, at 10.

Mr. Eskra further described in his report the various defects in the battery that could cause an internal short within a battery. These potential causes include overheating, a manufacturing defect within the cell, or through the degradation of cell material via byproducts caused when the battery experiences overcharge (charging higher than cell capacity) or over discharge (charging low or depleted cells). *See* Exhibit D, Michael Eskra Report, at 3-6. Battery management systems are necessary to prevent overcharge or discharge and to monitor and react to failing cells. *See* Exhibit D, Michael Eskra Report, at 5-6.

As for the specific cause of the short, Mr. Eskra ruled out abuse of the product as a potential cause. *See* Exhibit D, Michael Eskra Report, at 9. Though he is unable to identify a specific manufacturing defect, he cannot rule it out as a potential cause of the short. Exhibit G, Michael Eskra Dep. Tr., at 289-291. Further, the cause of the short could have been a function of the battery management system failing to prevent degradation via overcharge or over discharge or otherwise adequately monitor and react to the failing cell. In furtherance of this theory, Mr. Eskra tested two generations of iPads that would have had battery management systems similar to the subject iPad. *See* Exhibit D, Michael Eskra Report, at 10-11; Exhibit G, Michael Eskra Dep. Tr., at 149-150. The testing revealed that the battery management system allowed for the recharging of a battery cell that is at near 0 volts. *See* Exhibit D, Michael Eskra Report, at 10-11. Recharging a cell with such voltage can cause degradation over time via over discharge leading to a short. *See* Exhibit D, Michael Eskra Report, at 10-11. While the iPad itself is designed to shut off after the voltage reaches 3.1 volts in an attempt to prevent over discharge, the cell can nonetheless lose voltage if it left uncharged for an extended period of time or if normal aging has increased self-discharge. *See* Exhibit D, Michael Eskra Report, at 10-11. Thus, a defect in the battery management system cannot be ruled out.

### i.      Defendant mischaracterized Mr. Eskra's opinion.

Defendant does not challenge Mr. Eskra's general qualifications to testify as to the failure of the battery. Instead, its argument is premised on a mischaracterization of the testimony Mr. Eskra will provide at trial. Mr. Eskra does not opine that the cause of the fire is a specific defect within the battery's management system. Rather, he opines that the cause of the fire is a defect in the battery cell that caused it to short. The cause of the short could either be an issue with the battery management system allowing the recharge of depleted cells or otherwise failing to account for failing cells or a manufacturing defect. *See* Exhibit D, Michael Eskra Report, at 4-6. He does not identify a specific defect with the design of the battery management system itself. Rather, he opines, generally, that it is possible that it did not perform as needed here.

Though Mr. Eskra does not hold himself out to be an expert in designing battery management systems specifically, he has over 30 years' experience examining battery failures and working in the battery industry where designed and developed manufacturing processes for batteries. *See* Exhibit D, Michael Eskra Report, at 56-72. Accordingly, he has a sufficient basis to testify as to what a battery management system is, what is it designed to do, and whether it functioned properly here – which is the extent of his testimony about the iPad's battery management system. Under the circumstances, Mr. Eskra's background and experience is adequate to quality him as an expert to discuss the potential causes of the short within the battery cell.

### ii.      Eskra's methodology was reliable

Defendant's chief argument is that examining a CT scan to discern whether a battery cell was attacked by fire or the cause of a fire is an unreliable methodology. Though it attempts to paint a picture as if it is the entire weight of the scientific community that disagrees with Mr. Eskra's

methodology, it is only able to offer a single paper authored by a competing litigation consulting group. *See* Defendant's Motion, ECF No. 34-1, at 23. Moreover, Defendant ignores that Mr. Eskra's analysis was (a) not limited solely to a review of CT scans and (b) that he cites a research paper presented in 2007 at the Institute of Electrical Electronics Engineers conference that endorses using CT scans to determine points of faulting within cells. *See* Exhibit D, Michael Eskra Report, at 19 (reference 4).

