# EXHIBIT

# F

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**

```
 1              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA
 2
   MICHAEL MACALUSO              )
 3 122 Slaymaker Road            )
   Mildford, PA 18337            )
 4                               )
              Plaintiff,         )
 5                               )
              -vs-               )       Civil Action
 6                               )  No. 2:21-CV-01361
   APPLE, INC.                   )
 7 1 Infinite Loop               )
   MS:38:3TX                     )
 8 Cupertino, CA 95013           )
                                 )
 9            Defendant.         )

10

11

12                      - - - -

13          ZOOM DEPOSITION OF:  DAVID B. KLITSCH

14                      - - - -

15

16

17

18         DATE:  Thursday, March 24, 2022
                  10:05 a.m. Eastern Time
19

20     LOCATION:  Via Zoom

21

       TAKEN BY:  Defendant
22

23  REPORTED BY:  Ed Fulesday, RDR, CRR
                  Court Reporter/Notary Public
24                Reporter's Reference No. F220324
                  HUSEBY GLOBAL Reference No. 390357
25
```

**Page 2**

1        ZOOM DEPOSITION OF DAVID B. KLITSCH,
  a witness, called by the Defendant for examination,
2 in accordance with the Federal Rules of Civil
  Procedure, taken by and before Ed Fulesday, RDR, CRR,
3 a Registered Professional Reporter and Notary Public
  in and for the Commonwealth of Pennsylvania,
4 testified remotely via Zoom on Thursday, March 24,
  2022, commencing at 10:05 a.m. Eastern Time.
5
                        - - - -
6
  APPEARANCES:
7
      FOR THE PLAINTIFF:
8         (Appeared remotely via Zoom)
  Joseph McGlynn, Esq.
9 DELUCA LEVINE
  3 Valley Square, Suite 220
10 Blue Bell, PA 19422
  jMcGlynn@DelucaLevine.com
11 (267) 455-5119
12
13      FOR THE DEFENDANT:
          (Appeared remotely via Zoom)
14 Stephen Copenhaver, Esq.
  Steve.Copenhaver@afsLaw.com
15 ARENTFOX SCHIFF, LLP
  1301 Avenue of the Americas
16 42nd Floor
  New York, NY 10019
17 (212) 484-3900
18
19      NOTE:  All participants, including the court
  reporter, appeared remotely via Zoom from their
20 respective locations.
21
22
23
24
25

**Page 3**

1                * I N D E X *
2
  Examination by Mr. Copenhaver ................  5
3
  Certificate of Court Reporter ................ 257
4 Errata Sheet ................................. 258
5
6
7
8              * INDEX OF EXHIBITS *
9       NOTE:  Exhibits will be late filed.
10                                Marked/
                              Initial Reference
11
  Exhibit 1 -- Notice of Deposition .............  8
12
13 Exhibit 2 -- Witness' Report ..................  8
14
  Exhibit 3 -- Witness' Case List  ..............  8
15
16 Exhibit 4 -- Three-page PDF document of witness'
  invoices .................................... 17
17
18 Exhibit 5 -- Witness' notes ................... 19
19
  Exhibit 6 -- Witness' curriculum vitae ........ 34
20
21 Exhibit 7 -- Photo labeled Figure 11,
  Snack Packaging .............................. 52
22
23 Exhibit 8 -- Photo labeled Figure 13, adhered
  debris on left side of cooktop ............... 53
24
25 Exhibit 9 -- Witness' thumb drive ............. 95

**Page 4**

1 Exhibit 10 -- Mr. Copenhaver's screen shot of
  photo 00045 ................................. 139
2
3 Exhibit 11 -- Mr. Copenhaver's screen shot of
  photo PA070485 .............................. 158
4
5 Exhibit 12 -- Screen shot of a photo from one of
  the March 5 Scene Inspection photos and drew a
6 V pattern on it ............................. 193
7
  Exhibit 13 -- Figure 27 from SEL's original
8 report ...................................... 201
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 5**

1                    - - - -
2                DAVID B. KLITSCH,
3     having been duly administered an oath
4     to swear or affirm to tell the truth,
5             testified as follows:
6                    - - - -
7                  EXAMINATION
8                    - - - -
9 BY MR. COPENHAVER:
10 Q.  Good morning, sir.  My name's Steve Copenhaver.
11     I represent Apple, Inc.
12         We're here for your deposition in a
13     matter in which you've bone retained as an
14     expert on behalf of the plaintiff.  Is that
15     your understanding?
16 A.  Yes.
17 Q.  Will you please state your full name for the
18     record.
19 A.  David B. Klitsch.
20 Q.  Approximately how many times have you had your
21     deposition taken before?
22 A.  I would estimate about 40 times.
23 Q.  Do you maintain a list of the testimony you
24     provided, either at deposition or at trial?
25 A.  I'm sorry, could you repeat that?  A list?

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 6..9

Page 6

1 Q.   Correct.
2 A.   Yes.
3 Q.   Would you be able to provide that list?
4 A.   I believe I did provide a list of the last four
5       years.
6 Q.   I may have missed it.  Was it within the link
7       to your file?
8 A.   No, it was not.  That, I believe, was separate.
9       That was separate, I believe.  I had forwarded
10      that to Mr. McGlynn's office a couple weeks
11      ago.
12 Q.  I'll represent that I have not seen it yet, but
13      it could be just that I missed it.
14          Joe, do you know what's going on with
15      it?
16          MR. McGLYNN:  Let me look it up.  One
17      second.
18          THE WITNESS:  Joe, I had sent that to
19      your paralegal Josh Desko, I think it was.
20          MR. McGLYNN:  Yes.
21          THE WITNESS:  I had sent that, my CV
22      and --
23          MR. McGLYNN:  Yeah, I'm sure we have
24      it.  Let me just look.
25          Yeah, Steve, is that attached to your

Page 7

1       report?
2           MR. COPENHAVER:  Oh, that could be.
3       We can pull that open.
4           MR. McGLYNN:  Yeah, you should have a
5       fee schedule, CV and list of prior testimony.
6           MR. COPENHAVER:  Yeah, I don't have
7       that attached.  None of that is attached to the
8       report that I have.
9 BY MR. COPENHAVER:
10 Q.  And just so we're all on the same page, are you
11      able to see this (displaying document)?
12 A.  Yes, I am.
13 Q.  All right, so, just for the record, what I'm
14      showing you is a report dated February 14th,
15      2022, authored by Technical Fire Analysis, LLC.
16      Is that your company?
17 A.  Yes, it is.
18 Q.  If I scroll down to the -- well, if I scroll
19      down to the 25th page of that document, is that
20      your signature?
21 A.  My signature, yes.
22 Q.  Okay.  And then, after that I see sort of an
23      index, some photos, some diagrams of the home,
24      and then an evidence custody report.  And I
25      scrolled to the end of that, it's Page 40 of

Page 8

1       40.  Do you see that?
2 A.   I do.
3 Q.   Okay.  Is this a copy of the report you
4       authored in this case?
5 A.   Yes.
6 Q.   All right.  Just for future reference, let's go
7       ahead and mark that as Exhibit 2.  We'll mark
8       the Notice for your deposition as Exhibit 1.
9               - - - -
10     (Exhibits 1 and 2 marked for identification.)
11              - - - -
12 BY MR. COPENHAVER:
13 Q.  So, as you can see, at least in the report that
14      I have that we've marked Exhibit 2, I don't see
15      a testimony list appended to that.
16          MR. McGLYNN:  I'm emailing you right
17      now.
18          MR. COPENHAVER:  Okay, I have
19      received from you, Joe, a fee schedule, a CV.
20      No testimony list yet, but I'll -- there it is.
21      Great.
22              - - - -
23      (Exhibit 3 marked for identification.)
24              - - - -
25 BY MR. COPENHAVER:

Page 9

1 Q.   All right, we'll mark as Exhibit 3 this
2       document that I just received from Mr. McGlynn,
3       which appears to be a copy of your prior
4       four-year deposition and trial testimony; is
5       that correct?
6 A.   Yes.
7 Q.   Is this up-to-date as of today?
8 A.   Yes.
9 Q.   There were six cases listed on here:  four
10      depositions and two trials; is that correct?
11 A.  Yes, sir.
12 Q.  All right.  On any of those cases, have you
13      been retained by Mr. McGlynn or members of Mr.
14      McGlynn's law firm?
15 A.  That would be the last entry on May 20th, 2021.
16 Q.  And that's Allstate V. Dynamic Solutions slash
17      QVC?
18 A.  That is correct.
19 Q.  All right.  And is that a case in which you
20      were retained by attorneys representing
21      Allstate in a subrogation matter?
22 A.  Yes.
23 Q.  What was the -- was there a product involved in
24      that lawsuit?
25 A.  There was.

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022
Pages 10..13

Page 10

1 Q.   What was the product that you -- well, strike
2      that.
3            What was the product that was
4      contended by Allstate to have caused that fire?
5 A.   It was a plug-in bug lamp.
6 Q.   A bug lamp meaning something that would kill
7      bugs if they came into contact with it?
8 A.   Yes.
9 Q.   It's not a lamp shaped like a bug?
10 A.  No, not a lamp shaped like a bug, no.
11 Q.  In any other of these cases listed on Exhibit
12     3, were you retained by Mr. McGlynn or an
13     attorney with his firm?
14 A.  The November 23rd, 2020 case with Kovack versus
15     Makita, I was not assigned that fire through
16     the law firm.  I was assigned that through the
17     adjustor.  However, Deluca Levine firm ended up
18     with the file.
19 Q.  Okay.  What was the insurance company involved
20     in that lawsuit?
21 A.  That would have been Erie.
22 Q.  Any others?
23 A.  No.
24 Q.  Okay.  In how many of the cases listed on
25     Exhibit 3 were you disclosed on behalf of

Page 11

1      either -- well, disclosed on behalf of a
2      plaintiff in a fire subrogation matter?
3            MR. COPENHAVER:  Objection.
4 A.   I don't quite understand your question.
5 Q.   Sure.  You understand that the matter that
6      we're discussing today is a subrogation matter,
7      correct?
8 A.   Yes.
9 Q.   And do you understand that you were disclosed
10     by attorneys representing the plaintiff in that
11     matter, correct?
12 A.  Yes.
13 Q.  All right.  And the same is true in the
14     Allstate V Dynamic Solutions case, correct?
15 A.  Yes.
16 Q.  All right.  How many of the other cases listed
17     in Exhibit 3 is that also true?
18 A.  Starting at the top, Tuscarora Wayne, that was
19     a defense case.
20        Commonwealth versus Anthony Franklin,
21     that was actually a criminal homicide case.  I
22     was there on behalf of the defendant.
23        Kovack versus Makita, that was a
24     plaintiff case.
25        Liberty Mutual versus Timberline,

Page 12

1      that was a plaintiff case.
2            Austin V Erie Insurance, that was a
3      defense case.
4            And then the final one, Allstate V
5      Dynamic Solutions was a plaintiff case.
6 Q.   The defense cases -- the Austin case is one
7      where the insurance company was the defendant,
8      correct?
9 A.   Yes.  Yeah, the insured was suing the insurance
10     company for bad faith.
11 Q.  Okay, so, other than the first case and the
12     criminal case, you represented the insurance
13     company in all the other cases; is that
14     correct?
15 A.  Yes.
16 Q.  All right.  And you were just a fact witness in
17     the Austin matter, not an expert, correct?
18 A.  Correct.
19 Q.  So in all the cases listed here involving
20     insurance cases in which you testified as an
21     expert, it was on behalf of the plaintiff
22     insurance company seeking recovery of moneys
23     expended pursuant to a policy; is that correct?
24 A.  Yes.
25 Q.  You also produced a copy of your file -- well,

Page 13

1      strike that.
2            You mentioned just now, in talking
3      about the testimony list, you sent the CV, the
4      testimony list and some other stuff to Mr.
5      McGlynn's paralegal a few months or weeks ago.
6      What else did you send them?
7 A.   That was it.
8 Q.   Okay.  You provided a copy of your file in this
9      case; is that correct?
10 A.  Yes.
11 Q.  Are you able to see my screen?
12 A.  I do.  I can, yes.
13 Q.  Okay, I want to make sure that I have
14     everything that's within your file relative to
15     this case.
16            In the folder that I was able to
17     download, there were eight individual sub
18     folders; is that correct?
19 A.  Yes.
20 Q.  And those are entitled exemplar stove,
21     experimental testing, floorplans, photos,
22     provided docs, provided photos, screen shots,
23     and x-rays, correct?
24 A.  Yes.
25 Q.  Okay.  And then, after those there are seven

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 14..17

Page 14

1    individual PDF files; is that correct?
2 A. Yes.
3 Q. And just for the record, those are entitled
4    1708385L, which I take it is a model
5    designation for either the subject or an
6    exemplar range; is that correct?
7 A. Yes.
8 Q. There's a document entitled COC2, No. 583, a
9    change of custody report, that also appears in
10   your report, correct?
11 A. Yes.
12 Q. All right, there's a document entitled Macaluso
13   Notes.  And are those notes taken by you
14   relative to this case?
15 A. Yes.
16 Q. Okay, there's a Macaluso sign-in sheet from
17   June 24th, 2020, and that is what it is titled
18   to be, correct?
19 A. Yes.
20 Q. There's a document entitled Range Manual.  Is
21   that different from the COC2 document?
22 A. I don't think so.  I think I must have
23   downloaded it twice and renamed it range manual
24   off of the original file name.
25 Q. Okay.  And then there's a document entitled

Page 15

1    Summary.  What is that document?
2 A. That document is a document I prepared to
3    provide information to the experts at the
4    evidence exam since the experts were not at the
5    loss site.
6 Q. Okay.
7 A. A little bit of background information.
8 Q. Okay, and the last document is a copy of the
9    Protective Order that was entered in this case?
10 A. Yes.
11 Q. Even though it's zero kilobytes and did not
12   appear to have been downloaded, but is that
13   what it is?
14 A. That's what would have been, yeah.
15 Q. Okay.  Are there other materials within your
16   file for this case that do not appear on the
17   window that I'm showing you or within the
18   documents or folders I just read out?
19 A. No, not that I know of.  The only other thing
20   would be invoices,
21 Q. Do you maintain a copy of the communications,
22   letters, correspondence or emails you had with
23   Mr. McGlynn or his law firm?
24 A. Just whatever would be on my email, my email
25   program.

Page 16

1 Q. Okay.  And you did not provide those; is that
2    correct?
3 A. I did not.
4 Q. If you were asked to or ordered to, would you
5    be able to do so?
6 A. Yeah, I don't see why I would not be able to.
7    I mean, it should be in my email.
8 Q. Did Mr. McGlynn ask you to provide those?
9         MR. McGLYNN:  Objection.  Why would
10   he be able to answer that, Steve?
11        MR. COPENHAVER:  What's the
12   objection?
13        MR. McGLYNN:  Privileged.
14        MR. COPENHAVER:  Are you his
15   attorney?
16        MR. McGLYNN:  They're communications.
17        MR. COPENHAVER:  Okay.  Are you
18   instructing him not to answer?
19        MR. McGLYNN:  Did you ask him did I
20   say something to him?
21        MR. COPENHAVER:  I asked him whether
22   he was -- he was asked to collect those -- that
23   correspondence.
24        MR. McGLYNN:  Yeah, I can't imagine a
25   way that that wouldn't be protected under

Page 17

1    attorney-expert communications.
2         MR. COPENHAVER:  Yeah, I don't want
3    to fight with you about it.  I'm just asking
4    whether you're instructing him not to answer.
5         MR. McGLYNN:  Yes.
6         MR. COPENHAVER:  Okay.
7 BY MR. COPENHAVER:
8 Q. I assume you're going to take Mr. McGlynn's
9    instruction?
10 A. Yes.
11 Q. Okay.  You prepared some invoices for this
12   case?
13 A. I did.
14             - - - -
15   (Exhibit 4 marked for identification.)
16             - - - -
17 BY MR. COPENHAVER:
18 Q. Okay, I'm going to show you what we'll mark as
19   Exhibit 4.  What I have is a three-page PDF
20   document of invoices.  The first ends -- well,
21   I'll just do it by date, invoice date.
22        The first is a 3-5-2020 invoice date
23   totaled $1,313.08.
24        The second is a March 30th, 2020
25   invoice date for $1,321.78.

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 18..21

Page 18

1        And the third is a June 26, 2020
2    invoice date for $1,089.06.
3        Are these all of the invoices that
4    you have generated in connection with your work
5    in this case?
6 A.   Those are the only ones that I could locate.
7    Yesterday when I was recovering this
8    information, I realized there's only three
9    invoices on file for this particular case,
10    when, in fact, there was other work done.  You
11    can see that in my notes.  And for some reason,
12    it wasn't billed out.
13 Q.  Well, that was going to be my question.  Are
14    there invoices that were generated and sent
15    that you just couldn't find in your file, or is
16    it your understanding these are the only
17    invoices that were ever sent to anyone relative
18    to your work on this case?
19 A.  From what I can gather, these are the only
20    three invoices that have ever been generated
21    for this particular job.
22 Q.  So, have they just gotten a deal on your work,
23    or do you intend to invoice them in the future?
24 A.  I need to check with their billing person to
25    make sure that they only received three, and

Page 19

1    then act accordingly and hopefully submit other
2    invoices for the work that I've done.
3 Q.  Do you keep time sheets or other records that
4    detail the amount of time you spent or the
5    tasks that you worked on that would allow you
6    to generate those invoices?
7 A.  That would be in my notes.
8 Q.  All right, can you direct me to where in your
9    file I may be able to determine --
10 A.  Sure.
11 Q.  -- how many hours you spent on this case?
12 A.  Sure.  You could pull up my notes.  It's going
13    to be the first couple pages.
14        - - - -
15    (Exhibit 5 marked for identification.)
16        - - - -
17 BY MR. COPENHAVER:
18 Q.  So just we're all on the same page, what I did
19    is I went to your file and I'm opening up the
20    PDF document entitled Macaluso Notes, and it
21    looks like this (displaying).  Is this the
22    document you're referring to?
23 A.  Exactly.
24 Q.  And then where would I look at to see --
25 A.  Right there, right in front of you there.  So,

Page 20

1    at the time the assignment was received, I
2    spent 15 minutes making phone calls relative to
3    the fire.  And then on 3-5-2020 was my joint
4    scene exam.  So I was working there from 7:30
5    to 3 p.m., 126 miles.
6        And then the floorplan, the
7    subsequent joint scene exam where the evidence
8    was removed in March of 2020.  Then June of
9    2020 was the joint evidence exam.
10        And then I started working on the
11    report in November, and for whatever reason I
12    didn't put that down.
13        And then here's some conference
14    calls, and then there is the joint evidence
15    exam in October of 2021.
16 Q.  Okay.  How much time did you spend in the
17    preparation of your report?
18 A.  I would say probably around 16 hours.
19 Q.  I mean, is there something you can go to that
20    would demonstrate that, or is that just an
21    estimate that you're making today?  How are
22    you --
23 A.  Yeah, that's just an estimate I would make
24    today.  I mean, there's no type of document
25    that I could refer to.

Page 21

1 Q.  Okay, so, let me ask you this:  Other than the
2    specific times that are listed on Page 1 and
3    Page 3 of what we will mark as Exhibit 5, which
4    are your notes, and the estimate for 16 hours
5    in the preparation of your report, would that
6    be the total amount of time you spent on your
7    work on this matter?
8 A.  Well, also the evidence exams would have to be
9    billed out, the conference calls that you see
10    there.
11 Q.  That's what I mean.  So, counting for the time
12    on the first page, and the amount of time on
13    the second page, the amount of time on the
14    invoices that we have marked as Exhibit 4, and
15    the 16 hours for the preparation of your report
16    that you did in or around November of 2021,
17    does that account for all the time you spent
18    regarding your work in this case?
19 A.  No, no.  It would be more than the 16 hours I
20    mentioned for the report.
21        Could you enlarge that a little bit?
22 Q.  Sure can.
23 A.  That's great.  And then scroll down.  Keep
24    going.  So the evidence exam on -- so, that
25    looks like six hours.

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022
Pages 22..25

Page 22

1         And then scroll back up, please, to
2    the -- go ahead, scroll down a little bit.
3 Q.  Down?
4 A.  Down, up.  I'm looking for the other evidence
5    exam.
6 Q.  Oh, that's up here.
7 A.  Okay.  So there's another seven hours.  So that
8    would be 14, 20.
9         I mean, I think it's probably going
10   to be a total of somewhere around 35 hours or
11   so that has yet to be billed out.
12 Q.  And that 35 hours would include the preparation
13   of your report in or around November of 2021
14   and your attendance at these various evidence
15   examinations and your conferences with the
16   attorneys on behalf of Allstate?
17 A.  Yes.
18 Q.  What's your rate?
19 A.  One fifty-five an hour.
20 Q.  Since the preparation of your report and your
21   attendance and participation of the joint
22   evidence exams, have you spent any additional
23   time on this matter apart from the preparation
24   for this deposition?
25 A.  Say that again.

Page 23

1 Q.  Sure.
2         MR. McGLYNN:  Objection.
3 BY MR. COPENHAVER:
4 Q.  Apart from the 35 hours that you say remain
5    left to be billed, which consisted of the time
6    spent for the evidence exams, the time spent in
7    the preparation of your report, and the
8    conferences you had with the attorneys
9    representing Allstate, have you spent any
10   additional time on your work for this matter
11   other than preparing for this deposition?
12 A.  Yes.
13         MR. McGLYNN:  Objection.
14         MR. COPENHAVER:  Okay, what's the
15   basis of the objection?
16         MR. McGLYNN:  Form.
17         MR. COPENHAVER:  What was wrong with
18   the form?
19         MR. McGLYNN:  I could not -- there
20   was, like, seven parts to your question.
21 BY MR. COPENHAVER:
22 Q.  Okay.  Did you understand my question, Mr.
23   Klitsch?
24 A.  I think so, but if I could repeat it.
25 Q.  Sure.  You mentioned that you had 35 hours of

Page 24

1    time that remained to be billed in this case,
2    correct?
3 A.  Yes.
4 Q.  And you told me that that time consisted of
5    your participation of the evidence exams as
6    reflected in your notes, correct?
7 A.  Yes.
8 Q.  Your conference with the attorneys on behalf of
9    Allstate as reflected in your notes, correct?
10 A.  Yes.
11 Q.  And the preparation of your report as reflected
12   in your notes, correct?
13 A.  Yes.
14 Q.  Okay.  Other than that 35 hours consisting of
15   those things, have you spent any additional
16   time relative to your work on in this case
17   other than in preparation for today's
18   deposition?
19 A.  Yes.
20 Q.  Why didn't you include that in the 35 hours
21   that we just talked about?
22         MR. McGLYNN:  Objection.
23 A.  Because I'm not so sure I'm even going to bill
24   them for it.
25 Q.  Okay.  Why would you spend time on something

Page 25

1    you're not going to bill for?
2         MR. McGLYNN:  Objection.
3 BY MR. COPENHAVER:
4 Q.  Just doing it as a favor?
5 A.  It's not as a favor.
6 Q.  Okay.  Well, why don't you tell me what it is
7    and tell me why you might not bill for it.
8 A.  Because I took it upon myself to further
9    analyze things.
10 Q.  Are you talking about the testing videos --
11 A.  Yes.
12 Q.  -- and photos that are in your file?
13 A.  Yes.
14 Q.  You did that at your own direction?
15 A.  Yes.
16 Q.  Why did you do it?
17 A.  Why did I do it?  Because I'm re-evaluating
18   hypotheses based on data.
19 Q.  That testing was performed on March 4th?
20 A.  Yes.
21 Q.  That was after the preparation of your report?
22 A.  It was.
23 Q.  That was after the disclosure of your report?
24 A.  Yes.
25 Q.  Do you know whether or not that was after the

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                              Pages 26..29

Page 26

1    deadline for providing rebuttal opinions in
2    this case?
3 A.    I do not know.
4 Q.    Okay.  So I'm going to ask you questions about
5    that, but it's late, it's not disclosed, and
6    we're going to object to it and file the
7    appropriate motion with the court.  But just to
8    cover my bases, I'm going to ask you questions
9    about that undisclosed work that you did.
10         MR. McGLYNN:  Is that a question?
11         MR. COPENHAVER:  No.  It was just for
12    the record.  I don't want my asking questions
13    about it to be seen as a waiver of our
14    objection to an undisclosed opinion or work by
15    this expert that was not included in his report
16    or any rebuttal report by him.
17 BY MR. COPENHAVER:
18 Q.    How many hours did you spend on that
19    experiment?
20 A.    About eight.
21 Q.    Who was involved in that process?
22 A.    That was me and evidence technicians at
23    Insurance Evidence Services where the test was
24    held.
25 Q.    Did you perform that additional examination or

Page 27

1    experiment in consultation with any of the
2    other experts that have been disclosed on
3    behalf of plaintiff in this case?
4 A.    Say that again, please?
5 Q.    Sure.  Did you consult with or confer with any
6    of the other experts disclosed by plaintiff in
7    this case regarding either the setup or conduct
8    of that experiment?
9 A.    I don't think.  Maybe afterwards.  Maybe after
10    the test was done.
11 Q.    And who would that have been?
12 A.    I think both Mike Eskra and Frank Ferrese.
13 Q.    And did you guys have a phone call?  Did you
14    guys exchange emails or texts?  How did those
15    consultations happen?
16 A.    I think it was a phone call.
17 Q.    One phone call or more than one phone call?
18 A.    Oh, my god.  I don't recall.  I think it was
19    probably one phone call.
20 Q.    All right, describe that phone call to me.
21 A.    I dialed the number.  They answered.
22 Q.    What was the purpose of the phone call?
23 A.    To tell them about the test.
24 Q.    Did you share your screen and show them the
25    test?

Page 28

1 A.    I don't recall if I did that.
2 Q.    How did you guys --
3         MR. McGLYNN:  Steve, I'm sorry, let
4    me interrupt.  Dave, I don't want you to
5    address anything -- if there was any
6    conversations with me, I don't want you to
7    discuss those, okay?  I don't want to waive any
8    privilege, just to be advised.
9 BY MR. COPENHAVER:
10 Q.    Well, was there anyone present on that phone
11    call other that Mr. Eskra, Dr. Ferrese and
12    yourself?
13 A.    No.  And the phone calls would not have been
14    together like a conference call.
15 Q.    You had a separate phone call with Mike Eskra
16    and a separate phone call with Ferrese?
17 A.    Yes.
18 Q.    All right.  How did you set those phone calls
19    up?
20 A.    I don't understand.
21 Q.    Emails?  Texts?  Did you just cold-call them?
22 A.    Yeah, I think it was just a phone call.
23 Q.    I know, but was it a scheduled phone call?
24 A.    Not that I recall.
25 Q.    You just picked up the number and dialed each

Page 29

1    of those experts?
2 A.    Yeah.
3 Q.    Was that to ask them questions or to tell them
4    about the experiment?
5 A.    No, I believe it was to tell them about the
6    experiment.
7 Q.    Did they know --
8 A.    I didn't ask them --
9 Q.    I didn't mean to cut you off.  I'm sorry.
10         Did they know you were going to run
11    it before you ran it?
12 A.    No, I don't believe so.
13 Q.    So, what did you tell Mr. Eskra about how that
14    experiment went?
15 A.    I believe I explained the fire patterns to him,
16    and I explained to him the damage, the minimal
17    damage on the iPad.
18 Q.    Anything else?
19 A.    Not that I recall.
20 Q.    What did he tell you?
21 A.    I don't remember.  I mean, it was an
22    unremarkable phone call.  I don't remember what
23    he told me.
24 Q.    What else can you recall about the substance of
25    the conversation you had with Mike Eskra about

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                    **Pages 30..33**

Page 30

1   your experiment that you performed on March
2   4th, 2022?
3 A.   That's all.
4 Q.   How long did the phone call last?
5 A.   Couple minutes maybe.
6 Q.   Did you have any email, texts or other
7   communications with Mr. Eskra about the
8   experiment either before or after?
9 A.   Not that I recall.
10 Q.   I mean, presumably you would be able to find
11   out if asked, correct?
12 A.   Asked who?
13 Q.   If you were asked to determine whether you had
14   any communications with Mr. Eskra about this
15   experiment, that's something you could figure
16   out, correct?
17 A.   I guess I could go back through texts to look.
18 Q.   Have you done so?
19 A.   No, I have not.
20 Q.   Okay.  Tell me about the conversation you had
21   with Dr. Ferrese.  I may be mispronouncing his
22   name.  Can you pronounce it for me?
23 A.   Fer-reese (phonetically).
24 Q.   Ferrese.
25 A.   Yes.

Page 31

1 Q.   Can you tell me about the conversations you had
2   with Dr. Ferrese?
3 A.   Much of the same.
4 Q.   Well, what was the purpose of calling him?
5 A.   To let him know about the test and the result
6   of the test, the burn patterns observed, the
7   relatively lack of damage on the iPad.
8 Q.   Why?
9       MR. McGLYNN:  Objection.
10 A.   I don't understand your question.
11 Q.   What motivated you to call him to let him know?
12   If you were running a test that he didn't even
13   know you were running, you're past the point of
14   all expert disclosures in this case, what was
15   the point of picking the phone up, calling him
16   and telling him the results of the experiment
17   you ran?
18 A.   He's involved in the case.
19 Q.   Were you hoping that he would do something with
20   that information?
21       MR. McGLYNN:  Objection.
22 A.   Was I hoping he would do something with the
23   information?
24 Q.   Correct.
25 A.   I don't understand your question.  Like, do

Page 32

1   what with it?
2 Q.   Well, that's what I'm trying to figure out.
3   I'm just trying to figure out why you called
4   Dr. Ferrese and tell him about an experiment
5   you performed after the date for all
6   disclosures in this case.
7       MR. McGLYNN:  Objection.
8 A.   I don't know what he was going to do with it.
9   I didn't expect him to do anything with it.
10 Q.   You just thought you would share?
11       MR. McGLYNN:  Objection.
12 A.   Exactly.
13 Q.   Okay.  Did you take any notes about that
14   experiment?
15 A.   Just the videos and photographs.
16 Q.   Is the only video for that experiment the one
17   that begins with you trying to ignite the box
18   and ends prior to the suppression efforts being
19   completed?
20 A.   Yes.
21 Q.   Was there one camera or more than one camera?
22 A.   Just one.
23 Q.   Was the suppression videoed?
24 A.   No.
25 Q.   Why not?

Page 33

1 A.   'Cause we only had with one camera.
2 Q.   Well, why didn't you leave it running for the
3   suppression?
4 A.   'Cause we didn't.
5 Q.   I mean, was there a reason for that?
6       MR. McGLYNN:  Objection.
7 A.   It was -- I don't know, the camera was grabbed
8   out of the inspection hole and moved out of the
9   way, and then the hose was sprayed inside
10   there.  So --
11 Q.   Well, my question was:  Why was the camera
12   grabbed away and taken away and none of the
13   suppression efforts were recorded?
14 A.   So that the camera wouldn't get damaged with
15   the water.
16 Q.   I mean, presumably the camera could have been
17   backed up some and still have recorded the
18   suppression efforts, correct?
19       MR. McGLYNN:  Objection.
20 A.   No.
21 Q.   Why not?
22       MR. McGLYNN:  Objection.
23 A.   Because there was wood sheeting over -- there
24   was a hole drilled through the wood sheeting in
25   which the video camera was pointed through.

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                              Pages 34..37

Page 34

1 Q.   All right, well, obviously I'm going to have a
2      lot more questions about that experiment, but
3      we'll save those for a little later today.
4              I'm going to mark a copy of your CV
5      as Exhibit 6.  Do you have a copy of that in
6      front of you, or do you need me to pull it up?
7 A.   No, I have it.
8 Q.   I'll mark that as Exhibit 6.
9                 - - - -
10     (Exhibit 6 marked for identification.)
11                - - - -
12 BY MR. COPENHAVER:
13 Q.  Can you just walk me through your educational
14     history.
15 A.  Okay, I'm currently enrolled at Eastern
16     Kentucky University online for the bachelor's
17     program in fire, arson and explosion
18     investigation.
19             I have an associate's degree in fire
20     science which was obtained in May of 2007 from
21     Luzerne County Community College.
22             I attended the Pennsylvania State
23     Police Academy and graduated and promoted to
24     the rank of trooper in July of 1992.
25             And prior to that, I graduated from

Page 35

1      the Lackawanna Junior Community College, Act
2      120 Training for Municipal Police Officers.
3 Q.   How long did you serve as a Pennsylvania State
4      Trooper?
5 A.   20 years.
6 Q.   And you retired in what year?
7 A.   January of 2012.
8 Q.   Can you walk me through the progression of your
9      roles with the Pennsylvania State Police from
10     the time you joined to the time you retired.
11 A.  Sure.  So, when I was assigned coming out of
12     the Academy, I was assigned to the patrol unit
13     where I was on the patrol unit for eight years.
14 Q.  From when to when?
15 A.  I don't have that particular timeline available
16     on my CV.
17 Q.  Yeah, I don't need months or anything.  But you
18     graduated from the Academy in --
19 A.  In July of '92.
20 Q.  Okay.  So, about 1992 to about 2000 you were in
21     the patrol area?
22 A.  Right.
23 Q.  Okay.  That's good enough for me.
24 A.  Okay.  And then, during that time frame I took
25     on a part-time assignment investigating fires

Page 36

1      with the Fire Marshal's office, and that
2      started in 1995.
3              And then I did a two-year stint in
4      forensic services.
5 Q.   And what did that entail?
6 A.   That was evidence collection, processing of
7      crime scenes, homicides, robberies, rapes,
8      attend autopsies, things of that nature.
9 Q.   Okay, and that was from approximately 2000 to
10     2002, without holding you to specific dates?
11 A.  Yeah, approximately.
12 Q.  Okay.
13 A.  And then I believe it was in 2002, 2003
14     timeline is when I was assigned full-time to
15     the Fire Marshal's unit.  And that's where I
16     retired out of.
17 Q.  That was from 2002 slash 2003 to 2012?
18 A.  '12.
19 Q.  Okay, what was your actual title during that
20     period of time?
21 A.  During which period?
22 Q.  Thanks for clarifying.  2003 to 2012.
23 A.  Deputy Fire Marshal.
24 Q.  All right.  Your degree program at Eastern
25     Kentucky University, when is that scheduled to

Page 37

1      complete?
2 A.   Well, that depends how many classes I take.
3 Q.   Fair enough.
4 A.   You know, each credit.  So, it's a work in
5      progress, that's all I can tell you.
6 Q.   Fair enough.  How many credits are you required to
7      obtain the BS degree from Eastern Kentucky
8      University?
9 A.   120.
10 Q.  And how many credits are you through as of
11     March of 2022?
12 A.  I'm a junior.  So, I'm, like, three-quarters of
13     the way through.  I think it's somewhere around
14     70 -- in the 70-ish.
15 Q.  Okay.  Are you currently taking credits in this
16     term or semester?
17 A.  I'm sorry?
18 Q.  Is it a term or a semester program at Eastern
19     Kentucky?
20 A.  It's an eight-week accelerated program.  So, in
21     each normal semester, there are two eight-week
22     accelerated.
23 Q.  I understand.  In whatever eight-week program
24     we're in right now, are you currently taking
25     credits?

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 38..41

Page 38

1  A.    Yes.
2  Q.    How many credits are you currently signed up
3        for?
4  A.    That would be three.
5  Q.    And is that one class?
6  A.    Yes.
7  Q.    And what class is that?
8  A.    I think it's introduction to criminal
9        investigations.
10 Q.    Okay.  I've taken online classes before.  I get
11       it.  It's --
12 A.    It's a handful of times.
13 Q.    It's a handful of times, especially when you're
14       juggling other stuff.  I understand.
15            Okay, and then when you obtain all of
16       your credits, you will have what degree?
17 A.    I will have a bachelor's of science in fire,
18       arson and explosion investigation and a minor
19       in fire and safety engineering, I believe it
20       is.
21 Q.    What was the purpose for which you sought that
22       additional education especially because you've
23       been doing what you're doing for, I don't know,
24       some period of time?
25 A.    There are two things I wish I did in life.  One

Page 39

1        was join the military and two was get a
2        bachelor's degree.
3            So obviously there's no military
4        that's going to take me.  I could probably go
5        to Ukraine, but I don't want to do that.  So
6        that left me with the option, my bucket list,
7        of obtaining a bachelor's degree.  And I talked
8        about it for many years, and my wife said just
9        do it already, so I'm doing it.
10 Q.    I understand.  Are the certifications that are
11       listed on Page 3 of your report all of the
12       certifications that you hold?
13 A.    You're talking about the certified fire
14       investigator up at the top?
15 Q.    And then at the end you have fire service
16       certifications down at the bottom.
17 A.    Yeah, the fire service certifications deal with
18       firefighting operations and stuff.  I no longer
19       -- I retired from that.
20            So, up at the top there's
21       Pennsylvania State -- yes.
22 Q.    Have you ever published any literature within
23       the realm of fire science or fire
24       investigations?
25 A.    Well, only what's listed on Page 2.  I

Page 40

1        developed the Hero to Zero Firefighter Arsonist
2        Program back in 2007, and we just did a
3        relaunch -- a program update and a relaunch
4        last year, I believe.  And that deals with, you
5        know, combatting cases of firefighter arson.
6  Q.    Okay.  Is that published anywhere, or is that
7        something you present?
8  A.    Initially it was presented but now it's online.
9  Q.    Okay.  I mean, could I pull it up, or do I need
10       to pay for it?
11 A.    Well, normally it's free for everybody, but for
12       you, you can pay for it.
13            No, it's available -- it is available
14       free of charge online.
15 Q.    Okay.  Other than that, have you published
16       anything on the topic or within the area of
17       fire science or fire investigations?
18 A.    Pen to paper writing an article or a book, no.
19 Q.    Okay.  How many cases have you been retained on
20       by Deluca Levine?
21 A.    This month?  This year?
22 Q.    Ever.
23 A.    Ever?  I don't even have a number.
24 Q.    Can you estimate for me?
25 A.    I would estimate annually do about maybe 60

Page 41

1        cases a year maybe.
2  Q.    And that's been roughly true for approximately
3        how many of the past years?
4  A.    Probably about nine.
5  Q.    So you've done hundreds of cases for the Deluca
6        Levine firm, correct?
7              MR. McGLYNN:  Objection.
8  A.    Yes.
9  Q.    On a percentage basis, how much of the work
10       that TFA does in the litigations phase is with
11       Deluca Levine?
12 A.    I would estimate maybe 20 percent -- 20 to 25,
13       somewhere around there.
14 Q.    Would you consider Deluca Levine to be a
15       significant source of the work that you and
16       your firm do?
17             MR. McGLYNN:  Objection.
18 A.    One of them, sure.
19 Q.    Is that 20, 25 percent estimate in terms of
20       number of cases that you have with Deluca
21       Levine for Technical Fire Analysis in total or
22       for your cases that you're directly involved
23       in?
24 A.    No, that would be total.
25 Q.    Okay.  And if I were to ask you for the cases

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                    Pages 42..45

Page 42

1   that you're directly involved in, what
2   percentage of those -- the number of those
3   cases are ones that you're doing with Deluca
4   Levine, would that percentage change?
5 A.   Oh, yes.
6 Q.   So, for the ones that you're directly involved
7   in, what percentage of those are with Deluca
8   Levine?
9 A.   I would estimate maybe ten.
10 Q.  How many cases have you done where you have
11   been retained by attorneys on behalf of
12   Allstate?
13 A.  How many -- could you repeat that one more
14   time?
15 Q.  Sure.  How many cases have you been retained on
16   where the insurer is Allstate?
17       MR. McGLYNN:  Objection just as to
18   the time frame.
19 BY MR. COPENHAVER:
20 Q.  That's fair.  Within the past three years.
21 A.  How many cases?
22 Q.  Yes.
23 A.  Well, using 60 that I estimated earlier, times
24   three, 120 maybe.
25 Q.  Would it be 180?

Page 43

1 A.  Yeah.  Math isn't a strong point.
2 Q.  Fair enough, all right.
3       Have you been to the Deluca Levine
4   website recently?
5 A.  No.
6 Q.  You are listed on there a couple of times in
7   conjunction with some conferences that you
8   presented at or been involved in.  Does that
9   ring a bell?
10 A.  The conferences do.
11 Q.  There's one that was the NASP national
12   conference in Orlando, Florida dated November
13   18th, 2018, and it was a presentation that you
14   did with Mr. Eskra and some others entitled
15   Lithium Battery Fires and Products Liability
16   Update.  Do you recall that?
17 A.  I do.
18 Q.  What was that?
19 A.  It was a short presentation on lithium battery
20   fires.
21 Q.  To who?
22 A.  To other NASP members mainly made up of
23   attorneys and subrogation professionals.
24 Q.  And what was the purpose of that presentation?
25 A.  To share information.

Page 44

1 Q.  All right, were you there at the invitation of
2   Deluca Levine?
3 A.  Yes.
4 Q.  Did you present any materials at that
5   conference?
6 A.  I think I spoke for maybe two minutes, and the
7   rest was Mr. Eskra.
8 Q.  Was there a written presentation that you did?
9 A.  I believe there was an outline that was done.
10 Q.  Would you be able to find that outline if you
11   were asked to do so?
12 A.  I don't have it.
13 Q.  Why not?
14 A.  I was never given it.
15 Q.  Okay.  Do you have any written materials
16   regarding your presentation at that conference?
17 A.  Like what materials?
18 Q.  Notes, outlines, PowerPoints, photos,
19   conference materials, agenda, anything at all.
20 A.  No.  I think I got, like, a swag bag with some
21   stuff, but nothing like you described.
22 Q.  Okay.  Do you recall presenting at the NASP
23   conference in 2015 In Reno, Nevada at a
24   presentation called Fire Experts in Today's
25   Courts?

Page 45

1 A.  Yes.
2 Q.  What was that presentation?
3 A.  That was -- I'm trying to think.  That was more
4   like a round-table discussion with me being the
5   expert and a bunch of attorneys throwing
6   questions at me, almost like a mock courtroom,
7   direct and cross-examination scenario.
8 Q.  Do you have any written materials from that
9   presentation or conference?
10 A.  No.
11 Q.  Do you know if that was ever recorded?
12 A.  I know from -- I believe that was the first
13   segment NASP ever videoed and presented
14   virtually.  Whether they kept it, I have no
15   idea.
16 Q.  Okay.  Do you have a copy of that video?
17 A.  No.
18 Q.  Okay.  Were you there at the invitation of
19   Deluca Levine?
20 A.  Yes.
21 Q.  Other than those two NASP conferences, have you
22   ever presented in any other gathering of
23   attorneys at the invitation of Deluca Levine?
24 A.  Not that I recall.
25 Q.  There's a training addendum on your CV that

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**

Pages 46..49

Page 46

1  goes from Page 5 to Page 18.  What is that?
2  A.  That's the list of training classes that I have
3     acquired.
4  Q.  So these are trainings that you have attended,
5     not ones that you've taught; is that correct?
6  A.  Attended, correct.
7  Q.  Okay.  There's at least one of these, and
8     perhaps more, that dealt specifically with the
9     issue of appliance fires; is that correct?
10 A.  What page are you on?
11 Q.  Well, Page 5.  In January of 2022, there's one
12    called Investigating Fires Involving
13    Fireplaces, Chimneys and Fuel-Burning
14    Appliances.
15 A.  Okay.  I see that.
16 Q.  In January of 2020 on Page 7, there's one
17    called Introduction to Appliances from the
18    International Association of Arson
19    Investigators.
20        There may be a couple of others, but
21    do you recall those?
22 A.  I do.
23 Q.  Okay, do you have any -- well, for any of these
24    training programs that you went to that dealt
25    with fires involving appliances, did you retain

Page 47

1  any of the written materials from any of these
2  sessions?
3  A.  If I did, they would be packed away somewhere
4     in a box, if I did.
5  Q.  Do you know whether you did or didn't?
6  A.  I do not.
7        MR. COPENHAVER:  All right, so, we've
8     been going about an hour.  If we could take
9     just a couple-minute break, we can come back
10    and move into maybe some of the meat of the
11    stuff.
12        THE WITNESS:  Sounds good.
13        MR. McGLYNN:  Okay.
14              - - - -
15        (A recess was taken at 11:00 a.m. and
16    reconvened at 11:07 a.m.)
17              - - - -
18 BY MR. COPENHAVER:
19 Q.  All right, Mr. Klitsch, we're back from a brief
20    break.  Are you okay to keep going?
21 A.  Yes, I am.
22 Q.  All right.  And I dispensed with a lot of
23    formalities before this deposition because
24    you've done this a bunch.  But obviously if
25    there ever comes a time that you need to take

Page 48

1  for any reason, just speak up and we can do
2  that, all right?
3  A.  Yes.
4  Q.  As you notice, I try to take one about every
5     hour, but, you know, we're here on your
6     schedule.
7        When were you retained in this case?
8  A.  It would have been on March 4, 2020.
9  Q.  What's your understanding of when the fire
10    happened?
11 A.  March 2nd, 2020.
12 Q.  What were you retained to do to your
13    understanding?
14 A.  To go conduct an origin and cause
15    investigation.
16 Q.  In connection with your work, have you reviewed
17    the opinions or reports by any other expert?
18 A.  In this case?
19 Q.  Correct.
20 A.  Your defense experts.
21 Q.  Okay.
22 A.  Is that what you're asking me?
23 Q.  Any other experts at all?
24 A.  Yes.  Yours.
25 Q.  Okay.  And you mean Dr. Hoffmann and Mr.

Page 49

1  Swonder?
2  A.  Yes.
3  Q.  Did you review the original report?
4  A.  Review the -- I don't understand what you're
5     talking about.
6  Q.  Sure.  How many reports were prepared by SEL?
7  A.  My understanding, two.
8  Q.  Okay.  So the original one would be the first
9     one.  Did you review that one?
10 A.  I did.
11 Q.  When did you review that?
12 A.  When it was provided to me that day or maybe
13    the day after.  I'm not sure.
14 Q.  Okay.  Somewhere close in time to February
15    14th, 2022 when it was dated?
16 A.  Is that the date of the report?
17 Q.  Yes.
18 A.  Probably close to that.
19 Q.  Okay.  Did you formulate any opinions based
20    upon your review of that report?
21        MR. McGLYNN:  Objection.
22 A.  I don't quite understand your question.
23 Q.  Sure.  Did you generate any opinions responsive
24    to anything you read in the expert report by
25    SEL dated February 14, 2022?

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                              Pages 50..53

Page 50

1           MR. McGLYNN:  Objection.  Opinions
2     about your experts?
3           MR. COPENHAVER:  Correct.
4  A.  Yes.
5  Q.  And did you disclose those to anyone?
6           MR. McGLYNN:  Objection.
7  A.  Disclose them to anyone?
8  Q.  Did you reduce those opinions to writing?
9  A.  No, I did not.
10 Q.  Have you sent them to Apple?
11 A.  No.
12 Q.  Did you prepare a rebuttal report?
13 A.  I haven't been requested to.
14 Q.  Okay.  So you just sort of kept those opinions
15      to yourself?
16           MR. McGLYNN:  Objection.
17 A.  Yes.
18 Q.  Okay.  Do you anticipate expressing those
19      opinions at trial even though you haven't
20      disclosed them?
21           MR. McGLYNN:  Objection.
22 A.  I don't know how to answer that.  If I'm
23      permitted to, yes.  If I'm not, I --
24 Q.  Very good.  Well, I will ask you what those
25      opinions are, but I will ask the court that you

Page 51

1      not be permitted to express them because we're
2      sitting here in your deposition and I don't
3      have them yet.
4           So, just in case the federal court
5      decides to nonetheless allow you to express
6      them, what are the opinions that you generated
7      specific to the SEL report dated February 14th,
8      2022 subject to our objection as to their
9      non-disclosure?
10 A.  Right.  As a result of that, I re-evaluated the
11      data that I had.  Of interest to me was this --
12      the box, the corrugated packaging snack box.
13           So, one of the writings in his report
14      was about Costco, so a shopping trip to Costco
15      was held, and it was there where the box,
16      consistent with the remains that were found on
17      the cutting board, was found.  So that's what
18      prompted this experimental testing.
19           Up until that point, I had no idea
20      what size this snack packaging was.
21 Q.  That's consistent with the debris that was
22      found baked into the surface of the stovetop,
23      correct, the corrugated cardboard box?
24 A.  That cardboard box mass with the, I'll call it
25      the artwork of the chip bag stuff on it, that

Page 52

1      was recovered from the wooden cutting board.
2  Q.  I'm going to show you Figure 11 from the SEL
3      report.  This is the corrugated cardboard,
4      correct?
5  A.  That's what it looks like.
6  Q.  And this is what you're --
7  A.  Your --
8  Q.  Sorry.  Let me just ask my question because
9      otherwise Ed will get mad at us.
10 A.  I understand.
11 Q.  Is the photo that's depicted here that's
12      labeled Figure 11, snack packaging, is this
13      consistent with the snack packaging that you're
14      referring to?
15 A.  Yes.
16 Q.  All right.  We'll mark that as Exhibit 7.
17               - - - -
18      (Exhibit 7 marked for identification.)
19               - - - -
20 BY MR. COPENHAVER:
21 Q.  And is it your assumption or belief that none
22      of that material was found adhered to the
23      cooktop on the stove that was present in the
24      kitchen within the room of origin?
25           MR. McGLYNN:  Objection.

Page 53

1  A.  There appeared to be something adhered to the
2      left-front surface element.  I don't know if it
3      was cardboard or it was melted plastic with
4      ridges in it.
5  Q.  And are you referring to what's been marked
6      here -- or what's been labeled here as Figure
7      13, adhered debris on left side of cooktop?
8  A.  Yes.
9           MR. COPENHAVER:  All right, we'll go
10      ahead and mark that as Exhibit 8.
11               - - - -
12      (Exhibit 8 marked for identification.)
13               - - - -
14 BY MR. COPENHAVER:
15 Q.  Do you know whether or not that's the remnants
16      of corrugated cardboard packaging for the snack
17      box or not?
18 A.  I do not.
19 Q.  If it is, would that suggest that some of the
20      corrugated cardboard box and snack packaging
21      was on the surface of the cooktop at the time
22      of the fire?
23 A.  It would suggest that it was there after the
24      fire.
25 Q.  Well, it was there during the fire because it

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**

Pages 54..57

Page 54

1    adhered and melted to the stovetop, correct?
2          MR. McGLYNN:  Objection.
3 BY MR. COPENHAVER:
4 Q.   As opposed to being placed there after the
5    fire, right?
6          MR. McGLYNN:  Objection.
7 BY MR. COPENHAVER:
8 Q.   Go ahead, Mr. Klitsch.
9 A.   I hate to ask you, but could you repeat that
10    one more time?
11 Q.   Probably not, but I can do a close facsimile of
12    it.
13          You said that that's evidence that it
14    was there after the fire, if that's indeed the
15    cardboard box.  My question to you is:  Isn't
16    that evidence that it was there during the fire
17    given that it's burned onto the surface of the
18    cooktop?
19          MR. McGLYNN:  Objection.
20 A.   No.
21 Q.   Why not?
22 A.   Also that was adhered to the stovetop was the
23    melted filter from the left side of the -- the
24    underside of the microwave as well as a control
25    knob was there.

Page 55

1 Q.   Believe me, we'll get into both of those.
2 A.   Okay.  So, I can't say that that snack
3    packaging material, if it was cardboard, was
4    there at the time of the fire.  I can say that
5    it was there post fire.
6 Q.   But whether it was there at the time of the
7    fire, you can't say exactly one way or the
8    other?
9 A.   I cannot.
10 Q.   Okay.  All right, so, what are the opinions,
11    then, that you generated based upon your review
12    of the SEL report dated February 14th, 2022
13    other than that it caused you to re-evaluate
14    some issues relative to the presence of the
15    corrugated snack box?
16 A.   I believe that it was a malfunction of the iPad
17    that ignited the cardboard box -- the snack
18    packaging box that is on top of the wooden
19    cutting board.
20 Q.   And that is not an opinion that you expressed
21    in any of the reports you've disclosed in this
22    case, correct?
23          MR. McGLYNN:  Objection.
24 A.   The snack packaging box is not included in my
25    prior opinion, but my prior opinion does

Page 56

1    include a failure of the iPad.
2 Q.   Okay.  Your opinion today is that the iPad
3    ignited a snack box that was sitting on top of
4    the cutting board on a counter in the kitchen,
5    correct?
6 A.   Yes.
7 Q.   That opinion is nowhere discussed in your
8    report; is that correct?
9          MR. McGLYNN:  Objection.
10 BY MR. COPENHAVER:
11 Q.   If it is, you can point it to me.  But I read
12    your report, and I read it in some detail, and
13    I didn't see it.  So can you show me where in
14    your report you expressed --
15 A.   I just -- I just --
16 Q.   Hold on, Mr. Klitsch, let me finish my
17    question.
18          Can you please point me to where in
19    your report you expressed the opinion that the
20    iPad ignited the cardboard box that was sitting
21    on top of the cutting board on the counter in
22    the kitchen?
23          MR. McGLYNN:  Objection.  It's
24    argumentative and it contains a couple
25    different questions, Steve.

Page 57

1 A.   I explained to you, counselor, that my
2    issued report states my opinion being a failure
3    of the iPad.  It does not include the ignition
4    of the box.
5 Q.   And nonetheless, what caused you to re-evaluate
6    whether or not a box was present in proximity
7    to your perceived area of origin was your
8    review of the SEL report on February 14th --
9    dated February 14th, 2022, correct?
10          MR. McGLYNN:  Objection.
11 A.   Yes.
12 Q.   And you received that, in your memory, close in
13    time to when it was disclosed in February 14,
14    2022, correct?
15          MR. McGLYNN:  Objection.
16 A.   Yes.
17 Q.   And you did not conduct any experiment to test,
18    evaluate or otherwise probe any of those
19    opinions until March 4th, 2022, correct?
20          MR. McGLYNN:  Objection.
21 A.   Yes.
22 Q.   And do you know whether or not that was after
23    the time of any rebuttal disclosures?
24 A.   I don't know any deadlines.
25 Q.   Okay.  And whether or not it was past that, you

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                Pages 58..61

Page 58

1   have not expressed those opinions in any report
2   disclosed at any time in this case to your
3   knowledge; is that correct?
4                MR. McGLYNN:  Objection.
5 A.   I have not been requested to, no.
6 Q.   Nor have you done so on your own volition like
7   you did the experiment, correct?
8                MR. McGLYNN:  Objection.
9 A.   No.
10 Q.   Is that correct?
11 A.   I answered no.
12 Q.   I know.  It was a -- there's a double negative.
13   I said is that correct.  I'll ask it a
14   different way.
15 A.   Please.
16 Q.   Have you disclosed those opinions on your own
17   volition?
18 A.   No.
19                MR. McGLYNN:  I'm sorry to interrupt.
20   Could you give me just two minutes, Steve?  I
21   have a family member that's trying to reach me.
22                MR. COPENHAVER:  Of course.
23                MR. McGLYNN:  Thank you.
24                MR. COPENHAVER:  Yep.
25                     - - - -

Page 59

1                (A recess was taken at 11:19 a.m. and
2   reconvened at 11:24 a.m.)
3                     - - - -
4                MR. McGLYNN:  Thank you, guys.  I
5   appreciate it.
6 BY MR. COPENHAVER:
7 Q.   All right, Mr. Klitsch, we're back from a brief
8   break.
9                Let me try to figure out where to
10   pick back up.  Based upon your review, if I
11   understand you correctly, of SEL's February
12   14th, 2022 report, it caused you to re-evaluate
13   the presence of the cardboard snack box that
14   they identified; did I understand that
15   correctly?
16                MR. McGLYNN:  Objection.
17 A.   Yes.
18 Q.   All right.  And then, based upon that
19   re-evaluation, you performed some additional
20   analysis that included the experiment that
21   we'll talk about that you performed on March
22   4th, and that it is now your opinion that there
23   was a box sitting on top of the cutting board
24   that was ignited and that is what caused the
25   fire; is that correct?

Page 60

1                MR. McGLYNN:  Objection as to the --
2   objection.  Time frame.
3 A.   My opinion is it was ignited by the iPad.
4 Q.   And that the cardboard box that was sitting on
5   top of the cutting board was the first fuel
6   ignited by the iPad in your opinion?
7                MR. McGLYNN:  Objection.
8 A.   Yes.
9 Q.   And is that, in your opinion, what allowed it
10   to propagate up to the upper cabinets?
11 A.   Yes.
12 Q.   Did you form any other opinions based upon your
13   review of SEL's February 14th, 2022 report
14   other than, I guess, agreeing with them that a
15   cardboard box was present within the area of
16   the counter or the stove?
17                MR. McGLYNN:  Objection.
18 A.   Did I form any opinion after reading SEL's
19   report, any other opinion?
20 Q.   Correct.
21 A.   I'm just trying to think about the report in my
22   head.  I believe they're of the opinion that
23   the burner was on.  I'm not of that opinion.
24 Q.   That's in your report.  We can talk about that.
25 A.   Okay.

Page 61

1 Q.   Anything else?
2 A.   Not that I can think of right now.
3 Q.   Okay.  Did you also review SEL's supplemental
4   report dated February 28, 2022?
5 A.   Yes.
6 Q.   Did you formulate any opinions based upon your
7   review of that report?
8                MR. McGLYNN:  Objection.
9 A.   Much of the same.
10 Q.   Okay, anything in addition?
11 A.   No.
12 Q.   Are the materials that you reviewed and that
13   formed the bases for your opinions listed on
14   Page 1 of your report?
15 A.   Yes, for my initial report.
16 Q.   Did you perform any other reports, or did you
17   author any other reports?
18 A.   No.
19 Q.   All right, you said your initial report.  Were
20   you differentiating --
21 A.   Well, I'm just -- I'm indicating, if I'm
22   requested to do a rebuttal report, then, you
23   know, there would be other items that were
24   considered such as your defense expert reports.
25 Q.   I think even Joe might agree with me that the

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022

Pages 62..65

Page 62

1    time for that has passed, but maybe not.
2              Well, let me ask you this:  Are there
3    other materials you've reviewed that form the
4    bases for any of your opinions other than those
5    listed on your February 14th, 2022 report?
6 A. Not that I can think of.
7 Q. Were there any other interviews conducted or
8    discussions you had with any fact witnesses
9    other than those referenced in your February
10   14th, 2022 report?
11 A. Not that I can think of.
12 Q. Did you perform any tests or experiments in
13   conjunction with the preparation of the
14   opinions expressed in your February 14th, 2022
15   report?
16             MR. McGLYNN:  Objection.
17 A. Just cognitive tests.
18 Q. What do you mean by a cognitive test?
19 A. In my mind, running through hypotheses.
20 Q. Okay, when I'm talking about --
21 A. Physical tests.
22 Q. And when I talk about a test or experiment, I
23   mean a physical test.
24 A. No.
25 Q. Okay.  Is the only test or experiment that you

Page 63

1    performed the one that was performed on March
2    4th, 2022 with the cardboard box?
3              MR. McGLYNN:  Objection.
4 A. Yes.
5              MR. COPENHAVER:  What was the basis
6    of the objection, Joe, just to make sure that I
7    don't need to re-ask it?
8              MR. McGLYNN:  Because you have two
9    definitions of tests.  He said he did the test.
10   You said, no, I don't agree with you; I'm
11   talking about physical tests.  So if you want
12   to specify physical tests, you know, whatever
13   you mean, ask him that question.
14 BY MR. COPENHAVER:
15 Q. So, what kind of cognitive test did you do, Mr.
16   Klitsch?
17 A. Run -- utilizing the data, run the hypothesis
18   through my mind.  That's what a cognitive
19   continuity evaluation is.  I mean, it's sort of
20   hard to describe.
21 Q. Is that really a test?
22             MR. McGLYNN:  Objection.
23 A. I believe in 921 it lists it.
24 Q. Is it called a cognitive test?
25 A. I'm not sure it's cognitive.  It might and

Page 64

1    cognitive evaluation or analysis or something
2    along those lines.
3 Q. Well, sure, I understand you had thought about
4    stuff and you considered different things in
5    your mind.  But I mean actually putting those
6    to a test, pursuant to the scientific method,
7    to see whether a hypothesis is confirmed or
8    not.  That's what I mean by a test.
9              MR. McGLYNN:  Objection to form.
10 BY MR. COPENHAVER:
11 Q. Is the only test, in that definition that you
12   performed, the one that you performed on March
13   4th, 2022?
14 A. Yes.
15             MR. McGLYNN:  Objection.
16 BY MR. COPENHAVER:
17 Q. What was it within SEL's February 14th, 2022
18   report that caused you to re-evaluate the
19   presence of that corrugated cardboard box in
20   proximity to your area of origin?
21 A. I actually think it was the reference about
22   Costco, shopping at Costco.
23 Q. And what was about that that triggered your
24   re-evaluation?
25 A. Thinking, hey, maybe that box, that snack

Page 65

1    packaging box, was purchased at Costco, and I
2    might be able to determine how big or how small
3    this thing is.
4 Q. Was your assumption -- well, strike that.
5              You read the transcript of Mr.
6    Macaluso.  In fact, I think you interviewed
7    him, correct?
8 A. Yes.
9 Q. And what he said in his deposition, and I
10   assume in his interview to you, was that there
11   was no debris on the countertop in proximity to
12   the stovetop at the time he left the house
13   prior to the fire, correct?
14             MR. McGLYNN:  I'm objecting.  And I
15   don't want to interrupt you, Steve, but you are
16   asking about a couple different things.
17 BY MR. COPENHAVER:
18 Q. Well, at any point in time, whether a
19   deposition transcript or in your conversations
20   with him, did Mr. Macaluso indicate to you
21   that there was the presence of any debris in
22   proximity to the iPad or the stovetop at the
23   time he left prior to the fire?
24 A. What do you mean by debris?
25 Q. Well, what he said was that -- well, let me ask

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                    Pages 66..69

Page 66

1      you this.  Let me just ask you what he said.
2              What is your recollection of what Mr.
3      Macaluso either testified to, or told you
4      during your interview with him, about what was
5      present on the counter?
6 A.   He told me that there was the iPad there on
7      charge, and he explained to me that there was a
8      cutting board there with a knife that he had
9      utilized to cut up oranges for his son to take
10     to school.
11 Q.  And there was a cylindrical container
12     containing some utensils, correct?
13 A.  I believe so, yes.
14 Q.  And there was a Keurig coffee maker?
15 A.  Correct.
16 Q.  And that's all he told you was present on the
17     counter at the time he left prior to the fire,
18     correct?
19 A.  Yes.
20 Q.  You now believe that to be wrong, correct?
21          MR. McGLYNN:  Objection.
22 A.  I believe that there was likely this snack
23     package box there.
24 Q.  So you believe what Mr. Macaluso testified to
25     and that he told you during his interview is

Page 67

1      incorrect?
2          MR. McGLYNN:  Objection.
3 A.   What he told me -- what he told me is accurate.
4      He told me there was a cutting board there;
5      there was a cutting board.
6          He told me there was a Keurig there;
7      there was a Keurig.
8          He told me there was an Apple iPad
9      there; there was an Apple iPad there.
10 Q.  But he didn't tell you about the chips?
11 A.  I have no recollection about the chips.
12 Q.  Okay, and he didn't testify to the chips?
13 A.  Testify where?  In the deposition?
14 Q.  In the deposition.
15 A.  I don't recall seeing anything in his
16     deposition.
17 Q.  Okay.  And you also spoke with Mr. Macaluso's
18     fiancee, correct?
19 A.  I did.
20 Q.  And she said that she thought that the chips
21     would be up in the cabinet, correct?
22          MR. McGLYNN:  Objection.
23 BY MR. COPENHAVER:
24 Q.  And that's wrong, right?
25          MR. McGLYNN:  Objection.

Page 68

1 A.   I would think, based on the size of this box,
2      that I don't think it would be fit in the
3      cabinet.
4 Q.   Okay.  Mr. Macaluso also testified that he put
5      the cutting board next to the sink after he was
6      done with it prior to leaving, correct?
7 A.   When I interviewed him, he told me that he set
8      the cutting board and the knife on the counter
9      to the left of the stove.
10         Now, I believe he did offer
11     deposition testimony to what you just stated.
12 Q.  Okay, and that's inconsistent with the physical
13     evidence, correct?
14         MR. McGLYNN:  Objection.
15 A.  It is.
16 Q.  All right.  Mr. Macaluso also testified that
17     the Keurig was plugged into the outlet next to
18     the sink, correct?
19 A.  I believe so.  You know, the deposition was
20     taken 567 days after the fire too.
21 Q.  Yeah.  That's inconsistent with the physical
22     evidence, correct?
23 A.  Yes.
24 Q.  And Mr. Macaluso testified that the Keurig was
25     plugged into a different outlet than the iPad,

Page 69

1      correct?
2          MR. McGLYNN:  Objection.
3 A.   That was his testimony at the deposition.
4 Q.   Okay, and that's inconsistent with the physical
5      evidence, correct?
6          MR. McGLYNN:  Objection.
7 A.   Yes.
8 Q.   As a fire investigator, is it your experience
9      that oftentimes testimonial evidence or
10     people's recollections don't always line up
11     with the physical evidence?
12         MR. McGLYNN:  Objection.
13 A.  At times.
14 Q.  Is it important to consider the physical
15     evidence in making an origin and cause
16     determination?
17         MR. McGLYNN:  Objection.
18 A.  Yes.
19 Q.  In fact, that's one of the reasons it's
20     important to consider the physical evidence in
21     making an O and C determination because
22     testimonial evidence is not always or not
23     necessarily reliable, correct?
24         MR. McGLYNN:  Objection.
25 A.  Yes.

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 70..73

Page 70

1        MR. McGLYNN: Can I just -- Steve,
2   all of these questions are leading. I don't
3   want to interrupt you. I'm just letting you
4   know the basis after Mr. Klitsch's answer so
5   you understand.
6        MR. COPENHAVER: Thank you. Is it
7   your position that I'm not allowed to lead your
8   witness?
9        MR. McGLYNN: I'm not aware of why
10  you would be.
11       MR. COPENHAVER: I just want to make
12  sure that I understand your objection.
13       MR. McGLYNN: Do you know of some --
14  I mean, are you allowed to ask leading
15  questions? I mean, that's a form objection,
16  right?
17       MR. COPENHAVER: Yeah, I would agree
18  with you that your objection to form would
19  cover any objection to leading.
20       MR. McGLYNN: Okay.
21       MR. COPENHAVER: In fact, I'll give
22  you a standing objection on that if you want.
23       MR. McGLYNN: Yeah, I don't -- I
24  mean, there's a number of different issues
25  related to form, so if you --

Page 71

1        MR. COPENHAVER: I won't give you a
2   blanket one, but if it's just on leading, you
3   know, you can have it.
4        MR. McGLYNN: Okay. Let's move
5   forward.
6        MR. COPENHAVER: Okay.
7   BY MR. COPENHAVER:
8   Q.   As a fire investigator, when presented with an
9        alleged fact that's described by a witness like
10       Mr. Macaluso that's contradicted by the
11       available physical evidence, how do you
12       reconcile those?
13       MR. McGLYNN: Objection.
14  A.   Can you give me an example?
15  Q.   Like the cutting board. Mr. Macaluso told you
16       -- testified that it was by the sink; physical
17       evidence suggests that it was directly adjacent
18       to the stovetop. Which of those would you
19       believe?
20       MR. McGLYNN: Objection.
21  A.   The physical evidence.
22  Q.   Okay. Same thing with the outlet. Mr.
23       Macaluso said that the Keurig was plugged into
24       the outlet next to the sink. The physical
25       evidence demonstrates that it was not. Which

Page 72

1   of those would you believe?
2        MR. McGLYNN: Objection.
3   A.   The physical evidence.
4   Q.   Okay. As a fire investigator retained in this
5        case or any prior case by an insurance company,
6        do you automatically believe everything that an
7        insured tells you, or do you look for physical
8        evidence to see whether it supports or refutes
9        a statement by the insured?
10       MR. McGLYNN: Objection.
11  A.   I evaluate all of it.
12  Q.   Is it important to consider the physical
13       evidence?
14  A.   Sure.
15  Q.   And if the physical evidence contradicts the
16       evidence by the insured, then the physical
17       evidence is to be believed?
18       MR. McGLYNN: Objection.
19  A.   Yes, but it doesn't mean the insured was lying.
20  Q.   I never said lying.
21  A.   No, I'm just throwing -- I'm just letting it be
22       known.
23  Q.   Yeah, I'm not suggesting anyone's lying. I'm
24       just saying that people don't always give
25       exactly correct information.

Page 73

1        MR. McGLYNN: It sounded to me like
2   this was entirely hypothetical. Am I wrong
3   about that? Or are you asking a direct
4   question?
5        MR. COPENHAVER: Yes, you're wrong
6   about that.
7        MR. McGLYNN: Oh, okay. Objection.
8   BY MR. COPENHAVER:
9   Q.   What's the physical evidence in this case that
10       the knob on the control panel of the stove was
11       in its off position at the time the fire
12       started?
13       MR. McGLYNN: Objection.
14       MR. COPENHAVER: What's the objection
15  to that question?
16       MR. McGLYNN: I don't understand it.
17  I can't understand it.
18  BY MR. COPENHAVER:
19  Q.   Okay, do you agree with me that the knob -- the
20       control knob on the control panel to the stove
21       to the left-rear burner was found in its on
22       position after the fire, correct?
23  A.   Yes.
24  Q.   All right. What is the physical evidence, if
25       any -- physical evidence, not testimonial

Page 74

1  evidence but physical evidence -- that that
2  knob was in its off position at the time the
3  fire started?
4  A.  That particular knob in the off position?
5  Q.  Correct.
6  A.  There is no physical evidence that it was in
7  the off position.
8  Q.  Okay.  At the time of your initial report, or
9  your only report, you were not of the opinion
10  that there was a chip box sitting anywhere
11  adjacent to the iPad at the time the fire
12  started, correct?
13       MR. McGLYNN:  Objection.
14  A.  That's not true.
15  Q.  Okay, did you include it in your report?
16  A.  I did not.
17  Q.  But you still had that opinion?
18  A.  I saw -- I saw the chip box remains on the
19  cutting board.  I was of the belief that that
20  was up in the cabinet and potentially fell
21  down.
22  Q.  Fair enough.  And what I meant proximity to, I
23  meant on the same surface as.  So, not up in
24  the cabinet.  So let me re-ask the question,
25  and thanks for that clarification.

Page 75

1       When you authored your initial
2  report, you were not of the opinion that there
3  was a chip box sitting on the counter adjacent
4  to the iPad, correct?
5       MR. McGLYNN:  Objection.
6  A.  At the time of the fire?
7  Q.  Correct.  At the time of your initial report,
8  you were not of that opinion?
9       MR. McGLYNN:  Objection.
10  A.  No.
11  Q.  All right.  That's something that came after,
12  as we've discussed, and we'll discuss a little
13  later today, okay?
14       With that sort of initial conception,
15  what was your opinion about how the fire
16  propagated up to the cabinets?
17  A.  Failure of the iPad.
18  Q.  Exactly.  But how did that cause a fire in the
19  upper cabinet?
20       MR. McGLYNN:  Objection.
21  A.  Ignition of the underside of the cabinets.
22  I've seen multiple videos in training classes,
23  YouTube videos, et cetera, where these are
24  catastrophic fireball type of events.
25  Q.  So, your -- and again, I want to set aside the

Page 76

1  new opinion about the location of the chip box
2  for a moment, and I want to focus on the
3  opinions disclosed in your report for a moment.
4  Are you with me on that demarcation?
5       MR. McGLYNN:  Objection.
6  A.  Yes.
7  Q.  Okay.  The basis for your opinion that a
8  battery thermal event in an iPad was capable of
9  propagating up to and igniting the cabinets
10  above the counter was your view of videos of,
11  quote, these events?
12       MR. McGLYNN:  Objection.
13 BY MR. COPENHAVER:
14  Q.  Do I understand that correctly?
15  A.  Yes.
16  Q.  Okay.  When you say these events, what are you
17  referring to?
18  A.  Failures of batteries.
19  Q.  In what?
20       MR. McGLYNN:  Objection.
21  A.  Battery-operated devices.
22  Q.  Were any of those an alleged or purported
23  battery thermal event of an iPad?
24  A.  I don't recall if they were iPads.  I've seen
25  so many videos throughout the years of battery

Page 77

1  failures and fires and fireballs, I can't
2  recall.
3  Q.  Okay.  Can you point me to any video that
4  you've ever reviewed of an alleged or purported
5  battery thermal event in an iPad that you
6  believe demonstrates a quote/unquote fireball
7  of the type that you would think necessary to
8  propagate this fire to the upper cabinets above
9  the counter?
10       MR. McGLYNN:  Objection.
11  A.  Not that I could do sitting right here.
12  Q.  Okay.
13  A.  I've seen so many of them throughout the years.
14  Q.  You mean so many videos, but you can't
15  specifically say whether they were an iPad or
16  not?
17  A.  I cannot.
18  Q.  Okay.  Other than those types of videos, was
19  there any other basis for your initial opinion
20  that an iPad sitting on a counter that
21  underwent the battery thermal event could
22  produce flames sufficient to propagate up to
23  and involve the cabinets above the counter in
24  this home?
25       MR. McGLYNN:  Objection.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                              Pages 78..81

Page 78

1 A.   One more time, please?

2 Q.   Yeah.  So, I asked what the basis for your
3      opinion was that an iPad sitting on a counter
4      without a chip box next to it, if it underwent
5      a battery thermal event, could cause flames to
6      propagate up to and involve the cabinets above
7      the counter, and you told me about these videos
8      that we just discussed.

9              And all I'm asking is whether there's
10     any other basis for that other than the videos
11     or whether or not I can start asking a
12     different question.

13             MR. McGLYNN:  Objection.

14 A.   I believe I had a conversation with Eskra
15     about, you know, these failures and fireballs
16     and et cetera, and, you know, he was of the
17     opinion that, you know, these things happen and
18     it's a competent ignition source.

19 Q.   Is that something you're relying upon from Mr.
20     Eskra rather than an independent analysis by
21     yourself?

22             MR. McGLYNN:  Objection.

23 BY MR. COPENHAVER:

24 Q.   I'm just trying to figure out who to ask these
25     questions to, Mr. Klitsch.

Page 79

1              MR. McGLYNN:  Objection.

2 A.   So, I'm almost certain I reached out to Mr.
3      Eskra as I'm trying to analyze all this
4      information and asked him about a potential
5      failure of an iPad and the resulting fire slash
6      fireball, and he indicated to me that it was
7      quite possible.

8 Q.   Did he indicate to you anything else?

9 A.   No, not that I recall.

10 Q.   Do you know, this iPad on the counter, was it
11     sitting horizontally?

12 A.   Flat, you mean?

13 Q.   Flat, that's a good word for it.

14 A.   I would think.

15 Q.   Me too.  I just --

16 A.   I don't know.  But common sense would tell you
17     that it was likely flat.

18 Q.   If it was sitting flat and it underwent a
19     battery thermal event, do you know whether it
20     would vent laterally or vertically?

21 A.   I do not know that.

22 Q.   If it vented laterally, do you know how it
23     would be that any flames or materials would
24     reach the cabinets above it?

25             MR. McGLYNN:  Objection.

Page 80

1 A.   Only impacting off the backsplash and rolling
2      up would be --

3 Q.   Do you know whether that happened or not?

4              MR. McGLYNN:  Please just let him
5      finish.

6 BY MR. COPENHAVER:

7 Q.   Yeah, if I interrupted you, I'm sorry.  It's
8      not my intention.  It would be a byproduct of
9      our video.  I'm certainly not intending to cut
10     you off.  You're entitled to finish your
11     answers.

12 A.   So, you had asked me did I witness that?

13 Q.   Yeah, do you know whether that occurred in this
14     case or not?

15 A.   I was not at the house at the time of the fire.
16     I do not know that.

17             MR. McGLYNN:  Sorry, because I don't
18     think the record is clear, was the question do
19     you know whether it vented, how it vented?

20             MR. COPENHAVER:  Yeah, I asked him
21     how it would -- if it vented laterally, how it
22     would reach the cabinets, and he said if it got
23     to the backsplash and got directed upwards was
24     my question.

25 BY MR. COPENHAVER:

Page 81

1 Q.   Do you know how long during a battery thermal
2      event of the subject iPad it would have
3      expelled any flames, gases or any other
4      materials?

5 A.   I do not.

6              MR. McGLYNN:  Objection.

7 BY MR. COPENHAVER:

8 Q.   Did you conduct any tests to determine how long
9      the upper cabinets would have to be in contact
10     with flame in order to ignite?

11 A.   No.

12 Q.   Do you know at what temperature the iPad would
13     have expelled any flame material during a
14     battery thermal event?

15 A.   I do not.

16 Q.   Do you know at what temperature the upper
17     cabinets would ignite?

18 A.   Probably somewhere around the ignition
19     temperature of wood, around 450, 480, somewhere
20     around there.

21 Q.   And how long would that 480-, 450-degree
22     temperature have to be in contact with the
23     undersurface of the cabinets in order to ignite
24     the cabinets?

25 A.   I think it would depend on -- it would depend

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Pages 82..85

Page 82

1  on the type of wood, how thick it is, are there
2  any gaps in the wood that the flames can get up
3  past -- up into the cabinetry.
4  Q.  On these cabinets in this home, do you know how
5      long that 480-degree temperature would have to
6      be in contact with the underside of the
7      cabinets in order to actually involve those
8      cabinets in a fire?
9  A.  I do not.
10 Q.  Have you reviewed any studies or conducted any
11     yourself that would indicate whether or not an
12     iPad that underwent a battery thermal event
13     could produce a flame of the height and
14     intensity and duration necessary to ignite the
15     cabinets above the counter?
16          MR. McGLYNN:  Objection.
17 A.  I was unable to find any data.
18 Q.  Who was present at your scene inspection?
19 A.  Which time?
20 Q.  How many scene inspections did you do?
21 A.  There would have been two.
22 Q.  Okay, when was the first one?
23 A.  That would have been March 5th, 2020.
24 Q.  Right under the Covid gun.
25 A.  I think that was the Covid gun.

Page 83

1  Q.  Oh, was it?  My last day in the office was the
2      13th, but --
3  A.  Yeah, I think it was right in that area.
4  Q.  And when was your second scene inspection?
5  A.  That was March 31st, 2020.
6  Q.  Who was present at the first scene inspection?
7  A.  Just myself.
8  Q.  Any representative from Allstate?
9  A.  No.
10 Q.  Literally just you in the home and no one else?
11 A.  It was just me.
12 Q.  How long was that scene inspection?
13 A.  I would have to refer to the notes that
14     indicate the duration time there.  I think it
15     was somewhere around seven, eight hours, if my
16     memory serves me correct, including travel.
17 Q.  Had the scene been processed by the initial
18     on-scene investigators prior to your initial
19     visit on March 5th?
20 A.  Yes.  The State Police Fire Marshal.
21 Q.  Who sent you on the March 5th, 2020 scene
22     inspection?
23          MR. McGLYNN:  Objection.
24 A.  What do you mean who sent me?  Who assigned the
25     file to me?

Page 84

1  Q.  Yeah.  At whose request did you go visit the
2      scene on March 5th?
3  A.  That was from the office of Deluca Levine.
4  Q.  Did you think that it was odd that no
5      representative from any other interested or
6      potentially interested party was present?
7  A.  Such as who?
8  Q.  Anyone.
9          MR. McGLYNN:  Objection.
10 A.  Not really.  Many times I'm at the scene
11     myself.
12 Q.  Do you know whether or not there was any
13     interview taken of the homeowners prior to that
14     scene inspection to ascertain the identity of
15     any companies that may have had products within
16     the suspected room or area of origin?
17          MR. McGLYNN:  Objection.
18 A.  Do I know if there were any interviews
19     conducted by anyone to identify entities
20     related to appliance manufacturers?
21 Q.  Or any other potential ignition sources within
22     the suspected area of origin prior to your
23     March 5th, 2020 visit.
24 A.  Not that I'm aware of.
25 Q.  What did you do at that initial scene

Page 85

1      inspection?
2  A.  That was scene documentation, photographs.  I
3      did a Matterport 3D scan, measurements, scene
4      documentation.  I think it's described in my
5      report.
6  Q.  Okay.  Are all the photos you took from that
7      scene inspection within the three dash five
8      dash 2020 scene photos folder within your file?
9  A.  Yes.
10 Q.  Did you recover any debris on that initial
11     inspection?
12 A.  The initial day I believe I took custody of an
13     Apple iPad box that was in the master bedroom
14     closet that she had told me was associated with
15     the subject iPad.
16 Q.  Anything else?
17 A.  I would have to check the chain of custody to
18     see.  It looks like I took custody of the
19     damaged iPad remains to preserve them as well
20     as that box.
21 Q.  And when you arrived at the scene, the damaged
22     iPad remains were sitting on a cookie sheet on
23     the right side of the stove?
24 A.  They were in a cookie sheet on the stove.
25 Q.  And that is outside of your apparently --

**Page 86**

1    strike that.
2            That's outside of your alleged area
3    of origin, correct?
4 A.    That's outside my area of origin.
5 Q.   Yes.  And believe it or not, I'll have some
6    questions about how you determined that area of
7    origin.
8 A.    I'll bet.
9 Q.   I'm going to show you image 4507 from your
10    initial scene inspection.
11 A.    I see it.
12 Q.   The shadow on the right, meaning the portion of
13    the counter that we see to the right of the
14    tape measure, is that, in your opinion, the
15    area that was protected by the cutting board?
16 A.    The undamaged area you're talking about?
17 Q.   I am, yes.
18 A.    Yes.
19 Q.   And the part that comes down a little bit,
20    that's the shadow left by the handle for the
21    cutting board; is that correct?
22 A.    No.
23 Q.   That's incorrect?
24 A.    That is incorrect.  The cutting board was
25    turned the other way.

**Page 87**

1 Q.   Okay, and what's your basis for that?
2 A.    There's another -- there's a protected -- or
3    there's a shadow on the countertop underneath
4    the -- if you want to put that back up there.
5 Q.   Oh, I thought you were talking about a
6    different photo.  I was going to try to --
7 A.    No, no, no.
8 Q.   So essentially, right where the one-foot marker
9    is, right there (indicating), there is an area
10    consistent with the handle -- the handle
11    cut-out in the cutting board.
12            And if you go back a couple photos,
13    you will see when the image -- or I'm sorry,
14    when the debris is pulled away, you can see the
15    orientation of the cutting board with the knife
16    on it.
17 Q.   Is it this photo?
18 A.    No.  That's the screen from the --
19 Q.   Do you have a copy of the -- rather than me
20    scrolling through these, do you have access to
21    these photos?
22 A.    I do.
23 Q.   Could you pull them up and tell me where you're
24    referring to?
25 A.    Okay, let me -- I guess let me minimize this

**Page 88**

1    and see if I can access Dropbox from here.
2            It's going take a couple minutes
3    'cause I've got to pull the photos from the
4    cloud.
5 Q.   No problem.
6        MR. McGLYNN:  Joe, off the record
7    while he's doing that.
8        MR. COPENHAVER:  Yeah, that's fine.
9            - - - -
10        (There was a discussion off the
11    record followed by a brief pause in the
12    proceedings.)
13            - - - -
14 A.    They're downloading now.  So I'm just getting
15    to the kitchen here.
16 Q.   Great, thank you.  Appreciate it.
17 A.    Are you going to order lunch in for all of us
18    and we'll have a virtual lunch?
19 Q.   I guess it is 12 there.  What do you want to do
20    for lunch?  We're off the record.
21            - - - -
22    (There was a discussion off the record.)
23            - - - -
24 BY MR. COPENHAVER:
25 Q.   All right, back on the record.

**Page 89**

1 A.    All right, let me get back up to this photo.
2 Q.   Okay.
3 A.    So, if you go to 4516 --
4 Q.   And just for the record, we're within your
5    3-5-2020 scene photos folder?
6 A.    Yes.
7 Q.   And what number did you tell me?
8 A.    4516.  Are you going to bring it up?  So I'll
9    just minimize my stuff.
10 Q.   I am, yes.  No, wait a minute.  Enlarge.  All
11    right, there, okay.  Are you able to see this
12    or no?
13 A.    I see it.  I'm sorry.
14 Q.   Okay.  So I have 4516 up on the screen.  And
15    it's your belief that this shows us the
16    orientation of the cutting board?
17 A.    It does.  You can see the knife handle down in
18    the lower left corner.  And underneath that
19    mass that is right there associated with that
20    handle is, in fact, the cutting board cut-out
21    handle.
22 Q.   Where do we see that handle?  Is that not until
23    the artifacts inspection?
24 A.    Yes.  I believe that is when we -- when we
25    uncover the cutting board handle itself.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Pages 90..93

**Page 90**

1 Q.  Okay.  Was the location of this cutting board
2     as depicted in 4516 as you found it when you
3     got to the scene on March 5th?
4 A.  Yeah, there was a pile of debris on it that was
5     subsequently removed.
6 Q.  By you?
7 A.  Yes.
8 Q.  What was the purpose for removing that debris?
9 A.  To examine what was there.
10 Q.  Did you have any qualms about doing that
11      without any other parties present?
12          MR. McGLYNN:  Objection.
13 A.  I didn't discard the debris.  The debris was
14      right there on the countertop.  So, no, I did
15      not.
16 Q.  Okay.  And then you actually moved this cutting
17      board to some other location, correct?
18 A.  I picked it up and photographed it.
19 Q.  Right.  And that's what revealed that protected
20      area on the counter that we saw below?
21 A.  Yes.
22 Q.  What caused the protected area that you see
23      just above the cutting board adjacent to the
24      wall next to the Keurig?
25 A.  I don't know that.  It may have been the -- it

**Page 91**

1     may have been a container with the utensils in
2     it.
3 Q.  Do you know?
4 A.  I don't.
5 Q.  How long were you at the scene on March 5th?
6 A.  You already asked me that.  I think overall it
7     was seven, eight hours, including travel.  So,
8     probably four or five hours at the scene.
9 Q.  So you have these photos.  You did a Matterport
10      scan.  Did you take any notes or otherwise
11      memorialize any portion of your inspection on
12      March 5th?
13 A.  They would be in my notes, my Macaluso notes
14      that were provided.
15 Q.  If we look at those photos beginning at 4524,
16      what is depicted here?
17 A.  That is the remains of the iPad.
18 Q.  Okay, and this is not as it was found, correct?
19 A.  No.  I had removed those components out of the
20      baking sheet and put them on the stovetop for
21      photographs.
22 Q.  Okay.  Was this how they were displayed in the
23      baking sheet?
24 A.  No.  They were just piled one on top of the
25      other.

**Page 92**

1 Q.  Okay, and you had to separate them from one
2     another and lay them out on the stovetop in
3     order to get those photographs?
4 A.  Yes.
5 Q.  Okay, again, any concerns about doing that
6     without any other party present?
7          MR. McGLYNN:  Objection.
8 A.  No.  It was already handled.  It was already
9     placed in a pile.  I was just documenting it.
10 Q.  So what was the purpose of documenting it like
11      this instead of documenting it as found and
12      then waiting for, in this case, Apple to be put
13      on notice to participate in this initial
14      inspection?
15          MR. McGLYNN:  Objection.
16 BY MR. COPENHAVER:
17 Q.  If you know.
18 A.  Well, my experience has always been, when other
19      parties are placed on notice, they want to see
20      photographs of their device, their -- whatever
21      it is, so this would be one way of providing
22      that photographic means.
23 Q.  Did you think you were doing Apple a favor by
24      doing that without their presence?
25          MR. McGLYNN:  Objection.

**Page 93**

1 A.  Did I think I was doing Apple a favor?
2 Q.  Yeah.
3          MR. McGLYNN:  Objection.
4 A.  Maybe in a sense.
5 Q.  Okay.  You also took a photo of the circuit
6     breaker, and that's referenced in your
7     reported.  Were you correct about which
8     breakers had been tripped?
9 A.  I was not.
10 Q.  You saw reference to that in SEL's report,
11      correct?
12 A.  I did.  Unbeknownst to me, apparently someone
13      was in and manipulated the breakers in between
14      the time that the State Police Fire Marshal was
15      there and documented it and upon my arrival.
16 Q.  Did you -- I mean, do you disagree with SEL's
17      interpretation of that?
18 A.  I do not, no.
19 Q.  All right, was the only thing that you
20      collected from the scene the box and the
21      remains of the iPad after that initial March
22      5th inspection?
23 A.  Those two items, that's all I remember, yes.
24 Q.  You went back at the end of March for an
25      additional scene inspection, correct?

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                                  Pages 94..97

Page 94

1  A.    I did.

2  Q.    What was the purpose of that inspection?

3  A.    To collect -- to collect all the items.

4  Q.    And who was present at that scene inspection?

5  A.    That was myself and an evidence technician from

6        Insurance Evidence Services.

7  Q.    Do you know whether Apple was allowed to

8        participate at that evidence removal

9        inspection?

10 A.    I don't know if they were allowed.  I know it

11       was right in the midst of Covid, and I know

12       that was a big concern.  I sort of remember

13       some discussion about we can't travel during

14       Covid.  I'm not sure how the whole thing ended

15       up being.

16 Q.    Was that evidence retrieval inspection

17       videotaped?

18 A.    Yes.

19 Q.    Is that videotape in your file?

20 A.    It should be.

21 Q.    (Reviewing.)  Oh, I was looking in the wrong

22       folder.  There it is.  Yeah, I'll represent

23       that it is.  I have a folder called 3-31-2020

24       Evidence Removal.

25 A.    Yes.

Page 95

1  Q.    And then a separate called 3-31-2020 Scene

2        Videos in which there are seven separate video

3        files entitled MVI underscore 0029 through

4        0035.

5              Would those contain all of the videos

6        from the evidence retrieval inspection?

7  A.    Yes.

8  Q.    All right.  Was the purpose of these scene

9        inspections to make an area of origin

10       determination?

11 A.    That would -- yeah, that's one of the reasons.

12             MR. COPENHAVER:  And just for the

13       record, what I'm going to do, Mr. Court

14       Reporter, is ask someone to place Mr. Klitsch's

15       file that we keep referring to on a thumb

16       drive, and we'll send that to you.  And I would

17       just ask that that be marked as Exhibit 9 so we

18       have it in one file.

19             - - - -

20       (Exhibit 9 marked for identification.)

21             - - - -

22             COURT REPORTER:  Would you be sending

23       it to me?

24             MR. COPENHAVER:  I'll send it to

25       whomever we collectively think makes the most

Page 96

1        sense.  I just don't want to have to attach

2        each of these photos that I'm referring to, and

3        it's easier just to -- I'll send it to you.

4              COURT REPORTER:  Yes, you should send

5        that to me then.

6              MR. COPENHAVER:  I'll send it to you.

7              COURT REPORTER:  Could I get that

8        tomorrow?

9              MR. COPENHAVER:  Probably not.  It's

10       pretty large.  I have to transfer it onto a

11       thumb drive and then mail it.  So I think you

12       can get it by Monday or Tuesday.

13             COURT REPORTER:  All right, because I

14       was going to start working on this immediately.

15             MR. COPENHAVER:  We'll get it to you

16       as soon as we can.  I'm just trying to not make

17       promises that I can't keep in terms of timing.

18             COURT REPORTER:  All right.  And

19       during a break, I have your email address, and

20       I will send you my address, and just let me

21       know that you received that.

22             MR. COPENHAVER:  All right.

23 BY MR. COPENHAVER:

24 Q.    Is area of origin defined as a structure, part

25       of a structure, or a general geographical area

Page 97

1        location within a fire scene in which the point

2        of origin is reasonably believed to be located?

3  A.    That sounds about right.

4  Q.    So is there a difference between area of origin

5        and point of origin?

6  A.    The area of origin would be -- the point of

7        origin would be within the area of origin.

8  Q.    Right.  If that definition is correct, the area

9        of origin is the general geographical location

10       in which the point of origin is reasonably

11       believed to be, correct?

12 A.    I would agree with that.

13 Q.    All right.  And according to your report,

14       you've identified the area of origin as along

15       the south wall of the kitchen to the left of

16       the stove at the countertop level.  Is that

17       still your opinion?

18 A.    Yes.

19 Q.    Can you list for me all the bases for that

20       opinion?

21 A.    Sure.

22 Q.    Thanks.

23 A.    The Chapter 18 of NFPA 921 lists three

24       criteria, if you will, to determine origin:

25       witness statements and electronic data, fire

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022
Pages 98..101

**Page 98**

1 patterns, and fire dynamics.
2          So, unfortunately we don't have any
3 video so the electronic data is out.  So
4 witness statements.  So, the information that I
5 include in my analysis is, although Mr.
6 Macaluso was not present when the fire
7 occurred, he has information relative to the
8 conditions just prior to the fire.  And what I
9 mean by that is what was on the countertop,
10 what, if anything, was on the stove.
11          So he tells me he is positive that
12 the stove -- that the control knobs of the
13 stove are off.  He is positive that there is
14 nothing combustible on the stovetop.  He denies
15 any problems with the stove.  He tells me about
16 the contents of the countertop to the left of
17 the stove.  Stove and range I use
18 interchangeably here just for the record.
19          So, you know, he speaks about the
20 cutting board with the knife on that he had
21 used to cut oranges.  He also speaks about his
22 fiancee plugging in this iPad to charge it
23 because it was dead.  He speaks about the
24 outlet in which the iPad was plugged into to
25 the left of the range.

**Page 99**

1          So, from a fire pattern standpoint, I
2 am looking at the mass loss of the cabinetry,
3 the cabinetry immediately to the left of the
4 microwave and the range was consumed.  There's
5 a left-to-right movement pattern observed on
6 both the microwave and the front and rear
7 control panel of the range itself.
8          The -- I was trying to think what
9 else we got.  Oh, the timeline.  The timeline
10 of Mr. Macaluso leaving at 10 and arriving home
11 and subsequently calling 9-1-1, the 9-1-1 call
12 was placed I believe at 11:46.  So we have just
13 shy of a two-hour timeline is not consistent at
14 all with a cooking-related fire.
15          So all of that information, coupled
16 with the extensive damage that I observed to
17 the iPad, takes me to the countertop.
18 Q.  You mentioned witness statements which you
19     talked about; you mentioned fire patterns,
20     which you talked about; and then fire dynamics,
21     which I didn't hear a lot of.  In that bucket,
22     what were the fire dynamics that led you to
23     your conclusion about the area of origin?
24 A.  Once again, the mass loss, the mass loss of the
25     upper wooden cabinets and the subsequent

**Page 100**

1 collapse of the contents down onto the
2 countertop and across.
3 Q.  Did you credit all of the information that Mr.
4     Macaluso told you?
5          MR. McGLYNN:  Objection.
6 A.  What do you mean by credit?
7 Q.  Did you believe it uncritically?
8 A.  Yes, I have no reason to believe that the
9     information was not accurate.
10 Q.  So you just believed what he said?
11          MR. McGLYNN:  Objection.
12 A.  I believed what he said.
13 Q.  And you relied upon the information that he
14     told you, in part, in coming to your area of
15     origin determination, correct?
16 A.  Yes.
17 Q.  You later learned that things he said have been
18     incorrect, right?
19          MR. McGLYNN:  Objection.
20 A.  As it relates to the --
21     The presence of combustibles in the area of
22     origin, the location of the cutting board, the
23     location of the receptacle into which the
24     Keurig was plugged.
25 A.  The cutting board?

**Page 101**

1 Q.  Correct.  He testified that the cutting board
2     was next to the sink, right?
3 A.  Okay, all right, yeah, I agree.
4 Q.  Okay.  So there were things that he said that
5     turned out not to be correct, right?
6          MR. McGLYNN:  Objection.
7 A.  Yes.
8 Q.  And again, that's why it's important to find
9     physical evidence that either supports or does
10     not support the statements that are provided
11     'cause they don't always turn out to be true,
12     right?
13          MR. McGLYNN:  Objection.
14 A.  Correct.
15 Q.  You said that Mr. Macaluso said that there was
16     no combustible material on the stovetop, right?
17 A.  Yes.
18 Q.  And that was an important fact for you to
19     incorporate into your origin of the cause
20     analysis, right?
21 A.  Sure.
22 Q.  Mr. Macaluso also testified that other than
23     possibly the cutting board, there was no
24     combustible material on the counter between the
25     sink and the stovetop, correct?

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 102..105

Page 102

1            MR. McGLYNN:  Objection.
2 A.  Other than -- I mean, there was a Keurig there.
3 Q.  He didn't -- he did not testify that there was
4     a -- strike that.
5           He was asked during his deposition
6     what was on the counter between the sink and
7     the range, and he identified the iPad, the
8     cutting board, the knife, the Keurig and some
9     utensils in a jar, and that's it, correct?
10 A.  Okay, yes.
11 Q.  Okay.  Based upon your recently developed
12     opinion, that's no longer accurate, correct?
13           MR. McGLYNN:  Objection.
14 A.  Correct.
15 Q.  All right, so, he was incorrect about the
16     presence of combustibles on the counter between
17     the sink and the stovetop, correct?
18           MR. McGLYNN:  Objection.
19 BY MR. COPENHAVER:
20 Q.  In your view.
21 A.  I believe.
22 Q.  Okay.  Do you know whether or not he was also
23     incorrect about the presence of combustibles on
24     the stovetop?
25           MR. McGLYNN:  Objection.

Page 103

1 A.  I don't believe he's incorrect.
2 Q.  Well, we saw evidence of remnants of some of
3     the cardboard box on the stovetop, correct?
4 A.  If that is, in fact, remnants of cardboard
5     stovetop.  It was never -- it was never scraped
6     up.  I mean, it was some type of substance that
7     had grooves in it.
8 Q.  And it appeared visually consistent with
9     corrugated cardboard; would you give me that?
10 A.  I would probably give you that.
11 Q.  All right.  And if that turned out to be the
12     cardboard, then Mr. Macaluso was incorrect
13     about the presence of combustibles on the
14     stovetop, correct?
15           MR. McGLYNN:  Objection.
16 A.  Not necessarily.
17 Q.  Well, let me ask it this way:  You'd be unable
18     to say whether or not he was correct or not
19     about the presence of combustibles on the
20     stovetop if, what we see there, is, in fact,
21     corrugated cardboard, correct?
22           MR. McGLYNN:  Objection.
23 A.  I guess my hang-up is that the substance on the
24     front-left burner that we're referring to was
25     found post fire after things -- after the

Page 104

1     contents of the cabinet had failed and slid
2     down across the counter onto the stovetop after
3     firefighters were physically standing on top of
4     the counter and the stove moving around doing
5     their fire suppression work.
6           I can't say that that substance was
7     on the stove at the time of the fire versus got
8     repositioned there during fire suppression
9     efforts.
10 Q.  Or vice versa?  You just don't know?
11 A.  I don't know.
12 Q.  Okay.  How do you know Mr. Macaluso was right
13     about the controls being off if he was wrong
14     about everything else?  No, strike that.
15     That's not fair.
16           How do you know that he was right
17     about the controls being off if he was
18     incorrect about a number of other things?
19           MR. McGLYNN:  Objection.
20 A.  I give credence to Mr. Macaluso's statement
21     that the controls were off based on his
22     deposition testimony where he routinely checks
23     the control knobs.  He's a chef.  That's what
24     he does.  He works with stoves and stuff every
25     day, and he's aware of the hazards, and this is

Page 105

1     part of his routine.  I don't have any reason
2     to disbelieve him.
3 Q.  So that would be on the basis of Mr. Macaluso's
4     statements either to you or during his
5     deposition would be the basis on which you
6     would conclude that the control knob was in its
7     off position at the time the fire started?
8           MR. McGLYNN:  Objection.
9 A.  Yes.
10 Q.  Is there anything else that you're relying upon
11     for that opinion other than the statements of
12     Mr. Macaluso?
13           MR. McGLYNN:  Objection.
14 A.  That the control knob was off?
15 Q.  Correct.
16 A.  No.
17           MR. COPENHAVER:  Okay.  All right,
18     it's about 12:30.  Let's go ahead and take a
19     break.  I can take however long people want.
20     I'd suggest a half-hour.  But if it needs to be
21     longer or shorter than that, I'm pretty game.
22           THE WITNESS:  Let me ask you this:
23     How long do you think we're going to go today?
24           MR. COPENHAVER:  Oh, never ask a
25     lawyer that question.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 106..109

Page 106

1    THE WITNESS:  Just a ballpark.  I'm
2  not going to hold you to it.
3    MR. COPENHAVER:  Joe will hold me to
4  it.  You know, I --
5    THE WITNESS:  I mean, what do you
6  got, another four hours, five hours?
7    MR. COPENHAVER:  I hope I don't have
8  that long.  I hope that I don't.  I mean, four
9  hours would be on the most extreme end of that.
10  We're off the record by the way.
11    - - - -
12  (There was a discussion off the record.)
13    - - - -
14    MR. COPENHAVER:  Let's take twenty
15  minutes.  I'll see you at 10 till.
16    THE WITNESS: All right.
17    MR. McGLYNN:  All right.  Thanks.
18    - - - -
19    (A luncheon recess was taken at 12:28
20  p.m. and reconvened at 12:50 p.m.)
21    - - - -
22 BY MR. COPENHAVER:
23 Q.  All right, Mr. Klitsch, we're back from a
24  20-minute lunch break.  Are you okay to
25  continue on?

Page 107

1 A.  Yes, I am.
2 Q.  Okay.  When we broke, we were talking about the
3  bases for your area of origin determination,
4  and you talked about witness statements, fire
5  patterns and fire dynamics.
6    Before we move on to fire patterns,
7  is there anything else about the witness
8  statements that were important to your origin
9  determination?
10    MR. McGLYNN:  Objection.
11 A.  No.
12 Q.  All right.
13  Not that --
14 Q.  All right, fire patterns -- sorry.  You can
15  complete your response.
16 A.  I said not that I can think of.
17 Q.  Okay.  Next on fire patterns, you mentioned the
18  mass loss of the cabinetry immediately to the
19  left of the microwave and the range, the
20  left-to-right movement pattern both from the
21  microwave and front and rear of the control
22  panel of the stovetop and the damage to the
23  iPad.
24    Now, was there anything else about
25  the fire patterns that were important to your

Page 108

1  determination of an area of origin?
2 A.  The electrical activity on the line cord for
3  the Keurig, that falls under the fire pattern
4  realm.
5 Q.  Anything else?  And then I'll ask you some
6  questions about these.
7    MR. McGLYNN:  Objection.
8 A.  That, I believe, is all I can think of.
9 Q.  Okay.  So, let me ask you some hypotheticals.
10  The presence and location and type of fuel
11  impacts a fire pattern that you're going to
12  see, correct?
13 A.  The presence -- what else?
14 Q.  Location and type.
15 A.  Yes.
16 Q.  Meaning if the fuel is different in fire A than
17  fire B, it may impact the patterns that you'll
18  see, all else being equal; fair enough?
19 A.  It could.
20 Q.  Okay.  If the box of chips had been ignited on
21  the front of the box, if the first portion of
22  that box was ignited on the front of it, and it
23  eventually grew to involve the front of the
24  cardboard and eventually consumed the grease
25  and the bags of chips inside -- well, let me

Page 109

1  start over.  Strike that.
2    Is the ignition of the cardboard box
3  filled with the chips, is that, in your
4  opinion, what allowed the flames to propagate
5  up to the cabinets above the counter adjacent
6  to the stove?
7    MR. McGLYNN:  Objection.
8 A.  Yes.
9 Q.  All right.  If the fire -- the first flame --
10  the first ignition point on that box, had that
11  been on the front of the box, would that engulf
12  the whole box in flames?
13    MR. McGLYNN:  Objection.
14 A.  I would think so based on ventilation.
15 Q.  Sure.  If the first ignition point on that box
16  had been, as you're facing that box, to the
17  right side of the box, would the whole box be
18  engulfed in flames?
19    MR. McGLYNN:  Objection.
20 A.  Subsequently, likely.
21 Q.  If the first location of the flame had been on
22  the rear of that box, would the whole box had
23  been engulfed in flames?
24 A.  Likely.
25 Q.  If the first flame or ignition point on the box

Page 110

1   had been on the left side of the box, would the
2   whole box had been engulfed in flames?
3 A.   Likely.
4 Q.   Regardless of where the first ignition point
5      was on that box, once it had been engulfed in
6      flames, would it thereafter have been allowed
7      to propagate up to the cabinet above the
8      counter?
9            MR. McGLYNN:  Objection.
10 A.  Yes.
11 Q.  Would there be any difference in the fire
12     pattern on the cabinets or elsewhere depending
13     upon where the first ignition point was on that
14     box?
15 A.  Would there be any difference where?
16 Q.  On the fire patterns that you observed in the
17     room, depending upon where the first ignition
18     point was on the box, if we assume that
19     regardless of where it was it engulfed the
20     entire box?
21           MR. McGLYNN:  Objection.
22 A.  Probably not.
23 Q.  Okay.  Meaning, in this hypothetical, the most
24     readily available fuel to be ignited by that
25     initial ignition point is within that box,

Page 111

1      correct?
2            MR. McGLYNN:  Objection.
3 A.   It is the box.
4 Q.   It is the box, and as well as the greased bags
5      inside of it, correct?
6 A.   Oh, yeah, yeah.
7 Q.   And so, regardless of where it starts, it's
8      still just going to involve that whole package
9      and, as you say, propagate up and ignite
10     whatever is above it, correct?
11 A.  Yes.
12 Q.  If the burner had been left on, how hot would
13     it have gotten?
14 A.  Probably somewhere around 900 degrees.
15 Q.  In fact, you took some temperature readings of
16     it?
17           MR. McGLYNN:  I'm sorry, I'm
18     interrupting because you're switching from
19     hypothetical to this subject range or --
20           MR. COPENHAVER:  Yeah.  Very good, I
21     am.  Thanks for the clarification.
22 BY MR. COPENHAVER:
23 Q.  So on the subject range, in your experiment,
24     you did some temperature testing to determine
25     the temperature of the surface of the stove on

Page 112

1      the left-rear burner when it had been adjusted
2      in its as-found orientation after the fire,
3      correct?
4 A.   On the exemplar stove, yes.
5 Q.   Yeah, on the exemplar stove.
6 A.   Right.
7 Q.   And in that, you determined that the
8      temperature of the heating surface in the
9      left-rear burner location would be in excess of
10     900 degrees Fahrenheit, correct?
11 A.  Yeah, I seem to remember it was, like, 915
12     maybe, somewhere around there, a little over
13     900 F.
14 Q.  In fact, and we can just pull up your file, and
15     I'm going into the experimental testing folder,
16     and I'm in the burn sub folder.  I'll show it
17     to you once I pull it up.
18           And I'm on photo P3030009, and this
19     is what I'm referring to.  And my read of this,
20     and you can correct me if I'm wrong, but it
21     appears to suggest that the temperature of the
22     center position of that left-rear burner, when
23     the knob is oriented to its six position, is
24     approximately 945 degrees Fahrenheit?
25 A.  Yes.  Now, keep in mind there's a temperature

Page 113

1      limiter on there, so the temperature limiter
2      would allow the element to come on for a couple
3      seconds and then go off, come on, come off,
4      unless there is a pan or something sitting on
5      top of that element.
6 Q.   Okay.  And how is that temperature limiter
7      significant to the opinion about how hot that's
8      going to get?
9            MR. McGLYNN:  Objection.
10 A.  Well, it's above the ignition temperature of
11     cardboard.
12 Q.  That was going to be my next question.  We
13     would agree that the left-rear burner, when the
14     control knob is positioned to the position six,
15     gets hot enough to ignite cardboard?
16 A.  Yes.
17 Q.  And it would get hot enough to ignite a
18     cardboard chip box of the type that you found
19     in Costco, correct?
20 A.  I believe so.
21 Q.  How close would a box of chips of the type that
22     you got at Costco have to be to that burner in
23     order to ignite as a result of the temperature
24     emanating there that cooking surface?
25 A.  I believe it would have to be either -- I

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022

Pages 114..117

**Page 114**

1    believe the box would have to be on -- within
2    the circle, if you will, that depicts the
3    location of the surface element.  So it would
4    have to be within that circle.  So, yeah.
5 Q.  You're talking, if we look again at P3030009,
6    you're referring to the white circle around
7    that upper left -- or that rear-left burner?
8 A.  Correct.
9 Q.  All right.  And what is the basis for that
10    opinion?
11 A.  I've done some little experiments before for
12    other cases actually here at home.  My wife
13    wasn't too impressed about it.  But I took a
14    little cardboard box and set it on there, paper
15    towels, things of that nature, like, right up
16    near that circle imprint in there, and there
17    was no ignition after being left on there for
18    half an hour.
19 Q.  Have you done anything like that with this
20    range or with this particular type of cardboard
21    box?
22 A.  No.
23 Q.  Did you document any of those little
24    experiments that you performed?
25 A.  I did not.

**Page 115**

1 Q.  Did you present or publish those experiments
2    anywhere?
3 A.  No.
4 Q.  If a portion of that cardboard box had been
5    within -- strike that.
6         If a portion of the cardboard box
7    containing the chips that you believe was
8    present on the counter immediately prior to
9    this fire had been within that circle, and the
10    control knob had been oriented to its six
11    position in which it was found after the
12    incident, do you believe it would be likely
13    that that cardboard box would ignite?
14         MR. McGLYNN:  Objection as to likely.
15         MR. COPENHAVER:  More likely than
16    not.
17         MR. McGLYNN:  Objection.
18 A.  Yes, I do.  But that's not the data set that we
19    have here.
20 Q.  We'll talk about that.  Initially I just want
21    to understand whether it would do that.  And I
22    think your opinion was or your statement was
23    that, yeah, that would likely occur in that
24    hypothetical?
25 A.  Exactly, more likely than not.

**Page 116**

1 Q.  All right.  And you would agree that the
2    orientation of the control knob as it was found
3    to be in after the incident was at six on the
4    melt to high scale of these particular knobs,
5    correct?
6 A.  On the melt to high -- you say melt to high?
7 Q.  Melt to high.  So, from melt --
8 A.  Oh, okay, I understand.
9 Q.  -- to high, it was on six, correct?
10 A.  Yes.
11 Q.  I'm going to start using that instead of zero
12    to ten.
13         MR. McGLYNN:  I don't want to
14    interrupt you, Steve.  I'm just objecting
15    because I don't know what the time frame you
16    said, when.  Are you talking about this
17    picture, just so we're clear?
18         MR. COPENHAVER:  No.  I was talking
19    about the control knob on the subject range
20    after the fire was found to be oriented in the
21    six position.
22         MR. McGLYNN:  Okay, yes.  Sorry.
23         MR. COPENHAVER:  Okay.
24 BY MR. COPENHAVER:
25 Q.  And was that what you understood my question to

**Page 117**

1    be, Mr. Klitsch?
2 A.  Yes.
3 Q.  And in this hypothetical, had the cardboard box
4    been within that circle and ignited as a result
5    of that left-rear burner being on, is it your
6    opinion that that cardboard box would become
7    engulfed in flames?
8 A.  In the hypothetical, yes, more likely than not.
9 Q.  And is it your opinion in that hypothetical
10    that the propagation of the flames being fueled
11    by the cardboard box would reach the cabinetry
12    to the left and above the -- to the left of the
13    range and above the countertop?
14         MR. McGLYNN:  Objection.
15 A.  Yes, I believe that, and I also believe that it
16    would likely spread to the right.  There would
17    be no reason why fire would not propagate to
18    the right across the bottom of the microwave
19    and impact the cabinet on the right.  And
20    especially the papers -- there were actually
21    papers that were on the side of the
22    refrigerator that were held on with magnets
23    that were unburned.
24 Q.  So, what I'm --
25 A.  I'm sorry, go ahead.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 118..121

Page 118

1 Q.  No, you're fine.  Let me see if I can explain
2      this.  Well, here, let's ask:  Did you
3      determine the position of the cardboard box in
4      a location or orientation that you can say to a
5      reasonable degree of engineering certainty it
6      was more likely than not and at the time the
7      fire started?
8 A.  I believe.
9 Q.  Okay, let's do that first.
10 A.  Okay.  Go to -- you want me to help you?
11 Q.  That's what this is about.
12 A.  Go to the experimental testing, and then go
13      to -- what are the folder choices?
14 Q.  Burn and stove counter pics.  I believe you
15      want burn.
16 A.  Yeah.  I believe we're going to want both of
17      them to be honest with you, but let's just
18      start there.
19          So, if you want to -- I know there's
20      some in there without the box on, and I think
21      there's a scale in there showing the position
22      of the cutting board on the countertop in
23      relationship to the left-rear burner.  There
24      you go.  Maybe you can rotate that one or
25      something a little easier for us to look at, if

Page 119

1      you can.
2          There you go.  Went too far.
3 Q.  There you go.
4 A.  There you go.
5 Q.  So just for the record, the photo that you're
6      looking at is P3040014 within the burn sub
7      folder of your experimental testing.
8 A.  Right.
9 Q.  And what's the significance of this?
10 A.  So, that is -- that's another cutting board
11      that was cut down to the dimension of the --
12      we'll call it the subject cutting board, and
13      then placed on the countertop consistent with
14      the protected area on the subject countertop in
15      relationship to the range.
16 Q.  Okay.
17 A.  So you can see there that the edge of the
18      cutting board closest to the left-rear element
19      is just over four inches, four-and-a-half,
20      something like that, I can't really see it that
21      well, from the left edge of the circle
22      indicating the presence of the left surface
23      unit.
24 Q.  Okay, so, if I'm understanding what you just
25      told me correctly, the photo that we're looking

Page 120

1      at that ends in 0014, from the burn sub folder
2      of your experimental test folder, is your
3      attempt to place an exemplar cutting board on
4      an exemplar counter next to an exemplar
5      stovetop in the same position in which you
6      found the cutting board on the fire scene -- at
7      the fire scene on March 5th, 2020?
8          MR. McGLYNN:  Objection.
9 A.  Correct.
10 Q.  And based upon your measurement, you calculated
11      the right edge of that cutting board to be
12      somewhere between four and five inches away
13      from the ring demarking the heating elements of
14      that left-rear burner?
15 A.  Yeah.  And if you go to the other folder that
16      says counter pics or something, you will see
17      the actual countertop -- subject countertop
18      sitting next to the subject range with the --
19      there you go.  But I think there's one in
20      there, too, with a ruler in it getting the
21      measurement from that circle of the left-rear.
22      There you go.
23 Q.  Just for the record, you're referring to
24      P3040031 within the stove counter pics sub
25      folder of your experimental testing folder,

Page 121

1      correct?
2 A.  Yes.  So, that's the basis -- that's the basis
3      of the measurement for the exemplar setup.
4 Q.  Okay.  So, it leads back to my original
5      question of whether or not, to a reasonable
6      degree of engineering certainty, you formulated
7      a position as to -- strike that.
8          You formulated an opinion as to the
9      position of the cardboard box at the time of
10      the fire?
11 A.  Yes, I did.  And that's probably -- we're
12      probably going to have to go through a couple
13      other photos here.  What I mean by that is the
14      photo depicting the removal of that cardboard
15      snack packaging from the cutting board itself
16      showing the artwork.
17          Can I point you to that?
18 Q.  Yes.
19 A.  Okay.  Give me one second.
20 Q.  This is important.
21 A.  I understand.  I agree with you.
22          So that would be in the evidence
23      exam.
24          Do you have them downloaded on your
25      end, the 6-24-2020?  And the only reason I'm

**Page 122**

1 asking is because it looks like in that folder
2 there's two file formats.  One's a JPEG and the
3 other's a much larger file, an ORF, and I'm
4 just afraid it's going to take forever to
5 download.
6 Q.  **I can confirm that it does take forever.  But**
7      **yes, we do have those downloaded.**
8 A.  All right, so, let me just see if I can -- how
9      can I do that?  Maybe I can just be lucky and
10     find it.
11          What I'm looking for is a picture of
12     the cutting board with the mass on it, and then
13     one of the next pictures should be --
14 Q.  **I mean, are you seeing what I'm showing on the**
15     **screen?**
16 A.  Hold on.  Let me pull you back up 'cause I
17     minimized you.
18          Yes, you're right in the ballpark
19     there.  So --
20 Q.  **Here's sort of the first of those series.  I'm**
21     **going to pull it up.**
22 A.  Yeah, so, that area on the cutting board that
23     lacks debris, we'll call it, that was the area
24     of the packaging material.
25 Q.  **Again, for the record, we are looking at**

**Page 123**

1 P6240040 from your artifacts inspection of
2 6-4-2020.
3          And you believe that as we're looking
4 at the orientation of this photo with the
5 handle at the bottom of the photo --
6 A.  Yeah, that's not right.
7 Q.  **Well, I know.  I'm just talking about**
8      **positioning the -- box would have been on**
9      **the lower left portion of that cutting board?**
10 A.  Well, the orientation of the cutting board
11     itself is incorrect.
12 Q.  **Yeah, I don't care about that right now.  I'm**
13      **just trying to figure out where on the cutting**
14      **board you think the cardboard box was and why.**
15 A.  I think the box covered the cutting board, sat
16     on top of the cutting board.
17 Q.  **The entire cutting board?**
18 A.  Oh, yeah.
19 Q.  **Okay, why?**
20 A.  Because of -- because of the material, the
21     cardboard packaging that was pulled off of
22     there and the position of the artwork on the
23     box.
24 Q.  **Okay, if there was cardboard material on the**
25      **cardboard -- strike that.**

**Page 124**

1          If there was cardboard material on
2 the cutting board and we found cardboard
3 material baked into the stovetop, why do you
4 draw from that -- so, let's just assume that's
5 true, okay?  If you want to call it a
6 hypothetical, that's fine.  Are you with me so
7 far?
8 A.  I'm with you.
9 Q.  **Okay.  Why would you assume that that's**
10      **indicative of the cardboard box being present**
11      **on the cutting board prior to the fire but not**
12      **necessarily indicative of the cardboard box**
13      **being present -- also present partially on the**
14      **stovetop at the start of the fire?**
15 A.  Because of the dimensions of the box.
16 Q.  **You don't think --**
17 A.  The --
18 Q.  **You don't think -- oh, sorry, go ahead.**
19 A.  The cutting board, I believe, is 15 inches
20     long, and the box was, there's some pictures of
21     it, I think 15 and three-quarter inches long.
22 Q.  **But what I'm saying, if there is presence of it**
23      **on both, on portions of the cutting board and**
24      **portions of the stovetop, why is your take-away**
25      **from that that it was only on the cutting board**

**Page 125**

1 and not that it could have been on both?
2 A.  You must not be following me.  But based on the
3     length of the box and the position of the
4     artwork on the cutting board, it would be -- it
5     would not be possible -- the box is not long
6     enough to cover the cutting board, the length
7     of the cutting board, to go over and
8     subsequently cover any portion of that
9     left-rear element.
10 Q.  **Okay, show me on what basis you're concluding**
11      **that the box covered the entire length of the**
12      **cutting board.**
13          MR. McGLYNN:  Objection.
14          MR. COPENHAVER:  What's the basis of
15     the objection?
16          MR. McGLYNN:  Well, I mean, are you
17     saying show you a picture?
18          MR. COPENHAVER:  Show me his basis.
19          MR. McGLYNN:  Show you his basis.
20          MR. COPENHAVER:  Yeah.
21          MR. McGLYNN:  He's explained it to
22     you.  Are you asking him to show you a picture
23     that might help explain?
24 BY MR. COPENHAVER:
25 Q.  **Sir, did you understand my question?**

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                                    Pages 126..129

Page 126

1 A.   I sort of did, I think.
2 Q.   Okay, what's your basis for the opinion that
3      the cardboard box covered the entire length of
4      the cutting board?
5 A.   Based on the debris recovered from the cutting
6      board, to me, looked consistent with the box
7      material.  Even if the box did not cover the
8      entire cutting board and maybe would have been
9      on the countertop itself, the box is still not
10     long enough to reach the area of the left-rear
11     burner.
12 Q.  Is there a photograph or anything within your
13     file that you can point me to that demonstrates
14     why you believe that to be true?
15 A.  Sure.
16 Q.  Okay.
17 A.  Go back to -- go back to the burn test.
18         Okay, scroll down.  You'll see the
19     box on the counter.  Okay, there you're getting
20     into it.  So, scroll down a couple more or move
21     forward.  There you go.  Okay, go back there.
22     Go back there.  One more.  So, there you see
23     the box.  The length of the box is just shy of
24     16 inches.  I think it was 15 and
25     three-quarters or so.  So go ahead and move

Page 127

1      forward.
2 Q.   Okay, let me stop you there for a second.  On
3      what basis are you saying that this box is the
4      exact box that was present on the counter?
5      Well, that's a bad question.  It obviously is
6      not the exact box.
7              On what basis are you saying that the
8      box that you used in your exemplar testing is
9      representative of the size of box that was
10     present on the counter in your view prior to
11     the fire?
12 A.  Based on the information about shopping at
13     Costco, based on the recovered portion of the
14     box material from the cutting board that showed
15     the artwork of, I think it was, the Cheetos,
16     the red Dorito bag and the blue Dorito bag.
17     That was identical.
18 Q.  Do you know whether there are multiple-sized
19     boxes that contain Cheetos, Doritos or Doritos,
20     or whether there were back in March of 2020?
21 A.  This was the only -- this was the only box that
22     fit the bill of the artwork there.
23 Q.  Other than the artwork, is there another basis
24     for you opining that the size of the box that
25     you used in your experimental testing is the

Page 128

1      same as the size of the box that you believe
2      was present on the counter prior to the subject
3      fire?
4 A.   No.
5 Q.   All right.  You said next?
6 A.   Yeah, move forward.
7 Q.   Okay.
8 A.   Keep going.
9 Q.   Oh, and by the way, for the record, we were
10     looking at P3040027 within your burn sub folder
11     of your experimental testing folder.
12 A.  Keep going.  There you go.  So -- he left.  We
13     must be done.  I guess we're off the record.
14              - - - -
15     (Mr. Copenhaver's audio and video were lost.)
16              - - - -
17         MR. COPENHAVER:  Welcome back.  I'm
18     not sure what happened there.
19         MR. McGLYNN:  We were going to take a
20     little break, but we figured we'd wait till you
21     got back.
22         MR. COPENHAVER:  We're happy to.  My
23     computer went totally black for some reason.
24         MR. McGLYNN:  That's bad.  Are you
25     rebooting?

Page 129

1         MR. COPENHAVER:  No.  It's back.
2         MR. McGLYNN:  Oh, okay.
3         MR. COPENHAVER:  It had a little
4      hiccup.  Do you want to take a break?
5         THE WITNESS:  Yeah, why don't we take
6      five or something.
7         MR. COPENHAVER:  All right.
8              - - - -
9         (A recess was taken at 1:20 p.m. and
10     reconvened at 1:29 p.m.)
11              - - - -
12         MR. COPENHAVER:  Before we hop on,
13     can you get the last thing that you got from
14     either one of us before my computer went kaput?
15              - - - -
16     (The record was read back by the Reporter.)
17              - - - -
18 BY MR. COPENHAVER:
19 Q.   All right, so, apologies for the interruption,
20     Mr. Klitsch, counsel.  I had a computer issue,
21     but we're back.
22              We were looking at P3040027.  We were
23     talking about, Mr. Klitsch, your opinion as to
24     the position of that cardboard box that you
25     believe was present from the counter

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                    Pages 130..133

1   immediately prior to the fire.
2           You said to start scrolling through a
3   couple of the photos, so you just sort of tell
4   me where to stop, okay?
5 A.   Okay.
6 Q.   (Scrolling through photos.)
7 A.   There.
8 Q.   Okay, so, you had me stop at P3040030, which
9   is, again, in the burn sub folder.
10          What's the significance of this
11  photo?
12 A.   The significance of this photo shows the -- if
13   you're looking at the box, the right end of the
14   box is two inches away from the circular ring
15   indicating the presence of the surface burner
16   on the left-rear corner.
17 Q.   I think you told me earlier if, in a
18   hypothetical scenario, that burner was on and
19   that box was at least two inches over to the
20   right, that that would, in your view, likely
21   ignite the box?
22 A.   From its present position?
23 Q.   No.  If it had been moved two inches over, and
24   that burner was on, meaning two inches closer
25   to that heating element.

1 A.   Yes, then it's likely.
2 Q.   Okay.  So I understand that based upon where
3   you positioned it, you believe the edge of that
4   box to be approximately two inches away from
5   that heating element of that left-rear portion
6   of the oven.
7           My question to you is:  How did you
8   position the box in that orientation to leave
9   it two inches away from that heating element?
10 A.   Based on the recovered packaging material off
11   of the cutting board, on the handle end, that's
12   where the artwork showing the Doritos, et
13   cetera, was located.
14          So, if you go back -- go back -- just
15   go backwards on your slide deck here --
16 Q.   Well, it's not my slide deck.  These are just
17   your photos.
18 A.   I understand.
19 Q.   Okay.
20 A.   So you see the artwork on both the top and the
21   side.  And the recovered portion off of the
22   wooden cutting board showed a crease-in.  So I
23   believe it's going to be -- I believe it's
24   going to be that top crease.
25          So, in reality, I believe this box

1   was actually likely turned upside-down so that
2   as the top of the box as depicted here would
3   actually be against the cutting board.
4 Q.   Can you show me the photograph or photographs
5   upon which you're basing the opinion that there
6   was presence of the images of these chips in
7   proximity to the handle of the cutting board?
8 A.   I can.
9 Q.   Thank you.
10 A.   I'm going to minimize you here a second.
11 Q.   I take no offense.
12 A.   I'm going to try not to disconnect.
13 Q.   That was a low blow.
14 A.   You actually had it up earlier.  Remember when
15   we were looking for these photos?  It's going
16   to be in the -- oh, here we go.
17          So, I'm in the 6-24-2020 joint
18   evidence exam, and I just clicked on one of the
19   photos, and it happens to be it, and it's P6 --
20 Q.   Hold on.  Let me get there.  Sorry.
21 A.   Okay.
22 Q.   So I'm in the 6-24-2020 joint evidence exam
23   photos within the photos sub folder of your
24   file.
25 A.   Mm-hmm, yes.

1 Q.   And which photo am I pulling up?
2 A.   P6240052.
3 Q.   Okay.
4 A.   Let me enlarge it here.  Okay, so, that's
5   what's peeled off the cutting board, and you
6   can make out the Doritos image there.
7           If you go either forward or back, we
8   can sort of figure out where we're at here.
9           Okay, so, that's the cutting board.
10   No, I think you went too far.
11 Q.   I mean, we can see sort of the bigger one.
12 A.   Okay, yeah.
13 Q.   Let's just start with P6240040, 'cause that's
14   the first one of the cutting board that I see
15   in this series.  So, where on --
16 A.   Yeah, go either forward or backwards, because
17   the missing piece, the piece that's removed
18   from the cutting board, is the snack packaging
19   material.
20 Q.   Well, prior to this, there's nothing about the
21   cutting board, so it's got to go after this.
22   This is the -- as you see, if we look at 36,
23   it's an outlet, a receptacle; 37's a
24   receptacle; 38 is the countertop; 39's the
25   countertop; and 40 is the first one in the

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 134..137

Page 134

1    series where the cutting board is depicted.
2 A.  Mm-hmm.
3 Q.  So I can go forward from there to 40041, 42,
4     43, 44, 45, 46.
5 A.  Go ahead.  Go back.  Go back.
6 Q.  46.
7 A.  So that's the mass right there.
8 Q.  All right, is the cutting board depicted in
9     this photo?
10 A.  Oh, yeah.  It's sitting on top of it.  It's
11     sitting on top of the cutting board.
12 Q.  Is the mass depicted in this photograph?
13 A.  I actually believe -- now that I'm looking at
14     it, I believe it's going to be the mass that
15     still remains on the cutting board.
16 Q.  This mass here (indicating)?
17 A.  That's what I think, as we're moving through
18     the photos here.
19 Q.  So you think somewhere in this -- so, I'm
20     looking at 45.  You think somewhere in the mass
21     that's in the sort of upper right half on a
22     diagonal of the cutting board as depicted in
23     0045 are the remnants of portions of that
24     cardboard box?
25 A.  I believe so.

Page 135

1 Q.  All right.  Let's go through.  So here's 46.
2 A.  Right.
3 Q.  Do you want to go back to 46?
4 A.  Yeah, so, that mass right there is what's going
5     to be showing up in the next -- in the next
6     photo.  I just can't tell.  Go to the next
7     photo.
8          So, there it is there.  And you can
9     see -- essentially where you have your cursor,
10     there's a seam right there which I believe --
11     which I believe is going to be the seam of the
12     side wall and the top or in this case the
13     bottom.
14 Q.  As it sort of bends over?
15 A.  Right.
16 Q.  Okay.
17 A.  You can see all the artwork on there, Cheetos,
18     Doritos.
19 Q.  I'll stipulate that I see some chip images on
20     this.  But my question is:  How are you using
21     these photos to orient the position of the chip
22     box on the cutting board immediately prior to
23     the fire?
24 A.  Based on that artwork.
25 Q.  But if we -- but is the cutting board shown in

Page 136

1     0047?
2 A.  Not in 0047.
3 Q.  Okay, is the cutting board depicted in 0046?
4 A.  Yes.
5 Q.  Where is the handle to the cutting board in
6     0046?
7 A.  The handle is going to be to the left.  So if
8     you move your cursor diagonal up that front
9     edge to the left, right, and then go across --
10     no, you went way too far.  Right in that area
11     is going to be the handle.
12 Q.  But you can see it in 45 pretty clearly.
13 A.  Yeah.
14 Q.  So, do you agree with me that when we look at
15     0045, the mass appears to be not overlaying the
16     handle of the cutting board?
17          MR. McGLYNN:  Objection.
18 BY MR. COPENHAVER:
19 Q.  That turned out to be a difficult question.  Do
20     you understand my question?
21 A.  No, I understand your question.  Certainly
22     there was mass overtop of that handle.
23 Q.  But as depicted in 45?
24 A.  It's since been removed.
25 Q.  Okay.  So as depicted in 45, you agree with me

Page 137

1     that the mass is not depicted over that handle?
2 A.  Yes.
3 Q.  All right.  But the mass that you indicated
4     earlier that contains a portion of the box is
5     the mass that you see on sort of the -- as we
6     talked about earlier, the upper half on a
7     diagonal of the cutting board as we see on
8     0045, correct?
9 A.  I think.  I would like to go forward to some
10     photos that we were just looking at.
11 Q.  We can take all the time we need on this
12     because this sort of matters.
13 A.  No, I get it.  I get it.  Can we move forward?
14 Q.  Yeah, let's do this:  What I would like to do
15     is -- so, what I'm going to do is I'm going to
16     create an exhibit just so we can know what
17     we're talking about.
18          So I took a screen shot of 00045.
19     And what I -- what we were talking about was
20     that you can sort of see a line more or less of
21     debris on an angle on that cutting board that I
22     drew a red line that more or less demarcates
23     between the protected portions of the cutting
24     board as it appears on 45 and the side of the
25     cutting board that has debris on it.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 138..141

Page 138

1           Do you more or less agree that that's
2   a rough approximation of what we were talking
3   about?
4  A.   Yes.
5  Q.   Okay, and --
6           MR. McGLYNN:  The only caveat, Steve,
7   is I don't know -- you're using protected area
8   to indicate this area, and I don't know if Dave
9   agrees with that or not.
10          MR. COPENHAVER:  I just meant the
11  side with debris on it as depicted in 45 and
12  the side without debris on it as depicted on
13  45.
14          MR. McGLYNN:  Okay.
15          MR. COPENHAVER:  That's all I meant
16  by that.
17          MR. McGLYNN:  Okay.
18 BY MR. COPENHAVER:
19 Q.   And what we initially discussed was that on the
20  side with debris, that all sort of generally
21  marked with an X, that is where you had
22  suspected in the first part of this questioning
23  that the remnants of the cardboard box would
24  have been found, and that's what we're
25  exploring now.  Is that more or less accurate?

Page 139

1  A.   I believe that's where they were found.  Like I
2   said, I would like to see a couple other
3   photos.
4  Q.   That's fine.  What I'm going to do just for a
5   second, 'cause I may have to get into my
6   personal folder here, is just stop share while
7   I save this.
8  A.   Okay.
9  Q.   And we will mark that photo that I just created
10  as Exhibit 10, just so I don't have to try to
11  re-create this when I'm reading this dep.
12          - - - -
13  (Exhibit 10 marked for identification.)
14          - - - -
15 BY MR. COPENHAVER:
16 Q.   Okay, so, would you like me to start moving
17  forward in the sequence of photos?
18 A.   Yes, please.
19 Q.   Of course.  So, the reason every other one does
20  this is you mentioned it was in two file
21  formats, and apparently I don't have the driver
22  to download the second.
23 A.   Nor do I.
24 Q.   But I'm not -- we're not missing any photos.
25  We're just skipping the ones in that.

Page 140

1           Okay, so, here's 46.
2  A.   Are you able to zoom in on that at all?
3  Q.   Sure.  These are JPEGs, so it should be --
4   well, maybe not.  They're your photos.  I don't
5   know.  Maybe not.
6  A.   I'm just -- I'm trying to see if I can see the
7   handle.  It's sort of a bad angle of the
8   photograph.
9  Q.   Would it be easier for you to pull up your own
10  photos and run through them?
11 A.   Where are we at, 0046?
12 Q.   46.
13 A.   Minimize.  Oh, wrong one.
14          So if you go -- so you're at 46 now,
15  right?
16 Q.   If I can get back there.  Yes.
17 A.   Okay, so, you're at 46.  All right, so, if you
18  go to 51, let me switch over to your screen so
19  we can all see it.  So there is some more
20  packaging that's pulled up off of the cutting
21  board, but the problem is I can't make out the
22  orientation of the cutting board.
23 Q.   Well, when you did your experiment, were you
24  referencing anything when you were placing the
25  cardboard box and measuring it as depicted in

Page 141

1   the photograph we looked at?
2  A.   The artwork.
3  Q.   Yeah, but I mean in terms -- but, I mean, I'd
4   like to find those reference photographs so we
5   can attempt to -- I can probe the veracity of
6   that orientation, I mean, in all candor.
7  A.   There was another photograph I --
8           MR. McGLYNN:  Can we go off the
9   record a second?
10          MR. COPENHAVER:  That's fine.
11          - - - -
12  (There was a discussion off the record.)
13          - - - -
14 A.   I'm just looking at these photos here.
15 Q.   That's fine.
16 A.   Yeah, I really can't find any photographs
17  that's going to help me.
18 Q.   Let's go back on the record.
19 A.   Okay.  Hold on.  All right, I'm back with you.
20 Q.   All right, now, Mr. Klitsch, we took a quick
21  break while you were looking for some
22  photographs, and you were about to explain
23  something.
24 A.   I'm sorry?
25 Q.   You were about to explain what you found or

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 142..145

Page 142

1   didn't find after spending some time looking
2   through your photographs.
3 A.   Oh, yeah, I was looking for a particular photo
4   to help me with a reference for the box.
5 Q.   Were you able to locate anything?
6 A.   I was not.
7 Q.   All right, are you able to point to anything in
8   the evidentiary record or in your file that
9   supports the orientation and positioning of the
10   cardboard box in your experimental testing?
11 A.   Once again, the artwork being recovered from
12   the cutting board.
13 Q.   Well, I know, and that's what you said.  But
14   there has to be something that shows that where
15   the artwork was recovered from the cardboard --
16   from the cutting board mirrors where the
17   artwork would be in the orientation of your
18   cardboard box in your experiment to suggest
19   that you put it in the right place, right?
20 A.   Yeah, let me -- let's go to those experimental
21   testing counter pics, the folder.
22 Q.   Okay.
23 A.   So, if you go to P3040027, the one to the --
24   either one.  So, that protected area, that
25   protected area, based on the excavation of that

Page 143

1   cutting board and the cardboard would lend
2   itself to -- it would have had to have been
3   cardboard that was on that cutting board.
4 Q.   Why?
5 A.   I don't understand why.  What do you mean why?
6 Q.   I don't either.  What you're telling me is that
7   the bare portion of the cutting board that we
8   see on 3040027 within your counter photo sub
9   folder of your experimental testing is
10   indicative of the orientation or position of
11   the cardboard box at the time of the fire?
12 A.   Yeah, the box would have been covering it.
13 Q.   Okay.  Is that the only portion of the
14   cardboard box that it covered?  Sorry, strike
15   that.
16         Is that the only portion of the
17   cutting board that the cardboard box covered in
18   your view?
19 A.   No, I believe it likely covered the entire
20   cutting board based on the debris that was
21   pulled off of the cutting board.
22         MR. McGLYNN:  I don't want to --
23 BY MR. COPENHAVER:
24 Q.   That's what I'm asking you -- sorry, Joe.
25         MR. McGLYNN:  No, I don't want to

Page 144

1   interrupt you.  Go ahead.  I mean, I think
2   we're all sincerely trying to get to the same
3   place.  Can we just -- maybe if we could go off
4   the record.
5         MR. COPENHAVER:  Well, let me just
6   ask this --
7         MR. McGLYNN:  Okay.
8         MR. COPENHAVER:  -- and then we can
9   go off the record.
10 BY MR. COPENHAVER:
11 Q.   If the cardboard box covered the entirety of
12   that cutting board, what's the explanation for
13   why some of it is quote/unquote protected and
14   why other portions of it have debris on them?
15 A.   Repeat that for me one more time.
16 Q.   Sure.  I'm looking at exhibit -- or I'm sorry,
17   strike that.
18         I'm looking at photo P3040027.  You
19   indicated to me that the bare portion of this
20   photo is where the card -- strike that.
21         The bare portion of the cutting board
22   is where the cardboard box was, and then you
23   said it's your opinion that the cardboard box
24   was on top of the entirety of the cutting
25   board.  And my question to you is:  Then what's

Page 145

1   the significance of the bare portion?
2 A.   That's just where some cardboard remained.
3 Q.   You mean the portion of 0027 that still has
4   debris has cardboard box remaining on it?
5 A.   No.  I'm saying that clear protected area is
6   where the cardboard -- where the cardboard was
7   recovered from.
8 Q.   So, what's the debris on the other portion of
9   the cutting board?
10 A.   That's likely chip debris and box material and
11   debris that fell down from the cabinetry.
12 Q.   Then, I mean, what I'm trying to figure out,
13   Mr. Klitsch, is I pulled up 3040026 from your
14   counter -- I mean from your burn photos that
15   shows the cardboard box, is why you put the
16   cardboard box where you put it.
17         MR. McGLYNN:  Objection.
18 BY MR. COPENHAVER:
19 Q.   And there's portions of the cutting board that
20   are covered; there's portions of it that are
21   uncovered; there's portions of the handle that
22   are showing; that's portion of the handle that
23   are covered by a cardboard box.
24         My question to you is:  Why did you
25   position it like that and why do you believe

Page 146

1    that's a fair representation of the position
2    and orientation of the cardboard box at the
3    time of the fire?
4 A.    I believe that's a fair representation at the
5    time of the fire based on the analysis of the
6    debris from the cutting board. Granted, it
7    got --
8 Q.    Is there a photo of the cutting board that
9    indicates to you that that was the actual
10    position of the cardboard box?
11 A.    Not pre fire.
12 Q.    No, I meant post fire.
13 A.    Just the debris that was recovered from the
14    cutting board.
15 Q.    Yeah, but what you told me just a second ago
16    was that the cardboard box is over the entirety
17    of the cutting board.
18 A.    Right.
19 Q.    And here it's covering a portion of the cutting
20    board. Which one's correct?
21 A.    I agree with you.
22          MR. McGLYNN: I mean, come on, the
23    photo speaks for itself.
24          MR. COPENHAVER: Joe, I mean, in
25    fairness, he's measured this down to two

Page 147

1    inches. And had this thing been two inches
2    over to the right, it makes a big difference.
3          MR. McGLYNN: No, I --
4          MR. COPENHAVER: Hold on, Joe. So
5    I'm entitled to probe how carefully and how
6    accurately and how consistent with the
7    available evidence the position of the box is
8    in his experimental testing.
9          MR. McGLYNN: I'm not suggesting you
10    aren't. I'm just saying that the picture kind
11    of speaks for itself. We're kind of debating
12    whether or not it's on the whole cutting board
13    or not when he's saying it's a fair
14    representation of what it looked like.
15          I mean, that's on the whole cutting
16    board. There's a corner that it's not resting
17    on.
18          MR. COPENHAVER: Right.
19          MR. McGLYNN: I'm just saying it's --
20    I mean, the picture speaks for itself.
21          MR. COPENHAVER: I pressure it, Joe.
22    That's fine.
23 BY MR. COPENHAVER:
24 Q.    Mr. Klitsch, which on is it? Is the box over
25    the entirety of the cutting board, or is it as

Page 148

1    depicted in 0026 where it's over a portion of
2    the cutting board, or is it something
3    different? And can we tell based upon the
4    available physical evidence?
5 A.    Well, I would answer it like this, that --
6          MR. McGLYNN: Objection. Go ahead,
7    Dave.
8 A.    -- that the subject cutting board had debris
9    and box material covering the handle, where the
10    position of this test box does not cover the
11    handle in its entirety and, in fact, would be
12    shifted more towards -- would be shifted more
13    towards the element, and maybe it should be.
14 Q.    The position of this -- of the box in the
15    experimental test that you did has not
16    representative of the position of the box
17    relative to the cutting board that you believe
18    the box was in at the time of the fire; is that
19    accurate?
20          MR. McGLYNN: Objection.
21 A.    I believe it's -- I believe it is. If not,
22    it's very close.
23 Q.    Well, you just said that it's not covering the
24    handle, but you think in the actual fire it
25    covered the handle; is that right?

Page 149

1 A.    Yes. But if the box was covering the handle in
2    the experiment, the box would be even farther
3    away from the element.
4 Q.    Assuming you have the orientation correct of
5    he cutting board?
6          MR. McGLYNN: Objection.
7 BY MR. COPENHAVER:
8 Q.    Correct, Mr. Klitsch?
9 A.    I don't have any reason to believe the
10    orientation's wrong.
11 Q.    I'm just asking that assumes you have the
12    orientation of the cutting board correct.
13 A.    Yes.
14 Q.    All right, if the orientation of the cutting
15    board was, in fact, such that the handle was
16    closer to the burning element, covering more of
17    the handle would actually move the cardboard
18    closer to that heating element, correct?
19 A.    Not necessarily, I don't think --
20 Q.    Oh, come on.
21 A.    -- because if you rotated -- as it sits there
22    right now, if you rotated that entire thing 180
23    degrees and slid the box towards more over the
24    handle, it's still not going to -- it's
25    essentially going to be the same distance.

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022

**Page 150**

1 Q.  Well, you just told me that, looking at this
2     photograph 0026, if we move that closer to the
3     handle, it would be farther away from the
4     heating element.  So why is the inverse not
5     true?
6         MR. McGLYNN:  Objection.
7 A.  Maybe I'm misunderstanding.  So please explain
8     to me the inverse that you are referring to.
9 Q.  Move this cutting board 180 degrees so that the
10    handle is closer to the heating element.
11 A.  In the same footprint.
12 Q.  In the same footprint.  And then if you then
13    shift that cardboard box so it's covering the
14    entire handle, as you believe it was at the
15    time of the subject fire, that would move this
16    box closer to the heating element in that
17    hypothetical?
18        MR. McGLYNN:  Maybe I'm --
19        MR. COPENHAVER:  Joe, Joe --
20        MR. McGLYNN:  No, no, objection.
21        MR. COPENHAVER:  Joe --
22        MR. McGLYNN:  Objection.
23        MR. COPENHAVER:  We'll take yours
24    later.
25 A.  So you are proposing that if the cutting board

**Page 151**

1     was flipped 180 degrees in the footprint that
2     we see it here and the box was covering the
3     handle --
4 Q.  Right, the box would be closer to the heating
5     element than it appears in this photo?
6         MR. McGLYNN:  Objection.
7 A.  I don't think that's going to be accurate,
8     because if we do -- if we lift the box up -- as
9     we're looking at it right now, we lift the box
10    up and we rotate that cutting board 180 degrees
11    and set it back down, that's what we're going
12    to have.
13        If anything else, it would be shifted
14    to the left more.
15 Q.  Okay.  You said that this is a reasonable
16    approximation of where this box -- you believe
17    this box was at the time of the fire.  How
18    close is that?  How close is a reasonable
19    approximation?  What's the plus or minus on
20    that?
21 A.  I would say probably the exposed area of the
22    cutting board.
23 Q.  And how long is that?
24 A.  Oh, I don't know, to be honest with you.  I
25    can't tell, maybe --

**Page 152**

1 Q.  Can you estimate me in inches?
2         MR. McGLYNN:  Objection.
3 A.  Maybe two inches.
4 Q.  Okay.  I'm going to show you what is -- I'll
5     represent to you is a photo attached to the SEL
6     report.  It's number PA070488.  We can mark it
7     as an exhibit if you'd like.  But this is from
8     the artifact inspection, the subject range on
9     the right, the subject countertop on the left.
10    You see the area protected by presumably the
11    cutting board.
12        Are you oriented on this?
13 A.  Yeah, I'm with you.
14 Q.  Okay.  What's this rounded shadow type thing
15    (indicating on photograph)?
16 A.  It's a burn.
17 Q.  Caused by what?
18 A.  Fire.
19 Q.  Okay.  What's this -- what's this protected
20    area up here (indicating on photograph)?
21 A.  An unburned area.
22 Q.  Okay.  And what's this right here (indicating
23    on photograph)?
24 A.  The countertop.
25 Q.  Okay.  Is this the shadow from the handle

**Page 153**

1     (indicating on photograph)?
2 A.  I don't -- I don't believe it is because the
3     orientation of the cutting board was different
4     when I excavated it at the scene.
5 Q.  But you weren't first on the scene, right?
6 A.  I was not.
7 Q.  It had been processed prior to you getting
8     there, correct?
9 A.  Somewhat.
10 Q.  Okay.  Is there physical -- do you disagree
11    that this looks like it could be a shadow or an
12    unprotected area of the handle of the cutting
13    board?
14 A.  Can you show me a picture of the cutting board
15    in position -- in that orientation that you're
16    proposing?
17 Q.  Yeah, I'm sure that there's one here.  One
18    second.
19        This is PA070482 with the handle
20    positioned over that shadow mark on the
21    countertop.
22 A.  Okay.  And the wooden cutting board is hanging
23    over the edge of the range over the stovetop.
24 Q.  To get it -- to get the shadow within that
25    handle, this is the orientation in which that

Page 154

1      cutting board is located.
2 A.   Was that a question?
3 Q.   No, you asked me a question.  I answered it.
4 A.   Oh, I gotcha.  I gotcha.  My observation of
5      that photograph, of interest to me, is that the
6      wooden cutting board is actually hanging over
7      the stovetop.
8 Q.   Sure, and I'm sure Mr. McGlynn will have plenty
9      of questions about how this was positioned
10     similar to me asking you.
11            My original question was whether or
12     not that burned area surrounded on a few sides
13     by a protected area appears like it could be
14     the same shape as the handle on the cutting
15     board.
16 A.  Do you have a picture of maybe that cutting
17     board tilted up to show that particular area
18     you're talking about?
19 Q.  No.  It goes from here to here (indicating on
20     photograph).  So, you can sort of see the
21     orientation of the cutting board here.  And
22     then you see this -- and so, I'm looking at
23     485.
24            So there's the protected area caused
25     by what I think we all agree is likely the

Page 155

1      cutting board.  And then there's the indented
2      portion on the right of it that is not
3      protected.  And my question to you is whether
4      or not you believe that is -- that could be a
5      burn -- where it burned -- where the counter
6      was not protected because of the presence of
7      the handle of the cutting board?
8 A.   I don't believe that.  And the reason for my
9      negative response is that if you move your
10     cursor to the left onto the counter -- no, too
11     far.  Right off the edge of the range.  Move up
12     a little bit.  Right in there, that's burned.
13            Now, move forward to your cutting
14     board in position, your pictures.
15 Q.  Oh.
16 A.  I'm sorry.  That's not burned.  That area's not
17     burned.  The cutting board's still there.
18 Q.  What's not burned?
19 A.  The cutting board.  Are you able to share the
20     mouse with me?
21 Q.  No.  Let me ask you this:  Is there any
22     physical evidence, burn patterns or otherwise,
23     that indicate to you the orientation -- that
24     indicate to you, based upon your observations,
25     that you believe show the orientation of the

Page 156

1      cutting board as it was oriented at the time of
2      the fire rather than just what you saw after
3      the scene had been processed?
4 A.   Yes.  I believe -- and boy, if you could give
5      me the control here, I could share -- I could
6      explain to you.
7 Q.   You've got your file, right?
8 A.   I do.  What picture -- oh, 0051.  No, it's not
9      0051.  What picture was that?
10 Q.  The one I just showed you?
11 A.  Yeah.
12 Q.  It was 485 but it was an SEL photo.
13 A.  Oh, I don't have that.  I don't think I was
14     provided their photos.
15 Q.  It was on the end of their report.
16 A.  Oh, hold on.  Oh, yeah, I didn't print all of
17     that out.
18            Okay, so, there was a curved area on
19     the countertop consistent with the cut-out of
20     the handle, and the area closest to the
21     stove, yeah, so --
22 Q.  So the curved area that you're talking about
23     being consistent with the area of the handle is
24     what I'm highlighting with my cursor right
25     here; is that correct?

Page 157

1 A.   No, it's not.  Move to the left.  Move to the
2      left.  Go to that demarcation line right there.
3      Yep, right in there.  Go to the.  Nope.  I
4      don't think you're going to be able to -- oh,
5      there you go.
6 Q.   Ours we can zoom in on.
7 A.   Yeah.  So, go back to that demarcation line you
8      just ran up.  Yeah, right there, right around
9      that curved spot at the top, right there.
10     That's what I believe to be the cutting -- to
11     be the handle.
12            And then there's corresponding burn
13     patterns on the cutting board in the right
14     corner of the cutting board closest to the
15     range consistent with the damage that you see
16     on the countertop.
17 Q.  I'm going to -- just so I understand what
18     you're talking about, I'll take a screen shot
19     of this.
20            So, again, I took a screen shot of
21     SEL photo PA070485.  And at first I asked you
22     whether the shadow that I'm sort of putting a
23     box around in blue was consistent with the
24     handle of the cutting board, and in your
25     opinion you're saying it's not.  Am I right so

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                      Pages 158..161

Page 158

1    far?
2 A.    Yes.
3 Q.    Okay.  And then I'm saying -- then you pointed
4       me to this curve in red that I have attempted
5       to draw a curve around, and you're saying that,
6       in your view, is more consistent with the
7       handle of the cutting board; is that right?
8 A.    Yes.
9 Q.    Okay.  And you believe this is the physical
10      evidence as depicted here and what we'll mark
11      as Exhibit 11.
12                        - - - -
13      (Exhibit 11 marked for identification.)
14                        - - - -
15 A.   As well -- don't forget, as well as the fire
16      damage observed on the corner of the counter
17      closest to the range when you place the cutting
18      board back into position, there is
19      corresponding fire damage on the cutting board.
20 Q.   So, help me on this photo to understand where
21      you're talking about.
22 A.   Okay, on that photo, you're going to be up in
23      the upper right corner.
24 Q.   Okay.  You're sort of out of the image.  You
25      didn't clip it far enough, but we sort of get

Page 159

1       the point.
2                  Yeah, so that particular area in
3       there, that's all fire damage to the
4       countertop.  And when you put the -- when you
5       put the cutting board back into position, you
6       will see corresponding fire damage right there,
7       meaning the orientation that I believe it's in.
8 Q.    So in your view, when you're sort of looking
9       top-down onto the cutting board with the handle
10      at the top, you would see -- in your view, you
11      see damage to the lower right-hand portion of
12      the cutting board which would be consistent in
13      your view with the damage that you see in the
14      area marked more or less with a black X in
15      Exhibit 11?
16 A.   I don't think you had the orientation of the
17      cutting board.  You said the handle down.
18 Q.   No, the handle up, and that would be the lower
19      right as you're looking top-down.
20 A.   Well, why don't we do handle left or handle
21      right?
22 Q.   Okay, handle left, it would be the top right.
23 A.   Exactly.
24 Q.   Okay.  And that's marked in sort of the black
25      X, right?

Page 160

1 A.    Yes.
2 Q.    Let me save that.  And that would be exhibit
3       11.
4                So now that we believe -- or I
5       believe -- I think I understand the basis for
6       your opinion regarding the orientation and
7       position of the cutting board.  Your opinion
8       that the chip box covered most and maybe all
9       plus or minus two inches of the cutting board
10      is based upon your examination of the debris on
11      top of the cutting board; is that right?
12 A.   Yes.
13           MR. McGLYNN:  Can we take five
14      minutes now?
15           MR. COPENHAVER:  Of course, yeah.
16      That's fine.
17           MR. McGLYNN:  Thanks.
18                        - - - -
19           (A recess was taken at 2:14 p.m. and
20      reconvened at 2:22 p.m.)
21                        - - - -
22 BY MR. COPENHAVER:
23 Q.    All right, Mr. Klitsch, we're back from a
24      break.  Are you okay to keep going?
25 A.   Yes.  Steve, can we go to photos in my -- I'm

Page 161

1       just trying to think where they're at -- the
2       stove counter pics under experimental testing?
3       I think it might help clarify my position
4       regarding the cutting board.
5 Q.    Sure.  I'm here.
6 A.    All right, so, go to P3040026.  Let me enlarge
7       it here.  Okay, that's a cleaned-off
8       countertop, if you will, and it gives you a
9       better view of what I believe to be that handle
10      curve burned area.  And unfortunately, due to
11      the shadow, you really can't make out much of
12      the burned area in the upper right corner, but
13      we can move to a different photo.
14 Q.    You think this is the handle here (indicating
15      on photograph)?
16 A.   That's what I believe.
17 Q.    Why does it -- why is there no protected
18      area -- I mean, why does this end?  Meaning, if
19      it's the handle, why is there not a cylindrical
20      or a sort of ovular shadow or burned area with
21      everything else around it being protected by
22      the cutting board?
23           MR. McGLYNN:  Objection.
24 BY MR. COPENHAVER:
25 Q.    Is ovular a word?  That might be the basis for

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                          Pages 162..165

Page 162

1     the objection.
2  A.     It is today.  I understand what you're talking
3         about.
4              MR. McGLYNN:  That wasn't my
5         objection, no.
6  A.     I'm just wondering how you spell that.  Ed's
7         going to be asking.
8              So, yeah, I understand that.  But
9         that particular orientation lines up with the
10        fire damage in the upper right corner, where
11        the other orientation with the handle being to
12        the right, we'll call it, does not line up with
13        the fire damage in the upper right corner.
14 Q.     Well, if the handle was over here, wouldn't
15        that damage be down here (indicating on
16        photograph)?
17 A.     There's other photos, so let's --
18 Q.     But answer that question.  You said, in looking
19        at 0026, you think that the shadow or the dark
20        portion on the left is indicative of the
21        position of the handle because the damage on
22        the upper right-hand portion of this is
23        consistent with the damage on the opposite top
24        portion of the cutting board.  But if we were
25        to rotate that cutting board so the handle is

Page 163

1         on the right, wouldn't that damage be on the
2         lower left-hand portion of the cutting board
3         where we, in fact, see damage to the counter
4         here?
5              MR. McGLYNN:  Objection.
6  A.     I believe so.
7  Q.     Okay.  So, the fire damage that you're talking
8         about on the cutting board is consistent with
9         either orientation, is it not?
10 A.     No, it's not.  It's not.  It's not consistent
11        -- if the handle's on the right, the fire
12        damage in the upper right corner is not
13        consistent.
14 Q.     Wouldn't that -- in that scenario, the fire
15        damage would be on the -- the fire damage to
16        the cutting board would be on the lower left of
17        the cutting board if the handle was to the
18        right.  And we see damage, fire damage, in the
19        area of the lower left-hand side of the cutting
20        board in that orientation on the photo, do we
21        not?
22 A.     I agree with that.  But what I'm saying is if
23        the orientation of the cutting board is the
24        handle to the right, and you look at the fire
25        damage on the countertop in the upper right of

Page 164

1         this picture, there is not corresponding fire
2         damage to the upper right corner of the cutting
3         board.
4              Do you understand?
5  Q.     So, I think I understand what you're saying.
6         So right now we're not talking about the damage
7         -- we're talking about damage in a different
8         area of the cutting board than we were before.
9         Because in this photo, if the handle's to the
10        left in this photo 0026 from your counter
11        photos, if the handle is to the left, you were
12        talking about the damage on the upper
13        right-hand portion of the cutting board.
14 A.     Correct.
15 Q.     All right.  And then you would agree that if we
16        rotate it, that damage would be on the lower
17        left-hand portion of the cutting board?
18 A.     I agree with that.
19 A.     All right.
20 A.     But there would not be any damage to the
21        cutting board on the upper right corresponding
22        to the damage on the counter.
23 Q.     That's what you're saying, okay.
24 A.     Right.  So if you go forward, I think, one or
25        two, you're going to see -- yeah, there you go.

Page 165

1         So this might be a better picture to have that
2         particular discussion about.
3              So, you will see white -- right where
4         your cursor is at, on the next page, right
5         there, right where your cursor's at you'll see
6         some white lines, some white dashes.  Do you
7         see them?
8  Q.     Yes.
9  A.     Okay.  So that was the outline of the missing
10        portion of the cutting board.  So that was
11        brittle when we picked it up, so it fell apart.
12             So what I'm saying is the damage you
13        see on the upper right of the counter in the
14        corner, in the upper right corner of the
15        counter, is consistent with the damage we see
16        on the cutting board as it is in the
17        orientation as we see it right now with the
18        handle to the left.
19 Q.     But it --
20 A.     And there's also damage -- there's also damage
21        on the lower left.
22 Q.     I get what you're saying.
23             MR. McGLYNN:  That's 427.  Just tell
24        us the -- or I'm sorry, 027.
25             MR. COPENHAVER:  Yeah, 40027, right,

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 166..169

Page 166

1      yeah.  Thanks.
2 BY MR. COPENHAVER:
3 Q.    But if we rotate that cutting board so the top
4       of it is along that line of demarcation, and
5       the handle overlays that, what I was asking
6       whether or not it appears consistent with a
7       shadow caused by the handle, is there not
8       damage to the portion of the cutting board to
9       the left of the handle that's consistent with
10      the damage to the counter at that same
11      location?
12 A.   There is damage to the lower left.  And if you
13      would rotate it, I don't believe the damage you
14      observed on the lower left of that wooden
15      cutting board, once it's rotated 180 degrees,
16      would be consistent with the damage we see on
17      the counter.
18 Q.   Did you do that?  Did you assess that?
19 A.   I believe -- I believe I have some photos in
20      my -- it probably would have been the first
21      evidence exam where that orientation of the
22      cutting board was, as you are describing it,
23      could be.  Essentially a similar photograph
24      that SEL -- that you pulled up from SEL.
25 Q.   The first evidence exam or the evidence

Page 167

1      removal?
2 A.   No, the evidence exam in June I think it was.
3 Q.   June 24th.
4 A.   Yeah.  So if you zip through there, you're
5       going to see -- I think you're going to see a
6       picture of the cutting board with the knife on
7       and part of the cutting board hanging over the
8       edge, over the stovetop, if my memory's
9       correct.
10 Q.   So while I'm looking for that, why did you put
11      it in that orientation?
12 A.   Because I believe there was some discussion
13      about the orientation.
14 Q.   Could it have been in a different inspection?
15      I'm not sure that I see that in your photos.
16 A.   All right, let me go through.
17 Q.   I am actually looking.  I'm not trying to be
18      difficult.
19 A.   No, no, no.  I'm going to pull them up, too,
20      and see if we -- oh, man --
21 Q.   While you do that, I'm going to look at October
22      just in case.
23 A.   Yeah, you're going to leave me with the one
24      with the two files.
25 Q.   I think it might be in your October one.

Page 168

1 A.   Oh, you think?
2 Q.   I think I see it, just to save you some -- I
3       mean, obviously take as much time as you need,
4       but I'll show you what I'm seeing in October.
5 A.   We'll get through this.  Yeah, there you go.
6       There you go.
7 Q.   So, we're looking at your photos in your
8       October artifact inspection set within your
9       file, and we're beginning at PA070183, and
10      there's a series of photos of the countertop
11      and the cutting board that go through 070202.
12      Did I capture that correctly?
13 A.   Yep.
14 Q.   All right.  So these are your photos obviously.
15 A.   Yes.
16 Q.   Okay.  And I'm sort of toggling between 0193
17      and 0194 in which you appear to be overlaying
18      the handle of the cutting board over that
19      burned section that I was asking you about
20      earlier; is that correct?
21 A.   Yes.
22 Q.   And what do we see here?
23 A.   Well, what we see in 194 is a protected area
24      and then a burned area.
25          And then in 193 we see the cutting

Page 169

1      board laying down overtop of that burned area
2      and protected area.
3 Q.   Did you find those to be consistent in shape
4       and size, meaning the burned area with the
5       handle from the cutting board?
6 A.   They do.
7 Q.   Okay.
8 A.   They do.
9 Q.   But you also --
10 A.  Go ahead.
11 Q.   Sorry.  You also see sort of a cut or a line or
12      some sort of mark on the counter.  It looks
13      like cracking or crazing of some sort?
14 A.   That's burning.
15 Q.   Does that align with the same thing on the
16      cutting board?
17 A.   I don't know.
18 Q.   Okay.  Anyway, what was the purpose of these
19      photographs?
20 A.   I believe the orientation of the cutting board
21      came into question.
22 Q.   Okay.  And what did these photographs tell you?
23 A.   They told me that the orientation is likely not
24      that way.
25 Q.   Is it more likely than not to a reasonable

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 170..173

Page 170

1    degree of engineering certainty not this way?
2 A.   I don't believe it is.  The --
3 Q.   If --
4 A.   Go ahead.
5 Q.   To be fair, I'll ask that question again.
6           MR. McGLYNN:  Thank you.
7 BY MR. COPENHAVER:
8 Q.   You said it's likely not that way.  And my
9     question to you was:  Is it your opinion to a
10    reasonable degree of engineering certainty that
11    it's not that way or it's just likely not that
12    way?
13 A.  It's likely not that way.
14 Q.  Okay.  Do you allow for the possibility that
15    the way that you oriented in October -- your
16    October 2020 artifacts inspection was the way
17    that the cutting board was, in fact, oriented
18    at the time of the fire?
19          MR. McGLYNN:  Objection.
20 A.  I don't believe it is because of the lack of
21    damage in that upper right corner of the
22    photos you're flipping through so fast.
23 Q.  Sorry.  So, yeah, that's not my question.  My
24    question was whether or not you allow for the
25    possibility that that shadow that you were

Page 171

1    overlaying is, in fact, the cut-out of the
2     handle and the cutting board was, in fact, the
3     orientation where the handle was closer to the
4     stovetop as opposed to the Keurig?
5 A.   I believe they -- I believe the handle is to
6     the left, closer to the Keurig.
7 Q.   Okay.  And the primary basis for that is the
8     damage to the counter.  So we're looking at
9     70185 from your October artifacts inspection.
10    And is it accurate to say that the primary
11    basis for your positioning of the orientation
12    of the cutting board is that, in your opinion,
13    the damage to the counter, the upper right
14    portion of the counter, as observed in 185, is
15    inconsistent with the damage to the cutting
16    board in what would be its upper right corner
17    if the handle was positioned next to the
18    stovetop?
19          MR. McGLYNN:  Objection.
20 A.  Yes, coupled with the damage on the right edge
21    of the counter closest to the stove as well.
22 Q.  Okay.  So, I guess we've wrung every drop out
23    of your positioning of the cutting board,
24    although it won't surprise you to know you
25    haven't convinced me yet.

Page 172

1           But in terms of the positioning of
2     the cardboard box on top of it, again, that's
3     just because there was debris on the cutting
4     board from the box that had the logos on it?
5 A.   Yes.
6 Q.   Were they -- I don't know how to get rid of
7     this.
8 A.   I don't see anything.
9 Q.   That's 'cause I'm not sharing the screen.  I'm
10    getting pop-ups all of a sudden.
11          How do you account for -- I'm back up
12    on 0185.  If what you see on the right here on
13    the stovetop turns out to be, in fact,
14    cardboard -- do you see what I'm pointing at
15    here?
16 A.  I do, yes.
17 Q.  Okay.  How would you account for the presence
18    of cardboard melted to or adhered to the
19    stovetop?
20 A.  The activities associated with the combustion
21    event, the fire burning, the collapse coming
22    down.  So, it's hard to depict.
23          But, I mean, if you took your cursor
24    up in the upper left corner and essentially
25    went down to the right -- to the lower right

Page 173

1    corner, that's going to be the angle in which
2     the cabinetry and the entire contents of the
3     cabinetry is falling and impacting that and
4     driving that box onto the stovetop itself,
5     coupled with fire suppression activities,
6     coming in with hose lines blasting, coupled
7     with firefighters standing on top of that
8     countertop and the stove, moving their feet
9     with tools and working overhead.
10 Q.  Hold on.  I'm pulling something up.
11          Did you notice any remnants of the
12    cardboard box in your experimental testing
13    adhered to the stovetop, the exemplar stovetop?
14 A.  No.
15 Q.  So you did not get the same result in terms of
16    the presence of cardboard on the stovetop in
17    your experimental testing as we observed in the
18    subject fire, correct?
19 A.  No.
20 Q.  Is that correct?
21 A.  That is correct.  I'm sorry.
22 Q.  Okay.  Is there any test or study or any
23    evidentiary material in the file that you can
24    point to that would support any opinion that
25    the cardboard that we see adhered to the

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 174..177

Page 174

1    stovetop was not adhered into the position that
2    it was located in at the time the fire started?
3         MR. McGLYNN:  Objection.
4 A.  I mean, 921 there's language in there about
5    when fires occur, things get moved.  I mean,
6    it's -- I don't mean to sound disrespectful,
7    but it's sort of like common sense that when
8    there's a fire and things are collapsing, and
9    fire companies come in with, you know, attack
10   lines at 125 PSI and extinguish and they're
11   moving around, things get moved.
12 Q.  Well, to be fair, you told me that your basis
13   for positioning it on the cutting board was
14   where you found the debris of the cardboard
15   box.  So why is the same not true for where we
16   find debris of the cardboard box on the
17   stovetop?
18        MR. McGLYNN:  Objection.
19 A.  Being that, hypothetically, of course --
20 Q.  Sure.
21 A.  -- that the snack box was on the stove and,
22   during all of this, ends up on the cutting
23   board.
24 Q.  Now, my point is that you're using the position
25   of the debris from the cardboard box on the

Page 175

1    cutting board to say definitely that it was on
2    the cutting board at the time the fire started,
3    but you are discounting apparent cardboard
4    material on the stovetop and saying, well, it
5    couldn't have been there when it started
6    because things really move around after a fire.
7 A.  Yes, that is true, coupled with -- coupled with
8    the dimension of the box.
9         If the box sat on the cutting board
10   like I propose, the box is not long enough to
11   extend over the element or over onto the
12   element.
13 Q.  But again, that assumes that the presence of
14   the debris on the cutting board tells you
15   specifically where the cardboard box was
16   despite the PSI of the fire suppression efforts
17   and people moving around and things get moved
18   after a fire, and NFP 921, and it's common
19   sense.
20        MR. McGLYNN:  Objection.
21 A.  I believe it was on the cutting board at the
22   time of the fire based on -- I mean, if it
23   wasn't, I would expect the cutting board to be
24   burned.
25 Q.  But what about this:  What if it was shifted

Page 176

1    two inches over to the right, farther than you
2    think it was, and it overlapped a portion onto
3    the stovetop but still primarily on the cutting
4    board, how would it appear differently in your
5    view?
6 A.  So, if the cutting board with the box on top of
7    it was shifted two inches to the right, is that
8    what you're saying?
9 Q.  Yeah, either that or just the cardboard box was
10   shifted two inches to the right, so it's still
11   predominantly on the cutting board but is also
12   on the surface of the stovetop.
13 A.  Well, then we wouldn't have the recovered
14   packaging material on the cutting board where
15   we found it.
16 Q.  But --
17 A.  On the left side.
18 Q.  On what you believe to be the left side.
19 A.  Right.
20 Q.  Okay.  Assuming the dimension of the box you
21   tested is the actual dimension of the box in
22   the subject fire.
23        MR. McGLYNN:  Objection.
24 A.  Correct.
25 Q.  So, what if we move the whole cutting board

Page 177

1    over two inches so part of the cardboard box is
2    on the stovetop?
3 A.  Then it wouldn't line up with the protected
4    area on the counter.
5 Q.  Again, if your orientation of the cutting board
6    is as you believe it to be?  Sorry, if the
7    positioning of the cutting board is as you
8    believe it to be?
9         MR. McGLYNN:  Objection.
10 A.  Yes.
11 Q.  Okay.  Let's say the cardboard box was a little
12   bit longer than you think it is.  So, in my
13   hypothetical, it takes up a lot of the cutting
14   board but also gets onto the stovetop surface,
15   okay?
16 A.  Okay, how would the cutting -- how would the
17   cardboard box get longer?
18 Q.  If the model changed in the two years between
19   when you bought it and when the Macalusos
20   bought it and put it in the kitchen prior to
21   the fire.
22 A.  Okay.
23 Q.  I'm just saying what if the box dimensions
24   changed?  We don't know whether it did or
25   didn't, right?

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 178..181

Page 178

1 A.   Fair enough.
2 Q.   Okay.  So in this hypothetical, let's say it's
3      longer and a portion of the cardboard box gets
4      into that white circle of that left-rear
5      heating element, okay?
6            MR. McGLYNN:  Objection.
7 A.   Okay.
8 Q.   And that heating element is on.
9 A.   Okay.
10 Q.  We talked about what would happen.  We think
11     it's likely the box would ignite, right?
12 A.  Right.
13 Q.  And if it's just barely on there, so it's not,
14     like, sitting over whole stovetop, it's
15     primarily on the counter and it's primarily on
16     the cutting board, but a little portion is on
17     the heating element of that left-rear portion
18     of the stovetop.
19           MR. McGLYNN:  Objection.
20           MR. COPENHAVER:  I haven't even asked
21     my question yet, Joe.
22           MR. McGLYNN:  There were a couple
23     parts that --
24 BY MR. COPENHAVER:
25 Q.  Would the fire patterns be different?

Page 179

1            MR. McGLYNN:  Objection.
2 A.   I believe so.
3 Q.   But we talked about that earlier, right,
4      whether you ignite -- still the box is going to
5      get ignited, right?
6 A.   It is.
7 Q.   And whether you ignite the right portion of the
8      box as we talked about earlier or the front
9      portion of the box, the box itself is still
10     going to become engulfed in flames, it's still
11     going to propagate up, it's still going to
12     attack the bottom of the cabinets above the
13     counter at that location, correct?  Because
14     that's where the fuel; right?
15 A.  Sure.  But if you shift that box to the right
16     like you're proposing in your hypothetical,
17     that is going to be closer to the burner, to
18     the surface element, the electric surface
19     element, and there's going to be more fuel,
20     a/k/a the box, overtop of the range and
21     underneath the microwave.
22           So, as that box -- as that box
23     becomes involved, it's going to impact the
24     bottom of the microwave and it's going to
25     travel horizontally in all directions because

Page 180

1      it's an obstruction.  Then it's going to hit --
2      it's going to hit the right upper cabinet and
3      it's going to proceed to the refrigerator where
4      there were multiple pieces of paper on the left
5      side of the refrigerator that were unburned.
6      And the upper -- I'm sorry, and the upper right
7      cabinet still remains.
8 Q.   So are you telling me that if that box had
9      moved two inches over to the right, just two
10     inches over to the right, and got ignited, from
11     whatever source, the fire pattern would be that
12     vastly different in your view?
13           MR. McGLYNN:  Objection.
14 A.  I mean, drastically is -- you know, your
15     drastically and my drastically is probably
16     different.  I would answer the question that I
17     would expect the fire patterns to be different
18     to some degree.
19 Q.  What degree?
20           MR. McGLYNN:  Objection.
21 A.  I would expect probably the microwave light
22     lens to be fractured or gone.  I would expect
23     the right filter on the underside of the
24     microwave to be impacted, and that was still
25     there.

Page 181

1 Q.   Have you read -- I mean, what's your basis for
2      that?  Did you run any tests to support that?
3            MR. McGLYNN:  Objection.
4 A.   My basis, my experience, my hundreds of fires
5      of --
6 Q.   Did you run any tests to support that opinion?
7            MR. McGLYNN:  Objection.
8 A.   Physical tests, no.
9 Q.   Did you review tests run by anyone else that
10     support that opinion?
11           MR. McGLYNN:  Objection.
12 A.  No, I did not.
13 Q.  You mentioned there's electrical activity in
14     the line cord for the Keurig that supports this
15     location as your area of origin; is that right?
16 A.  Yes.
17 Q.  Would that electrical activity be different in
18     the hypothetical I just gave you?
19           MR. McGLYNN:  Is the box two inches
20     to the right?
21           MR. COPENHAVER:  Yeah, we're two
22     inches longer.
23           MR. McGLYNN:  All right.
24 A.  Are you saying would I not expect there to be
25     electrical activity or would I expect

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022
Pages 182..185

Page 182

1    additional electrical activity somewhere?
2 Q. Does the electrical activity that you see that
3    supports your area of origin, does that refute
4    or disprove the possibility that the cardboard
5    box was partially over the heating element on
6    the stove?
7 A.  That's a little confusing to me, but I think I
8    understand what you're asking me.
9         I would expect -- I would expect to
10   see that same electrical activity on the line
11   cord of the Keurig regardless if it's where I
12   propose it was or two inches over.
13 Q. Okay.  How do you account for the difference in
14   damage between the subject Keurig and the
15   Keurig in your experimental testing?
16 A.  Ventilation.
17 Q. In which direction?
18 A.  All directions.  The size of the test room I
19   think was 10-by-8-by-7, something like that.
20   And that burn was only ten minutes.
21 Q. Right, and there was substantially more damage
22   to the Keurig in your experimental photo -- or
23   your experimental test than there was to the
24   subject Keurig in the actual fire, correct?
25        MR. McGLYNN:  Objection.

Page 183

1 A.  I would agree with that.
2 Q. Even though it was only ten minutes long?
3         MR. McGLYNN:  Objection.
4 A.  Right.
5 Q. The fire patterns -- well, what kind of fire
6    pattern did you use to determine the area of
7    origin for the subject fire?
8 A.  The patterns I observed on the range --
9 Q. The pattern --
10 A.  I'm sorry?
11 Q. I didn't mean to cut you off.  I thought you
12   were done.  Continue.
13 A.  The patterns on the range, the patterns on the
14   microwave, the patterns on the cabinetry, the
15   mass loss of the cabinetry, the --
16 Q. Was it a V pattern, a U pattern, a saddle
17   pattern, an inverted V?  I mean, what was the
18   actual pattern?
19 A.  It was essentially a V pattern.
20 Q. Okay, can you draw that for me?
21 A.  A V?
22 Q. On the photo from the scene.  Can you show me
23   the V pattern that you determined and relied on
24   in making your area of origin determination.
25 A.  How would I do that?

Page 184

1 Q. Well, I can -- you can walk me through it and I
2    can make sure you adopt it before we mark it.
3    Is that fair?
4 A.  Yeah.  I thought there was some way you
5    could --
6 Q. I'm sure there is, but I don't know it.  So
7    we'll do it -- I'll call this the old-fashioned
8    way, but I'm not sure that qualifies.
9         So I'm going to pull up your photos
10   from your 3-5 scene inspection.  Is that fair.
11 A.  Yeah, that's fine.
12 Q. And then I'll let you pick the photo.
13 A.  Yeah, that's fine.
14 Q. This one good?
15 A.  Yeah.
16 Q. Okay.  So, let me -- I can do it better on this
17   program here.  I'm going to take a screen shot
18   of this, and I'm going to use a red pen, and
19   I'm going to make it a little thicker so I can
20   see it.
21        All right, and we can start with the
22   left.  So where should the V start its point as
23   it moves upwards to the left?
24 A.  I would move over.  Get up on counter level.
25   Move over.  Over.  Right about in there.

Page 185

1 Q. Okay.  So this dot that I made would be the
2    lower portion -- or would be an apex.  What's
3    the inverse of an apex?  It would be the bottom
4    of the V?
5 A.  I was looking at it more as two lines.  So
6    essentially --
7 Q. I want to draw an actual V.  But if that
8    doesn't suit your mind, then we can do
9    something different.
10 A.  Yeah, you know what?  I think there's a better
11   picture, like the cabinetry's back in position.
12 Q. Great.  Where can I find that?
13 A.  I think that's probably going to be towards the
14   end of those scene photos.  'Cause I remember I
15   hung up that upper cabinet above the microwave.
16   Of course, I wasn't able to put the microwave
17   back into position, but --
18 Q. Is this what you did?
19 A.  No.  Keep going.  It's towards the end I
20   believe.
21 Q. Well, as I'm looking for this, when is the
22   first time you realized that the knob for the
23   heating element on the left-rear of the
24   stovetop was on?
25 A.  At the first evidence exam.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022
Pages 186..189

Page 186

1 Q.   In this photo here, 4516, you have the handle
2      of the cutting board closer to the stovetop,
3      correct?
4 A.   No.  The handle -- the actual cutting board
5      handle is to the left by the knife handle.
6 Q.   Is the knife handle in your view closer to the
7      cutting board handle?
8 A.   Yes.
9 Q.   Okay.
10 A.  Oh, man, I could have swore I took some shots
11     of that.  All right, well, go back up to the
12     one you proposed the first time.  That's fine.
13     I think you have it on the right right there.
14 Q.  Yeah, I just don't know where it is.  I've got
15     to find it.
16                There it is.  Do you want to go to a
17     different -- do you want to go to March 30th?
18     I'm not trying to stick you with a photo that
19     you don't think is good enough to tell me what
20     you mean by your V pattern.
21 A.  Yeah, just see -- just go into the March 30th
22     or 31st, whenever that was, to see if there's a
23     better photo in there with that upper cabinet
24     in place.
25                No, I don't think so.  I think you're

Page 187

1      way past.  There's nothing right in the
2      beginning like a general overall shot?
3 Q.   Like when you get in the kitchen?  This is the
4      first one you see.
5 A.   All right, go to the next one.  It may be a
6      little cleaner.  I think you're going the wrong
7      way, aren't you?
8 Q.   No.  I'm going -- no.
9 A.   Okay, I was just documenting the whole place
10     again.  Ah, It's just so dark.  That's all
11     right, just use that other one.
12                MR. McGLYNN:  What about the State
13     Police, Dave?
14                THE WITNESS:  Yeah, Joe, they would
15     not have had that upper cabinet put back into
16     position either.
17                MR. McGLYNN:  Okay.
18 BY MR. COPENHAVER:
19 Q.   Where was that?  None of these are head-on.
20     None of these are right directly on.
21 A.   Is the upper cabinet there?
22 Q.   These?
23 A.   Yeah, that one.  Click that one.  No.
24 Q.   No?  This is the one that we were using.
25 A.   That's fine.  That's fine.

Page 188

1 Q.   All right, so --
2 A.   Are you sure you're not able to share?  I seem
3      to remember if you go up to the top, you're
4      going to see view options or you can share
5      controls or something that you can give me
6      mouse control that I can just draw it?  Do you
7      want to do that?
8 Q.   Let me try.
9 A.   I've done it before.
10 Q.  Annotate, more.
11 A.  Give controls I think it is.
12 Q.  I don't see give controls.
13 A.  Share controls?
14 Q.  Well, see if we can find the one that we agree
15     with.  If not, then I can look into that
16     further.
17 A.  No, that's -- this is fine.  Let's just use
18     this.  So, why don't we --
19 Q.  Okay, I got it.
20 A.  You got it?
21 Q.  Yep.
22 A.  All right, so, why don't we first draw, like,
23     an oval circle overtop of that mound on the
24     countertop.  Yeah, right in there.
25 Q.  Okay, let me just make it a little smaller.

Page 189

1      Okay, like this?
2 A.   Yeah, right in there.  I wouldn't go that far.
3 Q.   I thought you said over the debris.  Okay,
4      well, then I'm not going to do that.  I want to
5      know what you think, not what I think.
6 A.   I know.  I know.
7 Q.   Before I draw it, you tell me how far to go
8      over.
9 A.   Over to the range.
10 Q.  Just to here (indicating on photograph)?
11 A.  Yeah, over a little bit more.  Yeah, right in
12     there.
13 Q.  Okay, and make an oval starting there?
14 A.  Yep.
15 Q.  And go how far to the left?
16 A.  Keep going.  Turn back, circle around, connect
17     it up.
18 Q.  Okay.  I don't know if we can call that an
19     oval, but I made a red circle around where you
20     told me to circle the debris, correct?
21 A.  Right.
22 Q.  All right, and what is that intended to
23     indicate?
24 A.  That's my origin.
25 Q.  Okay, and tell me the V pattern that you used

## MICHAEL MACALUSO vs APPLE, INC.

David B. Klitsch on 03/24/2022      Pages 190..193

Page 190

1   to get there.

2 A.   Essentially draw angle, vertical lines coming

3    up off the rear red line.

4 Q.   From here (indicating on photograph)?

5 A.   Yeah, pretty close to there.

6 Q.   Do you want me to go further down or further

7    up?

8 A.   No, go up a little bit more. Right about

9    there.

10 Q.   Okay, and there's the origin point. And where

11    would you like the termination point of that

12    line?

13 A.   Well, it's a little -- it's a little inaccurate

14    because that cabinet door is open, so --

15 Q.   So if we just assume that --

16 A.   Yeah, essentially right in there.

17 Q.   Right around where I am?

18 A.   Yeah, that's fine. Come down and connect it up

19    to that prior dot.

20 Q.   I'm not going to do that 'cause I can't draw a

21    straight line, but I'll read it into the

22    record. And essentially the left-hand side of

23    the V goes from the red circle that intersects

24    the left edge of that circle up to the red

25    circle on the cabinet. If we were to draw a

Page 191

1   straight line between those two points, that

2    would be more or less the left edge of the V

3    pattern that you determine to help you identify

4    the area of origin; is that correct?

5 A.   Yeah.

6 Q.   All right. Then I'm going to switch colors to

7    blue, and I'm going ask you to do the same

8    thing for the other side of that V pattern, all

9    right?

10 A.   Okay. Go on up a little bit. Yeah, right

11    about in there.

12 Q.   Right here?

13 A.   Yep.

14 Q.   Here?

15 A.   Yep.

16 Q.   Okay. So now I've made a blue mark which

17    represents the bottom portion of the V on the

18    right side. And where would you like me to

19    place the blue dot -- corresponding blue dot on

20    the top of the V on the right side?

21 A.   Go ahead up in the area of the microwave, where

22    the microwave would sit. Move over to the

23    left. Up a little bit. Yeah, right in there

24    is fine.

25 Q.   Okay, I'd like to go to the same height as

Page 192

1   that, if I could, so we can do an actual V.

2    But if I can't, I can't.

3 A.   Well, you're not going to draw a V anyway, are

4    you?

5 Q.   I mean, probably not on this actual exhibit,

6    but, you know, likely at trial.

7 A.   Okay. Yeah, you can move up and to the right a

8    hair.

9 Q.   You think right there?

10 A.   Move to the right a little bit. Probably too

11    far. Right about there's fine.

12 Q.   Okay, can I make a dot right there?

13 A.   Yes.

14 Q.   Okay, have I done that?

15 A.   Looks to be.

16 Q.   Okay. So, if we were to draw -- connect a

17    point between the top red dot and the bottom

18    red dot, and then a separate line from the top

19    blue dot to the bottom blue dot, that would

20    more or less be the V pattern that you

21    determined and formed your opinion about the

22    area of origin for the fire?

23 A.   Yes.

24 Q.   All right. Let's mark that as Exhibit 12.

25      - - - -

Page 193

1      (Exhibit 12 marked for identification.)

2      - - - -

3 BY MR. COPENHAVER:

4 Q.   Out of curiosity, there's obviously a bunch of

5    burn pattern that goes up -- well, let me ask

6    you this: Do you agree that there's a burn

7    pattern that goes up at an angle along the

8    front control panel of the stove?

9 A.   Yeah, there's some fire damage there.

10 Q.   That is sort of lower on the bottom -- I'm

11    sorry, to the left on the bottom and proceeds

12    diagonally to the right?

13 A.   Yeah, that would be as a result of fire

14    impacting the underside of the microwave.

15 Q.   Okay. Why did you position your -- the right

16    side of your V where it is as opposed to

17    farther over to account for more of the damage

18    to the control panel of the stove?

19 A.   Because my origin is based off of the items I

20    have explained to you, the witness information,

21    the fire patterns, et cetera.

22 Q.   Well, the fire patterns is what I'm trying to

23    understand. Did your V pattern come after your

24    origin determination, or did your origin

25    determination come after your V pattern?

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                          Pages 194..197

Page 194

1          MR. McGLYNN:  Objection.
2 A.   No, my V pattern came before the origin
3    determination.
4 Q.   Okay.  So my question is:  Why didn't your V
5    pattern account for more of the directional
6    damage -- fire damage to the control panel of
7    the stove?
8          MR. McGLYNN:  Objection.
9 A.   Primarily based off of -- primarily based off
10    of witness statement.
11 Q.   What witness statement in particular, or
12    witness statements in particular, did you use
13    to make that decision relative to the position
14    of your V pattern?
15 A.   Mr. Macaluso's statement that the control knobs
16    were off, that there was nothing combustible on
17    the stove, the stovetop had not been used.
18          So, with the lack of fuel and the
19    lack of a heat source, you can't have a fire on
20    the stovetop.
21 Q.   What if he was wrong about that?
22          MR. McGLYNN:  Objection.
23 BY MR. COPENHAVER:
24 Q.   I mean, have you ever encountered a homeowner
25    who did something stupid and didn't, you know,

Page 195

1    remember it exactly correctly or, you know, for
2    whatever reason gave you incorrect information?
3          MR. McGLYNN:  Objection.
4 A.   There have been times.
5 Q.   Okay.  So what if Mr. Macaluso was just wrong?
6          MR. McGLYNN:  Objection.
7 BY MR. COPENHAVER:
8 Q.   Let's say that burner was on and there was fuel
9    on the stovetop.  Is a V pattern that -- just
10    based upon the fire damage, that includes more
11    of a control panel for the stove a wrong V
12    pattern in your view based upon just the fire
13    damage that we see in the photo?
14          MR. McGLYNN:  Objection.
15 A.   The problem I had with the stove scenario --
16    one of the other problems I had with the stove
17    scenario is the timeline.  The timeline is one
18    hour and 46 minutes.
19 Q.   We'll get that there in a second.
20 A.   Okay, I'm sorry.
21 Q.   I'm talking about just the fire damage that we
22    see on here.  If we either don't consider Mr.
23    Macaluso's statement to you or deposition
24    testimony, or if we account for the possibility
25    that he is incorrect for whatever reason, as he

Page 196

1    was about some other stuff, just based upon the
2    fire damage as it appears on Exhibit 12, is a V
3    pattern that extends further to the right and
4    incorporates more of the damage that we see on
5    the control panel of the stovetop incorrect in
6    your view based upon the fire damage?
7          MR. McGLYNN:  Objection.
8 A.   That was a whole lot.
9 Q.   Sure.  But do you understand what I'm saying?
10 A.   I sort of understand what you're saying.  But
11    the witness -- can you put that back up?
12 Q.   Yeah.  I thought you were -- I didn't know you
13    were going to reference it in your answer.  I
14    was going to pull something up.
15 A.   Maybe I won't, but it sort of helps me in the
16    thought process.
17 Q.   Oh, sure.  Go ahead.
18 A.   I sort of just lost my thought here.  Hold on.
19 Q.   Not my intention.  I'm sorry.
20 A.   I know.  I know.  Oh, god.
21 Q.   You said something about the witness
22    statements.
23 A.   Yes.  Oh, okay, thanks.  So certainly 921, in
24    order to -- one of the caveats you could use
25    for origin determination is witness statements.

Page 197

1    And, in fact, I was for fortunate enough to get
2    a statement from the witness, in this point,
3    Mr. Macaluso, to give me information.
4          If I did not have -- if I did not
5    have the luxury, we'll call it, of speaking to
6    Mr. Macaluso, maybe my origin would have
7    included that.
8 Q.   Okay.  So, if I ask that question again, if we
9    just look at the fire pattern, if this is what
10    you had, and we --
11 A.   And no witness statements?
12 Q.   No witness statements, okay?
13 A.   Gotcha.
14 Q.   Would a V pattern that includes a larger
15    portion of that range to account for some of
16    the damage that we see be necessarily incorrect
17    in your view?
18          MR. McGLYNN:  Objection.
19 A.   If there was no witness statement available,
20    probably not.
21 Q.   Okay.
22          MR. McGLYNN:  Is now a good time to
23    take two minutes, Steve?  How much longer?
24          MR. COPENHAVER:  Let me open up one
25    more photo.  I'll get him to comment on it and

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Page 198

1  then we can take a break just to sort of
2  complete this line of questioning.
3           MR. McGLYNN:  Okay.
4 BY MR. McGLYNN:
5 Q.  Do you remember the V pattern that was
6  contained within SEL's report?
7 A.  I could -- I have it here.  I could look at it.
8 Q.  And this was actually taken from your photo,
9  image 4460.  I suspect that's likely the same
10  one that we used to create your V pattern.  And
11  this is Figure 27 from SEL's original report.
12          If we take a look at that V pattern
13  that they've created here and, again, if we're
14  operating in the universe that we're not
15  relying upon Mr. Macaluso for his statements,
16  and you're looking at the V pattern that Dr.
17  Hoffmann has created here, do you believe
18  there's anything necessarily incorrect about
19  this?
20          MR. McGLYNN:  Objection.
21 A.  I believe probably the left line should move to
22  the left some more.
23 Q.  Okay.
24 A.  And I believe probably the right line should
25  move to the left some more.  And I make that

Page 199

1  comment based on the remains of the plastic
2  center control panel still being there.
3 Q.  So then let's do this then:  What do you
4  think of -- if we, for the purposes of this
5  question, discount Mr. Macaluso, and we just
6  draw -- you're just asked to draw a V pattern
7  on this that only accounts for the visible
8  damage seen in this photo, how far over to the
9  left would you move both of those lines?
10 A.  Which one do you want to start with?
11 Q.  The right one.
12 A.  Okay, move to the left some more.  More.
13  Probably right about there.  And then go up.
14  Probably much of the same angle that he has
15  there.
16 Q.  So is this fair?
17 A.  Oh, probably --
18 Q.  I'll move it.  Here?
19 A.  Yeah.  Move it to the left more.
20 Q.  All right, let me erase that.  Here?
21 A.  Probably a little bit more.  That's pretty
22  close.
23 Q.  Okay.  And then I'm going to do it with red on
24  the -- well, let's do it --
25 A.  Yellow or something.

Page 200

1 Q.  Yeah.  Okay, and then you'd move this one over
2  to the left?
3 A.  Yeah, I would, probably somewhere right around
4  in there.  Pretty much the same angle as he has
5  there.
6 Q.  So right about here?
7 A.  That's fair.
8 Q.  Okay.  So, if we were to look just at the fire
9  patterns, based upon the photograph that we
10  have up in front of us, do you think a
11  reasonable very V pattern in your view would be
12  slightly -- shifted slightly to the left of
13  what SEL determined, and that's indicated on
14  the left by a line that would connect the two
15  yellow dots, and on the right by a line that
16  would connect the two blue dots; is that
17  correct?
18 A.  Yes.
19 Q.  And is the area between those two dots the
20  potential area of origin in that scenario?
21          MR. McGLYNN:  Objection.
22 A.  In that scenario, I would agree with that.
23 Q.  Okay.  And would that include a portion of the
24  left-rear burner in that scenario?
25          MR. McGLYNN:  Objection.

Page 201

1 A.  It's hard to see on the photograph.
2 Q.  It would include a portion of the stovetop,
3  correct?
4 A.  Oh, yes.
5          MR. COPENHAVER:  So we will mark that
6  with Exhibit 13, and now we can take a break.
7          THE WITNESS:  Thank you.
8          - - - -
9  (Exhibit 13 marked for identification.)
10          - - - -
11          MR. McGLYNN:  How much longer do you
12  have to go, Steve, do you think?
13          MR. COPENHAVER:  You know, we got a
14  little bit sidetracked by that cutting board.
15  You know, maybe 90 minutes.
16          MR. McGLYNN:  Okay.  All right,
17  thanks.
18          MR. COPENHAVER:  Okay.
19          - - - -
20          (A recess was taken at 3:17 p.m. and
21  reconvened at 3:26 p.m.)
22          - - - -
23 BY MR. COPENHAVER:
24 Q.  All right, Mr. Klitsch, you mentioned one, I
25  think, final thing with respect to your area of

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 202..205

Page 202

1    origin and that was the timing of it all, so I
2    want to explore that with you.
3 A.    Sure.
4 Q.    Did you include any discussion about timing in
5    your report?
6           MR. McGLYNN:   Objection.
7 A.    One second, please.
8 Q.    Certainly.
9                  - - - -
10   (Brief pause while witness examined document.)
11                 - - - -
12 A.   I believe I make mention of Mr. Macaluso's
13   departure from the house at 10 a.m.
14          I make mention of the fire being
15   dispatched at 11:46.
16          I don't believe there's any actual
17   discussion.
18 Q.   Do you express any opinions in your report
19   regarding the timing of any of the events in
20   question and how they related to the cause of
21   the fire?
22          MR. McGLYNN:   Objection.
23 A.   No.
24 Q.   But nonetheless, you have the opinion that the
25   timing of the fire is inconsistent with it

Page 203

1    being a fire caused by exposure to a fuel, to
2    the heat source, of the stovetop; is that
3    correct?
4 A.    Correct.
5 Q.    When did you come up with that opinion?
6           MR. McGLYNN:   Objection.
7 A.    It would have been after I authored the report.
8 Q.    Would it have been before the deadline for
9    rebuttal reports?
10 A.   I don't know what the deadline for rebuttal
11   reports is.
12 Q.   Would it have been before February 28th?
13          MR. McGLYNN:   Objection.
14 A.   It may have been.
15 Q.   Okay.  But to your knowledge, has that opinion
16   ever been disclosed to Apple in this
17   litigation?
18          MR. McGLYNN:   Objection.
19 A.   I don't believe so.
20 Q.   Is the first time, to your knowledge, that it's
21   being disclosed to Apple or one of Apple's
22   representatives today on March 24th, 2022?
23          MR. McGLYNN:   Objection.
24 A.   I believe.
25 Q.   Well, nonetheless, I'll ask you some questions

Page 204

1    about it subject to our objection as to the
2    timing of the disclosure of that opinion.
3           Just explain to me what your opinion
4    is and the basis for it is.
5 A.    The basis of that opinion is that Mr. Macaluso
6    states that he leaves around 10 a.m., returns
7    to the home somewhere just prior to the 9-1-1
8    call being at 11:46.  So there's one hour and
9    46 minutes.
10          So, if -- hypothetically speaking, of
11   course, if this was a snack box on top of the
12   left-rear burner, I would expect that Mr.
13   Macaluso to likely come home to his home well
14   involved if not into the basement.
15 Q.   Okay.  If you were to put a cardboard box of
16   the type that you believe was present on the
17   counter at the time of the accident, in close
18   proximity to but not in direct contact with the
19   heating element of the type that was found in
20   the left-rear portion of the subject stovetop
21   for an hour and 45 minutes, could it catch
22   fire?
23 A.   It depends on close proximity.  Are you talking
24   up to that circle?  Are you talking just
25   hovering over that?

Page 205

1 Q.    Either one.  Is there a scenario in your mind
2    where it could be close enough to it where it
3    could catch fire but not directly in contact
4    with it such that it would catch fire
5    immediately upon contact?
6           MR. McGLYNN:   Objection.
7 A.    I believe in order to achieve ignition, it
8    would have to have been within that circle
9    outline of the surface element.
10 Q.   Have you undertaken any tests where you placed
11   a cardboard box of the type that you believe
12   was present on the counter at the time of the
13   subject fire in close proximity to the heating
14   element but not directly in contact with it to
15   see -- for upwards of an hour and 45 minutes to
16   see whether, at some point during that
17   timeline, it could catch fire?
18          MR. McGLYNN:   Objection.
19 A.   I have not.
20 Q.   Are you aware of anyone having performed such
21   an experiment or test?
22 A.   Of this particular box and range?  No.
23 Q.   What about a like cardboard box and a like
24   range?
25          MR. McGLYNN:   Objection.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Pages 206..209

Page 206

1 A.    I don't know that.
2 Q.    Anything else about that opinion I need to
3       know?
4               MR. McGLYNN:  Objection.
5 A.    I don't think so.
6 Q.    So I want to go back to the opinions discussed
7       in your report, which would be those in the
8       absence of the chips.
9               In your original report, is it true
10      that your assumptions about what was on that
11      counter consisted entirely of the cutting
12      board, the Keurig, the iPad and potentially the
13      utensil cylinder?
14              MR. McGLYNN:  Objection.  Objection.
15 BY MR. COPENHAVER:
16 Q.   Go ahead, Mr. Klitsch.
17 A.   That's my understanding.
18 Q.   All right.  What would be -- in that scenario,
19      what would have been your explanation for why
20      there's such more damage to the right than
21      there is to the left?  Meaning, why does it
22      involve the microwave and the control panel of
23      the stovetop to a greater degree than, for
24      example, the Keurig?
25              MR. McGLYNN:  Objection.

Page 207

1 A.    Based on ventilation.
2 Q.    Did you run any experiments to model that?
3 A.    No, I did not.
4 Q.    Other than sort of a general concept of
5       ventilation, are you basing that on anything
6       else, anything concrete or any evidentiary
7       materials in this case?
8               MR. McGLYNN:  Objection.
9 A.    Such as testing?  Is that what you're referring
10      to?
11 Q.   Sure.
12              MR. McGLYNN:  Objection.
13 A.   I did no testing related to ventilation or how
14      it affects the fire spread.
15 Q.   Do you have an explanation for how it's
16      possible in your opinion that a fire started
17      next to a coffee maker with sufficient
18      intensity to propagate up to the cabinets and
19      move right to the microwave but not involve the
20      coffee maker?
21              MR. McGLYNN:  Objection.
22 A.   Once again, ventilation.
23 Q.   Is the location of the iPad, in your
24      experimental testing that you performed earlier
25      this month, the location that you believe the

Page 208

1       iPad was in at the time of the fire?
2 A.    That's a struggle I have.  I don't know exactly
3       where the iPad was at, whether it was on the
4       front as is in the experimental test or if it
5       was off to the side.  He just tells me that it
6       was by the cutting board.
7 Q.    Yeah, and that's what I was going to ask.  And
8       I didn't see it in your report which is why I'm
9       curious about it.
10              Did you determine a specific location
11      of the iPad on that counter?
12 A.   When the subject countertop was cleaned off,
13      there was somewhat of a square area on the
14      front edge of the countertop.  That's what led
15      me to put the iPad where I put it for the
16      experimental test.
17 Q.   Do you consider that to be a possibility of
18      where it was located, or do you consider that
19      to be the specific location on a
20      more-likely-than-not basis than it actually was
21      prior to or at the time of the fire?
22 A.   I think it's possible.
23 Q.   Within your area of origin, are you able to
24      pinpoint it with any greater degree of
25      specificity on a more-likely-than-not basis to

Page 209

1       a reasonable degree of engineering certainty
2       where the iPad was located at the time the fire
3       started?
4               MR. McGLYNN:  Objection.
5 A.    Somewhere in close proximity to the cutting
6       board based on the information I have.
7 Q.    And would that be based upon the witness
8       statements of Mr. Macaluso?
9 A.    Correct.
10 Q.   Okay, anything else?
11 A.   That's all.
12 Q.   Do you know whether it was face-up or
13      face-down?
14 A.   I do not.
15 Q.   Do you know if the charging port was oriented
16      towards the back wall, towards the stovetop or
17      towards the kitchen?
18 A.   I don't for sure.  I can only assume that it
19      was facing the outlet.
20 Q.   And that's just based on how people plug things
21      in?
22 A.   Exactly.
23 Q.   Okay.  And I take it that you're not offering
24      any opinions about the mechanism by which it's
25      believed the iPad underwent the battery thermal

Page 210

1   event, correct?  That's Mr. Eskra's bailiwick?
2 A.   It is.  I mean, I believe the iPad is the cause
3      of the fire based on the extensive damage that
4      the iPad sustained.
5 Q.   Sure.  But in terms of identifying any defects,
6      in terms of identifying the particular
7      mechanism by which the battery thermal event
8      was caused, any potential alternative design,
9      things of that nature, those are not things
10     that you're offering any opinions about; is
11     that correct?
12 A.  That is correct, I am not.
13 Q.  Have you done a comparison for this -- specific
14     to iPads, comparing the damage to iPads that
15     have undergone battery thermal events compared
16     to those that have been attacked by external
17     sources of fire?
18         MR. McGLYNN:  Objection.
19 A.  Yes.  And I say yes only based on my
20     experimental testing.  You saw in the
21     photograph that there was one there.
22 Q.  Yes, and I'll talk about that.  But I mean sort
23     of generally speaking.
24 A.  Outside of that?
25 Q.  Outside of that individual test.

Page 211

1 A.  No.
2 Q.   Okay.  And that test did not involve obviously
3      an iPad that had been forced to undergo a
4      battery thermal event, correct?
5 A.  No.
6 Q.   So it was not necessarily a one-to-one
7      comparison with anything?  It was just a single
8      iPad, correct?
9 A.  It was just a single iPad?
10 Q.  You only used one iPad in that test, right?
11 A.  Oh, yeah, yeah.
12 Q.  You didn't test multiple iPads under different
13     usage scenarios to see what they would look
14     like, did you?
15 A.  No, no.
16 Q.  And when did you reach the opinion that the
17     damage to the iPad, as informed by your
18     experimental testing, was consistent with it
19     being the cause of the fire as opposed to a
20     victim of it?
21         MR. McGLYNN:  Objection.
22 A.  When did I reach that?
23 Q.  Yeah.  You mentioned the March 4th testing as
24     the testing that you performed.  So I'm just
25     trying to determine when that opinion was

Page 212

1   reached.
2         MR. McGLYNN:  When did he notice the
3      damage?
4 A.  I'm a little unclear, too, so if you could
5      just --
6 Q.   I was trying to make sure that you weren't
7      going to offer any opinions about the mechanism
8      of the purported battery thermal event and the
9      iPad.  And you basically confirmed that for me,
10     but you did say you're of the opinion that the
11     iPad was the cause of the fire as a result of
12     its damage.
13         I asked you whether you've ever
14     conducted any tests or reviewed any tests that
15     compared the damage to an iPad that had
16     undergone a battery thermal event as compared
17     to one that had been exposed to external
18     sources of flame.  You said the only thing that
19     fits within that is the tests that I performed,
20     the experimental tests that I performed on
21     March 4th.
22         Are you with me so far?
23 A.  I'm with you.  You're right.
24 Q.  Is all of that accurate more or less?
25 A.  Yes.

Page 213

1 Q.   Okay.  So my question to you is:  When was the
2      opinion reached by you that the damage to the
3      iPad, the subject iPad, was more consistent
4      with it being the cause of the fire as opposed
5      to it sustaining fire damage by virtue of being
6      involved in a fire?
7         MR. McGLYNN:  Objection.
8 A.  I could tell you that when I did my initial
9      scene exam and saw the incineration of the
10     iPad, it certainly struck me as odd, especially
11     when the Keurig is right there that sustained
12     some thermal damage.  But that really piqued my
13     interest at that point.
14 Q.  It's not piqued your interest.  When did you
15     reach that opinion that you've expressed during
16     this deposition?
17         MR. McGLYNN:  Objection.
18 BY MR. COPENHAVER:
19 Q.  Go ahead, Mr. Klitsch.
20 A.  The opinion that the iPad is the cause of the
21     fire?
22 Q.  No.  That the damage to the iPad indicates that
23     it was the cause of the fire.
24         MR. McGLYNN:  Objection.
25 BY MR. COPENHAVER:

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 214..217

Page 214

1 Q.   Go ahead, Mr. Klitsch.

2 A.   After the lab exams and after the analysis and
3      the CT scan and after Eskra looked at it.

4 Q.   Are you relying upon Mr. Eskra for that
5      opinion, or is that an opinion that you came to
6      independently?

7            MR. McGLYNN:  Objection.

8 A.   No, I believe I came to it independently after
9      all of the data was in.  But exactly when that
10     was, I can't put a time on that.

11 Q.  Was it before or after you conducted your March
12     4th experimental test with an exemplar iPad?

13 A.  I believe it was before.

14 Q.  Okay, then, if that was the only test that
15     you're aware of that compared damage and that
16     wasn't conducted until after, what was the
17     basis for your opinion to suggest that the
18     damage observed on the iPad is more consistent
19     with the iPad being the cause of as opposed to
20     simply present in the fire?

21 A.  Other fires that --

22           MR. McGLYNN:  Objection.  Asked and
23     answered a couple of times.

24 A.  The other fires I've investigated throughout my
25     career.  There have been countless fires where

Page 215

1      there have been iPads and tablets that have
2      been exposed or in the room of origin that
3      looked nowhere near the damage that this
4      subject iPad sustained.

5 Q.   Anything else?

6            MR. McGLYNN:  Objection.

7 A.   No.

8 Q.   Do you have the names of any of those prior
9      cases?

10 A.  Oh, my god, that would be quite the feat to try
11     and go through.

12 Q.  Sitting here today, are you able to identify
13     for me the names of any of those cases?

14           MR. McGLYNN:  Objection.

15 A.  Not as I sit here today.

16 Q.  Would you be able to find those if asked?

17 A.  That would be quite the feat because I would
18     have to go through many hundreds if not
19     thousands of photos to go through and see where
20     there's an iPad that was in a room of origin
21     that was thermally damaged.  It would be
22     ludicrous actually to try and accomplish that.

23 Q.  Did you consult with any of those photographs
24     in reaching the opinion that you've expressed
25     that the damage to the subject iPad is more

Page 216

1      consistent with the iPad being a cause of the
2      fire rather than simply being involved in the
3      fire?

4            MR. McGLYNN:  Objection.

5 A.   Are you asking if I reviewed any of those
6      photographs before I came to this?

7 Q.   That's right.

8 A.   No, I did not.

9 Q.   Okay.  The opinion that the damage to the iPad
10     is more consistent with it being the cause of
11     rather than simply involved in a fire, is that
12     expressed in your report?

13           MR. McGLYNN:  Objection.

14 A.  In my report, it indicates the iPad was
15     extensively damaged and was found to be in
16     numerous pieces.

17 Q.  Right.  So you described the nature of the
18     damage, but where is the affirmative opinion
19     expressed in your report?

20           MR. McGLYNN:  Objection.

21 A.  I don't believe that that is included in my
22     report.

23 Q.  Okay.  In your experiment, how long did -- you
24     held a direct flame to the cardboard box for a
25     period of time in order to get it to ignite,

Page 217

1      correct?

2 A.   Yes.

3 Q.   How long did you hold that direct flame to the
4      cardboard box before the fire was
5      self-sustaining?

6 A.   It's in the video.  Maybe five seconds maybe.

7 Q.   I'll pull it open.  All right, are you able to
8      see my screen?

9 A.   I can.

10 Q.  Okay.  So this is your video entitled MVI
11     underscore 0124 of your experimental testing
12     you performed, correct?

13 A.  Yes.

14 Q.  What was the purpose of having the Keurig
15     there?

16 A.  There was a -- I had an exemplar Keurig and I
17     said, hey, let's just put that in the corner
18     because there was a Keurig in the corner.

19 Q.  Did you want to see the extent of damage to it?

20 A.  Sure.

21 Q.  So, we're at -- do you agree we're at four
22     seconds in the video when the flame first makes
23     contact with the cardboard box?

24 A.  I would buy that.

25 Q.  So you tell me when the flame becomes

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                                    Pages 218..221

Page 218

1    self-sustaining and I'll stop it.
2 A.  About there.
3 Q.  That's 26 seconds?
4 A.  That's the way it looks.
5 Q.  All right.  So, you held a direct flame to the
6     cardboard box for 22 seconds before that fire
7     became self-sustaining, correct?
8 A.  Yes.
9 Q.  All right.  (Plays video.)  Is it still
10    self-sustaining?
11 A. Not the cardboard -- it doesn't look like the
12    box, but I think it's going inside the box.
13 Q. Do you know that for sure?
14 A. Well, if you go forward in the video, and I
15    take the flame away, and the box -- and the
16    flame, then I'm pretty sure that it's burning
17    the box.
18 Q. Was your goal to not apply the flame for any
19    longer than was necessary to start the fire?
20 A. Yes.
21 Q. All right.  Did I stop it at the time you
22    pulled the ignition -- the lighter away?
23 A. Yeah, you're pretty close.
24 Q. All right, so, you held an open flame to that
25    cardboard box for approximately one minute and

Page 219

1     14 seconds in order to start that cardboard box
2     on fire, correct?
3 A.  Yes.
4 Q.  Do you know whether an iPad that had undergone
5     a battery thermal event would be a competent
6     ignition source for that box?
7 A.  I believe it would be.
8 Q.  Did you run any tests to determine that?
9 A.  No, I did not run any tests.
10 Q. All right, so it took an open flame a minute
11    and 14 seconds to ignite the box.  Did you
12    cause the iPad to go thermal in an effort to
13    determine whether or not the iPad -- a battery
14    thermal event on an iPad would be a competent
15    ignition source for a box of chips like this?
16         MR. McGLYNN:  Objection.
17 A. Did I cause the iPad to go thermal, is that
18    what you're asking me?
19 Q. That's correct.
20 A. No, I did not.
21 Q. Did you review any tests, experiments or
22    studies regarding battery thermal events
23    involving iPads in an effort to assess whether
24    an iPad going thermal would be a competent
25    ignition source for a box of chips like this?

Page 220

1         MR. McGLYNN:  Objection.
2 A.  As I mentioned earlier, I viewed videos, you
3     know, resulting -- videos of battery failures
4     that result in fireballs and fire emanating
5     from the devices.  So, I haven't run any tests.
6 Q.  All right, and none of those videos, if I
7     remember correctly, are you able to say
8     involved iPads, correct?
9         MR. McGLYNN:  Objection.
10 A. I can't say.
11 Q. All right.  And you don't know for what
12    duration of time and this iPad, if it had gone
13    thermal, would have expelled flames or gases
14    sufficient to ignite things on fire, correct?
15         MR. McGLYNN:  Objection.
16 A. I do not know the duration.
17 Q. All right, and do you know how long of a
18    duration this box would have to be in contact
19    with the contents of a battery thermal event
20    from an iPad in order to catch on fire in the
21    way that you did it in this experiment?
22         MR. McGLYNN:  Objection.
23 A. No, I do not.
24 Q. All right.  Do you know whether the length of
25    the battery thermal event would be long enough

Page 221

1     to ignite this cardboard box that you believe
2     was present on the counter in light of the fact
3     that it took you a minute and 14 seconds to
4     ignite it using an open flame?
5         MR. McGLYNN:  Objection.
6 A.  Do I know how long it would be or take?  Is
7     that what you're --
8 Q.  Do you know whether it would be long enough to?
9 A.  I don't.
10 Q. All right, let me ask you a couple of questions
11    about the setup for this test.
12         Where was this performed?
13 A. Once again, it was at Insurance Evidence
14    Services.
15 Q. All right, and the stove that you used, was it
16    the same model as the stove found in the
17    Macalusos' home?
18 A. Yes.
19 Q. Was the microwave the same model?
20 A. It was not.  It was similar in dimension and
21    setup.
22 Q. Was it the same manufacturer?
23 A. This was a GE that was used.  I think the
24    subject microwave, if my memory serves me
25    correct, was Sears.

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                Pages 222..225

Page 222

1 Q.   Were the dimensions of the countertop and the
2      cabinets and the microwave the same as those
3      present in the Macaluso home?
4 A.   Yeah, the counter and the upper cabinets were
5      the same.  Like I said, the dimensions of the
6      microwave were close.
7 Q.   All right.  And again, you're not precisely
8      sure whether or not the location of the iPad,
9      as you placed it in the experiment, actually
10     mirrors the location of the iPad at the time of
11     the fire, correct?
12 A.  I am not.
13 Q.  And you're not sure the area where you ignited
14     the box is the ignition point of that box at
15     the time of the fire, correct?
16 A.  No, I did not.  The ignition location that I
17     used there was just because the iPad was right
18     there.
19 Q.  And did you actually hold the flame on the
20     bottom of the snack box?
21 A.  Yes.
22 Q.  And it's not on the same level as the iPad?
23     Meaning the chip box in the experimental test
24     sits on top of the cutting board, whereas the
25     iPad sits on the counter itself; is that

Page 223

1      correct?
2 A.   That is correct.  So the box would have been
3      elevated the thickness of the cutting board.
4 Q.   Right.  And is any portion of the iPad
5      underneath or in contact with the chip box in
6      your scenario?
7 A.   There are photographs of that.  I don't -- I
8      don't think it was in contact.  I think it was
9      close.
10 Q.  In the subject fire, was any portion of the
11     iPad in contact with or underneath the chip box
12     at the time of the fire?
13 A.  Once again, I don't know.  I'm not sure where
14     the iPad was located at.
15 Q.  And you're right, there are photos of it and I
16     didn't want to hide those from you.  And this
17     appears to be consistent with what you're
18     saying:  It's close to but not underneath the
19     chip box; is that fair reading of this
20     photograph?
21 A.  Yes.
22         MR. COPENHAVER:  And just for the
23     record, that was 3040028 from Mr. Klitsch's
24     burn photos.
25 BY MR. COPENHAVER:

Page 224

1 Q.   All right, I'm going to pull the video back up.
2      And I'm not going to make us watch all 15
3      minutes of it.  I'm sort of going to
4      fast-foward in minute or so increments.
5          So here we are two minutes after the
6      video starts.  It's still confined just to the
7      box, correct?
8 A.   Yes.
9 Q.   And the smoke is going directly upwards to the
10     cabinet above the counter?
11 A.  The upper cabinet, correct.
12 Q.  Three minutes in, still a relatively small fire
13     contained to the box itself, and the flames are
14     moving upwards towards that upper cabinet,
15     correct?
16 A.  Yeah, it's starting to bathe the bottom and the
17     front face of the upper cabinet immediately to
18     the left of the microwave.
19 Q.  Did this cabinet ever fall down?
20 A.  Yes, it did.
21 Q.  I know the bottom of it dropped down, but does
22     the entire cabinet fall down?
23 A.  I think the pieces fell off only because it was
24     screwed to the back wall of the cabinet.  I
25     would have to go -- we'd have to look at the

Page 225

1      photographs.
2 Q.   Yeah, let's do that at the end, but let's just
3      keep marching on here.
4          And the flame -- we're about three
5      minutes and 49 seconds into this video, and the
6      flames are basically going -- involving the
7      cabinet above the counter, correct, the upper
8      cabinet?
9 A.   Yes, to the left of the microwave.
10 Q.  This is confirmation, as if we needed any, that
11     this type of chip box is a sufficient fuel
12     source to propagate a fire up and to those
13     cabinets, correct?
14 A.  Yes.
15 Q.  On that, we don't disagree, I take it?
16 A.  No, I don't.
17 Q.  Okay.  You're getting a lot of movement of the
18     flame to the left over -- directly above the
19     Keurig here by about four minutes and 34
20     seconds in; do you agree?
21 A.  Yes.
22 Q.  Okay, is that consistent with what you think
23     happened in the subject fire?
24 A.  I mean, obviously I don't know for sure because
25     I wasn't there when the fire was burning.  But,

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Pages 226..229

Page 226

1  you know, certainly the Keurig sustained
2  thermal damage at the Macaluso residence.  I
3  don't know how much flame it took.
4  Q.  Okay.  But I think as we talked about, the
5      Keurig -- the exemplar Keurig in your
6      experimental test sustained significantly more
7      fire damage than the Keurig in the Macaluso
8      home?
9  A.  I would say that it sustained more damage than
10     the Macaluso.
11 Q.  So we're about six-and-a-half minutes in.  The
12     microwave appears to be melting and dripping
13     down onto the stovetop surface.  The cabinet is
14     more or less fully involved.
15         Do you agree?
16 A.  I would agree.
17 Q.  Jump ahead to eight minutes or so.  More of the
18     same.  Nine minutes.  The cabinet is still
19     present at nine minutes.  Do you agree?
20 A.  I'm not sure.
21 Q.  Okay.  What about there, can you tell?
22 A.  I can't tell if the cabinet to the left of the
23     microwave is still up, and it's the
24     corner-configurated cabinet burning, or if
25     they're both up yet.

Page 227

1  Q.  So we're at 12 minutes and 58 seconds in.  At
2      what point does the suppression start?  I think
3      I see some water.
4  A.  I mean, it should be starting here shortly.
5  Q.  (Video plays.)
6  A.  I think it's starting now.
7  Q.  Okay, about 13 minutes and change in?
8  A.  Right.
9  Q.  (Video plays.)  And at this point it looks like
10     the camera is getting --
11 A.  Obscured.
12 Q.  -- obscured by the suppression efforts and
13     shortly hereafter will be removed.
14         (Video plays.)  There we go.  At
15     about 14 minutes the camera gets removed,
16     correct?
17 A.  Yes.
18 Q.  All right.  And it looks like it gets moved at
19     least.  So is there another hole into this
20     fire --
21 A.  No, I think that's when someone was grabbing it
22     to move it out of there, I'm thinking.
23 Q.  Got it.  (Video plays.)  And then it ends.
24 A.  Right.
25 Q.  And then you have obviously a bunch of photos

Page 228

1  from that, some after-photos which I will pull
2  up, beginning at 3 -- again we're in the burn
3  sub folder.  So 3040052 shows it when the box
4  has just caught a flame.
5      And then the next photo, which is
6  3040053, is the photo after the fire, correct?
7  A.  Yes.
8  Q.  All right.  Compare the fire damage that we see
9      in your experimental test with the fire damage
10     that you observed in the Macaluso home.
11 A.  I think it's very similar in that we have the
12     consumption of the upper wooden cabinet
13     immediately to the left of the microwave.  We
14     have damage -- are we good?
15 Q.  Yeah.
16     We have damage to that corner upper wooden
17     cabinet.
18         We have a left-to-right movement
19     pattern on both the microwave and the range.
20         And we already talked about the
21     damage to the Keurig.
22 Q.  Which is, I think you said, not similar to the
23     damage to the Keurig in the subject fire?
24         MR. McGLYNN:  Objection.
25 BY MR. COPENHAVER:

Page 229

1  Q.  Is that incorrect?  Did I mishear that?
2         MR. McGLYNN:  Objection.
3  A.  The Keurig in the test burn sustained a greater
4      degree of damage than the subject Keurig.
5  Q.  Okay.  If I pull these up side by side, so on
6      the right is image P3040053 which is from your
7      burn folder and shows the aftermath of the
8      experimental burn, and the image on the left is
9      image 4460, which is your photo from March 2020
10     of your scene inspection, do you agree that in
11     the subject fire there was significantly more
12     involvement of the control panel of the stove
13     as compared to the experimental test?
14         MR. McGLYNN:  Objection.
15 A.  There's more damage.
16 Q.  Well, in the subject fire, there was so much
17     damage that both of the left-most control knobs
18     burned off during the fire, correct?
19 A.  Or they were knocked off.
20 Q.  It came off during the fire, correct?
21         MR. McGLYNN:  Objection.
22 A.  I would agree they came off during the fire.
23 Q.  And neither of those happened during the
24     experimental test; is that correct?
25 A.  It did not, but the experimental tests did not

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 230..233

Page 230

1    have anything loaded into the cabinets for when
2    the cabinets fail and all these items come
3    crashing down.
4 Q. Do you believe that the knobs were knocked
5    off --
6 A. Oh, yes.
7 Q. -- at the subject fire?
8 A. Yes.
9 Q. Is there any mechanical damage to suggest that
10   that's true?
11 A. The knob is off.  The knob is found on the
12   stovetop.
13 Q. Is there any mechanical damage to the stem --
14   well, question mark.
15      Is there any mechanical damage to the
16   stem of that control knob?
17 A. No.  It was fire-damaged.
18 Q. Okay, so, no mechanical damage to it?
19      MR. McGLYNN:  Objection.
20 A. No, because of the fire damage.
21 Q. Okay.  Is there any physical markings
22   consistent with them being forced off of their
23   stem during the fire?
24      MR. McGLYNN:  Objection.
25 A. Yes, the knob was found on the stovetop.

Page 231

1 Q. Anything else?
2 A. No, that's it.  The knob came off and found on
3    the stovetop.  There's no reasonable
4    explanation for that other than impact.
5 Q. So you do not think that damage by fire could
6    weaken those knobs and allow them to come off?
7 A. And essentially not get burned up?
8 Q. Well, they're metal, right?
9 A. No, they're not.
10 Q. What do you think they are?
11 A. There's some photos of it.  It's like a tin --
12   a light tin material.
13 Q. Is tin metal?
14 A. Yeah.
15      MR. McGLYNN:  Objection.
16 BY MR. COPENHAVER:
17 Q. So they're metal, right?
18      MR. McGLYNN:  Objection.
19 A. I would categorize it or describe it as like a
20   tin -- like a molded tin material.
21 Q. Were they melted?
22 A. There was -- I believe there was a portion of
23   it that was melted.  But the vast majority of
24   it was there.  It was certainly recognizable,
25   and it didn't come off the right side.

Page 232

1 Q. Well, the right side didn't sustain nearly as
2    much fire damage as the left side did as we can
3    see in image 460, right?
4 A. Yeah, the right side didn't receive any fire
5    damage.  The knobs are still there.
6 Q. I think we agree.  So, my question to you is:
7    What's the basis, other than the knobs being
8    off, to attribute the knobs coming off to force
9    as opposed to their involvement in a
10   significant fire?
11      MR. McGLYNN:  Objection.
12 A. Common sense.  I don't mean to be
13   disrespectful, but no.  Common sense and the
14   knob being found on the stovetop.
15 Q. Okay.  Can you point to me anything other than
16   the fact that you're telling me that's the
17   case?
18 A. Such as what?
19      MR. McGLYNN:  Objection.
20 BY MR. COPENHAVER:
21 A. A study, an experiment, some physical damage to
22   it, witness marks, anything other than me just
23   having to take your word for it.
24 A. I can point you to the State Police Fire --
25      MR. McGLYNN:  Objection.

Page 233

1 A. Sorry.  I can point you to the State Police
2    Fire Marshal photo that he took that shows all
3    of that cabinetry and the contents being spewed
4    down across the countertop and the stovetop.
5 Q. Okay, and, I mean, anything else?
6      MR. McGLYNN:  Objection.
7 A. That would be all.
8 Q. Okay.  So, are these push-to-turn knobs?
9 A. I believe so.
10 Q. And that's a safety feature, right?
11 A. That's what they say.
12 Q. Okay.  Well, do you disagree?
13      MR. McGLYNN:  Objection.
14 A. I've had cases where appliances were placed on
15   stoves, set on there, pushed back, and the next
16   thing you know the appliance is on fire.
17 Q. Do you believe this appliance was defective?
18      MR. McGLYNN:  Objection.
19 A. I didn't say anything about being defective.
20 Q. I'm just asking whether you think the design of
21   the control knobs on this particular model
22   stove is defective.
23      MR. McGLYNN:  Objection.
24 A. I'm not going to offer an opinion on design.
25 Q. I'm asking you what you think.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 234..237

Page 234

1 A.    I have no opinion.
2 Q.    Okay, very good.
3            MR. McGLYNN:  Objection.
4 BY MR. COPENHAVER:
5 Q.    How much force do you need to push the control
6       knobs in on the subject model stove in order to
7       engage them?
8            MR. McGLYNN:  Objection.
9 A.    I don't know that.
10 Q.   Okay.  Did you test that?
11 A.   I did not do any testing for that.
12 Q.   But you agree that in order to engage them you
13      need to push them in and then rotate them to
14      the desired level?
15           MR. McGLYNN:  Objection.
16 A.   If it's operating the way it should.
17 Q.   Okay.  Do you have any indication that this
18      stove did not operate the way that it should?
19           MR. McGLYNN:  Objection.
20 A.   The insured does not speak of any problems, but
21      maybe he's used to it operating that way too.
22      I don't know.
23 Q.   Okay, well, do you have any basis for opining
24      that this stove did not operate the way that it
25      should have?

Page 235

1 A.    I just told you I'm not offering an opinion on
2       that.
3 Q.    And if it operated the way that it should have,
4       in order to engage the control knob, you need
5       to push it in and then rotate it to its desired
6       temperature, correct?
7            MR. McGLYNN:  Objection.
8 A.    Yes.
9 Q.    All right.  So is it your opinion that
10      materials from the upper left cabinet pushed in
11      the control knob -- bypassed the first control
12      knob and then pushed in the second control knob
13      and rotated it to six on the way down to the
14      stovetop?
15 A.   How do we know that it bypassed the first one?
16 Q.   Well, the first one isn't engaged, is it?
17 A.   We don't know.
18 Q.   Did you look?
19 A.   It was destroyed.
20 Q.   Well, we're able to figure that out for the
21      second one, right?
22 A.   Maybe your expert figured it out.  But it was
23      destroyed.
24 Q.   So you don't know whether the front left -- the
25      one on the left controlled the front left

Page 236

1       heating element, correct?
2 A.    Yes.
3 Q.    All right, so you don't know whether the front
4       left one was engaged or not, correct?
5            MR. McGLYNN:  Objection.
6 A.    I don't.
7 Q.    All right.  So, it may or may not have bypassed
8       the first one; you're not offering an opinion
9       about that, right?
10 A.   No.
11 Q.   But at the very least, is it your opinion that
12      materials from the upper left cabinet fell out
13      of the cabinet, downwards and to the right,
14      then pushed in the button and then rotated it
15      to heating six all on the way down to the
16      stovetop?
17           MR. McGLYNN:  Objection.
18 A.   I think you're mischaracterizing that.  I
19      believe -- I believe that during the course of
20      this crashing of the contents and the cabinetry
21      coming down, the knob gets manipulated.  It's
22      ludicrous for me to say that the debris somehow
23      stops midstream and pushes -- goes a different
24      direction and pushes in and turns.
25 Q.   I agree.  So how did it happen?

Page 237

1            MR. McGLYNN:  Objection.
2 A.    Maybe the control knob wasn't working the way
3       it should have been working.
4 Q.    Do you know whether it was or wasn't?
5            MR. McGLYNN:  Objection.
6 A.    I don't.
7 Q.    So you don't actually know what happened, do
8       you?
9            MR. McGLYNN:  Objection.
10 A.   Yeah.  I know the iPad caused the fire.
11 Q.   No.  I mean with the control knob.
12           MR. McGLYNN:  Objection.
13 A.   I already told you I believe what happened
14      here.  And that is based on the photograph from
15      the State Police and the knob being found off.
16           There is no reasonable explanation
17      for that knob being off if the fire originates
18      in that left-rear -- in the left-rear burner.
19      That knob should be gone.
20 Q.   Can you engage that knob simply by
21      force-turning it?
22           MR. McGLYNN:  Objection.  I don't --
23      force-turning it?
24 BY MR. COPENHAVER:
25 Q.   Did you understand my question, Mr. Klitsch?

## MICHAEL MACALUSO vs APPLE, INC.
### David B. Klitsch on 03/24/2022

Pages 238..241

Page 238

1 A.  Force-turning it with what?  With --

2 Q.  Meaning can you activate that burner without
3     pushing it in to engage the knob?  If you just
4     cranked it to the right without pushing it in,
5     would that work?

6         MR. McGLYNN:  Objection.

7 A.  I don't know.  I'd like to go down and try it,
8     but my wife probably wouldn't let me.

9 Q.  And you never tried that on any exemplar stove,
10    have you?

11        MR. McGLYNN:  Objection.

12 A.  I did not.

13 Q.  Okay.  You don't know whether that would leave
14    any evidence of mechanical damage to the stem
15    or to the knob or to any other portion of the
16    stove, do you?

17        MR. McGLYNN:  Objection.

18 A.  I don't.

19 Q.  All right.  And you don't know whether that
20    would succeed in actually activating the
21    heating element on the stove, do you?

22        MR. McGLYNN:  Objection.

23 A.  If that would engage the heating element?

24 Q.  Yeah, if it would work.

25 A.  I think it would work as long as there's power

Page 239

1     to the appliance.

2 Q.  Even if you didn't push it in?

3         MR. McGLYNN:  Objection.

4 A.  It's possible.

5 Q.  Do you know that?

6 A.  I don't.

7 Q.  Okay.  So, if the only way that you know for
8     sure how to engage a heating element is to push
9     in the knob and turn it to a selected
10    temperature, how is it possible that dishes or
11    whatever other debris did that?

12 A.  Force.

13 Q.  But you don't know whether -- what do you mean
14    force?

15 A.  Force from the falling debris.

16 Q.  How much force would it take to force that knob
17    into position six without pushing it in?

18        MR. McGLYNN:  Objection.

19 A.  I already testified, I don't know that.

20 Q.  But it must have happened in this case?

21 A.  I believe so.

22 Q.  Okay.  How much force was created by the
23    falling of debris out of that cabinet?

24        MR. McGLYNN:  Objection.

25 A.  How would I know that?

Page 240

1 Q.  Great question.  What was in that cabinet?

2 A.  I believe a bunch of plates and cups.

3 Q.  And is that based upon photographs or witness
4     statements?

5 A.  That's based upon photographs.

6 Q.  Okay.  Mr. Macaluso's fiancee said there were
7     chips up there, right?

8 A.  That's what she said.

9 Q.  Did Mr. Macaluso say what was up there?

10 A.  I did not ask him.

11 Q.  Are you aware of any experiment run by anyone
12    ever that shows that plates and cups falling
13    out of a cabinet can activate a burner?

14        MR. McGLYNN:  Objection.

15 A.  No.

16 Q.  What's the most common cause of a house fire?

17        MR. McGLYNN:  Objection.

18 A.  I would have to say probably unattended
19    cooking, smoking.

20 Q.  A stove being left on would be up there, right?

21        MR. McGLYNN:  Objection.

22 A.  It's not unattended cooking.  There were no
23    pots or pans.

24 Q.  I'm not asking that.  I'm just asking a stove
25    left on is up there in terms of frequency of

Page 241

1     causes of house fires, correct?

2 A.  No.

3         MR. McGLYNN:  Objection.

4 A.  I would not agree with that.

5 Q.  A stove being left on is not unattended
6     cooking?  I mean unattended.

7         MR. McGLYNN:  Objection.

8 A.  Just by virtue of the stove being on does not
9     cause a fire.

10 Q.  You need fuel.

11 A.  You need fuel, exactly.  So just by virtue of
12    the stove being left on is not going to result
13    in a fire.

14 Q.  How long did the subject fire burn?

15 A.  How long did it burn?  Somewhere between an
16    hour and 46 minutes and -- sometime between
17    when he left at 10 and when it was reported at
18    11:46.

19 Q.  Do you know how long it burned?

20 A.  If I knew that, I would be able to tell you a
21    lot more information.

22 Q.  Did it burn longer or shorter than your
23    experimental test?

24 A.  I don't know.

25        MR. McGLYNN:  Objection.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 242..245

Page 242

1 BY MR. COPENHAVER:
2 Q.   What was the counter made out of in your
3       experimental test?
4 A.   I believe it was just painted quarter-inch
5       plywood.
6 Q.   Why didn't it burn through?
7 A.   Don't know.  It would have had to burn through
8       the -- it would have had to burn through the
9       cutting board.
10              There was some burning up in the
11      upper right corner that was very similar to the
12      damage we saw on the subject counter.  The
13      subject counter did not burn through.  I mean,
14      the firefighter was standing on it.
15 Q.   Was it made out of corrugated plywood?
16 A.   The subject one?
17 Q.   Yeah.
18 A.   It was like a Formica top, and I'm not sure
19      what was underneath of that, some type of
20      composite board maybe.  I'm not sure.
21 Q.   What are the photos in your experimental
22      testing folder, stove counter pics?
23 A.   Those are the -- that's the subject cutting
24      board, the subject counter, and the subject
25      stove.

Page 243

1 Q.   Were these done prior to the experiment?
2 A.   Yeah, the same day but before the burn.
3 Q.   And what was the purpose of these photographs?
4 A.   To try and, you know, replicate as best as
5       possible the burn.
6 Q.   What's this (indicating)?
7 A.   That, I was -- I cut open --
8 Q.   Sorry, I don't mean to interrupt, but for the
9       record, this is P3040035 from the, I think,
10      counter photos -- stove counter pics in the
11      experimental testing folder.
12 A.   We good?
13 Q.   Sorry, sir.
14 A.   Okay.  So, I was considering if the box -- if
15      the box was involved in fire, could the right
16      side of the box fall out onto the stovetop and
17      potentially adhere to that element.  That was
18      the purpose of that.  I mean, you can see there
19      that certainly it covered that particular area
20      if, in fact, it would fall out like that.
21 Q.   Or if it was open like that?
22              MR. McGLYNN:  Objection.
23 BY MR. COPENHAVER:
24 Q.   Correct?
25 A.   I'm not sure why you would open it like that.

Page 244

1 A.   I mean, that was a solid piece of cardboard.
2       The place to open it would be the top.
3 Q.   Do you know whether something like this
4       happened in the subject fire or not?
5 A.   I don't.  It was just a hypothesis.
6 Q.   Okay.  Was it either proved or disproved by any
7       of the work that you did?
8 A.   Yeah, the testing -- the test burn did not
9       result in that -- in falling out onto the
10      stovetop.
11 Q.   Did that disprove that that's what happened in
12      this case?
13              MR. McGLYNN:  Objection.
14 A.   I don't -- I don't believe that it happened in
15      this case.
16 Q.   I'm asking whether that testing either proved
17      or disproved it.
18              MR. McGLYNN:  Objection.
19 A.   I mean, if it didn't fall out, if it didn't
20      fall out at the test burn, then it would
21      disprove it.
22 Q.   Well, the knob didn't get turned on in the test
23      burn, but you're not saying it disproved that.
24              MR. McGLYNN:  Objection.
25 BY MR. COPENHAVER:

Page 245

1 Q.   Right?  Is that right?
2 A.   But once again, there was no contents in the
3       upper cabinet to compression down either.
4 Q.   Why didn't you test that theory?
5              MR. McGLYNN:  Objection.
6 A.   What do you mean, fill up the cabinet?
7 Q.   Yeah, see whether your theory holds water.
8 A.   My wife would not approve of me using her
9       dishes to do that, and I did not have exemplar
10      dishes, so --
11 Q.   I mean, you went and got an exemplar stove.
12      You're telling me you couldn't go get some
13      plates?
14              MR. McGLYNN:  Objection.
15 A.   I did not.
16 Q.   Why not?
17              MR. McGLYNN:  Objection.
18 A.   Because I didn't.
19 Q.   Wouldn't that have been helpful?
20              MR. McGLYNN:  Objection.
21 A.   Possibly.
22 Q.   Were you worried it wouldn't turn it on?
23              MR. McGLYNN:  Objection.
24 A.   No, I was not.
25 Q.   So it's your opinion that the contents of the

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 246..249

Page 246

1    cabinet rather than the cabinet itself
2    turned -- rotated that knob, the burner knob on
3    the stove; is that right?
4               MR. McGLYNN:  Objection.
5  A.   I don't believe I said that.  I don't know what
6       it was, if it was the cabinet, if it was
7       cabinet parts and pieces, or the contents of
8       the cabinet, or a combination thereof that
9       comes crashing down.
10 Q.   Were those materials on fire when they came
11      crashing down?
12              MR. McGLYNN:  Objection.
13 A.   I would probably believe that the cabinet
14      components would be.
15 Q.   What about the material -- was there any
16      flammable materials inside of that upper
17      cabinet?
18 A.   I think it was more like porcelain -- not
19      porcelain, but something like ceramic dishes
20      and cups, that type of stuff.
21 Q.   The knob and the vent under the left side of
22      the microwave were found underneath the debris
23      on top of the stovetop, correct?
24 A.   Yes.
25 Q.   So, must it have been sort of the first thing

Page 247

1       that came out of the -- well, the fire had to
2       be so involved, had it reached the bottom of
3       the microwave and caused the filter or the vent
4       to fall down onto the stovetop, and then
5       involve so much of the cabinet to cause it to
6       collapse, and then I guess the first thing out
7       of there knocked the control knobs off and made
8       them be underneath the rest of the debris that
9       fell out?  Is that the chronology in your view?
10              MR. McGLYNN:  Objection.
11 A.   I don't know if it was the first thing, the
12      second thing or the tenth thing.
13 Q.   But it was early on in the process, right?
14              MR. McGLYNN:  Objection.
15 BY MR. COPENHAVER:
16 Q.   Otherwise the knob would be on top of a lot of
17      that debris?
18              MR. McGLYNN:  Objection.
19 A.   Yes.
20              MR. COPENHAVER:  All right, we're on
21      the home stretch.  Can I take -- give me ten
22      minutes.
23              MR. McGLYNN:  Okay.
24              MR. COPENHAVER:  I'll be able to work
25      out some stuff.

Page 248

1               THE WITNESS:  What's home stretch?
2               MR. COPENHAVER:  It means I have no
3       identified next topic to go to, so it's going
4       to be clean-up.
5               THE WITNESS:  All right, fair enough.
6       Thanks.
7                     - - - -
8               (A recess was taken at 4:28 p.m. and
9       reconvened at 4:38 p.m.)
10                    - - - -
11 BY MR. COPENHAVER:
12 Q.   All right, are we ready to go back on?
13              I've confirmed that we're just about
14      done here.  I've got just a couple final
15      questions for you.
16              Was the stem to the control knob for
17      that left-rear -- or that top left heating
18      element melted?
19 A.   The top left heating element?
20 Q.   The rear -- whatever we're calling it, the one
21      that was on.
22 A.   Oh, the left-rear.
23 Q.   Left-rear.
24 A.   I don't think there was a stem left.
25 Q.   Was it melted away?

Page 249

1               MR. McGLYNN:  Objection.
2  A.   I believe there was some -- I believe there was
3       some thermal damage to what little was inside
4       of the control panel.
5  Q.   Can a stem melting away cause a knob to fall
6       off?
7               MR. McGLYNN:  Objection.
8  A.   I would expect the knob to be consumed before
9       the stem melted away.  The knobs are plastic.
10      The knobs are plastic, and I believe there is
11      like this tin cover over it.
12 Q.   Did any portion of the knob melt?
13 A.   The only thing I found was the tin cover.
14 Q.   Okay, did the plastic on the knob melt?
15 A.   I guess so because I didn't find it.
16 Q.   Could the knobs have melted off?
17 A.   They could have.
18              MR. McGLYNN:  Objection.
19 A.   But I don't understand how the tin would not
20      melt but the knob underneath of it melt.
21 Q.   Well, what are the relative melting points
22      between the tin and the plastic?
23 A.   I would have to look it up.
24 Q.   Do you know?
25 A.   I just said I would have to look it up.

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Pages 250..253

Page 250

1 Q.   Okay.  If the knob had melted off, do you have
2      an explanation for how the heating element
3      could have been engaged other than it being
4      left on?
5           MR. McGLYNN:  Objection.
6 A.   I'm not so sure the heating element was even
7      on.
8 Q.   Okay, we'll let our guys take care of that.
9      You already testified that it was.
10 A.  No.  I testified that the control knob was on.
11     I didn't testify that the heating element was
12     on.
13 Q.  Do you know whether it was or wasn't?
14 A.  I don't know if it was or was not.  I know
15     the control knob was on, but I also know the L1
16     conductor feeding the infinite control switch,
17     the control knob, was arc-servered and welded
18     to the chassis.
19 Q.  So, back to my question:  If we assume that the
20     heating element was on, and the knob melted
21     away, is there an explanation for how it could
22     have turned on in that scenario if the knob had
23     melted away other than it being left on?
24          MR. McGLYNN:  Objection.
25 A.  I'm not sure I understand.  So, if -- so what

Page 251

1      you're saying is if the knob was in the on
2      position and there's this ensuing fire and the
3      knob melts away.
4 Q.   As a result of the fire.
5 A.   Okay.
6 Q.   Is there another explanation for why that
7      heating element would be engaged other than
8      that knob being left on?
9           MR. McGLYNN:  Objection.
10 A.  The crashing down and the turning on and the
11     snapping of the knob all in one motion, that's
12     another scenario.
13 Q.  They are both scenarios?
14 A.  It's essentially one scenario.
15 Q.  Well, one it melts off; the other it's knocked
16     off by the cascading material.
17          MR. McGLYNN:  What's the question?
18 BY MR. COPENHAVER:
19 Q.  I'm saying if it melts off as opposed to the
20     other scenario, is there an explanation for why
21     that heating element is on other than that it
22     was left on by whomever used it last?
23 A.  But I'm not saying that the heating element was
24     on.
25 Q.  I am in this hypothetical.  And I'm asking

Page 252

1      whether there would be another explanation for
2      that, if the knob had melted off as opposed to
3      it being knocked off by a cascading series of
4      dinnerware?
5 A.   I can't think of one.
6 Q.   Do you have an explanation for why nothing
7      about your conclusions or your fire patterns or
8      your V patterns or your area of origin changed
9      from when you didn't think there was any fuel
10     on the counter to when you thought there was a
11     giant box filled with greasy chips on the
12     counter?
13          MR. McGLYNN:  Objection.
14 A.  My origin hasn't changed.
15 Q.  That's my point.
16 A.  Okay.
17          MR. McGLYNN:  So what is your
18     question?
19 BY MR. COPENHAVER:
20 Q.  My question is:  We talked about how the
21     presence of fuel can really change fire
22     patterns and, depending upon the location of
23     the fuel, the type of the fuel, the size of the
24     fuel, all that stuff, do you remember those
25     questions?

Page 253

1 A.   I do.
2 Q.   Okay, and you reached a bunch of opinions in
3      this case.  The fact that you put out in a Rule
4      26 disclosure in federal court that was
5      supposed to contain all of your opinions, and
6      you premised those opinions on the assumption
7      that there was not a large quantity of
8      combustible materials on the countertop, right?
9 A.   Yes.
10          MR. McGLYNN:  Objection.
11 BY MR. COPENHAVER:
12 Q.  And then after the fact, you have come to this
13     new opinion that there, in fact, is a giant
14     cardboard box filled with greasy chips that
15     just happens to be in your area of origin,
16     right?
17          MR. McGLYNN:  Objection.
18 A.  Yes.
19 Q.  Yet none of your opinions changed?
20          MR. McGLYNN:  Objection.
21 A.  Changed to how?
22 Q.  The presence -- so this fire acted exactly the
23     same way whether there was a fuel present there
24     or not?  That's your opinion?
25          MR. McGLYNN:  Objection.

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                      Pages 254..257

---

Page 254

1 A.   It's probably more likely that the scenario is
2      the cardboard -- or the snack chip box that was
3      there.
4 Q.   You were just -- what, were you just wrong in
5      your first report?
6              MR. McGLYNN:  Objection.
7 A.   I wouldn't say that.
8 Q.   What would you say?  You were incomplete?
9              MR. McGLYNN:  Objection.
10 A.  I would say it's a re-evaluation of hypotheses.
11 Q.  Was there a fire stick present at the fire
12     scene?
13 A.  A fire stick?
14 Q.  An Amazon fire stick?
15 A.  That was my understanding, when that particular
16     device was recovered, I had called him and
17     asked him what it could possibly be, and that's
18     what he told me it may be.
19 Q.  What was it?
20 A.  He told me he believed it was an Amazon fire
21     stick.
22 Q.  Was it?
23 A.  I don't know what it was.
24 Q.  Do you anticipate any additional work between
25     now and trial?

---

Page 255

1              MR. McGLYNN:  Objection.
2 A.   Potentially a rebuttal report.
3 Q.   Anything else?
4 A.   Nothing other than paperwork.
5 Q.   I mean, given that I don't have a report
6      detailing any of the opinions you generated as
7      a result of this experimental test, I'll just
8      ask a broad question:  Have we discussed during
9      this deposition all of the opinions you intend
10     to express, if allowed by the court, at the
11     trial of this case?
12 A.  Yes.
13 Q.  Have we discussed the bases for all of the
14     opinions that you intend to express, if allowed
15     by the court, at the trial of this case?
16 A.  Yes.
17 Q.  Okay, I think those are all the questions I
18     have for you at this time.  I appreciate your
19     time and your patience.
20 A.  Thank you.  I would like to read and sign.
21             MR. COPENHAVER:  And then I'll hang
22     on and we can figure out exhibits.
23             MR. McGLYNN:  I don't have any other
24     questions.  I don't have any questions.
25     Thanks, Steve.

---

Page 256

1              THE WITNESS:  Have a good night,
2      guys.
3              MR. COPENHAVER:  Thanks, Mr. Klitsch.
4              THE WITNESS:  Take care.  Bye.
5              COURT REPORTER:  Pardon me, counsel,
6      if you are ordering a transcript, what format
7      or formats would you like?
8              MR. COPENHAVER:  A PDF and PTX mini.
9              MR. McGLYNN:  A PDF only, please.
10             COURT REPORTER:  Thank you.
11                   - - - -
12     (The proceedings were concluded at 4:48 p.m.)
13                   - - - -
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 257

1           C E R T I F I C A T I O N
2      I, Ed Fulesday, RDR, CRR, a Registered
3 Professional Reporter and Notary Public, do hereby
4 certify that the witness, DAVID B. KLITSCH, was by me
5 first duly administered an oath to testify to the
6 truth; that the foregoing deposition was taken at the
7 time and place stated herein; and that the said
8 deposition was recorded stenographically by me and
9 then reduced to printing, constitutes a true record
10 of the proceedings.
11     I further certify that the inspection, reading
12 and signing of said deposition were NOT waived by
13 counsel for the respective parties and by the
14 witness.
15     I further certify that I am not a relative or
16 employee of any of the parties, or a relative or
17 employee of either counsel, and that I am in no way
18 interested directly or indirectly in this action.
19     IN WITNESS WHEREOF, I have hereunto affixed my
20 hand and seal this 28th day of March, 2022.
21
22  _____
23       Court Reporter / Notary Public
24
25

---

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**                    Page 258

```
                                         Page 258
 1 STATE OF _____)      E R R A T A
   COUNTY OF _____)      S H E E T
 2
   I, DAVID B. KLITSCH, have read the foregoing pages of
 3 my deposition given on Thursday, March 24, 2022, and
   wish to make the following, if any, amendments,
 4 additions, deletions or corrections:
   Pg/Ln  Should Read           Reason for Change
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20 In all other respects, the transcript is true and
   correct.
21 _____
                        DAVID B. KLITSCH
22 Subscribed and sworn to before me this
   _____ day of _____, 20_____.
23 _____
24 Notary Public
   Reporter's Reference No. F220324
25 HUSEBY GLOBAL Reference No. 390357
```

MICHAEL MACALUSO vs APPLE, INC.
**David B. Klitsch on 03/24/2022**       Index: $1,089.06..2002

**$**

**$1,089.06**
 18:2

**$1,313.08**
 17:23

**$1,321.78**
 17:25

**0**

**00045** 137:18

**0014** 120:1

**0026** 148:1
 150:2
 162:19
 164:10

**0027** 145:3

**0029** 95:3

**0035** 95:4

**0045** 134:23
 136:15
 137:8

**0046** 136:3,
 6 140:11

**0047** 136:1,
 2

**0051** 156:8,
 9

**0124** 217:11

**0185** 172:12

**0193** 168:16

**0194** 168:17

**027** 165:24

**070202**
 168:11

**1**

**1** 8:8,10
 21:2 61:14

**10** 99:10
 106:15
 139:10,13
 202:13
 204:6
 241:17

**10-by-8-by-7**
 182:19

**11** 52:2,12
 158:11,13
 159:15
 160:3

**11:00** 47:15

**11:07** 47:16

**11:19** 59:1

**11:24** 59:2

**11:46** 99:12
 202:15
 204:8
 241:18

**12** 36:18
 88:19
 192:24
 193:1
 196:2

227:1

**120** 35:2
 37:9 42:24

**125** 174:10

**126** 20:5

**12:28** 106:19

**12:30** 105:18

**12:50** 106:20

**13** 53:7
 201:6,9
 227:7

**13th** 83:2

**14** 22:8
 49:25
 57:13
 219:1,11
 221:3
 227:15

**14th** 7:14
 49:15 51:7
 55:12
 57:8,9
 59:12
 60:13
 62:5,10,14
 64:17

**15** 20:2
 124:19,21
 126:24
 224:2

**16** 20:18
 21:4,15,19
 126:24

**1708385L**
 14:4

**18** 46:1
 97:23

**180** 42:25
 149:22
 150:9
 151:1,10
 166:15

**185** 171:14

**18th** 43:13

**193** 168:25

**194** 168:23

**1992** 34:24
 35:20

**1995** 36:2

**1:20** 129:9

**1:29** 129:10

**2**

**2** 8:7,10,14
 39:25

**20** 22:8
 35:5
 41:12,19

**20-minute**
 106:24

**2000** 35:20
 36:9

**2002** 36:10,
 13,17

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022                    Index: 2003..480

| | | | |
|---|---|---|---|
| **2003** 36:13, 17,22 | **203**:22 | **3040026** 145:13 | **133**:25 |
| **2007** 34:20 40:2 | **20th** 9:15 | **3040027** 143:8 | **40027** 165:25 |
| **2012** 35:7 36:17,22 | **22** 218:6 | **3040028** 223:23 | **40041** 134:3 |
| **2015** 44:23 | **23rd** 10:14 | | **42** 134:3 |
| **2018** 43:13 | **24th** 14:17 167:3 203:22 | **3040052** 228:3 | **427** 165:23 |
| **2020** 10:14 14:17 17:24 18:1 20:8,9 46:16 48:8,11 82:23 83:5,21 84:23 85:8 120:7 127:20 170:16 229:9 | **25** 41:12,19 | **3040053** 228:6 | **43** 134:4 |
| | **25th** 7:19 | **30th** 17:24 186:17,21 | **44** 134:4 |
| | **26** 18:1 218:3 253:4 | **31st** 83:5 186:22 | **4460** 198:9 229:9 |
| | **27** 198:11 | **34** 225:19 | **45** 134:4,20 136:12,23, 25 137:24 138:11,13 204:21 205:15 |
| | **28** 61:4 | **35** 22:10,12 23:4,25 24:14,20 | |
| | **28th** 203:12 | **36** 133:22 | |
| | **2:14** 160:19 | **37's** 133:23 | **450** 81:19 |
| **2021** 9:15 20:15 21:16 22:13 | **2:22** 160:20 | **38** 133:24 | **450-degree** 81:21 |
| | **2nd** 48:11 | **39's** 133:24 | **4507** 86:9 |
| | ——————— | **3:17** 201:20 | **4516** 89:3, 8,14 90:2 186:1 |
| | **3** | **3:26** 201:21 | |
| **2022** 7:15 30:2 37:11 46:11 49:15,25 51:8 55:12 57:9,14,19 59:12 60:13 61:4 62:5,10,14 63:2 64:13,17 | **3** 8:23 9:1 10:12,25 11:17 20:5 21:3 39:11 228:2 | **3D** 85:3 | **4524** 91:15 |
| | | ——————— | **46** 134:4,6 135:1,3 140:1,12, 14,17 195:18 204:9 241:16 |
| | **3-31-2020** 94:23 95:1 | **4** | |
| | **3-5** 184:10 | **4** 17:15,19 21:14 48:8 | |
| | **3-5-2020** 17:22 20:3 89:5 | **40** 5:22 7:25 8:1 | **460** 232:3 |
| | | | **480** 81:19 |

480-    81:21

480-degree
  82:5

485   154:23
  156:12

49   225:5

4:28   248:8

4:38   248:9

4:48   256:12

4th   25:19
  30:2 57:19
  59:22 63:2
  64:13
  211:23
  212:21
  214:12

---

5

5   19:15
  21:3 46:1,
  11

51   140:18

567   68:20

58   227:1

583   14:8

5th   82:23
  83:19,21
  84:2,23
  90:3 91:5,
  12 93:22
  120:7

---

6

6   34:5,8,10

6-24-2020
  121:25
  132:17,22

6-4-2020
  123:2

60   40:25
  42:23

---

7

7   46:16
  52:16,18

70   37:14

70-ish   37:14

70185   171:9

7:30   20:4

---

8

8   53:10,12

---

9

9   95:17,20

9-1-1   99:11
  204:7

90   201:15

900   111:14
  112:10,13

915   112:11

92   35:19

921   63:23
  97:23
  174:4
  175:18
  196:23

945   112:24

---

A

a.m.   47:15,
  16 59:1,2
  202:13
  204:6

a/k/a   179:20

absence
  206:8

Academy
  34:23
  35:12,18

accelerated
  37:20,22

access   87:20
  88:1

accident
  204:17

accomplish
  215:22

account
  21:17
  172:11,17
  182:13
  193:17
  194:5
  195:24

197:15

accounts
  199:7

accurate
  67:3 100:9
  102:12
  138:25
  148:19
  151:7
  171:10
  212:24

accurately
  147:6

achieve
  205:7

acquired
  46:3

act   19:1
  35:1

acted   253:22

activate
  238:2
  240:13

activating
  238:20

activities
  172:20
  173:5

activity
  108:2
  181:13,17,
  25 182:1,
  2,10

actual   36:19
  120:17
  146:9
  148:24
  176:21
  182:24
  183:18
  185:7
  186:4
  192:1,5
  202:16

addendum
  45:25

addition
  61:10

additional
  22:22
  23:10
  24:15
  26:25
  38:22
  59:19
  93:25
  182:1
  254:24

address   28:5
  96:19,20

adhere
  243:17

adhered
  52:22
  53:1,7
  54:1,22
  172:18
  173:13,25
  174:1

adjacent
  71:17
  74:11  75:3
  90:23
  109:5

adjusted
  112:1

adjustor
  10:17

administered
  5:3

adopt   184:2

advised   28:8

affects
  207:14

affirm   5:4

affirmative
  216:18

afraid   122:4

after-photos
  228:1

aftermath
  229:7

agenda   44:19

agree   61:25
  63:10
  70:17
  73:19
  97:12
  101:3
  113:13
  116:1
  121:21

136:14,25
138:1
146:21
154:25
163:22
164:15,18
183:1
188:14
193:6
200:22
217:21
225:20
226:15,16,
19 229:10,
22 232:6
234:12
236:25
241:4

agreeing
60:14

agrees   138:9

ahead   8:7
22:2 53:10
54:8
105:18
117:25
124:18
126:25
134:5
144:1
148:6
169:10
170:4
191:21
196:17
206:16
213:19

214:1
226:17

align   169:15

alleged   71:9
76:22 77:4
86:2

allowed   60:9
70:7,14
94:7,10
109:4
110:6
255:10,14

Allstate
9:16,21
10:4 11:14
12:4 22:16
23:9 24:9
42:12,16
83:8

alternative
210:8

Amazon
254:14,20

amount   19:4
21:6,12,13

analysis
7:15 41:21
59:20 64:1
78:20 98:5
101:20
146:5
214:2

analyze   25:9
79:3

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

angle 137:21
  140:7
  173:1
  190:2
  193:7
  199:14
  200:4

Annotate
  188:10

annually
  40:25

answers
  80:11

Anthony
  11:20

anticipate
  50:18
  254:24

anyone's
  72:23

apex 185:2,
  3

apologies
  129:19

apparent
  175:3

apparently
  85:25
  93:12
  139:21

appeared
  53:1 103:8

appears 9:3
  14:9

112:21
136:15
137:24
151:5
154:13
166:6
196:2
223:17
226:12

appended
  8:15

Apple 5:11
  50:10
  67:8,9
  85:13
  92:12,23
  93:1 94:7
  203:16,21

Apple's
  203:21

appliance
  46:9 84:20
  233:16,17
  239:1

appliances
  46:14,17,
  25 233:14

apply 218:18

approve
  245:8

approximately
  5:20 36:9,
  11 41:2
  112:24
  131:4

218:25

approximation
  138:2
  151:16,19

arc-servered
  250:17

area 35:21
  40:16 57:7
  60:15
  64:20 83:3
  84:16,22
  86:2,4,6,
  15,16 87:9
  90:20,22
  95:9
  96:24,25
  97:4,6,7,
  8,14 99:23
  100:14,21
  107:3
  108:1
  119:14
  122:22,23
  126:10
  136:10
  138:7,8
  142:24,25
  145:5
  151:21
  152:10,20,
  21 153:12
  154:12,13,
  17,24
  156:18,20,
  22,23
  159:2,14
  161:10,12,

18,20
163:19
164:8
168:23,24
169:1,2,4
177:4
181:15
182:3
183:6,24
191:4,21
192:22
200:19,20
201:25
208:13,23
222:13
243:19
252:8
253:15

area's
  155:16

argumentative
  56:24

arrival
  93:15

arrived
  85:21

arriving
  99:10

arson 34:17
  38:18 40:5
  46:18

Arsonist
  40:1

article
  40:18

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

artifact
  152:8
  168:8

artifacts
  89:23
  123:1
  170:16
  171:9

artwork
  51:25
  121:16
  123:22
  125:4
  127:15,22,
  23 131:12,
  20 135:17,
  24 141:2
  142:11,15,
  17

as-found
  112:2

ascertain
  84:14

assess
  166:18
  219:23

assigned
  10:15,16
  35:11,12
  36:14
  83:24

assignment
  20:1 35:25

associate's
  34:19

Association
  46:18

assume   17:8
  65:10
  110:18
  124:4,9
  190:15
  209:18
  250:19

assumes
  149:11
  175:13

Assuming
  149:4
  176:20

assumption
  52:21 65:4
  253:6

assumptions
  206:10

attach   96:1

attached
  6:25 7:7
  152:5

attack   174:9
  179:12

attacked
  210:16

attempt
  120:3
  141:5

attempted
  158:4

attend   36:8

attendance
  22:14,21

attended
  34:22
  46:4,6

attorney
  10:13
  16:15

attorney-
expert   17:1

attorneys
  9:20 11:10
  22:16 23:8
  24:8 42:11
  43:23
  45:5,23

attribute
  232:8

audio   128:15

Austin   12:2,
  6,17

author   61:17

authored
  7:15 8:4
  75:1 203:7

automatically
  72:6

autopsies
  36:8

aware   70:9
  84:24
  104:25

205:20
214:15
240:11

─────────

         B

bachelor's
  34:16
  38:17
  39:2,7

back   22:1
  30:17 40:2
  47:9,19
  59:7,10
  87:4,12
  88:25 89:1
  93:24
  106:23
  121:4
  122:16
  126:17,21,
  22 127:20
  128:17,21
  129:1,16,
  21 131:14
  133:7
  134:5
  135:3
  140:16
  141:18,19
  151:11
  157:7
  158:18
  159:5
  160:23
  172:11
  185:11,17
  186:11

**MICHAEL MACALUSO vs APPLE, INC.**
David B. Klitsch on 03/24/2022          Index: backed..behalf

187:15
189:16
196:11
206:6
209:16
224:1,24
233:15
248:12
250:19

backed  33:17

background
15:7

backsplash
80:1,23

backwards
131:15
133:16

bad  12:10
127:5
128:24
140:7

bag  44:20
51:25
127:16

bags  108:25
111:4

bailiwick
210:1

baked  51:22
124:3

baking
91:20,23

ballpark
106:1

122:18

bare  143:7
144:19,21
145:1

barely
178:13

based  25:18
49:19
55:11
59:10,18
60:12 61:6
68:1
102:11
104:21
109:14
120:10
125:2
126:5
127:12,13
131:2,10
135:24
142:25
143:20
146:5
148:3
155:24
160:10
175:22
193:19
194:9
195:10,12
196:1,6
199:1
200:9
207:1
209:6,7,20
210:3,19

237:14
240:3,5

basement
204:14

bases  26:8
61:13 62:4
97:19
107:3
255:13

basically
212:9
225:6

basing  132:5
207:5

basis  23:15
41:9 63:5
70:4 76:7
77:19
78:2,10
87:1
105:3,5
114:9
121:2
125:10,14,
18,19
126:2
127:3,7,23
160:5
161:25
171:7,11
174:12
181:1,4
204:4,5
208:20,25
214:17
232:7

234:23

bathe  224:16

batteries
76:18

battery
43:15,19
76:8,23,25
77:5,21
78:5 79:19
81:1,14
82:12
209:25
210:7,15
211:4
212:8,16
219:5,13,
22 220:3,
19,25

Battery-
operated
76:21

bedroom
85:13

beginning
91:15
168:9
187:2
228:2

begins  32:17

behalf  5:14
10:25
11:1,22
12:21
22:16 24:8
27:3 42:11

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Index: belief..board

belief  52:21
  74:19
  89:15

believed
  72:17
  97:2,11
  100:10,12
  209:25
  254:20

bell  43:9

bends  135:14

bet  86:8

big  65:2
  94:12
  147:2

bigger
  133:11

bill  24:23
  25:1,7
  127:22

billed  18:12
  21:9 22:11
  23:5 24:1

billing
  18:24

bit  15:7
  21:21 22:2
  86:19
  155:12
  177:12
  189:11
  190:8
  191:10,23
  192:10

199:21
201:14

black  128:23
  159:14,24

blanket  71:2

blasting
  173:6

blow  132:13

blue  127:16
  157:23
  191:7,16,
  19 192:19
  200:16

board  51:17
  52:1 55:19
  56:4,21
  59:23 60:5
  66:8 67:4,
  5 68:5,8
  71:15
  74:19
  86:15,21,
  24 87:11,
  15 89:16,
  20,25
  90:1,17,23
  98:20
  100:22,25
  101:1,23
  102:8
  118:22
  119:10,12,
  18 120:3,
  6,11
  121:15
  122:12,22

123:9,10,
14,15,16,
17 124:2,
11,19,23,
25 125:4,
6,7,12
126:4,6,8
127:14
131:11,22
132:3,7
133:5,9,
14,18,21
134:1,8,
11,15,22
135:22,25
136:3,5,16
137:7,21,
24,25
140:21,22
142:12,16
143:1,3,7,
17,20,21
144:12,21,
25 145:9,
19 146:6,
8,14,17,20
147:12,16,
25 148:2,
8,17
149:5,12,
15 150:9,
25 151:10,
22 152:11
153:3,13,
14,22
154:1,6,
15,17,21
155:1,7,

14,19
156:1
157:13,14,
24 158:7,
18,19
159:5,9,
12,17
160:7,9,11
161:4,22
162:24,25
163:2,8,
16,17,20,
23 164:3,
8,13,17,21
165:10,16
166:3,8,
15,22
167:6,7
168:11,18
169:1,5,
16,20
170:17
171:2,12,
16,23
172:4
174:13,23
175:1,2,9,
14,21,23
176:4,6,
11,14,25
177:5,7,14
178:16
186:2,4,7
201:14
206:12
208:6
209:6
222:24

223:3
242:9,20,
24

board's
 155:17

bone  5:13

book  40:18

bottom  39:16
 117:18
 123:5
 135:13
 179:12,24
 185:3
 191:17
 192:17,19
 193:10,11
 222:20
 224:16,21
 247:2

bought
 177:19,20

box  32:17
 47:4
 51:12,15,
 23,24
 53:17,20
 54:15
 55:15,17,
 18,24
 56:3,20
 57:4,6
 59:13,23
 60:4,15
 63:2
 64:19,25
 65:1 66:23

68:1
74:10,18
75:3 76:1
78:4
85:13,20
93:20
103:3
108:20,21,
22 109:2,
10,11,12,
15,16,17,
22,25
110:1,2,5,
14,18,20,
25 111:3,4
113:18,21
114:1,14,
21 115:4,
6,13
117:3,6,11
118:3,20
121:9
123:8,14,
15,23
124:10,12,
15,20
125:3,5,11
126:3,6,7,
9,19,23
127:3,4,6,
8,9,14,21,
24 128:1
129:24
130:13,14,
19,21
131:4,8,25
132:2
134:24

135:22
137:4
138:23
140:25
142:4,10,
18 143:11,
12,14,17
144:11,22,
23 145:4,
10,15,16,
23 146:2,
10,16
147:7,24
148:9,10,
14,16,18
149:1,2,23
150:13,16
151:2,4,8,
9,16,17
157:23
160:8
172:2,4
173:4,12
174:15,16,
21,25
175:8,9,
10,15
176:6,9,
20,21
177:1,11,
17,23
178:3,11
179:4,8,9,
15,20,22
180:8
181:19
182:5
204:11,15

205:11,22,
23 216:24
217:4,23
218:6,12,
15,17,25
219:1,6,
11,15,25
220:18
221:1
222:14,20,
23 223:2,
5,11,19
224:7,13
225:11
228:3
243:14,15,
16 252:11
253:14
254:2

boxes  127:19

boy  156:4

break  47:9,
 20 59:8
 96:19
 105:19
 106:24
 128:20
 129:4
 141:21
 160:24
 198:1
 201:6

breaker  93:6

breakers
 93:8,13

bring  89:8

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022          Index: brittle..cabinets

brittle
  165:11

broad  255:8

broke  107:2

BS  37:7

bucket  39:6
  99:21

bug  10:5,6,
  9,10

bugs  10:7

bunch  45:5
  47:24
  193:4
  227:25
  240:2
  253:2

burn  31:6
  112:16
  118:14,15
  119:6
  120:1
  126:11
  128:10
  130:9
  145:14
  152:16
  155:5,22
  157:12
  182:20
  193:5,6
  223:24
  228:2
  229:3,7,8
  241:14,15,
  22 242:6,

7,8,13
  243:2,5
  244:8,20,
  23

burned  54:17
  154:12
  155:5,12,
  16,17,18
  161:10,12,
  20 168:19,
  24 169:1,4
  175:24
  229:18
  231:7
  241:19

burner  60:23
  73:21
  103:24
  111:12
  112:1,9,22
  113:13,22
  114:7
  117:5
  118:23
  120:14
  126:11
  130:15,18,
  24 179:17
  195:8
  200:24
  204:12
  237:18
  238:2
  240:13
  246:2

burning
  149:16

169:14
  172:21
  218:16
  225:25
  226:24
  242:10

button
  236:14

buy  217:24

Bye  256:4

bypassed
  235:11,15
  236:7

byproduct
  80:8

─────────────

        C
─────────────

cabinet
  67:21 68:3
  74:20,24
  75:19
  104:1
  110:7
  117:19
  180:2,7
  185:15
  186:23
  187:15,21
  190:14,25
  224:10,11,
  14,17,19,
  22,24
  225:7,8
  226:13,18,
  22,24

228:12,17
  235:10
  236:12,13
  239:23
  240:1,13
  245:3,6
  246:1,6,7,
  8,13,17
  247:5

cabinetry
  82:3 99:2,
  3 107:18
  117:11
  145:11
  173:2,3
  183:14,15
  233:3
  236:20

cabinetry's
  185:11

cabinets
  60:10
  75:16,21
  76:9 77:8,
  23 78:6
  79:24
  80:22
  81:9,17,
  23,24
  82:4,7,8,
  15 99:25
  109:5
  110:12
  179:12
  207:18
  222:2,4
  225:13

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022          Index: calculated..cases

230:1,2

**calculated**
120:10

**call** 27:13,
16,17,19,
20,22
28:11,14,
15,16,22,
23 29:22
30:4 31:11
51:24
99:11
119:12
122:23
124:5
162:12
184:7
189:18
197:5
204:8

**called** 32:3
44:24
46:12,17
63:24
94:23 95:1
254:16

**calling**
31:4,15
99:11
248:20

**calls** 20:2,
14 21:9
28:13,18

**camera** 32:21
33:1,7,11,
14,16,25

227:10,15

**candor** 141:6

**capable** 76:8

**capture**
168:12

**card** 144:20

**cardboard**
51:23,24
52:3 53:3,
16,20
54:15
55:3,17
56:20
59:13
60:4,15
63:2 64:19
103:3,4,9,
12,21
108:24
109:2
113:11,15,
18 114:14,
20 115:4,
6,13
117:3,6,11
118:3
121:9,14
123:14,21,
24,25
124:1,2,
10,12
126:3
129:24
134:24
138:23
140:25

142:10,15,
18 143:1,
3,11,14,17
144:11,22,
23 145:2,
4,6,15,16,
23 146:2,
10,16
149:17
150:13
172:2,14,
18 173:12,
16,25
174:14,16,
25 175:3,
15 176:9
177:1,11,
17 178:3
182:4
204:15
205:11,23
216:24
217:4,23
218:6,11,
25 219:1
221:1
244:1
253:14
254:2

**care** 123:12
250:8
256:4

**career**
214:25

**carefully**
147:5

**cascading**
251:16
252:3

**case** 8:4
9:19 10:14
11:14,19,
21,24
12:1,3,5,
6,11,12
13:9,15
14:14
15:9,16
17:12
18:5,9,18
19:11
21:18
24:1,16
26:2 27:3,
7 31:14,18
32:6 48:7,
18 51:4
55:22 58:2
72:5 73:9
80:14
92:12
135:12
167:22
207:7
232:17
239:20
244:12,15
253:3
255:11,15

**cases** 9:9,12
10:11,24
11:16
12:6,13,

19,20
40:5,19
41:1,5,20,
22,25
42:3,10,
15,21
114:12
215:9,13
233:14

catastrophic
75:24

catch  204:21
205:3,4,17
220:20

categorize
231:19

caught  228:4

caused  10:4
55:13 57:5
59:12,24
64:18
90:22
152:17
154:24
166:7
203:1
210:8
237:10
247:3

caveat  138:6

caveats
196:24

center
112:22
199:2

ceramic
246:19

certainty
118:5
121:6
170:1,10
209:1

certifications
39:10,12,
16,17

certified
39:13

cetera  75:23
78:16
131:13
193:21

chain  85:17

change  14:9
42:4 227:7
252:21

changed
177:18,24
252:8,14
253:19,21

Chapter
97:23

charge  40:14
66:7 98:22

charging
209:15

chassis
250:18

check  18:24
85:17

checks
104:22

Cheetos
127:15,19
135:17

chef  104:23

Chimneys
46:13

chip  51:25
74:10,18
75:3 76:1
78:4
113:18
135:19,21
145:10
160:8
222:23
223:5,11,
19 225:11
254:2

chips  67:10,
11,12,20
108:20,25
109:3
113:21
115:7
132:6
206:8
219:15,25
240:7
252:11
253:14

choices
118:13

chronology
247:9

circle
114:2,4,6,
16 115:9
117:4
119:21
120:21
178:4
188:23
189:16,19,
20 190:23,
24,25
204:24
205:8

circuit  93:5

circular
130:14

clarification
74:25
111:21

clarify
161:3

clarifying
36:22

class  38:5,7

classes  37:2
38:10 46:2
75:22

clean-up
248:4

cleaned
208:12

cleaned-off
161:7

cleaner

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

187:6

clear  80:18
  116:17
  145:5

Click  187:23

clicked
  132:18

clip  158:25

close  49:14,
  18  54:11
  57:12
  113:21
  148:22
  151:18
  190:5
  199:22
  204:17,23
  205:2,13
  209:5
  218:23
  222:6
  223:9,18

closer
  130:24
  149:16,18
  150:2,10,
  16  151:4
  171:3,6
  179:17
  186:2,6

closest
  119:18
  156:20
  157:14
  158:17
  171:21

closet  85:14

cloud  88:4

COC2  14:8,
  21

coffee  66:14
  207:17,20

cognitive
  62:17,18
  63:15,18,
  24,25  64:1

cold-call
  28:21

collapse
  100:1
  172:21
  247:6

collapsing
  174:8

collect
  16:22  94:3

collected
  93:20

collection
  36:6

collectively
  95:25

College
  34:21  35:1

colors  191:6

combatting
  40:5

combination
  246:8

combustible
  98:14
  101:16,24
  194:16
  253:8

combustibles
  100:21
  102:16,23
  103:13,19

combustion
  172:20

comment
  197:25
  199:1

common  79:16
  174:7
  175:18
  232:12,13
  240:16

Commonwealth
  11:20

communications
  15:21
  16:16  17:1
  30:7,14

Community
  34:21  35:1

companies
  84:15
  174:9

company  7:16
  10:19
  12:7,10,
  13,22  72:5

Compare
  228:8

compared
  210:15
  212:15,16
  214:15
  229:13

comparing
  210:14

comparison
  210:13
  211:7

competent
  78:18
  219:5,14,
  24

complete
  37:1
  107:15
  198:2

completed
  32:19

components
  91:19
  246:14

composite
  242:20

compression
  245:3

computer
  128:23
  129:14,20

concept
  207:4

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022   Index: conception..contradicted

conception
  75:14

concern
  94:12

concerns
  92:5

conclude
  105:6

concluded
  256:12

concluding
  125:10

conclusion
  99:23

conclusions
  252:7

concrete
  207:6

conditions
  98:8

conduct  27:7
  48:14
  57:17 81:8

conducted
  62:7 82:10
  84:19
  212:14
  214:11,16

conductor
  250:16

confer  27:5

conference
  20:13 21:9

24:8 28:14
43:12
44:5,16,
19,23 45:9

conferences
  22:15 23:8
  43:7,10
  45:21

confined
  224:6

confirm
  122:6

confirmation
  225:10

confirmed
  64:7 212:9
  248:13

confusing
  182:7

conjunction
  43:7 62:13

connect
  189:16
  190:18
  192:16
  200:14,16

connection
  18:4 48:16

considered
  61:24 64:4

consisted
  23:5 24:4
  206:11

consistent
  51:16,21
  52:13
  87:10
  99:13
  103:8
  119:13
  126:6
  147:6
  156:19,23
  157:15,23
  158:6
  159:12
  162:23
  163:8,10,
  13 165:15
  166:6,9,16
  169:3
  211:18
  213:3
  214:18
  216:1,10
  223:17
  225:22
  230:22

consisting
  24:14

consult  27:5
  215:23

consultation
  27:1

consultations
  27:15

consumed
  99:4
  108:24

249:8

consumption
  228:12

contact  10:7
  81:9,22
  82:6
  204:18
  205:3,5,14
  217:23
  220:18
  223:5,8,11

contained
  198:6
  224:13

container
  66:11 91:1

contended
  10:4

contents
  98:16
  100:1
  104:1
  173:2
  220:19
  233:3
  236:20
  245:2,25
  246:7

continue
  106:25
  183:12

continuity
  63:19

contradicted
  71:10

contradicts
  72:15

control
  54:24
  73:10,20
  98:12 99:7
  104:23
  105:6,14
  107:21
  113:14
  115:10
  116:2,19
  156:5
  188:6
  193:8,18
  194:6,15
  195:11
  196:5
  199:2
  206:22
  229:12,17
  230:16
  233:21
  234:5
  235:4,11,
  12 237:2,
  11 247:7
  248:16
  249:4
  250:10,15,
  16,17

controlled
  235:25

controls
  104:13,17,
  21 188:5,
  11,12,13

conversation
  29:25
  30:20
  78:14

conversations
  28:6 31:1
  65:19

convinced
  171:25

cookie
  85:22,24

cooking
  113:24
  240:19,22
  241:6

cooking-
related
  99:14

cooktop
  52:23
  53:7,21
  54:18

Copenhaver
  5:9,10
  7:2,6,9
  8:12,18,25
  11:3
  16:11,14,
  17,21
  17:2,6,7,
  17 19:17
  23:3,14,
  17,21 25:3
  26:11,17
  28:9 34:12
  42:19

47:7,18
50:3 52:20
53:9,14
54:3,7
56:10
58:22,24
59:6 63:5,
14 64:10,
16 65:17
67:23
70:6,11,
17,21
71:1,6,7
73:5,8,14,
18 76:13
78:23
80:6,20,25
81:7 88:8,
24 92:16
95:12,24
96:6,9,15,
22,23
102:19
105:17,24
106:3,7,
14,22
111:20,22
115:15
116:18,23,
24 125:14,
18,20,24
128:17,22
129:1,3,7,
12,18
136:18
138:10,15,
18 139:15
141:10

143:23
144:5,8,10
145:18
146:24
147:4,18,
21,23
149:7
150:19,21,
23 160:15,
22 161:24
165:25
166:2
170:7
178:20,24
181:21
187:18
193:3
194:23
195:7
197:24
201:5,13,
18,23
206:15
213:18,25
223:22,25
228:25
231:16
232:20
234:4
237:24
242:1
243:23
244:25
247:15,20,
24 248:2,
11 251:18
252:19
253:11

255:21
256:3,8

Copenhaver's
 128:15

copy  8:3
 9:3 12:25
 13:8 15:8,
 21 34:4,5
 45:16
 87:19

cord  108:2
 181:14
 182:11

corner  89:18
 130:16
 147:16
 157:14
 158:16,23
 161:12
 162:10,13
 163:12
 164:2
 165:14
 170:21
 171:16
 172:24
 173:1
 217:17,18
 228:16
 242:11

corner-
configurated
 226:24

correct  6:1
 9:5,10,18
 11:7,11,14

12:8,14,
17,18,23
13:9,18,23
14:1,6,10,
18 16:2
24:2,6,9,
12 30:11,
16 31:24
33:18 41:6
46:5,6,9
48:19 50:3
51:23 52:4
54:1 55:22
56:5,8
57:9,14,19
58:3,7,10,
13 59:25
60:20
65:7,13
66:12,15,
18,20
67:18,21
68:6,13,
18,22
69:1,5,23
72:25
73:22
74:5,12
75:4,7
83:16
86:3,21
90:17
91:18
93:7,11,25
97:8,11
100:15
101:1,5,
14,25

102:9,12,
14,17
103:3,14,
18,21
105:15
108:12
111:1,5,10
112:3,10,
20 113:19
114:8
116:5,9
120:9
121:1
137:8
146:20
149:4,8,
12,18
153:8
156:25
164:14
167:9
168:20
173:18,20,
21 176:24
179:13
182:24
186:3
189:20
191:4
200:17
201:3
203:3,4
209:9
210:1,11,
12 211:4,8
217:1,12
218:7
219:2,19

220:8,14
221:25
222:11,15
223:1,2
224:7,11,
15 225:7,
13 227:16
228:6
229:18,20,
24 235:6
236:1,4
241:1
243:24
246:23

correctly
 59:11,15
 76:14
 119:25
 168:12
 195:1
 220:7

correspondence
 15:22
 16:23

corrugated
 51:12,23
 52:3
 53:16,20
 55:15
 64:19
 103:9,21
 242:15

Costco  51:14
 64:22 65:1
 113:19,22
 127:13

counsel
 129:20
 256:5

counselor
 57:1

counter
 56:4,21
 60:16
 66:5,17
 68:8 75:3
 76:10
 77:9,20,23
 78:3,7
 79:10
 82:15
 86:13
 90:20
 101:24
 102:6,16
 104:2,4
 109:5
 110:8
 115:8
 118:14
 120:4,16,
 24 126:19
 127:4,10
 128:2
 129:25
 142:21
 143:8
 145:14
 155:5,10
 158:16
 161:2
 163:3
 164:10,22

 165:13,15
 166:10,17
 169:12
 171:8,13,
 14,21
 177:4
 178:15
 179:13
 184:24
 204:17
 205:12
 206:11
 208:11
 221:2
 222:4,25
 224:10
 225:7
 242:2,12,
 13,22,24
 243:10
 252:10,12

countertop
 65:11 87:3
 90:14
 97:16
 98:9,16
 99:17
 100:2
 117:13
 118:22
 119:13,14
 120:17
 126:9
 133:24,25
 152:9,24
 153:21
 156:19
 157:16

 159:4
 161:8
 163:25
 168:10
 173:8
 188:24
 208:12,14
 222:1
 233:4
 253:8

counting
 21:11

countless
 214:25

County 34:21

couple 6:10
 19:13 30:5
 43:6 46:20
 56:24
 65:16
 87:12 88:2
 113:2
 121:12
 126:20
 130:3
 139:2
 178:22
 214:23
 221:10
 248:14

couple-minute
 47:9

coupled
 99:15
 171:20
 173:5,6

 175:7

court  26:7
 50:25 51:4
 95:13,22
 96:4,7,13,
 18 253:4
 255:10,15
 256:5,10

courtroom
 45:6

Courts  44:25

cover  26:8
 70:19
 125:6,8
 126:7
 148:10
 249:11,13

covered
 123:15
 125:11
 126:3
 143:14,17,
 19 144:11
 145:20,23
 148:25
 160:8
 243:19

covering
 143:12
 146:19
 148:9,23
 149:1,16
 150:13
 151:2

Covid  82:24,

25 94:11,
14

cracking
169:13

cranked
238:4

crashing
230:3
236:20
246:9,11
251:10

crazing
169:13

crease
131:24

crease-in
131:22

create
137:16
198:10

created
139:9
198:13,17
239:22

credence
104:20

credit 37:4
100:3,6

credits
37:6,10,
15,25
38:2,16

crime 36:7

criminal
11:21
12:12 38:8

criteria
97:24

cross-
examination
45:7

CT 214:3

cups 240:2,
12 246:20

curiosity
193:4

curious
208:9

cursor 135:9
136:8
155:10
156:24
165:4
172:23

cursor's
165:5

curve 158:4,
5 161:10

curved
156:18,22
157:9

custody 7:24
14:9
85:12,17,
18

cut 29:9
66:9 80:9

98:21
119:11
169:11
183:11
243:7

cut-out
87:11
89:20
156:19
171:1

cutting
51:17 52:1
55:19
56:4,21
59:23 60:5
66:8 67:4,
5 68:5,8
71:15
74:19
86:15,21,
24 87:11,
15 89:16,
20,25
90:1,16,23
98:20
100:22,25
101:1,23
102:8
118:22
119:10,12,
18 120:3,
6,11
121:15
122:12,22
123:9,10,
13,15,16,
17 124:2,

11,19,23,
25 125:4,
6,7,12
126:4,5,8
127:14
131:11,22
132:3,7
133:5,9,
14,18,21
134:1,8,
11,15,22
135:22,25
136:3,5,16
137:7,21,
23,25
140:20,22
142:12,16
143:1,3,7,
17,20,21
144:12,21,
24 145:9,
19 146:6,
8,14,17,19
147:12,15,
25 148:2,
8,17
149:5,12,
14 150:9,
25 151:10,
22 152:11
153:3,12,
14,22
154:1,6,
14,16,21
155:1,7,
13,17,19
156:1
157:10,13,

14,24
158:7,17,
19 159:5,
9,12,17
160:7,9,11
161:4,22
162:24,25
163:2,8,
16,17,19,
23 164:2,
8,13,17,21
165:10,16
166:3,8,
15,22
167:6,7
168:11,18,
25 169:5,
16,20
170:17
171:2,12,
15,23
172:3
174:13,22
175:1,2,9,
14,21,23
176:3,6,
11,14,25
177:5,7,
13,16
178:16
186:2,4,7
201:14
206:11
208:6
209:5
222:24
223:3
242:9,23

CV  6:21 7:5
8:19 13:3
34:4 35:16
45:25

cylinder
206:13

cylindrical
66:11
161:19

D

damage
29:16,17
31:7 99:16
107:22
157:15
158:16,19
159:3,6,
11,13
162:10,13,
15,21,23
163:1,3,7,
12,15,18,
25 164:2,
6,7,12,16,
20,22
165:12,15,
20 166:8,
10,12,13,
16 170:21
171:8,13,
15,20
182:14,21
193:9,17
194:6
195:10,13,

21 196:2,
4,6 197:16
199:8
206:20
210:3,14
211:17
212:3,12,
15 213:2,
5,12,22
214:15,18
215:3,25
216:9,18
217:19
226:2,7,9
228:8,9,
14,16,21,
23 229:4,
15,17
230:9,13,
15,18,20
231:5
232:2,5,21
238:14
242:12
249:3

damaged
33:14
85:19,21
215:21
216:15

dark  162:19
187:10

dash  85:7,8

dashes  165:6

data  25:18
51:11

63:17
82:17
97:25 98:3
115:18
214:9

date  17:21,
22,25 18:2
32:5 49:16

dated  7:14
43:12
49:15,25
51:7 55:12
57:9 61:4

dates  36:10

Dave  28:4
138:8
148:7
187:13

David  5:2,19

day  49:12,
13 83:1
85:12
104:25
243:2

days  68:20

dead  98:23

deadline
26:1
203:8,10

deadlines
57:24

deal  18:22
39:17

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022          Index: deals..depositions

deals   40:4

dealt   46:8,
  24

debating
  147:11

debris   51:21
  53:7
  65:11,21,
  24 85:10
  87:14
  90:4,8,13
  122:23
  126:5
  137:21,25
  138:11,12,
  20 143:20
  144:14
  145:4,8,
  10,11
  146:6,13
  148:8
  160:10
  172:3
  174:14,16,
  25 175:14
  189:3,20
  236:22
  239:11,15,
  23 246:22
  247:8,17

decides   51:5

decision
  194:13

deck
  131:15,16

defective
  233:17,19,
  22

defects
  210:5

defendant
  11:22 12:7

defense
  11:19
  12:3,6
  48:20
  61:24

defined
  96:24

definition
  64:11 97:8

definitions
  63:9

degree   34:19
  36:24 37:7
  38:16
  39:2,7
  118:5
  121:6
  170:1,10
  180:18,19
  206:23
  208:24
  209:1
  229:4

degrees
  111:14
  112:10,24
  149:23
  150:9

151:1,10
  166:15

Deluca   10:17
  40:20
  41:5,11,
  14,20
  42:3,7
  43:3 44:2
  45:19,23
  84:3

demarcates
  137:22

demarcation
  76:4
  157:2,7
  166:4

demarking
  120:13

demonstrate
  20:20

demonstrates
  71:25 77:6
  126:13

denies   98:14

dep   139:11

departure
  202:13

depend   81:25

depending
  110:12,17
  252:22

depends   37:2
  204:23

depict
  172:22

depicted
  52:11 90:2
  91:16
  132:2
  134:1,8,
  12,22
  136:3,23,
  25 137:1
  138:11,12
  140:25
  148:1
  158:10

depicting
  121:14

depicts
  114:2

deposition
  5:12,21,24
  8:8 9:4
  22:24
  23:11
  24:18
  47:23 51:2
  65:9,19
  67:13,14,
  16 68:11,
  19 69:3
  102:5
  104:22
  105:5
  195:23
  213:16
  255:9

depositions

9:10

Deputy   36:23

describe
 27:20
 63:20
 231:19

describing
 166:22

design   210:8
 233:20,24

designation
 14:5

desired
 234:14
 235:5

Desko   6:19

destroyed
 235:19,23

detail   19:4
 56:12

detailing
 255:6

determination
 69:16,21
 95:10
 100:15
 107:3,9
 108:1
 183:24
 193:24,25
 194:3
 196:25

determine
 19:9 30:13

65:2 81:8
97:24
111:24
118:3
183:6
191:3
208:10
211:25
219:8,13

determined
 86:6 112:7
 183:23
 192:21
 200:13

developed
 40:1
 102:11

device   92:20
 254:16

devices
 76:21
 220:5

diagonal
 134:22
 136:8
 137:7

diagonally
 193:12

diagrams
 7:23

dialed   27:21
 28:25

difference
 97:4
 110:11,15

147:2
182:13

differentiatin
g   61:20

differently
 176:4

difficult
 136:19
 167:18

dimension
 119:11
 175:8
 176:20,21
 221:20

dimensions
 124:15
 177:23
 222:1,5

dinnerware
 252:4

direct   19:8
 45:7 73:3
 204:18
 216:24
 217:3
 218:5

directed
 80:23

direction
 25:14
 182:17
 236:24

directional
 194:5

directions
 179:25
 182:18

directly
 41:22
 42:1,6
 71:17
 187:20
 205:3,14
 224:9
 225:18

disagree
 93:16
 153:10
 225:15
 233:12

disbelieve
 105:2

discard
 90:13

disclose
 50:5,7

disclosed
 10:25
 11:1,9
 26:5 27:2,
 6 50:20
 55:21
 57:13
 58:2,16
 76:3
 203:16,21

disclosure
 25:23
 204:2

253:4

**disclosures**
31:14 32:6
57:23

**disconnect**
132:12

**discount**
199:5

**discounting**
175:3

**discuss** 28:7
75:12

**discussed**
56:7 75:12
78:8
138:19
206:6
255:8,13

**discussing**
11:6

**discussion**
45:4
88:10,22
94:13
106:12
141:12
165:2
167:12
202:4,17

**discussions**
62:8

**dishes**
239:10
245:9,10

246:19

**dispatched**
202:15

**dispensed**
47:22

**displayed**
91:22

**displaying**
7:11 19:21

**disprove**
182:4
244:11,21

**disproved**
244:6,17,
23

**disrespectful**
174:6
232:13

**distance**
149:25

**docs** 13:22

**document**
7:11,19
9:2 14:8,
12,20,21,
25 15:1,2,
8 17:20
19:20,22
20:24
114:23
202:10

**documentation**
85:2,4

**documented**
93:15

**documenting**
92:9,10,11
187:9

**documents**
15:18

**door** 190:14

**Dorito**
127:16

**Doritos**
127:19
131:12
133:6
135:18

**dot** 185:1
190:19
191:19
192:12,17,
18,19

**dots**
200:15,16,
19

**double** 58:12

**download**
13:17
122:5
139:22

**downloaded**
14:23
15:12
121:24
122:7

**downloading**

88:14

**drastically**
180:14,15

**draw** 124:4
158:5
183:20
185:7
188:6,22
189:7
190:2,20,
25 192:3,
16 199:6

**drew** 137:22

**drilled**
33:24

**dripping**
226:12

**drive** 95:16
96:11

**driver**
139:21

**driving**
173:4

**drop** 171:22

**Dropbox** 88:1

**dropped**
224:21

**due** 161:10

**duly** 5:3

**duration**
82:14
83:14
220:12,16,

18

**Dynamic**   9:16
11:14 12:5

**dynamics**
98:1
99:20,22
107:5

———————
**E**
———————

**earlier**
42:23
130:17
132:14
137:4,6
168:20
179:3,8
207:24
220:2

**early**   247:13

**easier**   96:3
118:25
140:9

**Eastern**
34:15
36:24
37:7,18

**Ed**   52:9

**Ed's**   162:6

**edge**
119:17,21
120:11
131:3
136:9
153:23

155:11
167:8
171:20
190:24
191:2
208:14

**education**
38:22

**educational**
34:13

**effort**
219:12,23

**efforts**
32:18
33:13,18
104:9
175:16
227:12

**eight-week**
37:20,21,
23

**electric**
179:18

**electrical**
108:2
181:13,17,
25 182:1,
2,10

**electronic**
97:25 98:3

**element**   53:2
113:2,5
114:3
119:18
125:9

130:25
131:5,9
148:13
149:3,16,
18 150:4,
10,16
151:5
175:11,12
178:5,8,17
179:18,19
182:5
185:23
204:19
205:9,14
236:1
238:21,23
239:8
243:17
248:18,19
250:2,6,
11,20
251:7,21,
23

**elements**
120:13

**elevated**
223:3

**email**   15:24
16:7 30:6
96:19

**emailing**
8:16

**emails**   15:22
27:14
28:21

**emanating**

113:24
220:4

**encountered**
194:24

**end**   7:25
39:15
93:24
106:9
121:25
130:13
131:11
156:15
161:18
185:14,19
225:2

**ended**   10:17
94:14

**ends**   17:20
32:18
120:1
174:22
227:23

**engage**
234:7,12
235:4
237:20
238:3,23
239:8

**engaged**
235:16
236:4
250:3
251:7

**engineering**
38:19
118:5

121:6
170:1,10
209:1

**engulf**
109:11

**engulfed**
109:18,23
110:2,5,19
117:7
179:10

**enlarge**
21:21
89:10
133:4
161:6

**enrolled**
34:15

**ensuing**
251:2

**entail**  36:5

**entered**  15:9

**entire**
110:20
123:17
125:11
126:3,8
143:19
149:22
150:14
173:2
224:22

**entirety**
144:11,24
146:16
147:25

148:11

**entities**
84:19

**entitled**
13:20
14:3,8,12,
20,25
19:20
43:14
80:10 95:3
147:5
217:10

**entry**  9:15

**equal**  108:18

**erase**  199:20

**Erie**  10:21
12:2

**Eskra**  27:12
28:11,15
29:13,25
30:7,14
43:14 44:7
78:14,20
79:3
214:3,4

**Eskra's**
210:1

**essentially**
87:8 135:9
149:25
166:23
172:24
183:19
185:6
190:2,16,

22 231:7
251:14

**estimate**
5:22
20:21,23
21:4
40:24,25
41:12,19
42:9 152:1

**estimated**
42:23

**evaluate**
57:18
72:11

**evaluation**
63:19 64:1

**event**  76:8,
23 77:5,21
78:5 79:19
81:2,14
82:12
172:21
210:1,7
211:4
212:8,16
219:5,14
220:19,25

**events**  75:24
76:11,16
202:19
210:15
219:22

**eventually**
108:23,24

**evidence**

7:24 15:4
20:7,9,14
21:8,24
22:4,14,22
23:6 24:5
26:22,23
36:6
54:13,16
68:13,22
69:5,9,11,
15,20,22
71:11,17,
21,25
72:3,8,13,
15,16,17
73:9,24,25
74:1,6
94:5,6,8,
16,24 95:6
101:9
103:2
121:22
132:18,22
147:7
148:4
155:22
158:10
166:21,25
167:2
185:25
221:13
238:14

**evidentiary**
142:8
173:23
207:6

**exact**  127:4,

6

exam  15:4
  20:4,7,9,
  15 21:24
  22:5
  121:23
  132:18,22
  166:21,25
  167:2
  185:25
  213:9

examination
  5:7 26:25
  160:10

examinations
  22:15

examine  90:9

examined
  202:10

exams  21:8
  22:22 23:6
  24:5 214:2

excavated
  153:4

excavation
  142:25

excess  112:9

exchange
  27:14

exemplar
  13:20 14:6
  112:4,5
  120:3,4
  121:3

127:8
173:13
214:12
217:16
226:5
238:9
245:9,11

exhibit  8:7,
  8,14,23
  9:1 10:11,
  25 11:17
  17:15,19
  19:15
  21:3,14
  34:5,8,10
  52:16,18
  53:10,12
  95:17,20
  137:16
  139:10,13
  144:16
  152:7
  158:11,13
  159:15
  160:2
  192:5,24
  193:1
  196:2
  201:6,9

exhibits
  8:10
  255:22

expect  32:9
  175:23
  180:17,21,
  22 181:24,
  25 182:9

204:12
249:8

expelled
  81:3,13
  220:13

expended
  12:23

experience
  69:8 92:18
  181:4

experiment
  26:19
  27:1,8
  29:4,6,14
  30:1,8,15
  31:16
  32:4,14,16
  34:2 57:17
  58:7 59:20
  62:22,25
  111:23
  140:23
  142:18
  149:2
  205:21
  216:23
  220:21
  222:9
  232:21
  240:11
  243:1

experimental
  13:21
  51:18
  112:15
  118:12

119:7
120:2,25
127:25
128:11
142:10,20
143:9
147:8
148:15
161:2
173:12,17
182:15,22,
23 207:24
208:4,16
210:20
211:18
212:20
214:12
217:11
222:23
226:6
228:9
229:8,13,
24,25
241:23
242:3,21
243:11
255:7

experiments
  62:12
  114:11,24
  115:1
  207:2
  219:21

expert  5:14
  12:17,21
  26:15
  31:14 45:5

48:17
49:24
61:24
235:22

experts
15:3,4
27:2,6
29:1 44:24
48:20,23
50:2

explain
118:1
125:23
141:22,25
150:7
156:6
204:3

explained
29:15,16
57:1 66:7
125:21
193:20

explanation
144:12
206:19
207:15
231:4
237:16
250:2,21
251:6,20
252:1,6

explore
202:2

exploring
138:25

explosion
34:17
38:18

exposed
151:21
212:17
215:2

exposure
203:1

express
51:1,5
202:18
255:10,14

expressed
55:20
56:14,19
58:1 62:14
213:15
215:24
216:12,19

expressing
50:18

extend
175:11

extends
196:3

extensive
99:16
210:3

extensively
216:15

extent
217:19

external

210:16
212:17

extinguish
174:10

extreme
106:9

_____

_____
              F
_____

face   224:17

face-down
209:13

face-up
209:12

facing
109:16
209:19

facsimile
54:11

fact   12:16
18:10 62:8
65:6 69:19
70:21 71:9
89:20
101:18
103:4,20
111:15
112:14
148:11
149:15
163:3
170:17
171:1,2
172:13
197:1
221:2

232:16
243:20
253:3,12,
13

Fahrenheit
112:10,24

fail   230:2

failed   104:1

failure   56:1
57:2 75:17
79:5

failures
76:18 77:1
78:15
220:3

fair   37:3,6
42:20 43:2
74:22
104:15
108:18
146:1,4
147:13
170:5
174:12
178:1
184:3,10
199:16
200:7
223:19
248:5

fairness
146:25

faith   12:10

fall
224:19,22

243:16,20
244:19,20
247:4
249:5

**falling**
173:3
239:15,23
240:12
244:9

**falls**  108:3

**family**  58:21

**farther**
149:2
150:3
176:1
193:17

**fast**  170:22

**fast-foward**
224:4

**favor**  25:4,5
92:23 93:1

**feat**
215:10,17

**feature**
233:10

**February**
7:14
49:14,25
51:7 55:12
57:8,9,13
59:11
60:13 61:4
62:5,9,14
64:17

203:12

**federal**  51:4
253:4

**fee**  7:5
8:19

**feeding**
250:16

**feet**  173:8

**fell**  74:20
145:11
165:11
224:23
236:12
247:9

**Fer-reese**
30:23

**Ferrese**
27:12
28:11,16
30:21,24
31:2 32:4

**fiancee**
67:18
98:22
240:6

**fifty-five**
22:19

**fight**  17:3

**figure**  30:15
32:2,3
52:2,12
53:6 59:9
78:24
123:13

133:8
145:12
198:11
235:20
255:22

**figured**
128:20
235:22

**file**  6:7
10:18
12:25
13:8,14
14:24
15:16
18:9,15
19:9,19
25:12 26:6
83:25 85:8
94:19
95:15,18
112:14
122:2,3
126:13
132:24
139:20
142:8
156:7
168:9
173:23

**files**  14:1
95:3
167:24

**fill**  245:6

**filled**  109:3
252:11
253:14

**filter**  54:23
180:23
247:3

**final**  12:4
201:25
248:14

**find**  18:15
30:10
44:10
82:17
101:8
122:10
141:4,16
142:1
169:3
174:16
185:12
186:15
188:14
215:16
249:15

**fine**  88:8
118:1
124:6
139:4
141:10,15
147:22
160:16
184:11,13
186:12
187:25
188:17
190:18
191:24
192:11

**finish**  56:16
80:5,10

| | | | |
|---|---|---|---|
| fire 7:15 | 16,17 | 180:11,17 | 16,18,20, |
| 10:4,15 | 109:9 | 182:24 | 22 230:7, |
| 11:2 20:3 | 110:11,16 | 183:5,7 | 20,23 |
| 29:15 | 112:2 | 192:22 | 231:5 |
| 34:17,19 | 115:9 | 193:9,13, | 232:2,4, |
| 36:1,15,23 | 116:20 | 21,22 | 10,24 |
| 38:17,19 | 117:17 | 194:6,19 | 233:2,16 |
| 39:13,15, | 118:7 | 195:10,12, | 237:10,17 |
| 17,23 | 120:6,7 | 21 196:2,6 | 240:16 |
| 40:17 | 121:10 | 197:9 | 241:9,13, |
| 41:21 | 124:11,14 | 200:8 | 14 243:15 |
| 44:24 48:9 | 127:11 | 202:14,21, | 244:4 |
| 53:22,24, | 128:3 | 25 203:1 | 246:10 |
| 25 54:5, | 130:1 | 204:22 | 247:1 |
| 14,16 | 135:23 | 205:3,4, | 251:2,4 |
| 55:4,5,7 | 143:11 | 13,17 | 252:7,21 |
| 59:25 | 146:3,5, | 207:14,16 | 253:22 |
| 65:13,23 | 11,12 | 208:1,21 | 254:11,13, |
| 66:17 | 148:18,24 | 209:2 | 14,20 |
| 68:20 69:8 | 150:15 | 210:3,17 | fire-damaged |
| 71:8 72:4 | 151:17 | 211:19 | 230:17 |
| 73:11,22 | 152:18 | 212:11 | |
| 74:3,11 | 156:2 | 213:4,5,6, | fireball |
| 75:6,15,18 | 158:15,19 | 21,23 | 75:24 77:6 |
| 77:8 79:5 | 159:3,6 | 214:20 | 79:6 |
| 80:15 82:8 | 162:10,13 | 216:2,3,11 | fireballs |
| 83:20 | 163:7,11, | 217:4 | 77:1 78:15 |
| 93:14 | 14,15,18, | 218:6,19 | 220:4 |
| 97:1,25 | 24 164:1 | 219:2 | |
| 98:1,6,8 | 170:18 | 220:4,14, | firefighter |
| 99:1,14, | 172:21 | 20 222:11, | 40:1,5 |
| 19,20,22 | 173:5,18 | 15 223:10, | 242:14 |
| 103:25 | 174:2,8,9 | 12 224:12 | firefighters |
| 104:5,7,8 | 175:2,6, | 225:12,23, | 104:3 |
| 105:7 | 16,18,22 | 25 226:7 | 173:7 |
| 107:4,5,6, | 176:22 | 227:20 | |
| 14,17,25 | 177:21 | 228:6,8,9, | firefighting |
| 108:3,11, | 178:25 | 23 229:11, | 39:18 |

Fireplaces
  46:13

fires  35:25
  43:15,20
  46:9,12,25
  77:1 174:5
  181:4
  214:21,24,
  25 241:1

firm  9:14
  10:13,16,
  17 15:23
  41:6,16

fit  68:2
  127:22

fits  212:19

flame  81:10,
  13 82:13
  109:9,21,
  25 212:18
  216:24
  217:3,22,
  25 218:5,
  15,16,18,
  24 219:10
  221:4
  222:19
  225:4,18
  226:3
  228:4

flames  77:22
  78:5 79:23
  81:3 82:2
  109:4,12,
  18,23
  110:2,6

117:7,10
  179:10
  220:13
  224:13
  225:6

flammable
  246:16

flat  79:12,
  13,17,18

flipped
  151:1

flipping
  170:22

floorplan
  20:6

floorplans
  13:21

Florida
  43:12

focus  76:2

folder  13:16
  85:8 89:5
  94:22,23
  112:15,16
  118:13
  119:7
  120:1,2,
  15,25
  122:1
  128:10,11
  130:9
  132:23
  139:6
  142:21
  143:9

228:3
  229:7
  242:22
  243:11

folders
  13:18
  15:18

footprint
  150:11,12
  151:1

force  232:8
  234:5
  239:12,14,
  15,16,22

force-turning
  237:21,23
  238:1

forced  211:3
  230:22

forensic
  36:4

forever
  122:4,6

forget
  158:15

form  23:16,
  18 60:12,
  18 62:3
  64:9
  70:15,18,
  25

formalities
  47:23

format  256:6

formats
  122:2
  139:21
  256:7

formed  61:13
  192:21

Formica
  242:18

formulate
  49:19 61:6

formulated
  121:6,8

fortunate
  197:1

forward  71:5
  126:21
  127:1
  128:6
  133:7,16
  134:3
  137:9,13
  139:17
  155:13
  164:24
  218:14

forwarded
  6:9

found  51:16,
  17,22
  52:22
  73:21 90:2
  91:18
  92:11
  103:25
  113:18

115:11
116:2,20
120:6
124:2
138:24
139:1
141:25
174:14
176:15
204:19
216:15
221:16
230:11,25
231:2
232:14
237:15
246:22
249:13

four-and-a-
half  119:19

four-year
 9:4

fractured
 180:22

frame  35:24
 42:18 60:2
 116:15

Frank  27:12

Franklin
 11:20

free  40:11,
 14

frequency
 240:25

front  19:25

34:6 99:6
107:21
108:21,22,
23 109:11
136:8
179:8
193:8
200:10
208:4,14
224:17
235:24,25
236:3

front-left
 103:24

fuel  60:5
 108:10,16
 110:24
 179:14,19
 194:18
 195:8
 203:1
 225:11
 241:10,11
 252:9,21,
 23,24
 253:23

Fuel-burning
 46:13

fueled
 117:10

full  5:17

full-time
 36:14

fully  226:14

future  8:6

18:23

_____

_____
        G
_____

game  105:21

gaps  82:2

gases  81:3
 220:13

gather  18:19

gathering
 45:22

gave  181:18
 195:2

GE  221:23

general
 96:25 97:9
 187:2
 207:4

generally
 138:20
 210:23

generate
 19:6 49:23

generated
 18:4,14,20
 51:6 55:11
 255:6

geographical
 96:25 97:9

giant  252:11
 253:13

give  58:20
 70:21

71:1,14
72:24
103:9,10
104:20
121:19
156:4
188:5,11,
12 197:3
247:21

goal  218:18

god  27:18
 196:20
 215:10

good  5:10
 35:23
 47:12
 50:24
 79:13
 111:20
 184:14
 186:19
 197:22
 228:14
 234:2
 243:12
 256:1

gotcha  154:4
 197:13

grabbed
 33:7,12

grabbing
 227:21

graduated
 34:23,25
 35:18

Granted
  146:6

grease
  108:24

greased
  111:4

greasy
  252:11
  253:14

great  8:21
  21:23
  88:16
  185:12
  240:1

greater
  206:23
  208:24
  229:3

grew  108:23

grooves
  103:7

guess  30:17
  60:14
  87:25
  88:19
  103:23
  128:13
  171:22
  247:6
  249:15

gun  82:24,
  25

guys  27:13,
  14 28:2

59:4 250:8
256:2

————————

       H

————————

hair  192:8

half  114:18
  134:21
  137:6

half-hour
  105:20

handful
  38:12,13

handle  86:20
  87:10
  89:17,20,
  21,22,25
  123:5
  131:11
  132:7
  136:5,7,
  11,16,22
  137:1
  140:7
  145:21,22
  148:9,11,
  24,25
  149:1,15,
  17,24
  150:3,10,
  14 151:3
  152:25
  153:12,19,
  25 154:14
  155:7
  156:20,23
  157:11,24

158:7
159:9,17,
18,20,22
161:9,14,
19 162:11,
14,21,25
163:17,24
164:11
165:18
166:5,7,9
168:18
169:5
171:2,3,5,
17 186:1,
4,5,6,7

handle's
  163:11
  164:9

handled  92:8

hang  255:21

hang-up
  103:23

hanging
  153:22
  154:6
  167:7

happen  27:15
  78:17
  178:10
  236:25

happened
  48:10 80:3
  128:18
  225:23
  229:23

237:7,13
239:20
244:4,11,
14

happy  128:22

hard  63:20
  172:22
  201:1

hate  54:9

hazards
  104:25

head  60:22

head-on
  187:19

hear  99:21

heat  194:19
  203:2

heating
  112:8
  120:13
  130:25
  131:5,9
  149:18
  150:4,10,
  16 151:4
  178:5,8,17
  182:5
  185:23
  204:19
  205:13
  236:1,15
  238:21,23
  239:8
  248:17,19
  250:2,6,

11,20
251:7,21,
23

height 82:13
191:25

held 26:24
51:15
117:22
216:24
218:5,24

helpful
245:19

helps 196:15

Hero 40:1

hey 64:25
217:17

hiccup 129:4

hide 223:16

high 116:4,
6,7,9

highlighting
156:24

history
34:14

hit 180:1,2

Hoffmann
48:25
198:17

hold 39:12
56:16
106:2,3
122:16
132:20

141:19
147:4
156:16
173:10
196:18
217:3
222:19

holding
36:10

holds 245:7

hole 33:8,
24 227:19

home 7:23
77:24 82:4
83:10
99:10
114:12
204:7,13
221:17
222:3
226:8
228:10
247:21
248:1

homeowner
194:24

homeowners
84:13

homicide
11:21

homicides
36:7

honest
118:17
151:24

hop 129:12

hope 106:7,
8

hoping
31:19,22

horizontally
79:11
179:25

hose 33:9
173:6

hot 111:12
113:7,15,
17

hour 22:19
47:8 48:5
114:18
195:18
204:8,21
205:15
241:16

hours 19:11
20:18
21:4,15,
19,25
22:7,10,12
23:4,25
24:14,20
26:18
83:15
91:7,8
106:6,9

house 65:12
80:15
202:13
240:16

241:1

hovering
204:25

hundreds
41:5 181:4
215:18

hung 185:15

hypotheses
25:18
62:19
254:10

hypothesis
63:17 64:7
244:5

hypothetical
73:2
110:23
111:19
115:24
117:3,8,9
124:6
130:18
150:17
177:13
178:2
179:16
181:18
251:25

hypothetically
174:19
204:10

hypotheticals
108:9

| | | | |
|---|---|---|---|
| **I** | 113:15,17, | 16 | 72:12 |
| | 23  115:13 | **image**  86:9 | 101:8,18 |
| **idea**  45:15 | 130:21 | 87:13 | 107:8,25 |
| 51:19 | 178:11 | 133:6 | 121:20 |
| **identical** | 179:4,7 | 158:24 | **impressed** |
| 127:17 | 216:25 | 198:9 | 114:13 |
| **identification** | 219:11 | 229:6,8,9 | **imprint** |
| 8:10,23 | 220:14 | 232:3 | 114:16 |
| 17:15 | 221:1,4 | **images**  132:6 | **inaccurate** |
| 19:15 | **ignited** | 135:19 | 190:13 |
| 34:10 | 55:17 | **imagine** | **inches** |
| 52:18 | 56:3,20 | 16:24 | 119:19 |
| 53:12 | 59:24 | **immediately** | 120:12 |
| 95:20 | 60:3,6 | 96:14  99:3 | 124:19,21 |
| 139:13 | 108:20,22 | 107:18 | 126:24 |
| 158:13 | 110:24 | 115:8 | 130:14,19, |
| 193:1 | 117:4 | 130:1 | 23,24 |
| 201:9 | 179:5 | 135:22 | 131:4,9 |
| **identified** | 180:10 | 205:5 | 147:1 |
| 59:14 | 222:13 | 224:17 | 152:1,3 |
| 97:14 | **igniting** | 228:13 | 160:9 |
| 102:7 | 76:9 | **impact** | 176:1,7,10 |
| 248:3 | **ignition** | 108:17 | 177:1 |
| **identify** | 57:3  75:21 | 117:19 | 180:9,10 |
| 84:19 | 78:18 | 179:23 | 181:19,22 |
| 191:3 | 81:18 | 231:4 | 182:12 |
| 215:12 | 84:21 | **impacted** | **incident** |
| **identifying** | 109:2,10, | 180:24 | 115:12 |
| 210:5,6 | 15,25 | **impacting** | 116:3 |
| **identity** | 110:4,13, | 80:1  173:3 | **incineration** |
| 84:14 | 17,25 | 193:14 | 213:9 |
| **ignite**  32:17 | 113:10 | **impacts** | **include** |
| 81:10,17, | 114:17 | 108:11 | 22:12 |
| 23  82:14 | 205:7 | **important** | 24:20  56:1 |
| 111:9 | 218:22 | 69:14,20 | 57:3  74:15 |
| | 219:6,15, | | 98:5 |
| | 25  222:14, | | |

200:23
201:2
202:4

included
26:15
55:24
59:20
197:7
216:21

includes
195:10
197:14

including
83:16 91:7

incomplete
254:8

inconsistent
68:12,21
69:4
171:15
202:25

incorporate
101:19

incorporates
196:4

incorrect
67:1
86:23,24
100:18
102:15,23
103:1,12
104:18
123:11
195:2,25
196:5

197:16
198:18
229:1

increments
224:4

indented
155:1

independent
78:20

independently
214:6,8

index   7:23

indicating
61:21 87:9
119:22
130:15
134:16
152:15,20,
22 153:1
154:19
161:14
162:15
189:10
190:4
243:6

indication
234:17

indicative
124:10,12
143:10
162:20

individual
13:17 14:1
210:25

infinite
250:16

information
15:3,7
18:8
31:20,23
43:25
72:25 79:4
98:4,7
99:15
100:3,9,13
127:12
193:20
195:2
197:3
209:6
241:21

informed
211:17

initial
61:15,19
74:8 75:1,
7,14 77:19
83:17,18
84:25
85:10,12
86:10
92:13
93:21
110:25
213:8

initially
40:8
115:20
138:19

inside   33:9

108:25
111:5
218:12
246:16
249:3

inspection
33:8 82:18
83:4,6,12,
22 84:14
85:1,7,11
86:10
89:23
91:11
92:14
93:22,25
94:2,4,9,
16 95:6
123:1
152:8
167:14
168:8
170:16
171:9
184:10
229:10

inspections
82:20 95:9

instructing
16:18 17:4

instruction
17:9

insurance
10:19
12:2,7,9,
12,20,22
26:23 72:5

94:6
221:13

insured  12:9
72:7,9,16,
19 234:20

insurer
42:16

intend  18:23
255:9,14

intended
189:22

intending
80:9

intensity
82:14
207:18

intention
80:8
196:19

interchangeabl
y  98:18

interest
51:11
154:5
213:13,14

interested
84:5,6

International
46:18

interpretation
93:17

interrupt
28:4 58:19

65:15 70:3
116:14
144:1
243:8

interrupted
80:7

interrupting
111:18

interruption
129:19

intersects
190:23

interview
65:10
66:4,25
84:13

interviewed
65:6 68:7

interviews
62:7 84:18

introduction
38:8 46:17

inverse
150:4,8
185:3

inverted
183:17

investigated
214:24

investigating
35:25
46:12

investigation

34:18
38:18
48:15

investigations
38:9 39:24
40:17

investigator
39:14 69:8
71:8 72:4

investigators
46:19
83:18

invitation
44:1
45:18,23

invoice
17:21,22,
25 18:2,23

invoices
15:20
17:11,20
18:3,9,14,
17,20
19:2,6
21:14

involve
77:23 78:6
82:7
108:23
111:8
206:22
207:19
211:2
247:5

involved

9:23 10:19
26:21
31:18
41:22
42:1,6
43:8
179:23
204:14
213:6
216:2,11
220:8
226:14
243:15
247:2

involvement
229:12
232:9

involving
12:19
46:12,25
219:23
225:6

ipad  29:17
31:7 55:16
56:1,2,20
57:3 60:3,
6 65:22
66:6 67:8,
9 68:25
74:11
75:4,17
76:8,23
77:5,15,20
78:3 79:5,
10 81:2,12
82:12
85:13,15,

19,22
91:17
93:21
98:22,24
99:17
102:7
107:23
206:12
207:23
208:1,3,
11,15
209:2,25
210:2,4
211:3,8,9,
10,17
212:9,11,
15 213:3,
10,20,22
214:12,18,
19 215:4,
20,25
216:1,9,14
219:4,12,
13,14,17,
24 220:12,
20 222:8,
10,17,22,
25 223:4,
11,14
237:10

ipads   76:24
210:14
211:12
215:1
219:23
220:8

issue   46:9

129:20

issued   57:2

issues   55:14
70:24

items   61:23
93:23 94:3
193:19
230:2

———————
J
———————

January   35:7
46:11,16

jar   102:9

job   18:21

Joe   6:14,18
8:19 61:25
63:6 88:6
106:3
143:24
146:24
147:4,21
150:19,21
178:21
187:14

join   39:1

joined   35:10

joint   20:3,
7,9,14
22:21
132:17,22

Josh   6:19

JPEG   122:2

JPEGS   140:3

juggling
38:14

July   34:24
35:19

Jump   226:17

June   14:17
18:1 20:8
167:2,3

junior   35:1
37:12

———————
K
———————

kaput   129:14

Kentucky
34:16
36:25
37:7,19

Keurig   66:14
67:6,7
68:17,24
71:23
90:24
100:24
102:2,8
108:3
171:4,6
181:14
182:11,14,
15,22,24
206:12,24
213:11
217:14,16,
18 225:19
226:1,5,7
228:21,23

229:3,4

kill   10:6

kilobytes
15:11

kind   63:15
147:10,11
183:5

kitchen
52:24
56:4,22
88:15
97:15
177:20
187:3
209:17

Klitsch   5:2,
19 23:23
47:19 54:8
56:16 59:7
63:16
78:25
106:23
117:1
129:20,23
141:20
145:13
147:24
149:8
160:23
201:24
206:16
213:19
214:1
237:25
256:3

Klitsch's

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

70:4 95:14
223:23

knew   241:20

knife   66:8
68:8 87:15
89:17
98:20
102:8
167:6
186:5,6

knob   54:25
73:10,19,
20 74:2,4
105:6,14
112:23
113:14
115:10
116:2,19
185:22
230:11,16,
25 231:2
232:14
235:4,11,
12 236:21
237:2,11,
15,17,19,
20 238:3,
15 239:9,
16 244:22
246:2,21
247:16
248:16
249:5,8,
12,14,20
250:1,10,
15,17,20,
22 251:1,

3,8,11
252:2

knobs   98:12
104:23
116:4
194:15
229:17
230:4
231:6
232:5,7,8
233:8,21
234:6
247:7
249:9,10,
16

knocked
229:19
230:4
247:7
251:15
252:3

knowledge
58:3
203:15,20

Kovack   10:14
11:23

———————

L

L1   250:15

lab   214:2

labeled
52:12 53:6

lack   31:7
170:20
194:18,19

Lackawanna
35:1

lacks   122:23

lamp   10:5,
6,9,10

language
174:4

large   96:10
253:7

larger   122:3
197:14

late   26:5

laterally
79:20,22
80:21

law   9:14
10:16
15:23

lawsuit   9:24
10:20

lawyer
105:25

lay   92:2

laying   169:1

lead   70:7

leading
70:2,14,19
71:2

leads   121:4

learned
100:17

leave   33:2

131:8
167:23
238:13

leaves   204:6

leaving   68:6
99:10

led   99:22
208:14

left   23:5
39:6 53:7
54:23
65:12,23
66:17 68:9
86:20
89:18
97:15
98:16,25
99:3
107:19
110:1
111:12
114:7,17
117:12
119:21,22
123:9
128:12
136:7,9
151:14
152:9
155:10
157:1,2
159:20,22
162:20
163:16
164:10,11
165:18,21
166:9,12,

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

14 171:6
172:24
176:17,18
180:4
184:22,23
186:5
189:15
190:24
191:2,23
193:11
198:21,22,
25 199:9,
12,19
200:2,12,
14 206:21
224:18
225:9,18
226:22
228:13
229:8
232:2
235:10,24,
25 236:4,
12 240:20,
25 241:5,
12,17
246:21
248:17,19,
24 250:4,
23 251:8,
22

left-front
53:2

left-hand
163:2,19
164:17
190:22

left-most
229:17

left-rear
73:21
112:1,9,22
113:13
117:5
118:23
119:18
120:14,21
125:9
126:10
130:16
131:5
178:4,17
185:23
200:24
204:12,20
237:18
248:17,22,
23

left-to-right
99:5
107:20
228:18

lend   143:1

length
125:3,6,11
126:3,23
220:24

lens   180:22

letters
15:22

letting   70:3
72:21

level   97:16
184:24
222:22
234:14

Levine   10:17
40:20
41:6,11,
14,21
42:4,8
43:3 44:2
45:19,23
84:3

Liability
43:15

Liberty
11:25

life   38:25

lift   151:8,
9

light   180:21
221:2
231:12

lighter
218:22

limiter
113:1,6

lines   64:2
162:9
165:6
173:6
174:10
185:5
190:2
199:9

link   6:6

list   5:23,
25 6:3,4
7:5 8:15,
20 13:3,4
39:6 46:2
97:19

listed   9:9
10:11,24
11:16
12:19 21:2
39:11,25
43:6 61:13
62:5

lists   63:23
97:23

Literally
83:10

literature
39:22

lithium
43:15,19

litigation
203:17

litigations
41:10

LLC   7:15

loaded   230:1

locate   18:6
142:5

located   97:2
131:13
154:1
174:2

208:18
209:2
223:14

**location**
76:1 90:1,
17 97:1,9
100:22,23
108:10,14
109:21
112:9
114:3
118:4
166:11
179:13
181:15
207:23,25
208:10,19
222:8,10,
16 252:22

**logos**  172:4

**long**  30:4
35:3 81:1,
8,21 82:5
83:12 91:5
105:19,23
106:8
124:20,21
125:5
126:10
151:23
175:10
183:2
216:23
217:3
220:17,25
221:6,8
238:25

241:14,15,
19

**longer**  39:18
102:12
105:21
177:12,17
178:3
181:22
197:23
201:11
218:19
241:22

**looked**  126:6
141:1
147:14
214:3
215:3

**loss**  15:5
99:2,24
107:18
183:15

**lost**  128:15
196:18

**lot**  34:2
47:22
99:21
177:13
196:8
225:17
241:21
247:16

**low**  132:13

**lower**  89:18
123:9
159:11,18

163:2,16,
19 164:16
165:21
166:12,14
172:25
185:2
193:10

**lucky**  122:9

**ludicrous**
215:22
236:22

**lunch**  88:17,
18,20
106:24

**luncheon**
106:19

**luxury**  197:5

**Luzerne**
34:21

**lying**  72:19,
20,23

———————————
**M**
———————————

**Macaluso**
14:12,16
19:20
65:6,20
66:3,24
68:4,16,24
71:10,15,
23 91:13
98:6 99:10
100:4
101:15,22
103:12

104:12
105:12
195:5
197:3,6
198:15
199:5
204:5,13
209:8
222:3
226:2,7,10
228:10
240:9

**Macaluso's**
67:17
104:20
105:3
194:15
195:23
202:12
240:6

**Macalusos**
177:19

**Macalusos'**
221:17

**mad**  52:9

**made**  43:22
185:1
189:19
191:16
242:2,15
247:7

**magnets**
117:22

**mail**  96:11

**maintain**

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022      Index: majority..materials

5:23 15:21

majority
231:23

make 13:13
18:25
20:23 63:6
70:11 95:9
96:16
133:6
140:21
161:11
184:2,19
188:25
189:13
192:12
194:13
198:25
202:12,14
212:6
224:2

maker 66:14
207:17,20

makes 95:25
147:2
217:22

making 20:2,
21 69:15,
21 183:24

Makita 10:15
11:23

malfunction
55:16

man 167:20
186:10

manipulated

93:13
236:21

manual
14:20,23

manufacturer
221:22

manufacturers
84:20

March 17:24
20:8 25:19
30:1 37:11
48:8,11
57:19
59:21 63:1
64:12
82:23
83:5,19,21
84:2,23
90:3 91:5,
12 93:21,
24 120:7
127:20
186:17,21
203:22
211:23
212:21
214:11
229:9

marching
225:3

mark 8:7
9:1 17:18
21:3 34:4,
8 52:16
53:10
139:9

152:6
153:20
158:10
169:12
184:2
191:16
192:24
201:5
230:14

marked 8:10,
14,23
17:15
19:15
21:14
34:10
52:18
53:5,12
95:17,20
138:21
139:13
158:13
159:14,24
193:1
201:9

marker 87:8

markings
230:21

marks 232:22

Marshal
36:23
83:20
93:14
233:2

Marshal's
36:1,15

mass 51:24
89:19
99:2,24
107:18
122:12
134:7,12,
14,16,20
135:4
136:15,22
137:1,3,5
183:15

master 85:13

material
52:22 55:3
81:13
101:16,24
122:24
123:20,24
124:1,3
126:7
127:14
131:10
133:19
145:10
148:9
173:23
175:4
176:14
231:12,20
246:15
251:16

materials
15:15
44:4,15,
17,19 45:8
47:1 61:12
62:3 79:23

81:4 207:7
235:10
236:12
246:10,16
253:8

Math    43:1

matter    5:13
  9:21 11:2,
  5,6,11
  12:17 21:7
  22:23
  23:10

Matterport
  85:3 91:9

matters
  137:12

Mcglynn
  6:16,20,23
  7:4 8:16
  9:2,13
  10:12
  15:23
  16:8,9,13,
  16,19,24
  17:5 23:2,
  13,16,19
  24:22 25:2
  26:10 28:3
  31:9,21
  32:7,11
  33:6,19,22
  41:7,17
  42:17
  47:13
  49:21
  50:1,6,16,

21 52:25
54:2,6,19
55:23
56:9,23
57:10,15,
20 58:4,8,
19,23
59:4,16
60:1,7,17
61:8 62:16
63:3,8,22
64:9,15
65:14
66:21
67:2,22,25
68:14
69:2,6,12,
17,24
70:1,9,13,
20,23
71:4,13,20
72:2,10,18
73:1,7,13,
16 74:13
75:5,9,20
76:5,12,20
77:10,25
78:13,22
79:1,25
80:4,17
81:6 82:16
83:23
84:9,17
88:6 90:12
92:7,15,25
93:3
100:5,11,
19 101:6,

13 102:1,
13,18,25
103:15,22
104:19
105:8,13
106:17
107:10
108:7
109:7,13,
19 110:9,
21 111:2,
17 113:9
115:14,17
116:13,22
117:14
120:8
125:13,16,
19,21
128:19,24
129:2
136:17
138:6,14,
17 141:8
143:22,25
144:7
145:17
146:22
147:3,9,19
148:6,20
149:6
150:6,18,
20,22
151:6
152:2
154:8
160:13,17
161:23
162:4

163:5
165:23
170:6,19
171:19
174:3,18
175:20
176:23
177:9
178:6,19,
22 179:1
180:13,20
181:3,7,
11,19,23
182:25
183:3
187:12,17
194:1,8,22
195:3,6,14
196:7
197:18,22
198:3,4,20
200:21,25
201:11,16
202:6,22
203:6,13,
18,23
205:6,18,
25 206:4,
14,25
207:8,12,
21 209:4
210:18
211:21
212:2
213:7,17,
24 214:7,
22 215:6,
14 216:4,

13,20
219:16
220:1,9,
15,22
221:5
228:24
229:2,14,
21 230:19,
24 231:15,
18 232:11,
19,25
233:6,13,
18,23
234:3,8,
15,19
235:7
236:5,17
237:1,5,9,
12,22
238:6,11,
17,22
239:3,18,
24 240:14,
17,21
241:3,7,25
243:22
244:13,18,
24 245:5,
14,17,20,
23 246:4,
12 247:10,
14,18,23
249:1,7,18
250:5,24
251:9,17
252:13,17
253:10,17,
20,25

254:6,9
255:1,23
256:9

Mcglynn's
6:10 9:14
13:5 17:8

meaning   10:6
86:12
108:16
110:23
130:24
159:7
161:18
169:4
206:21
222:23
238:2

means   92:22
248:2

meant   74:22,
23 138:10,
15 146:12

measure
86:14

measured
146:25

measurement
120:10,21
121:3

measurements
85:3

measuring
140:25

meat   47:10

mechanical
230:9,13,
15,18
238:14

mechanism
209:24
210:7
212:7

melt   116:4,
6,7
249:12,14,
20

melted   53:3
54:1,23
172:18
231:21,23
248:18,25
249:9,16
250:1,20,
23 252:2

melting
226:12
249:5,21

melts   251:3,
15,19

member   58:21

members   9:13
43:22

memorialize
91:11

memory   57:12
83:16
221:24

memory's

167:8

mention
202:12,14

mentioned
13:2 21:20
23:25
99:18,19
107:17
139:20
181:13
201:24
211:23
220:2

metal   231:8,
13,17

method   64:6

microwave
54:24
99:4,6
107:19,21
117:18
179:21,24
180:21,24
183:14
185:15,16
191:21,22
193:14
206:22
207:19
221:19,24
222:2,6
224:18
225:9
226:12,23
228:13,19
246:22

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Index: midst..moving

247:3

midst   94:11

midstream
  236:23

Mike   27:12
  28:15
  29:25

miles   20:5

military
  39:1,3

mind   62:19
  63:18 64:5
  112:25
  185:8
  205:1

mini   256:8

minimal
  29:16

minimize
  87:25 89:9
  132:10
  140:13

minimized
  122:17

minor   38:18

minus   151:19
  160:9

minute   89:10
  218:25
  219:10
  221:3
  224:4

minutes   20:2

30:5 44:6
58:20 88:2
106:15
160:14
182:20
183:2
195:18
197:23
201:15
204:9,21
205:15
224:3,5,12
225:5,19
226:11,17,
18,19
227:1,7,15
241:16
247:22

mirrors
  142:16
  222:10

mischaracteriz
ing   236:18

mishear
  229:1

mispronouncing
  30:21

missed   6:6,
  13

missing
  133:17
  139:24
  165:9

misunderstandi
ng   150:7

Mm-hmm
  132:25
  134:2

mock   45:6

model   14:4
  177:18
  207:2
  221:16,19
  233:21
  234:6

molded
  231:20

moment   76:2,
  3

Monday   96:12

moneys   12:22

month   40:21
  207:25

months   13:5
  35:17

more-likely-
than-not
  208:20,25

morning   5:10

motion   26:7
  251:11

motivated
  31:11

mound   188:23

mouse   155:20
  188:6

move   47:10
  71:4 107:6

126:20,25
128:6
136:8
137:13
149:17
150:2,9,15
155:9,11,
13 157:1
161:13
175:6
176:25
184:24,25
191:22
192:7,10
198:21,25
199:9,12,
18,19
200:1
207:19
227:22

moved   33:8
  90:16
  130:23
  174:5,11
  175:17
  180:9
  227:18

movement
  99:5
  107:20
  225:17
  228:18

moves   184:23

moving   104:4
  134:17
  139:16
  173:8

174:11
175:17
224:14

**multiple**
75:22
180:4
211:12

**multiple-sized**
127:18

**Municipal**
35:2

**Mutual**  11:25

**MVI**  95:3
217:10

_____

**N**
_____

**name's**  5:10

**names**  215:8,
13

**NASP**  43:11,
22 44:22
45:13,21

**national**
43:11

**nature**  36:8
114:15
210:9
216:17

**necessarily**
69:23
103:16
124:12
149:19
197:16

198:18
211:6

**needed**
225:10

**negative**
58:12
155:9

**Nevada**  44:23

**NFP**  175:18

**NFPA**  97:23

**night**  256:1

**non-disclosure**
51:9

**nonetheless**
51:5 57:5
202:24
203:25

**normal**  37:21

**notes**  14:13
18:11
19:7,12,20
21:4 24:6,
9,12 32:13
44:18
83:13
91:10,13

**notice**  8:8
48:4
92:13,19
173:11
212:2

**November**
10:14
20:11

21:16
22:13
43:12

**number**  27:21
28:25
40:23
41:20 42:2
70:24 89:7
104:18
152:6

**numerous**
216:16

_____

**O**
_____

**oath**  5:3

**object**  26:6

**objecting**
65:14
116:14

**objection**
11:3 16:9,
12 23:2,
13,15
24:22 25:2
26:14
31:9,21
32:7,11
33:6,19,22
41:7,17
42:17
49:21
50:1,6,16,
21 51:8
52:25
54:2,6,19

55:23
56:9,23
57:10,15,
20 58:4,8
59:16
60:1,2,7,
17 61:8
62:16
63:3,6,22
64:9,15
66:21
67:2,22,25
68:14
69:2,6,12,
17,24
70:12,15,
18,19,22
71:13,20
72:2,10,18
73:7,13,14
74:13
75:5,9,20
76:5,12,20
77:10,25
78:13,22
79:1,25
81:6 82:16
83:23
84:9,17
90:12
92:7,15,25
93:3
100:5,11,
19 101:6,
13 102:1,
13,18,25
103:15,22
104:19

105:8,13
107:10
108:7
109:7,13,
19 110:9,
21 111:2
113:9
115:14,17
117:14
120:8
125:13,15
136:17
145:17
148:6,20
149:6
150:6,20,
22 151:6
152:2
161:23
162:1,5
163:5
170:19
171:19
174:3,18
175:20
176:23
177:9
178:6,19
179:1
180:13,20
181:3,7,11
182:25
183:3
194:1,8,22
195:3,6,14
196:7
197:18
198:20

200:21,25
202:6,22
203:6,13,
18,23
204:1
205:6,18,
25 206:4,
14,25
207:8,12,
21 209:4
210:18
211:21
213:7,17,
24 214:7,
22 215:6,
14 216:4,
13,20
219:16
220:1,9,
15,22
221:5
228:24
229:2,14,
21 230:19,
24 231:15,
18 232:11,
19,25
233:6,13,
18,23
234:3,8,
15,19
235:7
236:5,17
237:1,5,9,
12,22
238:6,11,
17,22
239:3,18,

24 240:14,
17,21
241:3,7,25
243:22
244:13,18,
24 245:5,
14,17,20,
23 246:4,
12 247:10,
14,18
249:1,7,18
250:5,24
251:9
252:13
253:10,17,
20,25
254:6,9
255:1

obscured
227:11,12

observation
154:4

observations
155:24

observed
31:6 99:5,
16 110:16
158:16
166:14
171:14
173:17
183:8
214:18
228:10

obstruction
180:1

obtain   37:7
38:15

obtained
34:20

obtaining
39:7

occur   115:23
174:5

occurred
80:13 98:7

October
20:15
167:21,25
168:4,8
170:15,16
171:9

odd   84:4
213:10

offense
132:11

offer   68:10
212:7
233:24

offering
209:23
210:10
235:1
236:8

office   6:10
36:1 83:1
84:3

Officers
35:2

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022          Index: oftentimes..orient

oftentimes
  69:9

old-fashioned
  184:7

on-scene
  83:18

one's  122:2
  146:20

one-foot
  87:8

one-to-one
  211:6

online  34:16
  38:10
  40:8,14

open  7:3
  190:14
  197:24
  217:7
  218:24
  219:10
  221:4
  243:7,21,
  25 244:2

opening
  19:19

operate
  234:18,24

operated
  235:3

operating
  198:14
  234:16,21

operations
  39:18

opining
  127:24
  234:23

opinion
  26:14
  55:20,25
  56:2,7,19
  57:2 59:22
  60:3,6,9,
  18,19,22,
  23 74:9,17
  75:2,8,15
  76:1,7
  77:19
  78:3,17
  86:14
  97:17,20
  102:12
  105:11
  109:4
  113:7
  114:10
  115:22
  117:6,9
  121:8
  126:2
  129:23
  132:5
  144:23
  157:25
  160:6,7
  170:9
  171:12
  173:24
  181:6,10

192:21
202:24
203:5,15
204:2,3,5
206:2
207:16
211:16,25
212:10
213:2,15,
20 214:5,
17 215:24
216:9,18
233:24
234:1
235:1,9
236:8,11
245:25
253:13,24

opinions
  26:1 48:17
  49:19,23
  50:1,8,14,
  19,25 51:6
  55:10
  57:19
  58:1,16
  60:12
  61:6,13
  62:4,14
  76:3
  202:18
  206:6
  209:24
  210:10
  212:7
  253:2,5,6,
  19 255:6,
  9,14

opposed  54:4
  171:4
  193:16
  211:19
  213:4
  214:19
  232:9
  251:19
  252:2

opposite
  162:23

option  39:6

options
  188:4

oranges  66:9
  98:21

order  15:9
  81:10,23
  82:7 88:17
  92:3
  113:23
  196:24
  205:7
  216:25
  219:1
  220:20
  234:6,12
  235:4

ordered  16:4

ordering
  256:6

ORF  122:3

orient
  135:21

orientation
 87:15
 89:16
 112:2
 116:2
 118:4
 123:4,10
 131:8
 140:22
 141:6
 142:9,17
 143:10
 146:2
 149:4,12,
 14 153:3,
 15,25
 154:21
 155:23,25
 159:7,16
 160:6
 162:9,11
 163:9,20,
 23 165:17
 166:21
 167:11,13
 169:20,23
 171:3,11
 177:5

orientation's
 149:10

oriented
 112:23
 115:10
 116:20
 152:12
 156:1
 170:15,17

 209:15

origin   48:14
 52:24 57:7
 64:20
 69:15
 84:16,22
 86:3,4,7
 95:9 96:24
 97:2,4,5,
 6,7,9,10,
 14,24
 99:23
 100:15,22
 101:19
 107:3,8
 108:1
 181:15
 182:3
 183:7,24
 189:24
 190:10
 191:4
 192:22
 193:19,24
 194:2
 196:25
 197:6
 200:20
 202:1
 208:23
 215:2,20
 252:8,14
 253:15

original
 14:24
 49:3,8
 121:4

 154:11
 198:11
 206:9

originates
 237:17

Orlando
 43:12

other's
 122:3

outlet
 68:17,25
 71:22,24
 98:24
 133:23
 209:19

outline
 44:9,10
 165:9
 205:9

outlines
 44:18

oval   188:23
 189:13,19

oven   131:6

overhead
 173:9

overlapped
 176:2

overlaying
 136:15
 168:17
 171:1

overlays
 166:5

overtop
 136:22
 169:1
 179:20
 188:23

ovular
 161:20,25

_____

P

p.m.   20:5
 106:20
 129:9,10
 160:19,20
 201:20,21
 248:8,9
 256:12

P3030009
 112:18
 114:5

P3040014
 119:6

P3040026
 161:6

P3040027
 128:10
 129:22
 142:23
 144:18

P3040030
 130:8

P3040031
 120:24

P3040035
 243:9

P3040053
  229:6

P6  132:19

P6240040
  123:1
  133:13

P6240052
  133:2

PA070183
  168:9

PA070482
  153:19

PA070485
  157:21

PA070488
  152:6

package
  66:23
  111:8

packaging
  51:12,20
  52:12,13
  53:16,20
  55:3,18,24
  65:1
  121:15
  122:24
  123:21
  131:10
  133:18
  140:20
  176:14

packed  47:3

pages  19:13

painted
  242:4

pan  113:4

panel  73:10,
  20 99:7
  107:22
  193:8,18
  194:6
  195:11
  196:5
  199:2
  206:22
  229:12
  249:4

pans  240:23

paper  40:18
  114:14
  180:4

papers
  117:20,21

paperwork
  255:4

paralegal
  6:19 13:5

Pardon  256:5

part  86:19
  96:24
  100:14
  105:1
  138:22
  167:7
  177:1

part-time
  35:25

partially
  124:13
  182:5

participate
  92:13 94:8

participation
  22:21 24:5

parties
  90:11
  92:19

parts  23:20
  178:23
  246:7

party  84:6
  92:6

passed  62:1

past  31:13
  41:3 42:20
  57:25 82:3
  187:1

patience
  255:19

patrol
  35:12,13,
  21

pattern
  99:1,5
  107:20
  108:3,11
  110:12
  180:11
  183:6,9,
  16,17,18,
  19,23

186:20
189:25
191:3,8
192:20
193:5,7,
23,25
194:2,5,14
195:9,12
196:3
197:9,14
198:5,10,
12,16
199:6
200:11
228:19

patterns
  29:15 31:6
  98:1 99:19
  107:5,6,
  14,17,25
  108:17
  110:16
  155:22
  157:13
  178:25
  180:17
  183:5,8,
  13,14
  193:21,22
  200:9
  252:7,8,22

pause  88:11
  202:10

pay  40:10,
  12

PDF  14:1
  17:19

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

19:20
256:8,9

peeled  133:5

pen  40:18
184:18

Pennsylvania
34:22
35:3,9
39:21

people  72:24
105:19
175:17
209:20

people's
69:10

perceived
57:7

percent
41:12,19

percentage
41:9 42:2,
4,7

perform
26:25
61:16
62:12

performed
25:19 30:1
32:5
59:19,21
63:1 64:12
114:24
205:20
207:24

211:24
212:19,20
217:12
221:12

period
36:20,21
38:24
216:25

permitted
50:23 51:1

person  18:24

personal
139:6

phase  41:10

phone  20:2
27:13,16,
17,19,20,
22 28:10,
13,15,16,
18,22,23
29:22 30:4
31:15

phonetically
30:23

photo  52:11
87:6,17
89:1 93:5
112:18
119:5,25
121:14
123:4,5
130:11,12
133:1
134:9
135:6,7

139:9
142:3
143:8
144:18,20
146:8,23
151:5
152:5
156:12
157:21
158:20,22
161:13
163:20
164:9,10
182:22
183:22
184:12
186:1,18,
23 195:13
197:25
198:8
199:8
228:5,6
229:9
233:2

photograph
126:12
132:4
134:12
140:8
141:1,7
150:2
152:15,20,
23 153:1
154:5,20
161:15
162:16
166:23
189:10

190:4
200:9
201:1
210:21
223:20
237:14

photographed
90:18

photographic
92:22

photographs
32:15 85:2
91:21
92:3,20
132:4
141:4,16,
22 142:2
169:19,22
215:23
216:6
223:7
225:1
240:3,5
243:3

photos  7:23
13:21,22
25:12
44:18
85:6,8
87:12,21
88:3 89:5
91:9,15
96:2
121:13
130:3,6
131:17
132:15,19,

23 134:18
135:21
137:10
139:3,17,
24 140:4,
10 141:14
145:14
156:14
160:25
162:17
164:11
166:19
167:15
168:7,10,
14 170:22
184:9
185:14
215:19
223:15,24
227:25
231:11
242:21
243:10

physical
62:21,23
63:11,12
68:12,21
69:4,11,
14,20
71:11,16,
21,24
72:3,7,12,
15,16
73:9,24,25
74:1,6
101:9
148:4
153:10

155:22
158:9
181:8
230:21
232:21

physically
104:3

pick  59:10
184:12

picked  28:25
90:18
165:11

picking
31:15

pics  118:14
120:16,24
142:21
161:2
242:22
243:10

picture
116:17
122:11
125:17,22
147:10,20
153:14
154:16
156:8,9
164:1
165:1
167:6
185:11

pictures
122:13
124:20

155:14

piece  133:17
244:1

pieces  180:4
216:16
224:23
246:7

pile  90:4
92:9

piled  91:24

pinpoint
208:24

piqued
213:12,14

place  95:14
120:3
142:19
144:3
158:17
186:24
187:9
191:19
244:2

placing
140:24

plaintiff
5:14 11:2,
10,24
12:1,5,21
27:3,6

plastic  53:3
199:1
249:9,10,
14,22

plates
240:2,12
245:13

plays  218:9
227:5,9,
14,23

plenty  154:8

plug  209:20

plug-in  10:5

plugged
68:17,25
71:23
98:24
100:24

plugging
98:22

plywood
242:5,15

point  31:13,
15 43:1
51:19
56:11,18
65:18 77:3
97:1,5,6,
10 109:10,
15,25
110:4,13,
18,25
121:17
126:13
142:7
159:1
173:24
174:24
184:22

190:10,11
192:17
197:2
205:16
213:13
222:14
227:2,9
232:15,24
233:1
252:15

pointed
33:25
158:3

pointing
172:14

points  191:1
249:21

Police  34:23
35:2,9
83:20
93:14
187:13
232:24
233:1
237:15

policy  12:23

pop-ups
172:10

porcelain
246:18,19

port  209:15

portion
86:12
91:11
108:21

115:4,6
123:9
125:8
127:13
131:5,21
137:4
143:7,13,
16  144:19,
21  145:1,
3,8,22
146:19
148:1
155:2
159:11
162:20,22,
24  163:2
164:13,17
165:10
166:8
171:14
176:2
178:3,16,
17  179:7,9
185:2
191:17
197:15
200:23
201:2
204:20
223:4,10
231:22
238:15
249:12

portions
124:23,24
134:23
137:23
144:14

145:19,20,
21

position
70:7
73:11,22
74:2,4,7
105:7
112:22,23
113:14
115:11
116:21
118:3,21
120:5
121:7,9
123:22
125:3
129:24
130:22
131:8
135:21
143:10
145:25
146:1,10
147:7
148:10,14,
16  153:15
155:14
158:18
159:5
160:7
161:3
162:21
174:1,24
185:11,17
187:16
193:15
194:13
239:17

251:2

positioned
113:14
131:3
153:20
154:9
171:17

positioning
123:8
142:9
171:11,23
172:1
174:13
177:7

positive
98:11,13

possibility
170:14,25
182:4
195:24
208:17

possibly
101:23
245:21
254:17

post  55:5
103:25
146:12

potential
79:4 84:21
200:20
210:8

potentially
74:20 84:6
206:12

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

243:17
255:2

pots  240:23

power  238:25

Powerpoints
44:18

pre  146:11

precisely
222:7

predominantly
176:11

premised
253:6

preparation
20:17
21:5,15
22:12,20,
23 23:7
24:11,17
25:21
62:13

prepare
50:12

prepared
15:2 17:11
49:6

preparing
23:11

presence
55:14
59:13
64:19
65:21
92:24

100:21
102:16,23
103:13,19
108:10,13
119:22
124:22
130:15
132:6
155:6
172:17
173:16
175:13
252:21
253:22

present
28:10 40:7
44:4 52:23
57:6 60:15
66:5,16
82:18 83:6
84:6 90:11
92:6 94:4
98:6
115:1,8
124:10,13
127:4,10
128:2
129:25
130:22
204:16
205:12
214:20
221:2
222:3
226:19
253:23
254:11

presentation
43:13,19,
24 44:8,
16,24
45:2,9

presented
40:8 43:8
45:13,22
71:8

presenting
44:22

preserve
85:19

pressure
147:21

pretty  96:10
105:21
136:12
190:5
199:21
200:4
218:16,23

primarily
176:3
178:15
194:9

primary
171:7,10

print  156:16

prior  7:5
9:3 32:18
34:25
55:25
65:13,23
66:17 68:6

72:5 83:18
84:13,22
98:8 115:8
124:11
127:10
128:2
130:1
133:20
135:22
153:7
177:20
190:19
204:7
208:21
215:8
243:1

privilege
28:8

Privileged
16:13

probe  57:18
141:5
147:5

problem  88:5
140:21
195:15

problems
98:15
195:16
234:20

proceed
180:3

proceedings
88:12
256:12

proceeds
  193:11

process
  26:21
  196:16
  247:13

processed
  83:17
  153:7
  156:3

processing
  36:6

produce
  77:22
  82:13

produced
  12:25

product  9:23
  10:1,3

products
  43:15
  84:15

professionals
  43:23

program
  15:25
  34:17
  36:24
  37:18,20,
  23 40:2,3
  184:17

programs
  46:24

progress

37:5

progression
  35:8

promises
  96:17

promoted
  34:23

prompted
  51:18

pronounce
  30:22

propagate
  60:10
  77:8,22
  78:6 109:4
  110:7
  111:9
  117:17
  179:11
  207:18
  225:12

propagated
  75:16

propagating
  76:9

propagation
  117:10

propose
  175:10
  182:12

proposed
  186:12

proposing
  150:25

153:16
  179:16

protected
  16:25
  86:15 87:2
  90:19,22
  119:14
  137:23
  138:7
  142:24,25
  144:13
  145:5
  152:10,19
  154:13,24
  155:3,6
  161:17,21
  168:23
  169:2
  177:3

Protective
  15:9

proved
  244:6,16

provide  6:3,
  4 15:3
  16:1,8

provided
  5:24 13:8,
  22 49:12
  91:14
  101:10
  156:14

providing
  26:1 92:21

proximity

57:6 64:20
  65:11,22
  74:22
  132:7
  204:18,23
  205:13
  209:5

PSI  174:10
  175:16

PTX  256:8

publish
  115:1

published
  39:22
  40:6,15

pull  7:3
  19:12 34:6
  40:9 87:23
  88:3
  112:14,17
  122:16,21
  140:9
  167:19
  184:9
  196:14
  217:7
  224:1
  228:1
  229:5

pulled  87:14
  123:21
  140:20
  143:21
  145:13
  166:24
  218:22

pulling
  133:1
  173:10

purchased
  65:1

purported
  76:22 77:4
  212:8

purpose
  27:22 31:4
  38:21
  43:24 90:8
  92:10 94:2
  95:8
  169:18
  217:14
  243:3,18

purposes
  199:4

pursuant
  12:23 64:6

push  234:5,
  13 235:5
  239:2,8

push-to-turn
  233:8

pushed
  233:15
  235:10,12
  236:14

pushes
  236:23,24

pushing
  238:3,4

  239:17

put  20:12
  68:4 87:4
  91:20
  92:12
  142:19
  145:15,16
  159:4,5
  167:10
  177:20
  185:16
  187:15
  196:11
  204:15
  208:15
  214:10
  217:17
  253:3

putting  64:5
  157:22

_____

_____
        Q
_____

qualifies
  184:8

qualms  90:10

quantity
  253:7

quarter-inch
  242:4

question
  11:4 18:13
  23:20,22
  26:10
  31:10,25
  33:11

49:22 52:8
54:15
56:17
63:13
73:4,15
74:24
78:12
80:18,24
105:25
113:12
116:25
121:5
125:25
127:5
131:7
135:20
136:19,20,
21 144:25
145:24
154:2,3,11
155:3
162:18
169:21
170:5,9,
23,24
178:21
180:16
194:4
197:8
199:5
202:20
213:1
230:14
232:6
237:25
240:1
250:19
251:17

252:18,20
255:8

questioning
  138:22
  198:2

questions
  26:4,8,12
  29:3 34:2
  45:6 56:25
  70:2,15
  78:25 86:6
  108:6
  154:9
  203:25
  221:10
  248:15
  252:25
  255:17,24

quick  141:20

quote  76:11

quote/unquote
  77:6
  144:13

QVC  9:17

_____
        R
_____

ran  29:11
  31:17
  157:8

range  14:6,
  20,23
  98:17,25
  99:4,7
  102:7
  107:19

111:19,23
114:20
116:19
117:13
119:15
120:18
152:8
153:23
155:11
157:15
158:17
179:20
183:8,13
189:9
197:15
205:22,24
228:19

rank  34:24

rapes  36:7

rate  22:18

re-ask  63:7
74:24

re-create
139:11

re-evaluate
55:13 57:5
59:12
64:18

re-evaluated
51:10

re-evaluating
25:17

re-evaluation
59:19
64:24

254:10

reach  58:21
79:24
80:22
117:11
126:10
211:16,22
213:15

reached  79:2
212:1
213:2
247:2
253:2

reaching
215:24

read  15:18
49:24
56:11,12
65:5
112:19
129:16
181:1
190:21
255:20

readily
110:24

reading
60:18
139:11
223:19

readings
111:15

ready  248:12

reality
131:25

realized
18:8
185:22

realm  39:23
108:4

rear  99:6
107:21
109:22
190:3
248:20

rear-left
114:7

reason  18:11
20:11 33:5
48:1 100:8
105:1
117:17
121:25
128:23
139:19
149:9
155:8
195:2,25

reasonable
118:5
121:5
151:15,18
169:25
170:10
200:11
209:1
231:3
237:16

reasons
69:19
95:11

rebooting
128:25

rebuttal
26:1,16
50:12
57:23
61:22
203:9,10
255:2

recall  27:18
28:1,24
29:19,24
30:9 43:16
44:22
45:24
46:21
67:15
76:24 77:2
79:9

receive
232:4

received
8:19 9:2
18:25 20:1
57:12
96:21

recently
43:4
102:11

receptacle
100:23
133:23,24

recess  47:15
59:1
106:19
129:9

160:19
201:20
248:8

recognizable
231:24

recollection
66:2 67:11

recollections
69:10

reconcile
71:12

reconvened
47:16 59:2
106:20
129:10
160:20
201:21
248:9

record   5:18
7:13 14:3
26:12
80:18
88:6,11,
20,22,25
89:4 95:13
98:18
106:10,12
119:5
120:23
122:25
128:9,13
129:16
141:9,12,
18 142:8
144:4,9
190:22

223:23
243:9

recorded
33:13,17
45:11

records   19:3

recover
85:10

recovered
52:1 126:5
127:13
131:10,21
142:11,15
145:7
146:13
176:13
254:16

recovering
18:7

recovery
12:22

red   127:16
137:22
158:4
184:18
189:19
190:3,23,
24 192:17,
18 199:23

reduce   50:8

refer   20:25
83:13

reference
8:6 64:21

93:10
141:4
142:4
196:13

referenced
62:9 93:6

referencing
140:24

referring
19:22
52:14 53:5
76:17
87:24
95:15 96:2
103:24
112:19
114:6
120:23
150:8
207:9

reflected
24:6,9,11

refrigerator
117:22
180:3,5

refute   182:3

refutes   72:8

related
70:25
84:20
202:20
207:13

relates
100:20

relationship
118:23
119:15

relative
13:14
14:14
18:17 20:2
24:16
55:14 98:7
148:17
194:13
249:21

relaunch
40:3

reliable
69:23

relied
100:13
183:23

relying
78:19
105:10
198:15
214:4

remain   23:4

remained
24:1 145:2

remaining
145:4

remains
51:16
74:18
85:19,22
91:17
93:21

134:15
180:7
199:1

remember
 29:21,22
 93:23
 94:12
 112:11
 132:14
 185:14
 188:3
 195:1
 198:5
 220:7
 252:24

remnants
 53:15
 103:2,4
 134:23
 138:23
 173:11

removal
 94:8,24
 121:14
 167:1

removed  20:8
 90:5 91:19
 133:17
 136:24
 227:13,15

removing
 90:8

renamed
 14:23

Reno  44:23

repeat  5:25
 23:24
 42:13 54:9
 144:15

replicate
 243:4

report  7:1,
 8,14,24
 8:3,13
 14:9,10
 20:11,17
 21:5,15,20
 22:13,20
 23:7 24:11
 25:21,23
 26:15,16
 39:11
 49:3,16,
 20,24
 50:12
 51:7,13
 52:3 55:12
 56:8,12,
 14,19
 57:2,8
 58:1 59:12
 60:13,19,
 21,24
 61:4,7,14,
 15,19,22
 62:5,10,15
 64:18
 74:8,9,15
 75:2,7
 76:3 85:5
 93:10
 97:13

152:6
156:15
198:6,11
202:5,18
203:7
206:7,9
208:8
216:12,14,
 19,22
254:5
255:2,5

reported
 93:7
 241:17

Reporter
 95:14,22
 96:4,7,13,
 18 129:16
 256:5,10

reports
 48:17 49:6
 55:21
 61:16,17,
 24 203:9,
 11

repositioned
 104:8

represent
 5:11 6:12
 94:22
 152:5

representation
 146:1,4
 147:14

representative
 83:8 84:5

127:9
148:16

representative
s  203:22

represented
 12:12

representing
 9:20 11:10
 23:9

represents
 191:17

request  84:1

requested
 50:13 58:5
 61:22

required
 37:6

residence
 226:2

respect
 201:25

response
 107:15
 155:9

responsive
 49:23

rest  44:7
 247:8

resting
 147:16

result  31:5
 51:10
 113:23

117:4
173:15
193:13
212:11
220:4
241:12
244:9
251:4
255:7

resulting
79:5 220:3

results
31:16

retain   46:25

retained
5:13 9:13,
20 10:12
40:19
42:11,15
48:7,12
72:4

retired
35:6,10
36:16
39:19

retrieval
94:16 95:6

returns
204:6

revealed
90:19

review   49:3,
4,9,11,20
55:11 57:8
59:10

60:13
61:3,7
181:9
219:21

reviewed
48:16
61:12 62:3
77:4 82:10
212:14
216:5

Reviewing
94:21

rid   172:6

ridges   53:4

right-hand
159:11
162:22
164:13

ring   43:9
120:13
130:14

robberies
36:7

roles   35:9

rolling   80:1

room   52:24
84:16
110:17
182:18
215:2,20

rotate
118:24
151:10
162:25

164:16
166:3,13
234:13
235:5

rotated
149:21,22
166:15
235:13
236:14
246:2

rough   138:2

roughly   41:2

round-table
45:4

rounded
152:14

routine
105:1

routinely
104:22

Rule   253:3

ruler   120:20

run   29:10
63:17
140:10
181:2,6,9
207:2
219:8,9
220:5
240:11

running
31:12,13
33:2 62:19

S
─────────

saddle
183:16

safety   38:19
233:10

sat   123:15
175:9

save   34:3
139:7
160:2
168:2

scale   116:4
118:21

scan   85:3
91:10
214:3

scenario
45:7
130:18
163:14
195:15,17
200:20,22,
24 205:1
206:18
223:6
250:22
251:12,14,
20 254:1

scenarios
211:13
251:13

scene   20:4,7
82:18,20
83:4,6,12,

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022                    Index: scenes..set

17,21
84:2,10,
14,25
85:2,3,7,
8,21 86:10
89:5 90:3
91:5,8
93:20,25
94:4 95:1,
8 97:1
120:6,7
153:4,5
156:3
183:22
184:10
185:14
213:9
229:10
254:12

scenes  36:7

schedule  7:5
  8:19 48:6

scheduled
  28:23
  36:25

school  66:10

science
  34:20
  38:17
  39:23
  40:17

scientific
  64:6

scraped
  103:5

screen
  13:11,22
  27:24
  87:18
  89:14
  122:15
  137:18
  140:18
  157:18,20
  172:9
  184:17
  217:8

screwed
  224:24

scroll  7:18
  21:23
  22:1,2
  126:18,20

scrolled
  7:25

scrolling
  87:20
  130:2,6

seam
  135:10,11

Sears  221:25

seconds
  113:3
  217:6,22
  218:3,6
  219:1,11
  221:3
  225:5,20
  227:1

section

168:19

seeking
  12:22

segment
  45:13

SEL  49:6,25
  51:7 52:2
  55:12 57:8
  152:5
  156:12
  157:21
  166:24
  200:13

SEL's  59:11
  60:13,18
  61:3 64:17
  93:10,16
  198:6,11

selected
  239:9

self-
sustaining
  217:5
  218:1,7,10

semester
  37:16,18,
  21

send  13:6
  95:16,24
  96:3,4,6,
  20

sending
  95:22

sense  79:16
  93:4 96:1

174:7
175:19
232:12,13

separate
  6:8,9
  28:15,16
  92:1 95:1,
  2 192:18

sequence
  139:17

series
  122:20
  133:15
  134:1
  168:10
  252:3

serve  35:3

serves  83:16
  221:24

service
  39:15,17

services
  26:23 36:4
  94:6
  221:14

sessions
  47:2

set  28:18
  68:7 75:25
  114:14
  115:18
  151:11
  168:8
  233:15

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

Index: setup..similar

setup  27:7
  121:3
  221:11,21

shadow
  86:12,20
  87:3
  152:14,25
  153:11,20,
  24 157:22
  161:11,20
  162:19
  166:7
  170:25

shape  154:14
  169:3

shaped  10:9,
  10

share  27:24
  32:10
  43:25
  139:6
  155:19
  156:5
  188:2,4,13

sharing
  172:9

sheet  14:16
  85:22,24
  91:20,23

sheeting
  33:23,24

sheets  19:3

shift  150:13
  179:15

shifted
  148:12
  151:13
  175:25
  176:7,10
  200:12

shopping
  51:14
  64:22
  127:12

short  43:19

shorter
  105:21
  241:22

shortly
  227:4,13

shot  137:18
  157:18,20
  184:17
  187:2

shots  13:22
  186:10

show  17:18
  27:24 52:2
  56:13 86:9
  112:16
  125:10,17,
  18,19,22
  132:4
  152:4
  153:14
  154:17
  155:25
  168:4
  183:22

showed
  127:14
  131:22
  156:10

showing  7:14
  15:17
  118:21
  121:16
  122:14
  131:12
  135:5
  145:22

shown  135:25

shows  89:15
  130:12
  142:14
  145:15
  228:3
  229:7
  233:2
  240:12

shy  99:13
  126:23

side  53:7
  54:23
  85:23
  109:17
  110:1
  117:21
  131:21
  135:12
  137:24
  138:11,12,
  20 163:19
  176:17,18
  180:5

190:22
  191:8,18,
  20 193:16
  208:5
  229:5
  231:25
  232:1,2,4
  243:16
  246:21

sides  154:12

sidetracked
  201:14

sign  255:20

sign-in
  14:16

signature
  7:20,21

signed  38:2

significance
  119:9
  130:10,12
  145:1

significant
  41:15
  113:7
  232:10

significantly
  226:6
  229:11

similar
  154:10
  166:23
  221:20
  228:11,22

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022

242:11

simply
  214:20
  216:2,11
  237:20

sincerely
  144:2

single
  211:7,9

sink  68:5,
  18 71:16,
  24 101:2,
  25 102:6,
  17

sir  5:10
  9:11
  125:25
  243:13

sit  191:22
  215:15

site  15:5

sits  149:21
  222:24,25

sitting  51:2
  56:3,20
  59:23 60:4
  74:10 75:3
  77:11,20
  78:3
  79:11,18
  85:22
  113:4
  120:18
  134:10,11
  178:14

215:12

six-and-a-half
  226:11

size  51:20
  68:1
  127:9,24
  128:1
  169:4
  182:18
  252:23

skipping
  139:25

slash  9:16
  36:17 79:5

slid  104:1
  149:23

slide
  131:15,16

slightly
  200:12

small  65:2
  224:12

smaller
  188:25

smoke  224:9

smoking
  240:19

snack  51:12,
  20 52:12,
  13 53:16,
  20 55:2,
  15,17,24
  56:3 59:13
  64:25

66:22
121:15
133:18
174:21
204:11
222:20
254:2

snapping
  251:11

solid  244:1

Solutions
  9:16 11:14
  12:5

son  66:9

sort  7:22
  50:14
  63:19
  75:14
  94:12
  122:20
  126:1
  130:3
  133:8,11
  134:21
  135:14
  137:5,12,
  20 138:20
  140:7
  154:20
  157:22
  158:24,25
  159:8,24
  161:20
  168:16
  169:11,12,
  13 174:7

193:10
196:10,15,
18 198:1
207:4
210:22
224:3
246:25

sought  38:21

sound  174:6

sounded  73:1

sounds  47:12
  97:3

source  41:15
  78:18
  180:11
  194:19
  203:2
  219:6,15,
  25 225:12

sources
  84:21
  210:17
  212:18

south  97:15

speak  48:1
  234:20

speaking
  197:5
  204:10
  210:23

speaks
  98:19,21,
  23 146:23
  147:11,20

specific
  21:2 36:10
  51:7
  208:10,19
  210:13

specifically
  46:8 77:15
  175:15

specificity
  208:25

spell  162:6

spend  20:16
  24:25
  26:18

spending
  142:1

spent  19:4,
  11 20:2
  21:6,17
  22:22
  23:6,9
  24:15

spewed  233:3

spoke  44:6
  67:17

spot  157:9

sprayed  33:9

spread
  117:16
  207:14

square
  208:13

standing

70:22
104:3
173:7
242:14

standpoint
99:1

start  78:11
  96:14
  109:1
  116:11
  118:18
  124:14
  130:2
  133:13
  139:16
  184:21,22
  199:10
  218:19
  219:1
  227:2

started
  20:10 36:2
  73:12
  74:3,12
  105:7
  118:7
  174:2
  175:2,5
  207:16
  209:3

starting
  11:18
  189:13
  224:16
  227:4,6

starts  111:7

224:6

state  5:17
  34:22
  35:3,9
  39:21
  83:20
  93:14
  187:12
  232:24
  233:1
  237:15

stated  68:11

statement
  72:9
  104:20
  115:22
  194:10,11,
  15 195:23
  197:2,19

statements
  97:25 98:4
  99:18
  101:10
  105:4,11
  107:4,8
  194:12
  196:22,25
  197:11,12
  198:15
  209:8
  240:4

states  57:2
  204:6

stem
  230:13,16,
  23 238:14

248:16,24
249:5,9

Steve  5:10
  6:25 16:10
  28:3 56:25
  58:20
  65:15 70:1
  116:14
  138:6
  160:25
  197:23
  201:12
  255:25

stick  186:18
  254:11,13,
  14,21

stint  36:3

stipulate
  135:19

stop  127:2
  130:4,8
  139:6
  218:1,21

stops  236:23

stove  13:20
  52:23
  60:16 68:9
  73:10,20
  85:23,24
  97:16
  98:10,12,
  13,15,17
  104:4,7
  109:6
  111:25

112:4,5
118:14
120:24
156:21
161:2
171:21
173:8
174:21
182:6
193:8,18
194:7,17
195:11,15,
16 221:15,
16 229:12
233:22
234:6,18,
24 238:9,
16,21
240:20,24
241:5,8,12
242:22,25
243:10
245:11
246:3

stoves
104:24
233:15

stovetop
51:22
54:1,22
65:12,22
71:18
91:20 92:2
98:14
101:16,25
102:17,24
103:3,5,

14,20
104:2
107:22
120:5
124:3,14,
24 153:23
154:7
167:8
171:4,18
172:13,19
173:4,13,
16 174:1,
17 175:4
176:3,12
177:2,14
178:14,18
185:24
186:2
194:17,20
195:9
196:5
201:2
203:2
204:20
206:23
209:16
226:13
230:12,25
231:3
232:14
233:4
235:14
236:16
243:16
244:10
246:23
247:4

straight
190:21
191:1

stretch
247:21
248:1

strike   10:1
13:1 65:4
86:1 102:4
104:14
109:1
115:5
121:7
123:25
143:14
144:17,20

strong   43:1

struck
213:10

structure
96:24,25

struggle
208:2

studies
82:10
219:22

study   173:22
232:21

stuff   13:4
38:14
39:18
44:21
47:11
51:25 64:4
89:9

104:24
196:1
246:20
247:25
252:24

stupid
194:25

subject   14:5
51:8 81:2
85:15
111:19,23
116:19
119:12,14
120:17,18
128:2
148:8
150:15
152:8,9
173:18
176:22
182:14,24
183:7
204:1,20
205:13
208:12
213:3
215:4,25
221:24
223:10
225:23
228:23
229:4,11,
16 230:7
234:6
241:14
242:12,13,
16,23,24

244:4

submit   19:1

subrogation
  9:21  11:2,
  6  43:23

subsequent
  20:7  99:25

subsequently
  90:5  99:11
  109:20
  125:8

substance
  29:24
  103:6,23
  104:6

substantially
  182:21

succeed
  238:20

sudden
  172:10

sufficient
  77:22
  207:17
  220:14
  225:11

suggest
  53:19,23
  105:20
  112:21
  142:18
  214:17
  230:9

suggesting

72:23
147:9

suggests
  71:17

suing   12:9

suit   185:8

Summary   15:1

supplemental
  61:3

support
  101:10
  173:24
  181:2,6,10

supports
  72:8  101:9
  142:9
  181:14
  182:3

supposed
  253:5

suppression
  32:18,23
  33:3,13,18
  104:5,8
  173:5
  175:16
  227:2,12

surface
  51:22
  53:2,21
  54:17
  74:23
  111:25
  112:8

113:24
114:3
119:22
130:15
176:12
177:14
179:18
205:9
226:13

surprise
  171:24

surrounded
  154:12

suspect
  198:9

suspected
  84:16,22
  138:22

sustain
  232:1

sustained
  210:4
  213:11
  215:4
  226:1,6,9
  229:3

sustaining
  213:5

swag   44:20

swear   5:4

switch
  140:18
  191:6
  250:16

switching
  111:18

Swonder   49:1

swore   186:10

_____

T

tablets
  215:1

take-away
  124:24

takes   99:17
  177:13

taking
  37:15,24

talk   59:21
  60:24
  62:22
  115:20
  210:22

talked   24:21
  39:7
  99:19,20
  107:4
  137:6
  178:10
  179:3,8
  226:4
  228:20
  252:20

talking   13:2
  25:10
  39:13  49:5
  62:20
  63:11

86:16 87:5
107:2
114:5
116:16,18
123:7
129:23
137:17,19
138:2
154:18
156:22
157:18
158:21
162:2
163:7
164:6,7,12
195:21
204:23,24

tape 86:14

tasks 19:5

taught 46:5

Technical
 7:15 41:21

technician
 94:5

technicians
 26:22

telling
 31:16
 143:6
 180:8
 232:16
 245:12

tells 72:7
 98:11,15
 175:14

208:5

temperature
 81:12,16,
 19,22 82:5
 111:15,24,
 25 112:8,
 21,25
 113:1,6,
 10,23
 235:6
 239:10

ten 42:9
 116:12
 182:20
 183:2
 247:21

tenth 247:12

term 37:16,
 18

termination
 190:11

terms 41:19
 96:17
 141:3
 172:1
 173:15
 210:5,6
 240:25

test 26:23
 27:10,23,
 25 31:5,6,
 12 57:17
 62:18,22,
 23,25
 63:9,15,

21,24
 64:6,8,11
 120:2
 126:17
 148:10,15
 173:22
 182:18,23
 205:21
 208:4,16
 210:25
 211:2,10,
 12 214:12,
 14 221:11
 222:23
 226:6
 228:9
 229:3,13,
 24 234:10
 241:23
 242:3
 244:8,20,
 22 245:4
 255:7

tested
 176:21

testified
 5:5 12:20
 66:3,24
 68:4,16,24
 71:16
 101:1,22
 239:19
 250:9,10

testify
 67:12,13
 102:3
 250:11

testimonial
 69:9,22
 73:25

testimony
 5:23 7:5
 8:15,20
 9:4 13:3,4
 68:11 69:3
 104:22
 195:24

testing
 13:21
 25:10,19
 51:18
 111:24
 112:15
 118:12
 119:7
 120:25
 127:8,25
 128:11
 142:10,21
 143:9
 147:8
 161:2
 173:12,17
 182:15
 207:9,13,
 24 210:20
 211:18,23,
 24 217:11
 234:11
 242:22
 243:11
 244:8,16

tests 62:12,
 17,21

63:9,11,12
81:8
181:2,6,8,
9 205:10
212:14,19,
20 219:8,
9,21 220:5
229:25

texts  27:14
28:21
30:6,17

TFA  41:10

theory
245:4,7

thereof
246:8

thermal
76:8,23
77:5,21
78:5 79:19
81:1,14
82:12
209:25
210:7,15
211:4
212:8,16
213:12
219:5,12,
14,17,22,
24 220:13,
19,25
226:2
249:3

thermally
215:21

thick  82:1

thicker
184:19

thickness
223:3

thing  15:19
65:3 71:22
93:19
94:14
129:13
147:1
149:22
152:14
169:15
191:8
201:25
212:18
233:16
246:25
247:6,11,
12 249:13

things  24:15
25:9 36:8
38:25 64:4
65:16
78:17
100:17
101:4
103:25
104:18
114:15
174:5,8,11
175:6,17
209:20
210:9
220:14

thinking
64:25
227:22

thought
32:10 64:3
67:20 87:5
183:11
184:4
189:3
196:12,16,
18 252:10

thousands
215:19

three-page
17:19

three-quarter
124:21

three-quarters
37:12
126:25

throwing
45:5 72:21

thumb  95:15
96:11

till  106:15
128:20

tilted
154:17

Timberline
11:25

time  19:3,4
20:1,16
21:6,11,
12,13,17

22:23
23:5,6,10
24:1,4,16,
25 35:10,
24 36:20
38:24
42:14,18
47:25
49:14
53:21
54:10
55:4,6
57:13,23
58:2 60:2
62:1
65:12,18,
23 66:17
73:11
74:2,8,11
75:6,7
78:1 80:15
82:19
83:14
93:14
104:7
105:7
116:15
118:6
121:9
137:11
142:1
143:11
144:15
146:3,5
148:18
150:15
151:17
156:1

168:3
170:18
174:2
175:2,22
185:22
186:12
197:22
203:20
204:17
205:12
208:1,21
209:2
214:10
216:25
218:21
220:12
222:10,15
223:12
255:18,19

**timeline**
35:15
36:14
99:9,13
195:17
205:17

**times** 5:20,
22 21:2
38:12,13
42:23 43:6
69:13
84:10
195:4
214:23

**timing** 96:17
202:1,4,
19,25
204:2

**tin** 231:11,
12,13,20
249:11,13,
19,22

**title** 36:19

**titled** 14:17

**today** 9:7
11:6
20:21,24
34:3 56:2
75:13
105:23
162:2
203:22
215:12,15

**today's**
24:17
44:24

**toggling**
168:16

**told** 24:4
29:23
66:3,6,16,
25 67:3,4,
6,8 68:7
71:15 78:7
85:14
100:4,14
119:25
130:17
146:15
150:1
169:23
174:12
189:20
235:1

237:13
254:18,20

**tomorrow**
96:8

**tools** 173:9

**top** 11:18
39:14,20
55:18
56:3,21
59:23 60:5
91:24
104:3
113:5
123:16
131:20,24
132:2
134:10,11
135:12
144:24
157:3,9
159:10,22
160:11
162:23
166:3
172:2
173:7
176:6
188:3
191:20
192:17,18
204:11
222:24
242:18
244:2
246:23
247:16
248:17,19

**top-down**
159:9,19

**topic** 40:16
248:3

**total** 21:6
22:10
41:21,24

**totaled**
17:23

**totally**
128:23

**towels**
114:15

**training**
35:2 45:25
46:2,24
75:22

**trainings**
46:4

**transcript**
65:5,19
256:6

**transfer**
96:10

**travel** 83:16
91:7 94:13
179:25

**trial** 5:24
9:4 50:19
192:6
254:25
255:11,15

**trials** 9:10

MICHAEL MACALUSO vs APPLE, INC.
David B. Klitsch on 03/24/2022   Index: triggered..understanding

triggered
  64:23

trip  51:14

tripped  93:8

trooper
  34:24 35:4

true  11:13,
  17 41:2
  74:14
  101:11
  124:5
  126:14
  150:5
  174:15
  175:7
  206:9
  230:10

truth  5:4

Tuesday
  96:12

turn  101:11
  189:16
  239:9
  245:22

turned  86:25
  101:5
  103:11
  132:1
  136:19
  244:22
  246:2
  250:22

turning
  251:10

turns  172:13
  236:24

Tuscarora
  11:18

twenty
  106:14

two-hour
  99:13

two-year
  36:3

type  20:24
  75:24 77:7
  82:1 103:6
  108:10,14
  113:18,21
  114:20
  152:14
  204:16,19
  205:11
  225:11
  242:19
  246:20
  252:23

types  77:18

─────────

      U

─────────

Ukraine  39:5

unable  82:17
  103:17

unattended
  240:18,22
  241:5,6

Unbeknownst
  93:12

unburned
  117:23
  152:21
  180:5

unclear
  212:4

uncover
  89:25

uncovered
  145:21

uncritically
  100:7

undamaged
  86:16

undergo
  211:3

undergone
  210:15
  212:16
  219:4

underneath
  87:3 89:18
  179:21
  223:5,11,
  18 242:19
  246:22
  247:8
  249:20

underscore
  95:3
  217:11

underside
  54:24
  75:21 82:6

180:23
193:14

understand
  11:4,5,9
  23:22
  28:20
  31:10,25
  37:23
  38:14
  39:10
  49:4,22
  52:10
  59:11,14
  64:3 70:5,
  12 73:16,
  17 76:14
  115:21
  116:8
  121:21
  125:25
  131:2,18
  136:20,21
  143:5
  157:17
  158:20
  160:5
  162:2,8
  164:4,5
  182:8
  193:23
  196:9,10
  237:25
  249:19
  250:25

understanding
  5:15 18:16
  48:9,13

**MICHAEL MACALUSO vs APPLE, INC.**
**David B. Klitsch on 03/24/2022**          Index: understood..view

49:7
119:24
206:17
254:15

understood
116:25

undersurface
81:23

undertaken
205:10

underwent
77:21 78:4
79:18
82:12
209:25

undisclosed
26:9,14

unit   35:12,
13 36:15
119:23

universe
198:14

University
34:16
36:25 37:8

unprotected
153:12

unremarkable
29:22

up-to-date
9:7

update   40:3
43:16

upper   60:10
75:19 77:8
81:9,16
99:25
114:7
134:21
137:6
158:23
161:12
162:10,13,
22 163:12,
25 164:2,
12,21
165:13,14
170:21
171:13,16
172:24
180:2,6
185:15
186:23
187:15,21
222:4
224:11,14,
17 225:7
228:12,16
235:10
236:12
242:11
245:3
246:16

upside-down
132:1

upwards
80:23
184:23
205:15
224:9,14

usage   211:13

utensil
206:13

utensils
66:12 91:1
102:9

utilized
66:9

utilizing
63:17

———————

        V

vast   231:23

vastly
180:12

vent   79:20
246:21
247:3

vented   79:22
80:19,21

ventilation
109:14
182:16
207:1,5,
13,22

veracity
141:5

versa   104:10

versus   10:14
11:20,23,
25 104:7

vertical
190:2

vertically
79:20

vice   104:10

victim
211:20

video   32:16
33:25
45:16 77:3
80:9 95:2
98:3
128:15
217:6,10,
22 218:9,
14 224:1,6
225:5
227:5,9,
14,23

videoed
32:23
45:13

videos   25:10
32:15
75:22,23
76:10,25
77:14,18
78:7,10
95:2,5
220:2,3,6

videotape
94:19

view   76:10
102:20
127:10
130:20
143:18
158:6

159:8,10,
13  161:9
176:5
180:12
186:6
188:4
195:12
196:6
197:17
200:11
247:9

**viewed**  220:2

**virtual**
88:18

**virtually**
45:14

**virtue**  213:5
241:8,11

**visible**
199:7

**visit**  83:19
84:1,23

**visually**
103:8

**volition**
58:6,17

────────────
           **W**
────────────

**wait**  89:10
128:20

**waiting**
92:12

**waive**  28:7

**waiver**  26:13

**walk**  34:13
35:8  184:1

**wall**  90:24
97:15
135:12
209:16
224:24

**watch**  224:2

**water**  33:15
227:3
245:7

**Wayne**  11:18

**weaken**  231:6

**website**  43:4

**weeks**  6:10
13:5

**welded**
250:17

**white**  114:6
165:3,6
178:4

**whomever**
95:25
251:22

**wife**  39:8
114:12
238:8
245:8

**window**  15:17

**witnesses**
62:8

**wondering**
162:6

**wood**  33:23,
24  81:19
82:1,2

**wooden**  52:1
55:18
99:25
131:22
153:22
154:6
166:14
228:12,16

**word**  79:13
161:25
232:23

**work**  18:4,
10,18,22
19:2  21:7,
18  23:10
24:16
26:9,14
37:4  41:9,
15  48:16
104:5
238:5,24,
25  244:7
247:24
254:24

**worked**  19:5

**working**
20:4,10
96:14
173:9
237:2,3

**works**  104:24

**worried**
245:22

**writing**
40:18  50:8

**writings**
51:13

**written**
44:8,15
45:8  47:1

**wrong**  23:17
66:20
67:24
73:2,5
94:21
104:13
112:20
140:13
149:10
187:6
194:21
195:5,11
254:4

**wrung**  171:22

────────────
           **X**
────────────

**x-rays**  13:23

────────────
           **Y**
────────────

**year**  35:6
40:4,21
41:1

**years**  6:5
35:5,13

```
 39:8  41:3
 42:20
 76:25
 77:13
 177:18
```

**yellow**
```
 199:25
 200:15
```

**Yesterday**
```
 18:7
```

**Youtube**
```
 75:23
```

---

### Z

**zip**  167:4

**zoom**  140:2
```
 157:6
```