An identical argument challenging Mr. Eskra's methodology was rejected in *Auto-Owners Ins. Co. v. Makita USA, Inc.* 2021 WL 6196975, at *4 n.3 "While defendant contends that the methodology described by EFAA report does not address whether an Ion battery *caused* a fire, that methodology endorses examination of cell CT scans following a fire like that performed by Eskra. ("CT scanning is an excellent tool for determining the point(s) or region of faulting within an initiating cell.").) ("defendant is free to challenge whether Eskra's methodology is sound based on another scientific paper, which concludes that signs of damage to a cell from being the cause of fire and being the victim of fire are the same."). *Id.* at 4 [4]

Simply put, Mr. Eskra disagrees with the assertion that you cannot discern from a CT scan whether a battery caused the fire. In his report, Mr. Eskra identifies a number of different indicia that he looks for in CT scans to determine whether a battery failed due to a short compared to a battery attacked by fire. The paper offered by Defendant simply states that one of such indicium – convex bulging towards the bottom of a cell – can sometimes be found in CT scans of batteries attacked by fire. It does not address the other indicia, such as rounded edges or gas bulging within a cell that Mr. Eskra considers in totality when examining the physical battery and CT scans. More importantly, just because one indicium can sometimes be replicated in CT scans of batteries

attacked by fire that does not mean interpreting a CT scan is an unreliable method for purposes of examining a battery involved in a fire.

Defendant further argues that Mr. Eskra's method was tainted by confirmation bias, simply because he viewed the CT scans before examining the physical evidence. Though from his view of the CT scans he believed it was "highly probable" that the battery failed, he specifically testified that he went to the lab examine of the physical evidence "to discount that hypothesis" – which is exactly what an investigator is supposed to do under the scientific method. *See* Exhibit G, Michael Eskra Dep. Tr., 144. There is no "preferred order" for which piece of evidence should be examined before another piece. Under the circumstances, it cannot be said that Mr. Eskra's methodology was unreliable simply because he viewed evidence in an order that was not to Defendant's liking.

Defendant also argues that there is not a sufficient record from which Mr. Eskra can opine that there was internal short of the battery caused by over discharge. Mr. Eskra testified honestly that he could not state the specific mechanism that caused the short, as it could have been caused by over discharge, a manufacturing defect, or another issue with the battery management system failing to account for weakened or failing cells. *See* Exhibit G, Michael Eskra Dep. Tr., at 290. Mr. Eskra is only able to view the evidence available to him and the testimony provided. He is not able to examine the battery before or during its failure. As made clear in his testimony and report, the basis for his opinion that there was an internal short is based on a view of the CT scans and the record. To the extent that Defendant contends there are factual predicates not found in the record, that is an issue for cross-examination and it does not render his opinion inadmissible.

### iii.    Mr. Eskra's testing was reliable in demonstrating a potential failure.

Finally, Defendant argues that Mr. Eskra should be precluded because it believes his testing was unreliable. Defendant misstates the purpose of such testing. The testing was performed to

determine whether the battery management system was a potential cause of the short. *See* Exhibit G, Michael Eskra Dep. Tr., at 312-13 ("we were just testing to determine if it was a plausible failure.").

Mr. Eskra examined two different historic versions of Defendant's iPads and found that their internal battery management system allowed for charging of weakened cells. *See* Exhibit D, Michael Eskra Report, at 10-11. Mr. Eskra testified that, per his understanding of prior testimony from Defendant, the subject iPad would have had a similar battery management system. *See* Exhibit G, Michael Eskra Dep. Tr., at 149-150. The testing is not offered of proof that Defendant's iPad failed due to a specific defect in the battery management system. Rather, it is meant as support for his assertion that the battery management system was involved as a potential failure mode, among others, for the short that caused the fire. Accordingly, the testing is reliable and relevant to Mr. Eskra's opinion on a potential cause of the short.

## V.   CONCLUSION

For the reasons stated above, Plaintiff respectfully requests Defendant's Motion be denied.

<b>de LUCA LEVINE LLC</b>

BY:  **/s/ Joseph L. McGlynn**_____
        JOSEPH L. MCGLYNN,
        PA ID No.: 201181
        Three Valley Square, Suite 220
        Blue Bell, PA  19422
        Phone:  (215) 383-0081
        Fax:  (215) 383-0082
        E-Mail: jmcglynn@delucalevine.com
        ATTORNEY FOR PLAINTIFF